# Exhibit 1

1    R. JULY SIMPSON, WSBA #45869
      WILLIAM MCGINTY, WSBA #41868
2    ANDREW HUGHES, WSBA #49515
      BRIAN HUNT ROWE, WSBA #56817
3    Assistant Attorneys General
      JEFFREY T. EVEN, WSBA #20367
4    Deputy Solicitor General
      KRISTIN BENESKI, WSBA #45478
5    First Assistant Attorney General
      Washington State Office of the Attorney General
6    7141 Cleanwater Dr. SW
      PO Box 40111
7    Olympia, WA 98504-0111
      (360) 709-6470

8

9             **UNITED STATES DISTRICT COURT**
            **EASTERN DISTRICT OF WASHINGTON**
10                  **AT YAKIMA**

11    MICHAEL SCOTT BRUMBACK,      NO. 1:22-cv-03093-MKD
      an individual, et al.,

12                         DECLARATION OF
              Plaintiffs,         SAUL CORNELL IN
13                         OPPOSITION TO PLAINTIFFS'
              v.             MOTION FOR INJUNCTIVE AND
14                         DECLARATORY RELIEF
      ROBERT W. FERGUSON, in his
15    official capacity as Washington    NOVEMBER 23, 2022
      State Attorney General, et al.,    With Oral Argument: 11:00 a.m.

16              Defendants.

17       I, Saul Cornell, declare under penalty of perjury under the laws of the United

18 States that the information in this declaration is true:

19       1.    I am over the age of 18, competent to testify as to the matters in my

20 declaration, and make this declaration based on my personal knowledge.

21       2.    I am the Paul and Diane Guenther Chair in American History at

22 Fordham University. The Guenther chair is one of three endowed chairs in the

DECLARATION OF SAUL          1          ATTORNEY GENERAL OF WASHINGTON
CORNELL IN OPPOSITION TO                Complex Litigation Division
PLAINTIFFS' MOTION FOR                 7141 Cleanwater Dr. SW
INJUNCTIVE AND DECLARATORY             PO Box 40111
RELIEF – NO. 1:22-cv-03093-MKD          Olympia, WA 98504-0111
                                            (360) 709-6470

Simpson Decl., Exhs. p.002

1    history department at Fordham and the only one in American history. In addition

2    to teaching constitutional history at Fordham University to undergraduates and

3    graduate students, I teach constitutional law at Fordham Law School. I have been

4    a Senior Visiting research scholar on the faculty of Yale Law School, the University

5    of Connecticut Law School, and Benjamin Cardozo Law School. I have given

6    invited lectures, presented papers at faculty workshops, and participated in

7    conferences on the topic of the Second Amendment and the history of gun

8    regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA

9    Law School, the University of Pennsylvania Law School, Columbia Law School,

10    Duke Law School, Pembroke College Oxford, Robinson College, Cambridge,

11    Leiden University, and McGill University.[1]

12        3.    My writings on the Second Amendment and gun regulation have been

13    widely cited by state and federal courts.[2] My scholarship on this topic has appeared

14    in leading law reviews and top peer reviewed legal history journals. I authored the

15    chapter on the right to bear arms in the Oxford Handbook of the U.S. Constitution

16    and co-authored the chapter in The Cambridge History of Law in America on the

17    Founding Era and the Marshall Court, the period that includes the adoption of the

18    Constitution and the Second Amendment. Saul Cornell, *The Right to Bear Arms*, *in*

19    _____

20        [1] For a full *curriculum vitae* listing relevant invited and scholarly

21    presentations, *see* Ex. A.

22        [2] For a list of court citations, *see* Ex. B.

DECLARATION OF SAUL
CORNELL IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
INJUNCTIVE AND DECLARATORY
RELIEF – NO. 1:22-cv-03093-MKD

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    *The Oxford Handbook of the U.S. Constituion* 739–759 (Mark Tushnet, Sanford

2    Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter*

3    *15: The Consolidation of the Early Federal System*, *in* 1 *The Cambridge History of*

4    *Law in America* 518–544 (Christopher Tomlins & Michael Grossberg eds. 2008).

5    Thus, my expertise not only includes the history of gun regulation and the right to

6    keep and bear arms, but also extends to American legal and constitutional history

7    broadly defined.

8         4.    From its outset the Second Amendment recognized both the right to

9    keep and bear arms and the right of the people to regulate arms to ensure public

10   safety and order. Although rights and regulation are often cast as antithetical in the

11   modern gun debate, the founding generation saw the two goals as complementary.

12   Without robust regulation of arms, it would have been impossible to implement the

13   Second Amendment and its state analogues, which required government to identify

14   members of the militia, take stock of their weapons, and assess their competency

15   with their use. H. Richard Uviller & William G. Merkel, *The Militia and the Right*

16   *to Arms, or, How the Second Amendment Fell Silent* 150 (2002) The lengthy militia

17   statutes enacted by the individual states and the First Congress, among the longest

18   and most detailed laws enacted in early America, testify to this fact. Saul Cornell

19   and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun*

20   *Control*, 73 Fordham L. Rev. 487 (2004) [3] These laws defined who was part of the

21

22        [3] Discussing the requirements regarding inspection and mustering imposed

DECLARATION OF SAUL
CORNELL IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
INJUNCTIVE AND DECLARATORY
RELIEF – NO. 1:22-cv-03093-MKD

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   militia, who was excused from duty, and what weaponry the citizens were required

2   to procure to meet this obligation, and listed penalties for violating these

3   provisions.[4] E.g., Act of May 8, 1792, 1792 Conn. Pub. Acts 440 (forming the state

4   militia); Act of July 19, 1776, ch. I, 1775–1776 Mass. Acts 15 (regulating the

5   militia of Massachusetts); Act of Apr. 3, 1778, ch. 33, 1778 Laws of N.Y. 62

6   (regulating the militia of New York State); Act of Mar. 20, 1780, ch. CLXVII,

7   1780 Pa. Laws 347 (regulating the militia of Pennsylvania); Act of Mar. 26, 1784,

8   1784 S.C. Acts 68 (regulating militia of South Carolina).

9        5.    It is impossible to make sense of the numerous laws enacted by the

10   founding generation and later generations to preserve the peace without

11   recognizing that the right to keep and bear arms was understood to further the goals

12   of ordered liberty, not undermine them. The founding generation did not oppose

13   government regulation and would have been astonished by the view that regulation

14   was antithetical to liberty. Early American firearms regulation carried forward a

15   tradition inherited from English common law in which the right of self-defense was

16   regulated to preserve the peace and promote public safety. The individual states

17   enacted a variety of laws: disarming dangerous person, regulating public carry,

18   imposing safe storage requirements, and compelling those capable of bearing arms

19

20

21   —————————————

   on members of the militia.

22

DECLARATION OF SAUL
CORNELL IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
INJUNCTIVE AND DECLARATORY
RELIEF – NO. 1:22-cv-03093-MKD

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    to purchase their own weapons for mandatory militia service.[5]

2         6.    In the decades after the adoption of the Second Amendment, firearms

3    regulation increased dramatically. The nineteenth century witnessed an expansion

4    of regulation in response to new and unprecedented problems created by firearms.

5    This formative period of American law, the era of the Marshall Court, witnessed

6    the emergence of a distinctive body of police-power jurisprudence by state and

7    federal courts. The power to regulate firearms and gunpowder has always been

8    central to the police power and historically was shared by states, local

9    municipalities, and to some extent the federal government (when administering

10   federal land and buildings). Harry N. Scheiber, *State Police Power*, Encyclopedia

11   of the American Constitution 1744 (Leonard W. Levy et al. eds., MacMillan 4th

12   ed. 1986). The adoption of the Constitution and the Bill of Rights did not deprive

13   states of their longstanding police powers. Indeed, ratification was only possible

14   because Federalists offered their Anti-Federalist opponents firm assurances that

15   the new government would not, and could not, threaten the individual states'

16   police-power authority. Federalists and Anti-Federalists disagreed over many legal

17   issues, but one point on which there was broad agreement was that the federal

18   _____

19        [5] In many cases states recognized that minors would need to have such

20   weapons purchased by parents or legal guardians, *see* Saul Cornell, *"Infants" and*

21   *Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical*

22   *Record,* 39 Yale L. & Pol'y Rev. Inter Alia 1 (2021).

DECLARATION OF SAUL
CORNELL IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
INJUNCTIVE AND DECLARATORY
RELIEF – NO. 1:22-cv-03093-MKD

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    Constitution did not encroach on the traditional police powers of the individual

2    states. "Brutus," a pseudonym used by a leading Anti-Federalist, emphatically

3    declared that "[I]t ought to be left to the state governments to provide for the

4    protection and defence [sic] of the citizen against the hand of private violence, and

5    the wrongs done or attempted by individuals to each other . . . ." Federalist Tench

6    Coxe concurred, asserting that: "[t]he states will regulate and administer the

7    criminal law, exclusively of Congress." States, he assured the American people

8    during ratification, would continue to legislate on all matters related to the police

9    power, "such as unlicensed public houses, nuisances, and many other things of the

10   like nature."[6] The application of the police power to firearms and ammunition was

11   singled out as the *locus classicus* of state police power by Chief Justice

12   John Marshall in his discussion of laws regulating gunpowder in *Brown v.*

13   *Maryland*, where he stated that "[t]he power to direct the removal of gun powder

14   is a branch of the police power." *Brown v. Maryland*, 25 U.S. (12 Wheat.) 419

15   (1827)

16        7.    Although there is a growing body of scholarship in the field of legal

17   and constitutional history and the history of firearms regulations, Second

18   _____

19        [6] Brutus, *Essays of Brutus VII* , reprinted in 2 *The Compelete Antifederalist*

20   358, 400–05 (Herbert J. Storing ed., 1981).   Tench Coxe, A Freeman, PA.

21   GAZETTE, Jan. 23, 1788, reprinted in Friends of the Constitution: Writings of the

22   "Other" Federalists 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1988)

DECLARATION OF SAUL
CORNELL IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
INJUNCTIVE AND DECLARATORY
RELIEF – NO. 1:22-cv-03093-MKD

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

Simpson Decl., Exhs. p.007

1    Amendment scholarship is a relatively young field compared to other well studied

2    sub-fields of constitutional and legal history.

3        8.    One important difference between research on the history of firearms

4    regulation, in contrast to other subfields of law, is that there is no Westlaw-like

5    searchable database for this topic. The most important collection of sources in a

6    digital and searchable format, the Duke Firearms Research Center Repository of

7    Historical Gun Laws, is a useful starting point for research in this area, but the

8    collection has serious gaps and has not been substantially updated since its

9    inception in 2019. The Duke collection contains only a smattering of the many

10   local ordinances that proliferated during the era of the Fourteenth Amendment's

11   ratification and are a key part of the historical inquiry required by *Bruen*. *New York*

12   *State Rifle & Pistol Ass'n v. Bruen*, __ U.S. __, 142 S. Ct. 2111 (2022). Although

13   some of these missing materials are available from other online sources, in many

14   other cases one must travel to the location of these historical archives, rare book

15   libraries, and other repositories of primary sources and do the research on site to

16   locate the relevant materials.

17       9.    In short, research on historical gun regulation is time-consuming, far

18   more so than many other areas of legal history where many "one-stop shop" digital

19   collections, most notably Westlaw and Hein-Online, have made some of the

20   traditionally arduous tasks of legal research and writing less cumbersome and labor

21   intensive. Given that one must combine research in the existing digital sources with

22   more traditional and time-consuming primary source research in archives and rare

DECLARATION OF SAUL                          7              ATTORNEY GENERAL OF WASHINGTON
CORNELL IN OPPOSITION TO                                            Complex Litigation Division
                                                                     7141 Cleanwater Dr. SW
PLAINTIFFS' MOTION FOR                                                    PO Box 40111
INJUNCTIVE AND DECLARATORY                                          Olympia, WA 98504-0111
RELIEF – NO. 1:22-cv-03093-MKD                                         (360) 709-6470

1    book collections, the inquiry required by *Bruen* is both more labor-intensive and

2    time-consuming than other forms of legal research typically associated with

3    constitutional litigation. In the years since *District of Columbia v. Heller*, 554 U.S.

4    570 (2008) was decided, a burgeoning body of scholarship has started to remedy

5    this deficiency, but new materials and scholarship continue to emerge slowly,

6    expanding our understanding of the scope of arms regulation in the Anglo-

7    American legal tradition. Still, much work needs to be done to fill out this picture.

8        10.    The methods of legal historical research require a deep immersion in

9    the primary source materials, conscious attention to the limits and strengths of

10   various types of legal sources, and a broad knowledge of related historical

11   subfields. In addition to a familiarity with legal history, one must canvass other

12   subfields such as military history, social history, the history of criminal law to

13   implement *Bruen's* directive to evaluate the context in which particular laws were

14   passed and the underlying societal concerns driving these efforts to mitigate the

15   harmful effects of guns.[7] To avoid approaching history, text, and tradition with an

---

17       [7] For a discussion of the minimum standard for undergraduate history

18   majors, *see* Mary Lynn Rampolla, *A Pocket Guide To Writing In History* 18 (8th

19   ed., 2015). For a primer written for graduate students, *see* Martha Howell & Walter

20   Prevenier, *From Reliable Sources: An Introduction to Historical Methods* 128

21   (2001). On the methods of professional legal history, *see generally The Oxford

22   Handbook Of Legal History* (Markus Dirk Dubber and Christopher L. Tomlins,

DECLARATION OF SAUL              8          ATTORNEY GENERAL OF WASHINGTON
CORNELL IN OPPOSITION TO                         Complex Litigation Division
PLAINTIFFS' MOTION FOR                             7141 Cleanwater Dr. SW
INJUNCTIVE AND DECLARATORY                            PO Box 40111
RELIEF – NO. 1:22-cv-03093-MKD                    Olympia, WA 98504-0111
                                                     (360) 709-6470

1    "ahistorical literalism" it is vital to survey historical scholarship across a broad

2    range of subfields.[8] *Franchise Tax Bd. Of Cal. v. Hyatt*, 139 S. Ct. 1485, 1498

3    (2019). Social history, cultural history, economic history, and military history all

4    shed important light on the original meaning of the Second Amendment. One must

5    avoid the common tendency, closely associated with "law office history," to treat

6    sources in isolation, decontextualized, floating freely, detached from the web of

7    historical meaning that originally made them comprehensible to Americans in

8    1791, and ignoring the way specific pieces of evidence fit together to form a

9    coherent whole.[9] J.H. Hexter, Reappraisals in History 194–45 (1961). Any effort

10   to understand the Second Amendment and the history of American gun regulation

11   must therefore canvass a variety of historical topics, not traditionally part of

12   litigation, including such diverse subfields as legal history, social history, cultural

13   history, economic history, and military history.[10]

_____

14   eds., 2018). On the methods of originalism, *see* Keith E. Whittington,

15   *Originalism: A Critical Introduction*, 82 Fordham L. Rev. 375 (2013). One the

16   proper role of history in constitutional law, *see generally* Richard H. Fallon Jr., *The*

17   *Many and Varied Roles of History in Constitutional Adjudication*, 90 Notre Dame

18   L. Rev. 1753 (2015).

21   [10] The best illustration of the breadth of approaches adopted by modern legal

22   historians of the United States is the three volume *Cambridge History of Law in*

DECLARATION OF SAUL
CORNELL IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
INJUNCTIVE AND DECLARATORY
RELIEF – NO. 1:22-cv-03093-MKD

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1       11.    Finally, much of the writing on the topic of the Second Amendment

2    and gun regulation is highly partisan and has been produced by activists with close

3    ties to political advocacy groups.  In contrast to other thriving fields of legal

4    history, such as the history of federalism or the First Amendment, the number of

5    professional legal historians working on the history of gun regulation remains

6    small. One consequence of this fact is that any claim or citation made in the existing

7    law review literature must be carefully scrutinized for its historical accuracy and

8    potential ideological bias. Typically, in less contentious and ideologically charged

9    sub-fields of the law, one can spot-check citations in the "scholarly" literature and

10    largely trust that historical claims are generally accurate, but this is not true in the

11    field of Second Amendment "scholarship." Vetting particular claims and checking

12    sources is therefore essential and further increases the amount of time needed to

13    conduct reliable historical research.

14       12.    Although I could and likely will spend years on research in this area,

15    I recognize that litigation is not scholarship and cannot await the development of

16    the most complete and accurate answers possible. I anticipate it will take me

17    approximately six to nine months to delve deeply enough into the areas outlined

18    above to formulate an expert report.

19

20    ———————————————

21    *America. See generally The Cambridge History of Law in America* (Michael

22    Grossberg & Christopher L. Tomlins eds., 2008).

DECLARATION OF SAUL           10           ATTORNEY GENERAL OF WASHINGTON
CORNELL IN OPPOSITION TO                   Complex Litigation Division
PLAINTIFFS' MOTION FOR                    7141 Cleanwater Dr. SW
INJUNCTIVE AND DECLARATORY             PO Box 40111
RELIEF – NO. 1:22-cv-03093-MKD             Olympia, WA 98504-0111
                                        (360) 709-6470

1

2
I declare under penalty of perjury under the laws of the State of

3
Washington and the United States that the foregoing is true and correct.

DATED this 21 day of October 2022 at Bronx, New York.

4

5
*Saul Cornell*

6
_____
Saul Cornell

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

DECLARATION OF SAUL
CORNELL IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
INJUNCTIVE AND DECLARATORY
RELIEF – NO. 1:22-cv-03093-MKD

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1                          **PROOF OF SERVICE**

2          I hereby certify that I electronically filed the foregoing with the Clerk of

3   the Court using the CM/ECF System, which in turn automatically generated a

4   Notice of Electronic Filing (NEF) to all parties in the case who are registered

5   users of the CM/ECF system.

6          I declare under penalty of perjury under the laws of the United States of

7   America that the foregoing is true and correct.

8          DATED this 24th day of October 2022 at Seattle, Washington.

9
                                    *s/ Andrew Hughes*
10                                  ANDREW HUGHES, WSBA #49515
                                    Assistant Attorney General
11

12

13

14

15

16

17

18

19

20

21

22

DECLARATION OF SAUL                          12          ATTORNEY GENERAL OF WASHINGTON
CORNELL IN OPPOSITION TO                                        Complex Litigation Division
                                                                  7141 Cleanwater Dr. SW
PLAINTIFFS' MOTION FOR                                                 PO Box 40111
INJUNCTIVE AND DECLARATORY                                         Olympia, WA 98504-0111
RELIEF – NO. 1:22-cv-03093-MKD                                       (360) 709-6470

# Exhibit A

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University

441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

| Fellowships and Grants |
|---|

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

1 | S a u l   C o r n e l l

## Prizes and Awards

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

## Publications, Presentations and Media Appearances

### Books:

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell]  (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000)  (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Interviews, Editorials, Essays, Podcasts:

*"Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions,"* SCOTUSblog (Jun. 27, 2022, 5:05 PM), https://www.scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions/

"Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
SLATE June 24, 2022

"The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022

"The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022

"Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022

"The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021

"'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021

"Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021

"Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021

"Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021

"Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate

"What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021

"Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019

"Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019

"The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019

"The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.

"Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018

"Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017

"The State of the Second Amendment," National Constitution Center, Podcast October, 2017

"Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017

"Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017

"Half Cocked," *Book Forum* April 2016

"Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016

"Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015

"The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]

PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013

"All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

"What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010

"Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)

"What's Happening to Gun Control,"   To the Point, NPR. March 11, 2010

"Getting History Right," *National Law Journal,* March 1, 2010

"History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008

"The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008

"Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007

"A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV  ( 2006)

"Taking a Bite out of the Second Amendment," *History News Network,* January 30, 2005

"Gun Control," Odyssey, Chicago NPR September 8, 2004

"Loaded Questions," *Washington Post Book World*  February 2, 2003

"The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002

"Real and Imagined," *New York Times*, June 24, 1999

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" 55  University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*, 89 Fordham Law Review  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism,"  Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review *Res Gestae*  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal  56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal  69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of  A merican Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" Albany Government Law  Review 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," Maryland Law Review (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion," Chicago-Kent Law Review (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," Law and History Review (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review 47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," Stanford Law and Policy Review (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," Fordham Law Review 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed:  The Bill of Rights (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in  The Blackwell Companion to American Thought, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contextualism, and Post-Modern History," <u>American Studies</u> (1995): 57-80

"Canon Wars II:  The Return of  the Founders," <u>Reviews in American History</u> 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," <u>Law and History Review</u> (1994): 1-28

"Early American History in a Post-Modern Age," <u>William and Mary Quarterly</u> 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:  The Political Thought of the Founders Reconsidered," <u>Reviews in American History</u> 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in <u>New York in the Age</u> of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," <u>Journal of American History</u> (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," <u>Northwestern University Law Review</u> (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," <u>The Pennsylvania Magazine of History and Biography</u> (1988): 103-130

**Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011

8 | S a u l   C o r n e l l

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's <u>The People Themselves</u>, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's <u>Original Meanings</u>, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

## Other Professional Activities

Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)

Program Committee, Annual Conference, Society of the Historians of the Early American Republic, Philadelphia, PA 2008
Editorial Board, American Quarterly (2004-2007)
Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001-2004
Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001

Co-Founder Ohio Early American Studies Seminar
NEH Fellowship Evaluator, New Media Projects, Television Projects
Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)


**Book Reviews:**

Journal of American History
William and Mary Quarterly
American Studies  Journal of the Early Republic
Pennsylvania Magazine of History and Biography
American Quarterly
American Journal of Legal History
Law and History Review

**Journal and Book Referee:**

Journal of American History
William and Mary Quarterly
Diplomatic History
Pennsylvania Magazine of History and Biography
Law and History Review
Harvard Law Review
Stanford Law Review
Yale Law Journal
University Press of Virginia
University of North Carolina Press
Stanford University Press
University of Massachusetts Press
Oxford University Press
Cambridge University Press
University of Michigan Press
Harvard University Press

# Exhibit B

**Saul Cornell**
**Court Citations**

**Supreme Court**

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

**Federal Courts**

Jones v. Bonta, 34 F.4th 704 (9th Cir. 2022)

Duncan v. Bonta, 19 F.4th  (2021).

Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives, 5 F.4th 407 (4th Cir.), as amended (July 15, 2021), vacated as moot, 14 F.4th 322 (4th Cir. 2021), cert. denied sub nom. Marshall v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 142 S. Ct. 1447 (2022).

Nat'l Rifle Ass'n of Am., Inc. v. Swearingen, 545 F. Supp. 3d 1247 (N.D. Fla. 2021).

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

1

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom. United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom. United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts**

State v. Christen, 2021 WI 39, 396 Wis. 2d 705, 958 N.W.2d 746, cert. denied, 142 S. Ct. 1131, 212 L. Ed. 2d 20 (2022).

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

2

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

# Exhibit 2

1   R. JULY SIMPSON, WSBA #45869
    WILLIAM MCGINTY, WSBA #41868
2   ANDREW HUGHES, WSBA #49515
    BRIAN HUNT ROWE, WSBA #56817
3   Assistant Attorneys General
    JEFFREY T. EVEN, WSBA #20367
4   Deputy Solicitor General
    KRISTIN BENESKI, WSBA #45478
5   First Assistant Attorney General
    Washington State Office of the Attorney General
6   7141 Cleanwater Dr. SW
    PO Box 40111
7   Olympia, WA 98504-0111
    (360) 709-6470

8
                  **UNITED STATES DISTRICT COURT**
9                 **EASTERN DISTRICT OF WASHINGTON**
                          **AT YAKIMA**
10

11   MICHAEL SCOTT BRUMBACK,          | NO. 1:22-cv-03093-MKD
     an individual, et al.,           |
12                                    | DECLARATION OF
                     Plaintiffs,      | ROBERT J. SPITZER IN
13                                    | OPPOSITION TO
                 v.                   | PLAINTIFFS' MOTION
14                                    | FOR INJUNCTIVE AND
     ROBERT W. FERGUSON, in his       | DECLARATORY RELIEF
15   official capacity as Washington  |
     State Attorney General, et al.,  | NOVEMBER 23, 2022
16                                    | With Oral Argument: 11:00 a.m.
                     Defendants.      |

17        I, Robert J. Spitzer, declare under penalty of perjury under the laws of the

18   United States that the information in this declaration is true:

19        1.      I received my A.B. in Political Science, summa cum laude, from

20   State University of New York College at Fredonia in 1975, my Masters degree

21   in Government from Cornell University in 1978 and my PhD in Government

22   from Cornell University in 1980. I am currently a Distinguished Service

DECLARATION OF ROBERT J.              1    ATTORNEY GENERAL OF WASHINGTON
SPITZER IN OPPOSITION TO                        Complex Litigation Division
PLAINTIFFS' MOTION FOR                             7141 Cleanwater Dr. SW
INJUNCTIVE AND DECLARATORY                              PO Box 40111
RELIEF – NO. 1:22-cv-03093-MKD                     Olympia, WA 98504-0111
                                                        (360) 709-6470

1    Professor Emeritus of Political Science at the State University of New York at

2    Cortland. I was also a visiting professor at Cornell University for thirty years,

3    among other positions. I have been studying and writing about gun policy for

4    over thirty years and am the author of six books and over 100 articles, paper, and

5    essays on gun policy. My expertise includes the history, law, politics, and

6    tradition of weapons regulations and habits in the United States. A true and

7    correct copy of my current curriculum vitae is attached to this declaration as

8    Exhibit A.

9        2.    I have been retained by the State of Washington to provide expert

10    opinion and testimony regarding the history and tradition of weapons regulations

11    in the United States and setting those regulations into the appropriate historical

12    context as required by the recent United States Supreme Court decision in *New*

13    *York State Rifle & Pistol Association, Inc. v. Bruen*, __ U.S. __, 142 S. Ct. 2111

14    (2022), which I have read and am familiar with. My research and report will focus

15    on the history and development of large capacity magazines and whether or not

16    Washington's laws concerning large capacity magazines are analogously similar

17    to weapons regulations in the history and tradition of the United States.

18        3.    My understanding of the Supreme Court's decision in *Bruen* is that

19    there is now a requirement to compare historical regulations to modern ones to

20    determine whether the modern regulations "impose a comparable burden on the

21    right of armed self-defense and whether that burden is comparably justified . . . ."

22

DECLARATION OF ROBERT J.           2          ATTORNEY GENERAL OF WASHINGTON
SPITZER IN OPPOSITION TO                              Complex Litigation Division
PLAINTIFFS' MOTION FOR                                  7141 Cleanwater Dr. SW
INJUNCTIVE AND DECLARATORY                                  PO Box 40111
                                                        Olympia, WA 98504-0111
RELIEF – NO. 1:22-cv-03093-MKD                             (360) 709-6470

1    *Id.* at 2133. This analysis looks to whether there is "a well-established and

2    representative historical analogue, not a historical *twin*." *Id.* Further, in "cases

3    implicating unprecedented societal concerns or dramatic technological

4    changes"—as is the case here—the analysis "may require a more nuanced

5    approach." *Id.* at 2132. Accordingly, my research, opinions, and testimony will

6    be concerned with whether such historical analogues exist with respect to

7    Washington's large capacity magazine (LCM) law.

8         4.    Although my prior work makes me well suited to analyze this issue,

9    the kind of analysis required by *Bruen* is a largely unexplored area, particularly

10   with respect to large capacity magazines and other gun accessories. However, my

11   work so far leads me to believe that there likely are historical analogues. In recent

12   years, new and important research and writing has been undertaken to chip away

13   at old myths to present a more accurate and pertinent sense of our gun past. This

14   work has shown that gun laws are by no means a contemporary phenomenon. In

15   fact, gun laws are as old as gun possession and spanned every conceivable

16   category of regulation from gun acquisition, sale, possession, transport, use, and

17   deprivation through outright confiscation, hunting and recreational regulations,

18   registration requirements, and outright gun bans. Robert J. Spitzer, *Guns Across*

19   *America: Reconciling Gun Rules and Rights* (Oxford University Press, 2015).

20   For the first 300 years of America's existence, gun laws and gun rights went

21

22

DECLARATION OF ROBERT J.                    3              ATTORNEY GENERAL OF WASHINGTON
SPITZER IN OPPOSITION TO                                        Complex Litigation Division
PLAINTIFFS' MOTION FOR                                            7141 Cleanwater Dr. SW
INJUNCTIVE AND DECLARATORY                                            PO Box 40111
                                                                 Olympia, WA 98504-0111
RELIEF – NO. 1:22-cv-03093-MKD                                        (360) 709-6470

1    hand-in-hand. It is only recently that the gun debate has become more politicized

2    such that a victory for one side is viewed as a loss for the other.

3         5.    The historical research concerning weapons regulations demanded

4    by *Bruen* is not merely a matter of excavating and examining what laws were

5    passed by state or federal legislatures in the past. Rather, *Bruen* asks "whether

6    modern and historical regulations impose a comparable burden on the right of

7    self-defense and whether that burden is comparably justified . . . ." *Bruen*, 142

8    S. Ct. at 2133. I understand this to mean an analysis of how much the past law

9    burdened the right to self-defense compared to the current law, and whether the

10   justification for this limitation is sufficiently similar to the justification for the

11   current law. This requires understanding the context of the historical law: how

12   individuals and legislatures of the past understood the right to self-defense, and

13   what was going on at the time that required the regulation to be enacted.

14        6.    To understand this I use the following three-step framework. First,

15   someone will invent and likely patent a firearm or firearm accessory. At this stage

16   the impact on society is zero. As an example of this first step: an early multi-shot

17   gun, the Puckle Gun, patented in 1718, could fire nine rounds per minute. It is

18   often cited as demonstrating the early commonality of multi-shot firearms. But

19   this heavy weapon was designed to be fired from a tripod, was developed for

20   military use, and was likely never manufactured beyond perhaps a prototype.

21   James Winant, *Firearms Curiosa* 219–21 (Bonanza Books, 1955). A picture of

22

DECLARATION OF ROBERT J.                    4          ATTORNEY GENERAL OF WASHINGTON
SPITZER IN OPPOSITION TO                                   Complex Litigation Division
PLAINTIFFS' MOTION FOR                                       7141 Cleanwater Dr. SW
                                                                  PO Box 40111
INJUNCTIVE AND DECLARATORY                                    Olympia, WA 98504-0111
RELIEF – NO. 1:22-cv-03093-MKD                                   (360) 709-6470

1  that firearm is below:



7.    The second step is that, assuming the technology is feasible, meaning it can be reliably manufactured and it works as intended, the military will often first or exclusively adopt the new firearm technology. Examples of these are the machine gun (a fully automatic weapon), the AR-15, and the gun silencer. The designers of the AR-15 and silencer both said that they were designed for military use and not designed for civilian use. The machine gun was initially used solely by and for the military.

8.    The third step incorporates instances when the firearm technology passes into civilian use and subsequently causes societal or criminal violence or other form of "terror" or other social ill among the population resulting in governments acting to regulate the technology. The Colt pistol, machine gun, AR-15, and silencer are instructive. In the 1830s Samuel Colt developed and improved the first practical, reliable pistol that could be shot more than once without reloading (the "pepperbox," a multi-shot firearm where the number of shots fired equaled the number of barrels bundled together, found some civilian

DECLARATION OF ROBERT J.
SPITZER IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
INJUNCTIVE AND DECLARATORY
RELIEF – NO. 1:22-cv-03093-MKD

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    market popularity in the early 1800s, but it was rapidly eclipsed by the superior

2    Colt revolver, as the pepperbox was heavy, inaccurate, and prone to misfiring (a

3    picture appears below). Lewis Winant, *Pepperbox Firearms* 30, 31 (Greenberg

4    Publisher, 1952); Larry Koller, *The Fireside Book of Guns* 154 (Simon and

5    Schuster, 1959).



9.    Nonetheless Colt could not make a go of manufacturing his multi-shot weapon for many years because he could find no market for them either from the government or the public. The government dismissed the weapon as a "novelty"[1] and, after an 1837 test, concluded it was "entirely unsuited to the

_____

[1] Pamela Haag, *The Gunning of America* 24 (Basic Books, 2016).

DECLARATION OF ROBERT J.
SPITZER IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
INJUNCTIVE AND DECLARATORY
RELIEF – NO. 1:22-cv-03093-MKD

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    general purposes of the service."[2] This early failure drove Colt to bankruptcy. It

2    took the Civil War to finally spur the post-Civil War spread of the Colt-type

3    revolver and similar firearms into society, when these practical and reliable

4    multi-shot handguns along with improved manufacturing techniques and heavy

5    marketing resulted in the proliferation of handguns among the public and a rapid

6    increase in gun violence. But this proliferation and the subsequent gun violence

7    was also accompanied by the rapid spread of laws restricting or barring their use,

8    such as laws barring concealed carry, open carry, and the brandishing or display

9    of weapons. Robert J. Spitzer, *Gun Law History in the United States and Second*

10    *Amendment Rights*, 80 Law and Contemporary Problems 55, 63–67 (2017);

11    Robert J. Spitzer, *The Gun Dilemma: How History is Against Expanded Gun*

12    *Rights* 72–81 (Oxford University Press, 2022). Thus, the mere existence of guns

13    or new gun technology does not equal general availability, much less general use

14    of the weapons, until such time as they spread into the public.

15          10.    Machine guns are another example of this pattern. Weapons capable

16    of firing rounds in rapid succession can be traced to guns of the late 19th and

17    early 20th centuries, like the hand-cranked, multi-barreled Gatling gun. It and its

18    successors were military weapons designed to be fired from a tripod or similar

19    supporting apparatus, owing to their size and weight. The development of a fully

---

20

21         [2] Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter That Changed*

22    *America* 136 (Scribner, 2021).

DECLARATION OF ROBERT J.
SPITZER IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
INJUNCTIVE AND DECLARATORY
RELIEF – NO. 1:22-cv-03093-MKD

         7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    automatic machine gun for battlefield use, firing all of its rounds from a single

2    barrel and single trigger pull, came to fruition during World War I, and to

3    devastating effect, where tripod-mounted machine guns on the battlefield fired at

4    least 200–400 rounds per minute from a gun weighing roughly 100 pounds. Out

5    of World War I came a practical, lighter-weight, reliable hand-held fully

6    automatic weapon. Though it was developed for the war, it came too late in the

7    war to have much effect. After the war, gun manufacturers began to market the

8    machine gun to police forces and civilians, most notably the Thompson

9    submachine gun, also known as the Tommy Gun. The Tommy Gun, capable of

10   receiving stick magazines holding 20–30 rounds or drum magazines holding up

11   to 100 rounds, was advertised as the "ideal weapon for the protection of large

12   estates, ranches, plantations, etc." John Ellis, *The Social History of the Machine

13   Gun* 149–52 (Johns Hopkins University Press, 1986). A true and correct copy of

14   this ad is attached hereto as Exhibit B. But their rampant and deadly use in high

15   profile robberies and gangland shootings resulted in public outcry, prompting at

16   least 32 states to ban them, and the eventual passage of the 1934 National

17   Firearms Act which has since tightly regulated machine guns, sharply limiting

18   their circulation. National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat.

19   1236.

20          11.    Similarly, the silencer was invented in the early 1900s with the

21   purpose of military use. Alice Clink Schumacher, *Hiram Percy Maxim* 61 (The

22

DECLARATION OF ROBERT J.                      8              ATTORNEY GENERAL OF WASHINGTON
SPITZER IN OPPOSITION TO                                          Complex Litigation Division
                                                                   7141 Cleanwater Dr. SW
PLAINTIFFS' MOTION FOR                                                  PO Box 40111
INJUNCTIVE AND DECLARATORY                                         Olympia, WA 98504-0111
RELIEF – NO. 1:22-cv-03093-MKD                                        (360) 709-6470

1   Ham Radio Publishing Group, 1970). Nonetheless, the silencer was also

2   marketed to civilians in articles, interviews, and newspaper advertisements, and

3   was also then subject to government restrictions. Silencers became so much a

4   part of the popular culture that there were prolific and even comical references to

5   the Maxim silencer as a euphemism for something to be fitted to anything that

6   should be silenced such as over-zealous sports fans, crying babies, soup-slurpers,

7   and Suffragettes. Newspaper advertisements emphasized the value of a silencer

8   in hunting or shooting in places where the noise of gunfire might be particularly

9   troublesome. As it turned out, the noise of gunfire is particularly troublesome to

10   those engaged in poaching, hunting out of season, or otherwise engaging in

11   criminal or illegal shooting where a gun is discharged. There are prolific

12   newspaper accounts of silencers being used in crimes such as robberies, murders,

13   and gang shootings in the early decades of the 20th century. Victims, witnesses,

14   and bystanders consistently reported that they heard no gunshot sounds when the

15   shots were fired by guns that were used with silencers. This understandably

16   caused public fear and outcry with many arguing that the silencer was an

17   incentive to commit crimes given that the noise accompanying the discharge of a

18   weapon attracts attention and thus is a natural deterrent to gun crimes. Spitzer,

19   *The Gun Dilemma* at 55–63. In 1934 the federal government stepped in to

20   regulate silencers with the previously mentioned National Firearms Act. By 1936

21   at least 15 states had restricted silencers. *Id.* at 57–58.

22

DECLARATION OF ROBERT J.
SPITZER IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
INJUNCTIVE AND DECLARATORY
RELIEF – NO. 1:22-cv-03093-MKD

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1          12.    History repeated itself in the 1990s when states and the federal

2   government began to regulate Assault Rifles, assault pistols like the TEC-9, and

3   LCMs (magazines holding more than 10 rounds). The AR-15 was first produced

4   by the ArmaLite Company in the late 1950s (the basis for the "AR" name).

5   According to one of its designers, the weapon was "designed for full automatic

6   military use. It wasn't really designed as a sporting rifle." GP, *CNBC America's*

7   *Gun -- The Rise of the AR-15 – History of the Armalite Rifle*, YouTube (April 25,

8   2013), https://www.youtube.com/watch?v=OCvjoFPD5Kg. ArmaLite sold the

9   rights to the gun to the Colt Company in 1959. A few years later, the weapon was

10  adopted by the American military and produced as the M16, where it came in to

11  use during the Vietnam War in the 1960s. These military weapons came to have

12  three firing capabilities: fully automatic, semi-automatic, and (sometimes)

13  "selective fire" or three-round bursts. Civilian versions could and can fire only in

14  a semi-automatic fashion. Colt received permission to market a semi-automatic

15  version of the AR-15 to the civilian market, but these weapons did not catch on

16  in the American market in a significant way until the late 1980s, when Chinese

17  manufacturers flooded the market with cheap weapons, including their own semi-

18  automatic version of the AK-47. Spitzer, *Guns Across America* at 79–85.

19         13.    Assault pistols refer to guns that fire in a semi-automatic fashion but

20  that "combine the firepower of a rifle, able to accept high-capacity ammunition

21  magazines designed for assault rifles, with the increased concealability of a

22

DECLARATION OF ROBERT J.                    10          ATTORNEY GENERAL OF WASHINGTON
SPITZER IN OPPOSITION TO                                       Complex Litigation Division
PLAINTIFFS' MOTION FOR                                          7141 Cleanwater Dr. SW
                                                                    PO Box 40111
INJUNCTIVE AND DECLARATORY                                     Olympia, WA 98504-0111
RELIEF – NO. 1:22-cv-03093-MKD                                     (360) 709-6470

1   handgun." Violence Policy Center, *AR-15 and AK-47 Assault Pistols: Rifle*

2   *Power in a Handgun*, https://vpc.org/studies/armor.pdf (last visited Oct. 18,

3   2022). The TEC-9 pistol, for example, was originally developed for military use

4   as it was "originally designed as a submachine gun for the South African

5   government." H. Rep. 103-489 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1820. It

6   came standard with a "magazine holding 36 rounds . . . a threaded barrel to accept

7   a silencer, and a barrel shroud to cool the barrel during rapid fire." *Id.*

8        14.    By the late 1980s and early 1990s the AR-15 and similarly styled

9   weapons, along with the LCMs they could receive, began to enter the popular

10  culture and proliferate amongst civilians, including criminals. Spitzer, *The Gun*

11  *Dilemma* at 27–30. In the 1980s and 1990s, assault pistols like Israeli made Uzi

12  pistols, MAC-10s, the Intratec TEC-22 Scorpion, and TEC-9s became favorites

13  of drug gangs, and were popularized in mass culture through movies and

14  television programs like Rambo, Commando, The A-Team and Miami Vice. Tom

15  Diaz, *Making a Killing* 22–23, 124–34 (The New Press, 1999). According to the

16  U.S. House of Representatives Report from the federal Assault Weapons Ban,

17  the TEC-9 pistol was "the undisputed favorite of drug traffickers, gang members

18  and violent criminals." H. Rep. 103-489 at 32. Assault pistols, including newer

19  versions, continued to be attractive to criminals and gangs, and have also been

20  involved in gun trafficking between the U.S. and Mexico. Violence Policy Center

21  at 1.

22

DECLARATION OF ROBERT J.
SPITZER IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
INJUNCTIVE AND DECLARATORY
RELIEF – NO. 1:22-cv-03093-MKD

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1        15.     Similarly, AR-15s and LCMs have been used in some of the most

2    heinous gun crimes perpetrated by single shooters that our society has ever seen.

3    Although mass killings are as old as time, mass killings perpetrated by single

4    persons using multi-shot weapons are a modern phenomenon linked closely with

5    the circulation of ARs and LCMs. From 1989 to the present we have seen

6    numerous and ever-more frequent mass shootings involving ARs and LCMs.

7    These include the Stockton, California elementary school shooting in 1989; three

8    mass shootings in Waco, Texas, San Francisco, and on a Long Island commuter

9    train, all in 1993 (all of which helped spur enactment of the 1994 federal law);

10   the Columbine High School shooting in 1999; the Aurora, Colorado, movie

11   theater shooting and the Sandy Hook elementary school shooting, both in 2012;

12   the Parkland shooting in 2018; and the Buffalo and Uvalde mass shootings in

13   2022. *Id.* at 32–33. As these terrifying crimes garnered significant national

14   attention states began to regulate the AR-15-type firearm. The federal

15   government enacted a 10 year ban of ARs and LCMs in 1994. Robert J. Spitzer,

16   *The Politics of Gun Control* 205–11 (8th Edition, 2021).

17       16.     With the understanding that research is yet to be conducted, and I

18   am not now ready to provide final opinion and testimony regarding this matter,

19   there is ample reason to believe that Washington's large capacity magazine laws

20   are analogous to weapons regulations finding firm support in United States

21   history and tradition.

22

DECLARATION OF ROBERT J.                    12        ATTORNEY GENERAL OF WASHINGTON
SPITZER IN OPPOSITION TO                                    Complex Litigation Division
PLAINTIFFS' MOTION FOR                                        7141 Cleanwater Dr. SW
                                                                    PO Box 40111
INJUNCTION AND DECLARATORY                                   Olympia, WA 98504-0111
RELIEF – NO. 1:22-cv-03093-MKD                                   (360) 709-6470

1       17.   First, there is a history in the United States dating back to the

2  Founding of our Nation and through the time of the adoption of the Fourteenth

3  Amendment of regulating and even banning weapons that follow the three-step

4  process I outline above: invention, popularization, and societal terror that needs

5  to be regulated as the weapons increasingly are used in crimes. Examples of this

6  include weapons such as Bowie knives, slung shots, Billy clubs, and trap guns.

7       18.   The regulation of LCMs extends back further than generally

8  recognized and these regulations spread almost as soon as removable magazines

9  became available to the general public as parts of firearms dating to the 1920s. It

10  is important to note here that I am referring to weapons that were actually usable,

11  reliable, and widely circulated. I am not referring to the types of experimental,

12  purely military, or one-off guns where the technology was experimental or not

13  widely spread due to the types of issues I raise above, i.e., they were unreliable,

14  designed for military use, too large or heavy for general use, too expensive for

15  general circulation, or just too complicated.

16       19.   As discussed above, multi-shot weapons did not begin to circulate

17  or proliferate until the late 19th century. For example, the widely known

18  Winchester 1873 repeating rifle could fire up to fifteen rounds without reloading,

19  but it "was designed for sale to the Government as a military arm." Larry Koller,

20  *The Fireside Book of Guns* 112 (Simon and Schuster, 1959). A gun whose

21  legendary status wildly outdistanced its actual production and impact, it was

22

DECLARATION OF ROBERT J.
SPITZER IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
INJUNCTIVE AND DECLARATORY
RELIEF – NO. 1:22-cv-03093-MKD

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    nevertheless an important firearm in the late nineteenth century, although this

2    "quintessential frontier rifle flourished later, in the 'post-frontier' early 1900s. Its

3    celebrity biography backdated its diffusion and even its popularity." Haag, *The*

4    *Gunning of* America at 179. The Winchester, however, was not a semi-automatic

5    firearm, in that a lever had to be manipulated in a forward-and-back motion

6    before each pull of the trigger. And when the gun was emptied, it had to be

7    manually reloaded, one round at a time. With all this, the Winchester was by no

8    means universally embraced by long gun users. Indeed, "a good many westerners

9    would have nothing to do with the early Winchesters or other repeaters, for

10    reasons they considered very sound, and not until the 1880s did the repeating rifle

11    assert its dominance over the single-shot breechloader." Louis A. Garavaglia &

12    Charles G. Worman, *Firearms of the American West, 1866-1894* 129 (University

13    of New Mexico Press, 1985).

14    20.    As discussed above with machine guns and silencers, large capacity

15    magazines are increasingly being used for nefarious purposes while

16    simultaneously being advertised and touted for other uses. Though LCMs are

17    being pushed as necessary for self-defense, the ability to fire numerous rounds

18    without reloading is rarely if ever useful or necessary in self-defense situations

19    but is increasingly appealing to mass shooters. It is also a major source of injury

20    and death in gun crime more generally. LCMs have been used in more than half

21    of all mass shootings. In mass shootings where LCMs were used there were 155%

22

DECLARATION OF ROBERT J.
SPITZER IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
INJUNCTIVE AND DECLARATORY
RELIEF – NO. 1:22-cv-03093-MKD

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    more people shot and 47% more deaths. Since 2004 LCM use has increased

2    steadily and LCMs are now used in over 40% of all serious violent incidents. In

3    response to this general societal terror, as of the present twelve states, plus the

4    District of Columbia, have enacted LCM limits.

5         21.    The account above summarizes my initial opinion in this case.

6    However, these are areas that I seek to explore in greater detail.

7         22.    The work and analysis I describe above is little explored territory.

8    Relatively few researchers have focused on the field of weapons history or

9    historical laws regulating weapons, and more historical data continues to come

10   to light.

11        23.    My work and analysis in this area continues as I conduct the research

12   I have described above. I estimate that I may be able to provide a final report or

13   opinion in the six to nine month timeframe.

14        I declare under penalty of perjury under the laws of the State of

15   Washington and the United States that the foregoing is true and correct.

16        DATED this __19th__ day of __October__ 2022, in Cortland, New York.

17

18                                           *Robert J. Spitzer*
                                             _____
                                             Robert J. Spitzer, Ph.D.

19

20

21

22

DECLARATION OF ROBERT J.               15        ATTORNEY GENERAL OF WASHINGTON
SPITZER IN OPPOSITION TO                              Complex Litigation Division
PLAINTIFFS' MOTION FOR                                  7141 Cleanwater Dr. SW
INJUNCTIVE AND DECLARATORY                                  PO Box 40111
RELIEF – NO. 1:22-cv-03093-MKD                         Olympia, WA 98504-0111
                                                           (360) 709-6470

1                              **PROOF OF SERVICE**

2          I hereby certify that I electronically filed the foregoing with the Clerk of

3   the Court using the CM/ECF System, which in turn automatically generated a

4   Notice of Electronic Filing (NEF) to all parties in the case who are registered

5   users of the CM/ECF system.

6          I declare under penalty of perjury under the laws of the United States of

7   America that the foregoing is true and correct.

8          DATED this 24th day of October 2022 at Seattle, Washington.

9

10                                   *s/ Andrew Hughes*
                                     ANDREW HUGHES, WSBA #49515
11                                   Assistant Attorney General

12

13

14

15

16

17

18

19

20

21

22

DECLARATION OF ROBERT J.                    16          ATTORNEY GENERAL OF WASHINGTON
SPIT  ER IN OPPOSITION TO                                   Complex Litigation Division
PLAINTIFFS' MOTION FOR                                        7141 Cleanwater Dr. SW
INJUNCTIVE AND DECLARATORY                                          PO Box 40111
RELIEF – NO. 1:22-cv-03093-MKD                                Olympia, WA 98504-0111
                                                                  (360) 709-6470

# Exhibit A

April 2022

## Curriculum Vitae

### Robert J. Spitzer

### Distinguished Service Professor, Emeritus
### SUNY Cortland

Address:    5333 Center St.
Alexandria, VA  23188
(607) 423-1781
Robert.spitzer@cortland.edu; robertjspitzer53@gmail.com
https://sites.google.com/site/robertspitzercortland/

Education:    A.B. (Political Science), summa cum laude, SUNY College at Fredonia, 1975.
M.A. Cornell University, 1978.
Ph.D. Cornell University, 1980.

Positions Held:

Department Chair, SUNY Cortland, 2008-2020.
Interim Department Chair, SUNY Cortland, 2004-2005.
Distinguished Service Professor, SUNY Cortland, 1997.
Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-1990, 1992-2017.
Professor, SUNY Cortland, 1989 to 1997.
Continuing Appointment, SUNY Cortland, 1986.
Associate Professor, SUNY Cortland, 1984 to 1989.
Department Chair, SUNY Cortland, 1983 to 1989.
Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985, 1986, 1988.
Copy Editor, Administrative Science Quarterly, 1982 to 1983.
Adjunct Professor, Tompkins-Cortland Community College, 1982-83.
Assistant Professor, SUNY Cortland, 1979 to 1984.
Instructor, Cornell University, 1979.
Instructor, Eisenhower College, 1978-1979.
Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.

1

<u>Honors</u>:

Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.

Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.

Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.

Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.

Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.

Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.

SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.

Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."

Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.

Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.

Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.

<u>Who's Who in the World</u>, 1996.

<u>Dictionary of International Biography</u>, 1995.

<u>Who's Who in the East</u>, 1995-96; 1997-98

<u>Ex officio</u> member, Cortland County Bicentennial Committee, 1987-89.

Chair, SUNY Cortland Bicentennial Committee, 1987-89.

Phi Eta Sigma, SUNY Cortland, 1994.

Phi Kappa Phi, SUNY Cortland, 1990.

<u>Men of Achievement</u> (1986)

<u>Contemporary Authors</u>, vol. 112 (1985) and subsequent updates.

<u>International Authors and Writers Who's Who</u>, 1985-present.

<u>International Who's Who in Education</u>, Winter 1985-86.

Herbert H. Lehman Graduate Fellowship, 1975-79.

<u>Who's Who Among Students in American Universities and Colleges</u>, 1974-75.

Phi Beta Kappa Club, SUNY College at Fredonia, 1975.

2

Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.

<u>Research Fellowships and Projects</u>:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.

<u>Publications and Papers</u>:

<u>Books</u>:

<u>The Presidency and Public Policy:  The Four Arenas of Presidential Power</u> (University, AL:  The University of Alabama Press, 1983).  A study of the President's relations with Congress in the making of domestic policy.  Revised version of doctoral dissertation.

<u>The Right to Life Movement and Third Party Politics</u> (Westport, CT: Greenwood Press, 1987).  A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

<u>The Presidential Veto:  Touchstone of the American Presidency</u> (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

Editor, <u>The Bicentennial of the U.S. Constitution:  Commemoration and Renewal</u> (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial.  Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert

3

Spitzer.

President and Congress:  Executive Hegemony at the Crossroads of American Government (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, Media and Public Policy (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

The Politics of Gun Control (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, Politics and Constitutionalism: The Louis Fisher Connection, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

The Right to Bear Arms: Rights and Liberties Under the Law (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

Essentials of American Politics, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

4

<u>Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning</u> (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

<u>We the People: Essentials Edition</u>, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021).

<u>Gun Control: A Documentary and Reference Guide</u> (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

<u>The Gun Debate: An Encyclopedia of Gun Rights and Gun Control</u>, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

<u>Guns across America: Reconciling Gun Rules and Rights</u> (New York: Oxford University Press, 2015); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

<u>The Gun Dilemma: How History Is Against Expanded Gun Rights</u> (New York: Oxford University Press, 2023, forthcoming). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, <u>Series on American Constitutionalism</u>, SUNY Press, 1996-present. Books include:
> Daniel Hoffman, <u>Our Elusive Constitution,</u> (1997)
> Martin Sheffer, <u>God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment,</u> (1999)
> Daniel Levin, <u>Representing Popular Sovereignty: The Constitution in American Political Culture,</u> (1999)
> Robert Spitzer, ed., <u>Politics and Constitutionalism,</u> (2000)
> Laura Langer, <u>Judicial Review in State Supreme Courts</u> (2002)
> Ian Brodie, <u>Friends of the Court</u> (2002)
> Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination Law and Policy</u> (2002)
> Artemus Ward, <u>Deciding to Leave: The Politics of Retirement from the United States Supreme Court</u> (2003)

James T. McHugh, Ex Uno Plura: State Constitutions and Their Political Cultures (2003)

Stephen Newman, ed., Constitutional Politics in Canada and the United States (2004).

Stephen Kershnar, Justice for the Past (2004).

Timothy R. Johnson, Oral Arguments and Decision Making on the U.S. Supreme Court (2004).

Christopher P. Banks, David B. Cohen, and John C. Green, eds., The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics (2005)

Kenneth D. Ward and Cecilia R. Castillo, eds., The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory (2005).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform (2006).

Frank P. Grad and Robert F. Williams, State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments (2006).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform, 3 vols. (2006).

Cary Federman, The Body and the State: Habeas Corpus and American Jurisprudence (2006).

Christopher S. Kelley, ed., Executing the Constitution: Putting the President Back into the Constitution (2006).

David Fagelson, Justice as Integrity: Tolerance and the Moral Momentum of Law (2006).

Christopher Shortell, Rights, Remedies, and the Impact of State Sovereign Immunity (2008).

Robert Blomquist, The Quotable Judge Posner (2010).

Kirk A. Randazzo, Defenders of Liberty or Champions of Security? (2010).

Pamela Corley, Concurring Opinion Writing on the U.S. Supreme Court (2010).

Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2nd ed. 2010).

Julia R. Azari, et al., eds., The Presidential Leadership Dilemma (2013).

Stephen A. Simon, Universal Rights and the Constitution (2014).

Kirk A. Randazzo and Richard W. Waterman, Checking the Courts (2014).

Anthony Maniscalco, Public Spaces, Marketplaces, and the Constitution (2015).

Goirgi Areshidze et al., eds., Constitutionalism, Executive Power, and the Spirit of Moderation (2016).

Peter J. Galie, et al., eds., New York's Broken Constitution (2016).

Robert J. Hume, Ethics and Accountability on the U.S. Supreme Court (2017).

Michael A. Dichio, The U.S. Supreme Court and the Centralization of Federal Authority (2018).

Clyde H. Ray, John Marshall's Constitutionalism (2019).

Daniel P. Franklin, et al., The Politics of Presidential Impeachment (2020).

6

Robert M. Howard, et al., <u>Power, Constraint, and Policy Change: Courts and Education Finance Reform</u> (2021).
Mark C. Dillon, <u>The First Chief Justice</u> (2022).

Book Series Editor, <u>Presidential Briefing Books</u>, Routledge, 2015-present.
Mary Stuckey, <u>Political Rhetoric</u> (2015)
Michael A. Genovese, <u>Presidential Leadership in an Age of Change</u> (2015)
Christopher Fettweis, <u>Making Foreign Policy Decisions</u> (2016)
Nancy Maveety, <u>Picking Judges</u> (2016)
Richard S. Conley, <u>Presidential Relations with Congress</u> (2017)
Andrew L. Stigler, <u>Governing the Military</u> (2019)
Graham G. Dodds, <u>The Unitary Presidency</u> (2020)

Member, Board of Editors for the <u>Encyclopedia of Guns in American Society</u>, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011-2016.

<u>Book Chapters</u>:

"Third Parties in New York," in <u>Governing New York State</u> (formerly <u>New York State Today</u>), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.:  SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in <u>Social Regulatory Policy: Recent Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO:  Westview Press, 1988), 111-141.

"The President's Veto Power," in <u>Inventing the American Presidency: Early Decisions and Critical Precedents</u>, ed. by Thomas Cronin (Lawrence, KA:  University Press of Kansas, 1989), 154-179.

"President and Congress," in <u>The CQ Guide to the Presidency</u>, ed. by Michael Nelson (Washington, D.C.:  Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in <u>Encyclopedia of American Political Parties and Elections</u>, ed. by L. Sandy Maisel (New York:  Garland Pub., 1991): American Labor Party, Benjamin Bubar,

7

closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, American Government: Freedom and Power (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in Encyclopedia of the American Legislative System, ed. by Joel Silbey (NY:  Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in The Presidency and the Persian Gulf War, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York:  Praeger, 1993).

"Is the Separation of Powers Obsolete?" in The Presidency Reconsidered, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in Understanding the Presidency, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the Encyclopedia of the American Presidency, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the Encyclopedia of the United States Congress, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in The Constitution and the Conduct of American Foreign Policy, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in The Executive Office of the President, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the Oxford Historical Guide to American Government (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in Liberty Under Law, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

8

"Multi-Party Politics in New York," in Multi-Party Politics and American Democracy, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, We the People (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in The Encyclopedia of American Third Parties, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in Prayers in the Precincts, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in The Clinton Scandal and the Future of American Politics, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in Politics and Constitutionalism, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the Encyclopedia of American Political History, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in The Constitution and Its Amendments, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in The Second Amendment in Law and History, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in The Oxford Companion To United States History ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in The Presidency and the Law: The Clinton Legacy, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

9

"The Veto King: The 'Dr. No' Presidency of George Bush," in <u>Honor and Loyalty: Inside the Politics of the Bush White House</u>, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the <u>Encyclopedia of Guns in American Society</u>, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the <u>Encyclopedia of the American Presidency</u>, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for <u>The Encyclopedia of New York State</u>, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," <u>Transformed By Crisis: The Presidency of George W. Bush and American Politics</u>, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in <u>Debating the Presidency</u>, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in <u>Thinking About the Presidency</u>, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Executing the Constitution</u>, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in <u>Social Issues in America: An Encyclopedia</u>, 8 vols., ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," <u>The Presidency and the Challenge of Democracy</u>, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," <u>Encyclopedia of American Civil Liberties</u>, 4 vols., ed. By Paul

10

Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," <u>Gun Violence: Opposing Viewpoints</u>, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," <u>Presidential Power in America</u>, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," <u>Encyclopedia of American Government and Civics</u> ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," <u>Encyclopedia of Political Communication</u> ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in <u>Leadership at the Crossroads</u>, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in <u>Encyclopedia of Issues in U.S. Public Policy</u>, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in <u>Winning the Presidency 2008</u>, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in <u>Debating Reform: Conflicting Perspectives on How to Fix the American Political System</u>, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in <u>Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi</u>, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" <u>You Asked: 20 Questions About America</u>, U.S. Department of State, 2010.

"Liberals and the Presidency," <u>Contending Approaches to the American Presidency</u>, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" <u>The American Presidency in the 21st Century</u>, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in <u>Governing America</u>, ed. By Paul Quirk and William Cunion (New

11

York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," <u>Encyclopedia of Applied Ethics</u>, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" <u>Winning the Presidency 2012</u>, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." <u>American Government</u>. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" <u>A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton</u>, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," <u>American Governance</u>, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," <u>American Presidents and the Constitution</u>, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," <u>The George W. Bush Presidency</u>, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Stricter Gun Laws are Reasonable and Sensible," <u>Gun Control in the United States: A Reference Handbook</u>, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," <u>Guns: Interdisciplinary Approaches to Politics, Policy, and Practice</u>, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," <u>Presidential Leadership and the Trump Presidency: Executive Power and Democratic Governance</u>, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Looking Down the Barrel of the 2020 Elections," <u>The 2020 Presidential Election: Key Issues and Regional Dynamics</u>, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," <u>Developments in American Politics 9</u>, Gillian

12

Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"To Brandish or Not to Brandish: The Consequences of Gun Display," New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, forthcoming).


Articles:

"Jamestown:  Anatomy of an All-American City," Sunday Buffalo Courier Express Magazine, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, The Journal of Politics, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," Presidential Studies Quarterly, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," Presidential Studies Quarterly, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," National Civic Review, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," Party Line, 17 (September 1984).

"Shooting Down Gun Myths," America, June 8, 1985, pp. 468-69.  Reprinted in: the Des Moines Register, October 24, 1985; Criminal Justice, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); U.S. News and World Report educational study unit on Gun Control, April/May, 1987; Gun Control, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and The Informed Argument, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY:  Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," America, June 15, 1985.

"The Item Veto Reconsidered," Presidential Studies Quarterly 15(Summer, 1985): 611-17.

"Promoting Policy Theory:  Revising the Arenas of Power" Policy Studies Journal, 15 (June 1987), 675-89. Reprinted in Public Policy Theories, Models, and Concepts, ed. by Daniel C. McCool (Prentice-Hall, 1995).

13

"A Course Module:  The Politics of Abortion," <u>NEWS for Teachers of Political Science</u>, 53 (Spring, 1987).

"But for A Single Vote...," <u>New York Delegate</u>, July, 1987. Abridged version appeared on editorial page of the <u>Rochester Times Union</u>, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", <u>Election Politics</u>, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," <u>Policy Studies Journal</u>, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," <u>Policy Studies Journal</u>, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," <u>PS:  Political Science and Politics</u>, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," <u>PS:  Political Science and Politics</u>, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," <u>Oklahoma City University Law Review</u>, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," <u>Congress and the Presidency</u>, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," <u>Pace Law Review</u>, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" <u>The Spectator</u>, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," <u>Political Science Quarterly</u>, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," <u>Presidential Studies Quarterly</u>, 28 (Fall 1998): 799-805.

"Clinton's Impeachment Will Have Few Consequences for the Presidency," <u>PS: Political Science and Politics</u>, 32 (September 1999).

"The Gun Dispute," <u>American Educator</u>, 23 (Summer 1999): 10-15.  Reprinted in <u>Annual</u>

1 4

Editions: Criminal Justice (Dushkin/McGraw-Hill, 2000); and in Criminology (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," Congress Monthly, September/October 2000.

"Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, Silveira v. Lockyer (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Presidential Studies Quarterly 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the Emerson Case," St. John's Law Review 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," Focus on Law Studies 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," Fordham Law Review 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," PS: Political Science and Politics 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, The PRG Report 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, American Literary History 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, Injury Prevention 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," Albany Government Law Review 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," Presidential Studies Quarterly 38(June 2008): 329-46.

"Still Saving the Constitution from Lawyers: A Response," Gonzaga Law Review 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," Government, Law and Policy Journal 14(Summer 2012): 57-64.

15

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," Presidential Studies Quarterly 42(September 2012): 637-55.

"Gun Laws," New York State Bar Association Journal 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," Presidents and Executive Politics Report 35(Fall 2012).

"Writing the Gun Debate," Los Angeles Review of Books, February 10, 2013.

"A Historical Look at Gun Control in America," WCNY Magazine, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," PS: Political Science and Politics 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," The Islamic Monthly, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," White House Studies 12(October 2013): 125-46.

"A Look at the 2014 Elections," WNCY Magazine, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," Albany Law Review, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," Social Science Docket, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," The Critique (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," Law and Contemporary Problems 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" Items: Insights from the Social Sciences, Social Science Research Council, October 17, 2018.

"Effective Gun Regulation Can Be Compatible with Gun Rights," The Regulatory Review, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Law and Contemporary Problems 83, 3(2020): 231-55.

16

<u>Op-Ed Articles</u>

"Court Rulings on 2nd Amendment:  No Individual Right to Keep Arms," <u>Des Moines Register</u>, October 24, 1985.

"Gun Control and Pressure Politics," <u>Syracuse Post-Standard</u>, November 30, 1985.

"Pocket Vetoes and Abuse of Power," <u>Rochester Times Union</u>, January 7, 1987.

"But for One Vote, a Different Nation," <u>Rochester Times Union</u>, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," <u>Rochester Times Union</u>, September 14, 1987.

"The Great Gun Fallacy," <u>Syracuse Post-Standard</u>, March 30, 1989.

"Four Cases on Right to Bear Arms," <u>Syracuse Post-Standard</u>, April 22, 1989.

"Don't Start Line-Item Veto," <u>Syracuse Post-Standard</u>, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," <u>Syracuse Post-Standard</u>, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," <u>Los Angeles Times</u>, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" <u>Christian Science Monitor</u>, September 19, 1997.

"Assault Weapons Ban," <u>Christian Science Monitor</u>, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," <u>Syracuse Post-Standard</u>, February 10, 1999.

"Gun Industry Doesn't Know What's Good for It: Regulation," <u>Syracuse Post-Standard</u>, April 20, 1999.

"The Gun Saga in Congress," <u>Intellectual Capital</u>, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" <u>Intellectual Capital</u>, 4 (June 10-17,

17

1999).

"Welcome to Soviet – er, New York – Politics," Intellectual Capital 5(February 10-17, 2000).

"Gun Control After Columbine," Intellectual Capital 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," The Catholic Review, March 30, 2000.

"Why Would Anyone Want the Job Now?" Chicago Tribune, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," Syracuse Post-Standard, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," Syracuse Post-Standard, June 12, 2001.

"Exposure Erodes Clout of NRA," Columbus Dispatch, April 24, 2003.

"Hazing Scandals," Syracuse Post-Standard, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, Syracuse Post-Standard, February 18, 2004.

"NRA Loses Its Political Firepower," Los Angeles Times, April 12, 2004. Also in the Deseret News.

"A 'Tortured' Interpretation of the President's Vast Powers," Syracuse Post-Standard, June 18, 2004.

"Clearing the Air," Syracuse Post-Standard, August 4, 2004.

"Why Gun Ban Died Quietly," San Jose Mercury News, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," Christian Science Monitor, August 18, 2005. Also published in the Deseret News, Sacramento Bee, the Fresno Bee, the Modesto Bee, the Ithaca Journal, the Johnstown Breeze, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," Syracuse Post-Standard, January 29, 2006.

18

"Working Hard to Misconstrue the 2nd Amendment," History News Network (www.hnn.us), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" Syracuse Post-Standard, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network (www.hnn.us) January 7, 2008.

"The 'Pocket Veto' Peril," Los Angeles Times, January 8, 2008. Reprinted in the St. Louis Post-Dispatch, St. Paul Pioneer Press, Wilmington Star News (NC), News and Observer (NC), The Morning Call (Pa.), Contra Costa Times (CA), the Sun News (FL), The Vindicator, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, Cleveland Plain Dealer, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, Syracuse Post-Standard, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge (www.thefacultylounge.org), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network (www.hnn.us), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us), January 12, 2009.

"Early Voting for New York Elections," Cortland Standard, May 27, 2009.

"A Better Way to Run Our Elections," Syracuse Post Standard, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post (www.huffingtonpost.com), posted December 22, 2009.

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post (www.huffingtonpost.com), posted April 1, 2010.

19

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post (www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com), posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5, 2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard,* January 16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post,* January 3, 2012.

"The Disappearing Faculty," *The Huffington Post,* February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

"Why We've Learned Nothing from Watergate," *The Huffington Post,* June 20, 2012.

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post,* June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard,* July 4, 2012.

"Aurora Won't Change Anything," *Salon,* July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill,* January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News,* January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News,* January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard,* January 7, 2014.

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

21

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog*, American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine*, June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him." *Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,* January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington*

22

*Post*, June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Guns Return to American Elections," *US Election Analysis 2016: Media, Voters and the Campaign*, Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 18, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times,* October 3, 2017.

"An American Standoff," *New York Daily News,* October 8, 2017.

23

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post,* February 15, 2018.

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation,* February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News,* March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard,* March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post,* May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com,* September 13, 2018.

"The Gun Safety Issue is Actually Helping Democrats," *New York Times,* November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard,* December 30, 2018.

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,* August 6, 2019.

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

24

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts,* The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network,* December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Guns and the 2020 Elections," *US Election Analysis 2020,* Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 15, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.  140

"The Problem with a Self-Pardon," *History News Network,* January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

25

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot,* February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK,* February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.


Testimony, Briefs, and Reports:

"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting:  Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and Sine Die Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?"  Testimony

26

presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA, February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

27

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Baker,* No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. In 2019 the U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February

28

2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta,* U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.


Papers and Presentations (not including those given on the Cortland campus):

"The President as Policy-Maker:  The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party:  The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic:  Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet:  Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power:  Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power:  The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto:  Expanding Presidential Prerogatives Through the Back Door,"

American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete?  An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington, D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day':  The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the <u>Washington Post</u>, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

30

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in The Politics of Gun Control," Gettysburg College, Gettysburg, PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit, the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

31

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November 1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes: The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

33

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

34

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY,

35

August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

36

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America," Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol Association v. NYC,* November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

37

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University, April 5, 2022.


Panel Participation:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans:  An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science

38

Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

39

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

40

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022.


Book Reviews:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

PL94-142:  An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative

41

Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the American Political Science Review, December, 1983.

A Case of Third Party Activism, by James Canfield, reviewed in Perspective, July-August, 1984.

Winners and Losers:  Campaigns, Candidates and Congressional Elections, by Stuart Rothenberg, reviewed in the American Political Science Review, December, 1984.

The Political Presidency, by Barbara Kellerman, reviewed in Perspective, January-February, 1985.

Presidents and Promises, by Jeff Fishel, reviewed in the American Political Science Review, December, 1985.

The Elections of 1984, ed. by Michael Nelson, reviewed in Perspective, May/June, 1985.

Economic Conditions and Electoral Outcomes, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in Perspective, May/June, 1986.

Presidential Transitions:  Eisenhower Through Reagan, by Carl M. Brauer, in Perspective, January/February, 1987.

Religion and Politics in the United States, by Kenneth D. Wald, in Journal for the Scientific Study of Religion, September, 1988.

Abortion and Divorce in Western Law, by Mary Ann Glendon, in The Annals of the American Academy of Political and Social Science, September, 1988.

The American Political Economy, by Douglas Hibbs, in Perspective, Spring, 1988.

God in the White House, by Richard G. Hutcheson, Jr., in Perspective, Fall, 1988.

The Reagan Legacy, Charles O. Jones, ed., in Social Science Quarterly, June, 1989.

Dilemmas of Presidential Leadership From Washington Through Lincoln by Richard Ellis and Aaron Wildavsky, in Perspective, September, 1989.

42

Taming the Prince by Harvey Mansfield, Jr., in Governance, April, 1990.

Public Policy and Transit System Management, ed. by George M. Guess, in Perspective, Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives,  Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H. Richard Uviller and William G. Merkel, Journal of American History, March 2004.

Power Without Persuasion: The Politics of Direct Presidential Action, by William G. Howell, Perspectives on Politics, June 2004.

44

The George W. Bush Presidency: An Early Assessment, ed. By Fred Greenstein, Perspectives, Spring 2004.

The Invention of the United States Senate, by Daniel Wirls and Stephen Wirls, Perspectives, Summer 2004.

The Mythic Meanings of the Second Amendment, by David C. Williams, Law and Politics Book Review, April 2004.

Empowering the White House, by Karen M. Hult and Charles E. Walcott, Rhetoric and Public Affairs, Fall 2005.

Defining Americans:  The Presidency and National Identity, by Mary E. Stuckey, Perspectives, Spring 2005.

Presidential Leadership: Rating the Best and Worst in the White House, ed. By James Taranto and Leonard Leo, Rhetoric and Public Affairs, Summer 2006.

A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, by Saul Cornell, American Journal of Legal History, October 2006.

The Founders' Second Amendment: Origins of the Right to Bear Arms, by Stephen Halbrook, Law and Politics Book Review 18(October 2008).

Out of the Shadow: George H.W. Bush and the End of the Cold War, by Christopher Maynard, Journal of American History (September 2009).

Guns, Democracy, and the Insurrectionist Idea, by Joshua Horwitz, Law and Politics Book Review 19(June 2009).

Talking Together, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

Accidental Presidents, by Philip Abbott, Presidential Studies Quarterly, June 2010.

The Co-Presidency of Bush and Cheney, by Shirley Anne Warshaw, Congress and the Presidency, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by

45

Brien Hallett, <u>Law and Politics Book Review</u> 22(November 2012).

<u>Congress vs. the Bureaucracy: Muzzling Agency Public Relations</u>, by Mordecai Lee, <u>The Journal of American History</u> (December 2012).

<u>Arming and Disarming</u>, by R. Blake Brown, <u>Law and History Review</u> (November 2013).

<u>Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution</u>, by Heidi Kitrosser, <u>Congress and the Presidency</u> 42(2015).

<u>The Six-Shooter State: Public and Private Violence in American Politics</u> by Jonathan Obert and <u>The Lives of Guns</u> ed. by Jonathan Obert, Andrew Poe and Austin Sarat, <u>Perspectives on Politics</u> 17(September 2019).

<u>The Toughest Gun Law in the Nation</u> by James B. Jacobs and Zoe Fuhr, <u>Criminal Law and Criminal Justice Books</u>, March 2020.

<u>Warped Narratives: Distortion in the Framing of Gun Policy</u> by Melissa K. Merry, <u>Perspectives on Politics</u> 18(September 2020).

Selected Media Appearances/Quotations:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN, and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Ali Velshi," "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the <u>New York Times</u>, the <u>Washington Post</u>, <u>Time Magazine</u>, <u>Newsweek</u>, <u>Der Spiegel</u> (Germany), <u>USA Today</u>, the <u>Los Angeles Times</u>, the <u>Wall Street Journal</u>, the <u>Christian Science Monitor</u>, the <u>Boston Globe</u>, the <u>Chicago Tribune</u>, the <u>Philadelphia Inquirer</u>, the <u>Miami Herald</u>, <u>Houston Chronicle</u>, the <u>St. Louis Post-Dispatch</u>, <u>San Francisco Chronicle</u>, the <u>Dallas Morning News</u>, the <u>Baltimore Sun</u>, the <u>Detroit Free Press</u>, the <u>Seattle Post-Intelligencer</u>, <u>Newsday</u>, the <u>Denver Post</u>, <u>Kansas City Star</u>, <u>Dallas News</u>, <u>Pittsburgh Post-Gazette</u>, <u>New Orleans Times Picayune</u>, <u>Orlando Sentinel</u>, <u>Columbus Dispatch</u>, <u>Buffalo News</u>, <u>San Jose Mercury News</u>, <u>Albany Times-Union</u>, <u>St. Petersburg Times</u>, <u>Arkansas Democrat-Gazette</u>, <u>Newark Star-Ledger</u>, <u>Bergen Record</u>, <u>Congress Daily</u>, <u>The Hill</u>, <u>CQ Report</u>, <u>Rolling Stone</u>, <u>The Nation</u>, <u>Ladies Home Journal</u>, the <u>National Journal</u>, <u>The Spectator</u>, <u>Legal Times</u>, <u>Financial Times</u>, <u>Toronto Globe</u>, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the

46

Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area colleges.

Professional Associations:

Scholars Strategy Network.
American Political Science Association.
Center for the Study of the Presidency.
Presidents and Executive Politics Section (formerly the Presidency Research Group),
    APSA; served on Governing Board of PRG, 1991 to 2003.
New York Political Science Association.
Pi Sigma Alpha.
Phi Kappa Phi.

<u>Teaching Areas</u>:

<u>American Government</u>:  courses taught include Introduction to American Government, The Legislative Process, Political Parties and Social Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

<u>Public Policy</u>:  courses taught include Introduction to Public Policy, Gun Policy. Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

<u>Teaching-Related Awards</u>:

Three-time recipient of the SUNY Cortland Student Government Association Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students."  (The only faculty member ever to win this award more than once.)

47

<u>Other Professional Activities</u>

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, <u>PRG Report</u>, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics, American Political Science Association, 1997.

48

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press, University of Chicago Press, University of California Press, Princeton University Press, Cornell University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan, University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge, University of Alabama Press, American Political Science Review, PS, Comparative Politics, American Journal of Political Science, Policy Studies Journal, Policy Studies Review, Political Science Quarterly, the Journal of Politics, Western Political Quarterly, Polity, Social Science Quarterly, Political Behavior, American Politics Quarterly, Political Communication, Legislative Studies Quarterly, Government and Policy, Congress and the Presidency, Social Science Journal, Journal of Policy History, Political Research Quarterly, Presidential Studies Quarterly, Politics and Policy, and the National Science Foundation.


Selected Community Service

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present; for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County, 2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).

Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's Odyssey 2010 Project, 1996.

# Exhibit B

family silver, might well have misjudged its markets. For the sub-machine gun was legally available to any-one, and lack of police and military interest made it by default a civilian weapon. And so it came to pass that the Thompson – manufactured in peacetime, sold on the commercial market – was, in a sense, a machine gun for the home.[3]

Commercially, then, the gun was a flop. And so it remained until the outbreak of the Second World War, when the British, and later the Americans, ordered these guns in their tens of thousands. But even had the Second World War never been fought it seems certain that the 'tommy gun'



## The Thompson Submachine Gun
### *The Most Effective Portable Fire Arm In Existence*

THE ideal weapon for the protection of large estates, ranches, planta-tions, etc. A combination machine gun and semi-automatic shoulder rifle in the form of a pistol. A compact, tremen-dously powerful, yet simply operated machine gun weighing only seven pounds and having only thirty parts. Full auto-matic, fired from the hip, 1,500 shots per minute. Semi-automatic, fitted with a stock and fired from the shoulder, 50 shots per minute. Magazines hold 50 and 100 cartridges.

THE Thompson Submachine Gun in-corporates the simplicity and infalli-bility of a hand loaded weapon with the effectiveness of a machine gun. It is simple, safe, sturdy, and sure in action. In addition to its increasingly wide use for protection purposes by banks, in-dustrial plants, railroads, mines, ranches, plantations, etc., it has been adopted by leading Police and Constabulary Forces, throughout the world and is unsurpassed for military purposes.

*Information and prices promptly supplied on request*

**AUTO-ORDNANCE CORPORATION**
302 Broadway   *Cable address: Autordco*   New York City

*A rather fanciful advert for the Thompson Gun 1922*

151

# Exhibit 3

1    R. JULY SIMPSON, WSBA #45869
     WILLIAM MCGINTY, WSBA #41868
2    ANDREW HUGHES, WSBA #49515
     BRIAN HUNT ROWE, WSBA #56817
3    Assistant Attorneys General
     JEFFREY T. EVEN, WSBA #20367
4    Deputy Solicitor General
     KRISTIN BENESKI, WSBA #45478
5    First Assistant Attorney General
     Washington State Office of the Attorney General
6    7141 Cleanwater Dr. SW
     PO Box 40111
7    Olympia, WA 98504-0111
     (360) 709-6470

8

9                    **UNITED STATES DISTRICT COURT**
                     **EASTERN DISTRICT OF WASHINGTON**
                              **AT YAKIMA**
10

11   MICHAEL SCOTT BRUMBACK,            NO. 1:22-cv-03093-MKD
     an individual, et al.,
                                        DECLARATION OF BRENNAN
12                  Plaintiffs,         RIVAS, Ph.D. IN OPPOSITION
                                        TO PLAINTIFFS' MOTION
13          v.                          FOR INJUNCTIVE AND
                                        DECLARATORY RELIEF
14   ROBERT W. FERGUSON, in his
     official capacity as Washington    NOVEMBER 23, 2022
15   State Attorney General, et al.,    With Oral Argument: 11:00 a.m.

16                  Defendants.

17          I, Brennan Rivas, declare under penalty of perjury under the laws of the

18   United States that the information in this declaration is true:

19          1.     I have a Ph.D. in history from Texas Christian University awarded in

20   2019. My expertise includes the history and tradition of weapons regulations in the

21   United States. A true and correct copy of my current curriculum vitae is attached

22   to this declaration as Exhibit A.

DECLARATION OF BRENNAN RIVAS,              1        ATTORNEY GENERAL OF WASHINGTON
Ph.D. IN OPPOSITION TO PLAINTIFFS'                        Complex Litigation Division
MOTION FOR INJUNCTIVE AND                                     7141 Cleanwater Dr. SW
                                                                  PO Box 40111
DECLARATORY RELIEF –                                         Olympia, WA 98504-0111
NO. 1:22-cv-03093-MKD                                            (360) 709-6470

1          2.     I have been retained by the State of Washington to provide expert

2    opinions and testimony regarding the history and tradition of weapons regulations

3    in the United States. I am currently involved in research to develop such opinions

4    and testimony, which will focus on the analysis required by the recent United States

5    Supreme Court decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*,

6    __ U.S. __, 142 S. Ct. 2111 (2022), which I have read and am familiar with. That

7    is, my research and report will focus on whether or not Washington's laws

8    concerning large capacity magazines are analogously similar to weapons

9    regulations representative of the history and tradition of the United States.

10         3.     The Supreme Court held in *Bruen*, among other things, that "cases

11   implicating unprecedented societal concerns or dramatic technological changes

12   may require a more nuanced approach" to the analogical inquiry. *Id.* at 2132.

13   Particularly, *Bruen* requires a comparison between historical regulations and

14   modern ones in order to determine whether current regulations "impose a

15   comparable burden on the right of armed self-defense and whether that burden is

16   comparably justified." *Id.* at 2133. Whether or not a modern weapons regulation is

17   constitutional under the Second Amendment depends upon whether there is "a

18   well-established and representative historical *analogue*, not a historical *twin*." *Id.*

19   Accordingly, my research, opinions, and testimony will concern whether such

20   historical analogues exist with respect to Washington's large capacity magazine

21   law, Engrossed Substitute S.B. (ESSB) 5078, 67th Leg., 2022 Reg. Sess.

22         4.     Historical research concerning weapons regulations is not a simple

DECLARATION OF BRENNAN RIVAS,                    2          ATTORNEY GENERAL OF WASHINGTON
Ph.D. IN OPPOSITION TO PLAINTIFFS'                              Complex Litigation Division
MOTION FOR INJUNCTIVE AND                                         7141 Cleanwater Dr. SW
                                                                      PO Box 40111
DECLARATORY RELIEF –                                              Olympia, WA 98504-0111
NO. 1:22-cv-03093-MKD                                               (360) 709-6470

1   matter of examining readily available sources reflecting what laws were passed by

2   state or federal legislatures. Many important and relevant materials remain

3   undigitized, requiring researchers to seek out answers to pressing questions in

4   places far afield of the readily available online sources. Chief among these are

5   archives whose collections of various primary sources have the capacity to

6   illuminate the context, consequences, and original intent of historical laws and

7   regulations.

8       5.      One of the research avenues I am pursuing in connection with this case

9   is an exploration of archival records housed at the McCracken Research Library,

10  which is affiliated with the Buffalo Bill Center of the West in Cody, Wyoming. I

11  have traveled there and spent a week exploring their collections, which include the

12  extant records of the Winchester Repeating Arms Company in addition to a number

13  of other firearm-related records. Due to time constraints, I had to move quickly

14  through these materials and take photographs of documents that appeared to be

15  particularly useful. This is a common approach to archival research that is done

16  within a tight timeline; but it requires significant follow-up after the fact in the form

17  of reexamining the photographs and organizing the information they convey. For

18  this case, I took several hundred photos of documents, books, and other records

19  while keeping minimal hand-written notes. It will take some time for me to translate

20  the information from the photos into useable data for this case.

21      6.      Applying the process of historical inquiry to current cases like this one

22  requires careful analysis. For instance, one would not expect to see historical laws

DECLARATION OF BRENNAN RIVAS,             3          ATTORNEY GENERAL OF WASHINGTON
Ph.D. IN OPPOSITION TO PLAINTIFFS'                       Complex Litigation Division
                                                             7141 Cleanwater Dr. SW
MOTION FOR INJUNCTIVE AND                                       PO Box 40111
DECLARATORY RELIEF –                                       Olympia, WA 98504-0111
                                                              (360) 709-6470
NO. 1:22-cv-03093-MKD

1    or regulations concerning large capacity magazines, because the modern large

2    capacity magazine as we know it today was not widely distributed in the United

3    States until quite recently. The semi-automatic weapons with which 21st-century

4    Americans associate large capacity magazines were either not in existence or not

5    manufactured in large numbers until the 20th century. Nineteenth-century

6    magazines capable of storing more than 10 rounds of ammunition at a time were

7    not usually detachable (which made for slower reloading time) or were designed

8    for large, military-grade firearms that were not capable of being used or carried for

9    personal use. The process of identifying appropriate historical analogues for

10   modern regulations requires deeper analysis that takes into consideration the salient

11   technological differences between current and historical firearms while also

12   considering the extent to which historical magazines and their associated firearms

13   were prevalent in society and associated with perceived societal problems like

14   interpersonal violence, criminal activity, and public terror.

15        7.    Several unique and distinct cultures, peoples, and traditions scattered

16   across this vast continent have come together over the past three centuries and more

17   to create the United States that we inhabit today. To evaluate whether ESSB 5078

18   is analogous to historical regulations consistent with the tradition and history of the

19   United States requires evaluation of each of these cultural threads, including an

20   appropriate consideration of each one's context and place within the broader trends

21   of the country as a whole.

22        8.    My work is not yet done, and my opinions in this matter are far from

DECLARATION OF BRENNAN RIVAS,                    4          ATTORNEY GENERAL OF WASHINGTON
Ph.D. IN OPPOSITION TO PLAINTIFFS'                              Complex Litigation Division
MOTION FOR INJUNCTIVE AND                                          7141 Cleanwater Dr. SW
                                                                        PO Box 40111
DECLARATORY RELIEF –                                              Olympia, WA 98504-0111
NO. 1:22-cv-03093-MKD                                                 (360) 709-6470

1    complete at this stage. The research and analysis required to document and explain

2    the development of large capacity magazines and the implications of that process

3    upon the regulatory policies and criminal statutes of this country is vast; it would

4    take many years to put together a national narrative that comports with the scholarly

5    standards for the study of history. Understanding, however, that litigation is not

6    scholarship even where the two seek similar answers with similar methods, I

7    estimate that I may be able to provide a final report or opinion in the six- to nine-

8    month timeframe.

9        9.    Even though much research remains to be done, and having

10    acknowledged that I am not now ready to provide a final opinion and testimony

11    regarding this matter, there is reason to believe that ESSB 5078 is analogous to

12    weapons regulations firmly supported by United States history and tradition. In

13    particular, ESSB 5078 is similar in many ways to historical regulations imposed

14    upon revolvers and other pistols between 1879 and 1881, very near chronologically

15    and politically to the ratification of the 14th Amendment.

16        10.    Samuel Colt was not the first inventor to produce a multi-shot pistol,

17    but he was the first whose creation became technologically and socially significant.

18    By the mid-1830s, Colt's tinkering had produced a working revolver, but it took

19    decades for his invention to become commercially successful.

20        11.    The Colt revolver diverged from pistols then widely available in two

21    critical ways. First, it was breech-loading, meaning that ammunition did not need

22    to be inserted through the end of the barrel (muzzle-loading). Second, it allowed

DECLARATION OF BRENNAN RIVAS,
Ph.D. IN OPPOSITION TO PLAINTIFFS'
MOTION FOR INJUNCTIVE AND
DECLARATORY RELIEF –
NO. 1:22-cv-03093-MKD

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

Simpson Decl., Exhs. p.105

1  for multiple shots without reloading; the standard design eventually settled at six

2  rounds. The earliest revolvers (those manufactured prior to and during the Civil

3  War) were of the "cap and ball" type, which required a delicate and

4  time-consuming reloading process. By about the 1870s, technological

5  developments in the design and functionality of ammunition meant that later

6  models of Colt's could use individual cartridges; these could be inserted fairly

7  quickly into the cylinder, which made the reloading process much more swift—a

8  boon on the battlefield, but a new danger in other contexts.

9        12.    Though Colt's revolver was a revolutionary device that represented a

10  paradigmatic shift in firearm technology, his company initially struggled to reach

11  its potential. The expiration of Colt's patent in 1857 opened the door for other

12  manufacturers to enter the market without having to endure the same decades-long

13  startup cost. Meanwhile, the growing crisis over slavery and its looming prospect

14  of war gave Colt what he had always wanted—substantial government patronage.

15  Southern states ordered as many revolvers as they could in the lead-up to

16  Fort Sumter, and Colt's Patent Fire Arms Manufacturing Company was more than

17  willing to deliver. But the far more important contracts came from the United States

18  military apparatus, whose orders for pistols skyrocketed during the course of the

19  Civil War. Wartime production by Colt, in addition to the new entrants in the

20  market (like Smith & Wesson), created an unprecedented infrastructure to

21  manufacture staggeringly large quantities of pistols. As production capacity

22  increased and the U.S. military demobilized, more of these weapons became

DECLARATION OF BRENNAN RIVAS,
Ph.D. IN OPPOSITION TO PLAINTIFFS'
MOTION FOR INJUNCTIVE AND
DECLARATORY RELIEF –
NO. 1:22-cv-03093-MKD

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

available to and affordable for American consumers; the net result was that more and cheaper pistols spread throughout the country, introducing the United States to its first experience with rampant gun violence.

13.    The Civil War Era, making up the central three decades of the nineteenth century (1840–1870), marked a sharp divergence for the United States in terms of high rates of violence and homicide in comparison to other Western nations. Distrust in governing institutions and tremendous economic change wrought by industrialization primed Americans for homicidal violence unlike anything experienced before. In northern cities, rising population levels encouraged urbanization, labor agitation, and poverty, which caused an increase in homicide and crime. Though military victory and a renewed faith in American government reduced homicide in northern states after the 1860s, the rates for the 1870s and 1880s remained higher than those from the more peaceful era prior to the 1840s, and by the close of the 1890s northern homicide rates began ratcheting upward yet again. Broader crime rates for the late nineteenth century are harder to pin down than those for homicide, but the development of urban, industrial life produced abundant opportunities for the criminally inclined. That city governments enacted new criminal ordinances and increased funding for police strongly suggests that urban residents perceived themselves to be more vulnerable to victimization than they had been in the past. In the southern states, the revolutionary consequences of emancipation and Reconstruction created an atmosphere of distrust, mutual hatred, and deeply ideological partisanship that resulted in tremendous, gut-wrenching

DECLARATION OF BRENNAN RIVAS,
Ph.D. IN OPPOSITION TO PLAINTIFFS'
MOTION FOR INJUNCTIVE AND
DECLARATORY RELIEF –
NO. 1:22-cv-03093-MKD

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    violence suffered primarily by Black Americans and their political allies. The

2    disruption of war, occupation, and frequent changes in state government and

3    constitutional structure bred attitudes of vigilantism and disregard for the judicial

4    process. Rates of violence and homicide remained quite high in the southern states

5    across the nineteenth century. The proliferation of deadly weapons, and especially

6    easily concealable pistols, to a point of near ubiquity in American communities

7    rendered the interpersonal conflicts that erupted as a result of urbanization,

8    Reconstruction, economic hardship, and social dislocation all the more deadly.

9        14.    The response to this gun violence varied across the United States. The

10   most popular approach was the enactment or strengthening of public carry laws.

11   The closing third of the nineteenth century saw a flurry of this activity as states and

12   municipalities tried new penalties, added new weapons to the prohibited list, and

13   generally attempted to eliminate small weapons from the public sphere.

14       15.    Another strategy employed by state governments to reduce gun

15   violence and gun crime was to tax certain types of firearms. In 1894, Georgia

16   enacted a new occupation tax law that applied to "[d]ealers in pistols and other

17   weapons." 1894 Ga. Laws 12, at 21, https://dlg.usg.edu/record/dlg_zlgl_7534301

18   2/fulltext.text. A dealer in "pistols, toy pistols shooting cartridges, pistol or rifle

19   cartridges, dirks, bowie-knives, or metal knucks" had to pay 25 dollars per place of

20   business. *Id.* In 1907, the Texas legislature placed a 50 percent sales tax upon

21   pistols; dealers had to report their sales and pay the required tax to the state

22   comptroller's office on a quarterly basis. *See* An Act providing for the levy and

DECLARATION OF BRENNAN RIVAS,
Ph.D. IN OPPOSITION TO PLAINTIFFS'
MOTION FOR INJUNCTIVE AND
DECLARATORY RELIEF –
NO. 1:22-cv-03093-MKD

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   collection of an occupation tax . . ., Tex. Gen. Laws, ch. XVIII (1907); *See also*

2   Brennan Gardner Rivas, *The Deadly Weapon Laws of Texas: Regulating Guns,*

3   *Knives, and Knuckles in the Lone Star State*, 1836–1930, (PhD diss., Texas

4   Christian Univ., 2019) 161–162. Sales and occupation taxes like these tended to be

5   less about generating revenue than regulating an activity that was frowned upon by

6   society more generally. Occupation tax laws applied to vendors who appealed to

7   vices like smoking, gambling, and playing games as well as peddlers and itinerant

8   salesmen. When a Texas appellate court upheld the stringent sales tax (over loud

9   complaints by hardware dealers), the judge described the business of selling pistols

10  as one "hurtful to the welfare of society" and among that class of occupations

11  "detrimental to the health, morals, or good order of society." *Caswell & Smith v.*

12  *State*, 148 S.W. 1159, 1161 (Tex. App. 1912). As a result, the court reasoned that

13  the legislature "would have the right, not only to levy an excessive tax, which

14  would be prohibitory thereof, but could go further and absolutely prohibit any one

15  from engaging therein." *Id.* at 1162.

16      16.    Arkansas and Tennessee adopted a two-pronged approach that

17  displayed attributes of public carry laws as well as dealer regulations. The first

18  prong was to prohibit the public carrying of pistols. Courts in both states struck

19  down early versions of the laws. *Andrews v. State*, 50 Tenn. (1 Heisk.) 165 (1871);

20  *Wilson v. State*, 33 Ark. 557 (1878). But they were quickly amended to exclude

21  army and navy pistols when held in the hand. The replacement Tennessee statute

22  read, "that it shall not be lawful for any person to publicly carry a dirk, sword cane,

DECLARATION OF BRENNAN RIVAS,
Ph.D. IN OPPOSITION TO PLAINTIFFS'
MOTION FOR INJUNCTIVE AND
DECLARATORY RELIEF –
NO. 1:22-cv-03093-MKD

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such

2    as are commonly carried and used in the United States army, and in no case shall it

3    be lawful for any person to carry such army pistol publicly or privately about his

4    person in any other manner than openly in his hands." *State v. Wilburn*, 66 Tenn.

5    57, 61 (1872). It is worth noting that even the exempted army/navy pistols could

6    not be carried concealed, or even visible within a waistband or hip holster; the only

7    way to carry legally exempted pistols was to hold them in one's hand. The purpose

8    of this additional restriction was to curtail as much as possible the carrying of these

9    weapons in public spaces so that a person would only do so in the event of a real

10   emergency, such as preparing for or responding to an attack at or near the

11   defender's residence. Arkansas's replacement statute was substantially similar. *See*

12   An Act to Preserve the Public Peace and Prevent Crime, 1881 Ark. Acts 191,

13   ch. XCVI, § 1–2 ("That any person who shall wear or carry, in any manner

14   whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane,

15   brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols

16   as are used in the army or navy of the United States, shall be guilty of a

17   misdemeanor. . . . Any person, excepting such officers or persons on a journey, and

18   on his premises, as are mentioned in section one of this act, who shall wear or carry

19   any such pistol as i[s] used in the army or navy of the United States, in any manner

20   except uncovered, and in his hand, shall be guilty of a misdemeanor.") The

21   Tennessee Supreme Court upheld that state's replacement statute against

22   constitutional challenge. *Wilburn*, 66 Tenn. at 61. The revised Arkansas statute

DECLARATION OF BRENNAN RIVAS,
Ph.D. IN OPPOSITION TO PLAINTIFFS'
MOTION FOR INJUNCTIVE AND
DECLARATORY RELIEF –
NO. 1:22-cv-03093-MKD

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   received no notable opposition.

2       17.   The second prong was a prohibition on the sale of certain pistols.

3   Tennessee prohibited "any person to sell, or offer to sell, or bring into the State for

4   the purpose of selling, giving away, or otherwise disposing of, belt or pocket

5   pistols, or revolvers, or any other kind of pistol, except army or navy pistols." *State*

6   *v. Burgoyne*, 75 Tenn. 173, 173–74 (1881). Arkansas followed suit, and further

7   prohibited the sale of pistol cartridges as well. "Any person who shall sell, barter,

8   or exchange, or otherwise dispose of, or in any manner furnish to any person any

9   dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any

10  pistol, of any kind of whatever, except as are used in the army or navy of the United

11  States, and known as the navy pistol, or any kind of cartridge for any pistol, or any

12  person who shall keep such arms or cartridges for sale, shall be guilty of a

13  misdemeanor." 1881 Ark. Acts 192, ch. XCVI (96), § 3.

14      18.   Throughout the nineteenth century, Americans voiced their

15  displeasure with the practice of carrying weapons in public spaces.[1]

16  Condemnations of such behavior and calls for regulations rang out across the

17  _____

18      [1] For example, *see* Patrick Charles, *Armed in America* 152 (2018) (noting

19  the Georgia Supreme Court's view that it was "at a loss to follow the line of thought

20  that extends the guarantee to the right to carry pistols, dirks, Bowie-knives, and

21  those other weapons of like character, which, as all admit, are the greatest nuisances

22  of our day." (quoting *Hill v. State*, 53 Ga. 472, 474 (1874))).

DECLARATION OF BRENNAN RIVAS,          11          ATTORNEY GENERAL OF WASHINGTON
Ph.D. IN OPPOSITION TO PLAINTIFFS'                        Complex Litigation Division
                                                            7141 Cleanwater Dr. SW
MOTION FOR INJUNCTIVE AND                                        PO Box 40111
DECLARATORY RELIEF –                                       Olympia, WA 98504-0111
NO. 1:22-cv-03093-MKD                                          (360) 709-6470

1    country and became increasingly common during the late nineteenth century when

2    economic and technological developments had made them easier to produce and

3    cheaper to purchase. Arkansas and Tennessee were no exception to this national

4    rule, and commentators there engaged in the same discourse as their counterparts

5    elsewhere. The "shocks and violent convulsions which have been so fatal to law

6    and order in the South" were well known, as was the fact that "the pistol, the knife,

7    the shotgun and the bludgeon too often do their bloody work." *Crime in the South*,

8    *Arkansas Democrat*, June 7, 1879 at 2. After the 1875 statute went into effect in

9    Arkansas, news editors began praising it as "about the best law that has ever been

10   enacted in this state," and one added that, had it been in effect since statehood in

11   1836, it "would have saved the lives of thousands of good men who have fallen

12   victim to the vice of carrying deadly weapons, or from the results and natural

13   consequences thereof." *Newport News*, quoted in *Daily Arkansas Gazette*,

14   April 27, 1875, at 2. Some judges in Tennessee began handing down penalties of a

15   fifty-dollar fine (about $1,400 today[2]) plus sixty days in jail, and "as a result few

16   persons carry deadly weapons in [that] county."[3] Reports of this rigid enforcement

---

[2] *See* https://www.in2013dollars.com/.

[3] The practice began with Judge Horrigan of Shelby County, the seat of which is Memphis, Tennessee. Judge Quarles of Nashville declared his intention to follow suit. *Daily Arkansas Gazette*, Jan. 7, 1883, at 4. Judge Allen of

---

DECLARATION OF BRENNAN RIVAS,
Ph.D. IN OPPOSITION TO PLAINTIFFS'
MOTION FOR INJUNCTIVE AND
DECLARATORY RELIEF –
NO. 1:22-cv-03093-MKD

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   in Tennessee elicited praise among Arkansans, who viewed it as a social benefit

2   that in Tennessee "men who for years converted themselves into walking arsenals

3   discover that they can pursue their ordinary vocations without fear that they may at

4   any moment be called upon to defend their persons against assault." *Daily Arkansas*

5   *Gazette*, Jan. 7, 1883, at 4. From their perspective, the distrust of one's fellow

6   community members that went along with habitual gun-toting was a burden of fear

7   that could only be lifted by prohibiting deadly weapons in the public sphere.

8   Middle-class Americans, white southerners included, held the view that carrying

9   deadly weapons was not honorable, and that such behavior should be stopped. *See*

10  *Daily Arkansas Gazette*, *supra* n.14; *see also* Mark Anthony Frassetto, "The Myth

11  of Open Carry," UC Davis L. Rev. 55, 2518–2519 (2022).

12          19.     To understand these regulations, it is necessary to understand the

13  different kinds of pistols and revolvers available during this time period. At the

14  large end was the "army pistol" or "holster pistol," which was originally fashioned

15  _____

16  Davidson County, Tennessee pledged to "impartially enforce the law" regarding

17  weapons and "declared that 'it would make no difference of how high degree a man

18  was, if he was convicted before him of carrying a pistol he would have to go to jail

19  as well as pay a fine, and it simply came down to this: if he was bound to carry a

20  pistol he was bound to go to jail.  That only ruffians carried pistols and it gave them

21  an unfair advantage over other citizens.'" *Daily Arkansas Gazette*, May 13, 1883,

22  at 4.

DECLARATION OF BRENNAN RIVAS,           13      ATTORNEY GENERAL OF WASHINGTON
Ph.D. IN OPPOSITION TO PLAINTIFFS'                    Complex Litigation Division
MOTION FOR INJUNCTIVE AND                               7141 Cleanwater Dr. SW
DECLARATORY RELIEF –                                         PO Box 40111
NO. 1:22-cv-03093-MKD                                   Olympia, WA 98504-0111
                                                            (360) 709-6470

1 after the "horse pistols" that had been adopted by mounted units in Europe and the

2 United States. Such pistols were typically designed to be carried in a

3 saddle-mounted holster and could weigh four pounds or more when loaded.

4 Though the holster pistol became slightly smaller and more conducive to being

5 worn on the person by officers beginning in the 1870s, it remained the largest gun

6 in Colt's pistol lineup and carried a higher caliber; these firearms were issued to

7 military personnel in large numbers by the United States army and navy during the

8 Civil War and postbellum eras. As discussed above, the Arkansas and Tennessee

9 restrictions carved out an exception for these weapons when carried openly in the

10 hand.

11   20. Second were "belt pistols." These were midsized models and would

12 have been worn in a hip holster attached to the belt. These midsized pistols became

13 popular among civilians and may have been the most common type of revolver in

14 the country around the time of the Civil War. They seem to have taken on the

15 moniker "navy pistols" during the antebellum years when Colt's "belt" model

16 featured an engraving of a naval battle. In the postbellum decades, "army" or

17 "holster" models became smaller and the differences between them and Colt's

18 "navy" pistols lessened. During the period in which these statutes were written—

19 about fifteen years after the Civil War—the "army/navy" description most likely

20 reflected this technological evolution by referring to the larger, heavier, higher

21 caliber pistols with longer barrels that were then issued by the United States

22 military.  The sales bans under discussion here generally included "belt" pistols, so

DECLARATION OF BRENNAN RIVAS,
Ph.D. IN OPPOSITION TO PLAINTIFFS'
MOTION FOR INJUNCTIVE AND
DECLARATORY RELIEF –
NO. 1:22-cv-03093-MKD

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

Simpson Decl., Exhs. p.114

1    it remains unclear whether and to what extent Colt's Navy pistol (which was

2    technically a "belt" model) would have qualified for regulatory exemption on the

3    basis of its name and/or its use by the military forces.

4         21.    Finally, the third kind of pistol available was the "pocket pistol."

5    These were substantially smaller than the holster and belt models. Pocket pistols

6    ranged from single-shot, muzzle-loading derringers with barrels under two inches

7    to revolvers like Colt's "pocket navy" six-shooter with a three-inch barrel. After

8    the Civil War, military purchases slowed, which led gun manufacturers to pivot

9    toward civilian sales. They marketed pocket pistols heavily. For instance, Colt

10   produced both a "ladies' model" as well as a "house" pistol—though the latter

11   became more widely known as a "Fisk" for its use in the infamous murder of the

12   robber baron Jim Fisk in 1872. The explosion in production was all the more

13   pronounced due to the entry of imitation brands that used lower quality metals with

14   less sophisticated workmanship to sell pocket pistols at much lower prices than the

15   competition. These cheap revolvers could be had for a few dollars, with used ones

16   selling for even less.

17        22.    It is in this context that the public carry regulations and associated

18   sales bans and prohibitory taxes mentioned above must be understood. A

19   confluence of technical advancements and social changes resulted in the

20   widespread adoption of new weapons, causing new societal problems that

21   increased levels of interpersonal violence and ratcheted up public fear. In response,

22   state legislatures enacted regulations targeting the source of that problem. In

DECLARATION OF BRENNAN RIVAS,                    15          ATTORNEY GENERAL OF WASHINGTON
Ph.D. IN OPPOSITION TO PLAINTIFFS'                                   Complex Litigation Division
                                                                       7141 Cleanwater Dr. SW
MOTION FOR INJUNCTIVE AND                                                   PO Box 40111
DECLARATORY RELIEF –                                                  Olympia, WA 98504-0111
NO. 1:22-cv-03093-MKD                                                    (360) 709-6470

1    particular, "pocket pistols"—designed to be concealed from public view and

2    increasingly easy to obtain by those wishing to cause harm, were a target of these

3    laws. The legislatures of both Tennessee and Arkansas prohibited both the public

4    carrying of these weapons and their sale to the general public. These regulations

5    remained in force well into the twentieth century.

6         23.   This has obvious parallels with Washington's regulation of large

7    capacity magazines. Like pocket pistols in the latter half of the nineteenth century,

8    large capacity magazines in the later parts of the twentieth, and earlier parts of the

9    twenty-first, became widely available for the first time. And they are, like pocket

10   pistols, associated with new social problems including the unique interpersonal

11   violence of mass shooting incidents. ESSB 5078, being a prohibition on the sale,

12   transfer, and manufacture of such magazines, is quite similar to the sales

13   prohibitions in Tennessee and Arkansas and other firearm restrictions—even

14   though the historical examples discussed above applied to an entire class of

15   firearms, whereas ESSB 5078 does not regulate any actual firearms, but only

16   detachable firearm accessories.

17        24.   As stated above, my work in this area is not complete. There is

18   significant research and analysis still to be conducted. However, this brief account

19   of pistol regulations from late-nineteenth century Tennessee and Arkansas

20   illustrates that Washington's regulation is very likely consistent with the broad

21   history and tradition of the United States.

22

DECLARATION OF BRENNAN RIVAS,
Ph.D. IN OPPOSITION TO PLAINTIFFS'
MOTION FOR INJUNCTIVE AND
DECLARATORY RELIEF –
NO. 1:22-cv-03093-MKD

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    I declare under penalty of perjury under the laws of the United States and the

2  State of Washington that the foregoing is true and correct.

3

4    DATED this _20_ day of __October__ 2022 at Fort Worth, Texas.

5    *Brennan Nicole Rivas*

6    BRENNAN NICOLE RIVAS, Ph.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

DECLARATION OF BRENNAN RIVAS,                     17              ATTORNEY GENERAL OF WASHINGTON
Ph.D. IN OPPOSITION TO PLAINTIFFS'                                       Complex Litigation Division
MOTION FOR INJUNCTIVE AND                                                  7141 Cleanwater Dr. SW
                                                                                    PO Box 40111
DECLARATORY RELIEF –                                                      Olympia, WA 98504-0111
NO. 1:22-cv-03093-MKD                                                          (360) 709-6470

1      **PROOF OF SERVICE**

2          I hereby certify that I electronically filed the foregoing with the Clerk of the

3      Court using the CM/ECF System, which in turn automatically generated a Notice

4      of Electronic Filing (NEF) to all parties in the case who are registered users of the

5      CM/ECF system.

6          I declare under penalty of perjury under the laws of the United States of

7      America that the foregoing is true and correct.

8          DATED this 24th day of October 2022 at Seattle, Washington.

9

10                         _s/ Andrew Hughes_____
                           ANDREW HUGHES, WSBA #49515
11                         Assistant Attorney General

12

13

14

15

16

17

18

19

20

21

22

DECLARATION OF BRENNAN RIVAS,            18          ATTORNEY GENERAL OF WASHINGTON
Ph.D. IN OPPOSITION TO PLAINTIFFS'                        Complex Litigation Division
MOTION FOR INJUNCTIVE AND                                   7141 Cleanwater Dr. SW
                                                                 PO Box 40111
DECLARATORY RELIEF –                                        Olympia, WA 98504-0111
NO. 1:22-cv-03093-MKD                                          (360) 709-6470

# Exhibit A

# Brennan Gardner Rivas

Curriculum Vitae · July 2022

brennan.rivas.phd@gmail.com
*Professional Website*
*817.690.3918*

## Employment

Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
    University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History,
    2019-2020

## Education

Ph.D., History, Texas Christian University, 2019
    Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
    the Lone Star State, 1836-1930"
    Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
    Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications

*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
    1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
    on the Place of Guns in American Law and Society* (New York: Oxford University Press,
    forthcoming)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
    (May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
    Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
    Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
    Press, 2019.
Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
    *Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

1

## Public History

"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made by History Blog* (Jun 2022)
~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"

"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
~ Public lecture featuring special insights for genealogical researchers

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
~ Research presentation focusing on interpretation of county court records

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Lloyd Lewis Fellowship in American History, 2021-2022
~ Awarded by the Newberry Library to scholars using its collection to research topics in American history

Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books

The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students

Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*
Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights
Status: Editing manuscript

"The Texas Anti-Trust Movement: Antimonopoly, Populism, and Reform in the Long Progressive Era"

2

Aim: Scholarly article interpreting Texas antitrust policy an example of innovative reform in the Great Plains and trans-Mississippi West
Status: Research and writing in progress

## University Teaching Experience

*Instructor of Record*

Lecturer in American History, Texas Christian University                              2019-2020
   "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
   "American History since 1877: The Quest for Equality" (HIST 10613)
   "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*

Teaching Assistant, Texas Christian University                              2017-2018
   American History to 1877 (HIST 10603)
   American History since 1877 (HIST 10613)

*Teaching Interests*

American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service

Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
   ~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development

Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
   ~ Provide honest and confidential information to prospective graduate students

3

Graduate Student Mentor, 2015
   ~ Informal departmental program designed to ease the transition for incoming graduate
     students

## Professional Memberships
Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

## Languages
Spanish (Proficient)
Latin (Proficient)

## References
Gregg Cantrell, Erma and Ralph Lowe Chair in Texas History
Texas Christian University
Fort Worth, TX 76129
g.cantrell@tcu.edu

Saul Cornell, Paul and Diane Guenther Chair in American History
Fordham University
New York, NY
scornell1@fordham.edu

Brian DeLay, Preston Hotchkis Chair in the History of the United States
University of California, Berkeley
Berkeley, California 94720
delay@berkeley.edu

Laura F. Edwards, Class of 1921 Bicentennial Professor in the History of American Law and
   Liberty
Princeton University
Princeton, NJ 08544
laura.edwards@princeton.edu

Patrick J. Charles
Research Division Supervisor
Air Force Historical Research Agency
Maxwell AFB, AL 36112
patrickcharles26@gmail.com

LeAnna Schooley, Executive Director, Center for Texas Studies
Texas Christian University
Fort Worth, TX 76129
l.schooley@tcu.edu

4