1

2

3

4

5

6                                                      The Honorable David G. Estudillo

7                          **UNITED STATES DISTRICT COURT**
                          **WESTERN DISTRICT OF WASHINGTON**
8                                    **AT SEATTLE**

9    GABRIELLA SULLIVAN, et al.,                 NO. 3:22-cv-05403-DGE

10                        Plaintiffs,            STATE DEFENDANTS'
                                                 RESPONSE AND
11           v.                                  CROSS-MOTION FOR
                                                 SUMMARY JUDGMENT
12   BOB FERGUSON, in his Official Capacity
     as Washington State Attorney General, et al.,   NOTE ON MOTION CALENDAR:
13                                               October 16, 2023
                          Defendants,
14
     ALLIANCE FOR GUN RESPONSIBILITY,
15
                          Intervenor-Defendant.
16

17

18

19

20

21

22

23

24

25

26

STATE DEFENDANTS' RESPONSE AND                   ATTORNEY GENERAL OF WASHINGTON
CROSS-MOTION FOR SUMMARY                              Complex Litigation Division
JUDGMENT                                                7141 Cleanwater Dr SW
NO. 3:22-cv-05403-DGE                                       PO Box 40111
                                                        Olympia, WA 98504-0111
                                                          (360) 709-6470

1

**TABLE OF CONTENTS**

2

I.    INTRODUCTION ................................................................................................ 1

3

II.   BACKGROUND .................................................................................................. 3

4

     A.   SB 5078 Prohibits the Manufacture and Sale of LCMs ........................... 3

5

     B.   LCMs Are Not Commonly Used in Self-Defense ..................................... 4

6

     C.   LCMs Are Disproportionately Used in Mass Shootings ........................... 5

7

     D.   This Lawsuit ............................................................................................. 6

8

III.  ARGUMENT ...................................................................................................... 7

9

     A.   The *Bruen* Test ........................................................................................ 7

10

     B.   Plaintiffs' Motion Rests Entirely on a Legally Incorrect Premise ............ 8

11

     C.   LCMs Are Not Covered by the Second Amendment's Text ..................... 9

12

           1.   LCMs are not "arms," and limiting their manufacture and sale does not
               infringe on any protected conduct .................................................... 9

13

           2.   LCMs are not in common use for self-defense ................................ 12

14

           3.   LCMs are "dangerous and unusual" firearm accessories ................. 22

15

     D.   SB 5078 Fits Well Within the Robust History and Tradition of Regulating
         Weapons Used in Interpersonal Violence in the United States ............... 24

16

           1.   SB 5078 responds to dramatic technological change and unprecedented
               social concerns ................................................................................. 24

17

           2.   States have long regulated weapons used for lawless violence ....... 26

18

               a.   Regulations on trap guns and clubs ...................................... 26

19

               b.   Regulations on Bowie knives and pistols .............................. 27

20

               c.   Twentieth century regulations on automatic and semi-automatic
                    weapons ................................................................................ 29

21

22

           3.   SB 5078 is consistent with the historical tradition of weapons regulation ...... 30

23

IV.  CONCLUSION ................................................................................................. 32

24

25

26

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

# TABLE OF AUTHORITIES

## Cases

*Barnett v. Raoul*,
   --- F. Supp. 3d ---, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) ........................................... 13

*Barnett v. Raoul*,
   No. 23-1828 (7th Cir. 2023) ........................................................................................... 13

*Bevis v. City of Naperville*,
   --- F. Supp. 3d ---, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023)............................ 1, 5, 23, 31

*Blevins v. Gaming Ent. (Indiana) LLC*,
   No. 4:17-cv-00083-TWP-DML, 2019 WL 2754405 (S.D. Ind. July 1, 2019)..................... 19

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
   --- F. Supp. 3d ---, 2023 WL 2655150 (D. Del. Mar. 27, 2023)................................. 2, 26, 31

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)........................................................... 9, 12-14, 17, 23, 30

*Duncan v. Bonta*,
   19 F.4th 1087 (9th Cir. 2021) ........................................................................................ 16

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) ................................................................... 2, 13, 18, 19

*Fyock v. Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015) ........................................................................... 22, 23

*Hanson v. District of Columbia*,
   --- F. Supp. 3d ---, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ................ 2, 13, 15-17, 26, 31

*Hartford v. Ferguson*,
   --- F. Supp. 3d ---, 2023 WL 3836230 (W.D. Wash. June 6, 2023)........................... 9, 26, 32

*Herrera v. Raoul*,
   --- F. Supp. 3d ---, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) ......................... 2, 23, 26, 31

*Jackson v. City & Cnty. of San Francisco*,
   746 F.3d 953 (9th Cir. 2014) ....................................................................................... 11

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) ................................................................... 2, 13-19, 24

*Nat'l Ass'n for Gun Rights v. Lamont*,
   --- F. Supp. 3d ---, 2023 WL 4975979 (D. Conn. Aug. 3, 2023)..... 2, 4, 13, 15, 18, 19, 26, 32

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022).......................................1, 7, 9, 10, 12-14, 18, 19, 23-26, 32

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

ii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
        804 F.3d 242 (2d Cir. 2015) .................................................................. 6
2

3   *Ocean State Tactical, LLC v. Rhode Island,*
        --- F. Supp. 3d ---, 2022 WL 17721175 (D.R.I. Dec. 14, 2022)............... 1, 10, 11, 13, 17, 18

4   *Oregon Firearms Fed'n v. Kotek Oregon All. for Gun Safety,*
        --- F. Supp. 3d ----, 2023 WL 4541027 (D. Or. July 14, 2023)
5       ................................................................ 2, 5, 6, 10, 11, 13, 16, 18, 23, 25, 27, 29, 30, 31

6   *Oregon Firearms Fed'n v. Kotek,*
        No. 2:22-CV-01815-IM, 2023 WL 3687404 (D. Or. May 26, 2023).................................... 9
7

8   *Oregon Firearms Fed'n, Inc. v. Brown,*
        --- F. Supp. 3d ---, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ............................................ 25

9   *Teixeira v. Cnty. of Alameda,*
        873 F.3d 670 (9th Cir. 2017) ...................................................................... 12
10

11  *Teter v. Lopez,*
        No. 20-15948, 2023 WL 5008203 (9th Cir. Aug. 7, 2023) ....................................... 14, 23, 27

12  *United States v. Alaniz,*
        69 F.4th 1124 (9th Cir. 2023) ...................................................................... 7, 8, 14
13

14  *United States v. Cox,*
        906 F.3d 1170 (10th Cir. 2018) ...................................................................... 10

15  *United States v. Tilotta,*
        No. 3:19-CR-04768-GPC, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022).......................... 12
16

17                              **Constitutional Provisions**

18  U.S. Const. amend. II......................................................................................... 9

19                                      **Statutes**

20  18 U.S.C. § 922(o) (2023) ..................................................................................... 30

21  Violent Crime Control and Law Enforcement Act of 1994,
        Pub. L. No. 103-322, 108 Stat. 1998 .............................................................. 22, 30

22                                        **Rules**

23  Fed. R. Evid. 803(6).............................................................................................. 21

STATE DEFENDANTS' RESPONSE AND          iii          ATTORNEY GENERAL OF WASHINGTON
CROSS-MOTION FOR SUMMARY                              Complex Litigation Division
JUDGMENT                                              7141 Cleanwater Dr SW
NO. 3:22-cv-05403-DGE                                 PO Box 40111
                                                      Olympia, WA 98504-0111
                                                      (360) 709-6470

## <u>Other Authorities</u>

ATF, *Report and Recommendation of the Importability of Certain Semiautomatic Rifles*
(July 6, 1989), https://www.atf.gov/file/61761/download........................................................ 15

ATF, *Study on the Importability of Certain Shotguns* (Jan. 2011),
https://www.atf.gov/resource-center/docs/january-2011-importability-certain-
shotgunspdf/dow
nload ................................................................................................................................... 15

ATF, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles*
(Apr. 1998), https://www.atf.gov/resource-center/docs/guide/department-treasury-
study-sporting-suitability-modified-semiautomatic/download............................................. 15

Engrossed Substitute S.B. 5078,
67th Leg., Reg. Sess. (Wash. 2022)................................................................................. 3, 17

H.R. Rep. 117-346 (2022) ......................................................................................................... 17

H.R. Rep. No. 103-489 (1994),
*reprinted in* 1994 U.S.C.C.A.N. 1820 .................................................................................. 15

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

iv

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

# I.     INTRODUCTION

Responding to an epidemic of gun violence, and the uniquely modern crisis of mass shootings that terrorize Americans in schools and public places across the country, the Washington Legislature enacted Senate Bill (SB) 5078 to limit the manufacture and sale of one particular firearm accessory with a disproportionate role in mass shootings: large capacity magazines (LCMs). Plaintiffs seek to overturn this common-sense law, arguing that it is facially invalid and every single one of its possible applications is unconstitutional. But their legal theory lacks merit. As the Supreme Court reiterated in *Bruen*, the Second Amendment does not guarantee civilians the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570 (2008)). LCMs are not covered by the Second Amendment because they are not "arms," nor are they necessary for any firearms to function exactly as intended—rather, their distinguishing function is to allow a shooter to rapidly fire more than ten rounds of ammunition without having to reload their weapon. Further, LCMs are neither useful nor commonly used for self-defense—rather, they enable individuals to injure and kill as many people as possible as quickly as possible in a military-style assault. Washington's regulation of LCMs fits comfortably within the long historical tradition of regulating dangerous and unusual weapons to promote public safety.

Following *Bruen*, federal courts have consistently rejected Second Amendment challenges to LCM restrictions. *See Ocean State Tactical, LLC v. Rhode Island*, --- F. Supp. 3d ---, 2022 WL 17721175, at *13, *15 (D.R.I. Dec. 14, 2022) (["P]laintiffs have failed to meet their burden of establishing that LCMs are 'Arms' within the textual meaning of the Second Amendment" and "failed to establish . . . that LCMs are weapons of self-defense, such that they would enjoy Second Amendment protection."); *Bevis v. City of Naperville*, --- F. Supp. 3d ---, 2023 WL 2077392, at *16 (N.D. Ill. Feb. 17, 2023) ("Because . . . high-capacity magazines are particularly dangerous weapon accessories, their

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

regulation accords with history and tradition."); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, --- F. Supp. 3d ---, 2023 WL 2655150, at *13 (D. Del. Mar. 27, 2023) (concluding Delaware's prohibition on LCMs is "consistent with the Nation's historical tradition of firearm regulation"); *Hanson v. District of Columbia*, --- F. Supp. 3d ---, 2023 WL 3019777, at *12 (D.D.C. Apr. 20, 2023) ("[Large capacity magazines] fall outside of the Second Amendment's scope because they are most useful in military service and because they are not in fact commonly used for self-defense."); *Herrera v. Raoul*, --- F. Supp. 3d ---, 2023 WL 3074799, at *4 (N.D. Ill. Apr. 25, 2023) (concluding Illinois' prohibition on LCMs is "consistent with 'the Nation's historical tradition of firearm regulation,' namely the history and tradition of regulating particularly 'dangerous' weapons"); *Oregon Firearms Fed'n v. Kotek Oregon All. for Gun Safety*, --- F. Supp. 3d ----, 2023 WL 4541027, at *1 (D. Or. July 14, 2023) ("Plaintiffs have not shown that the Second Amendment protects large-capacity magazines . . . . And even if the Second Amendment were to protect large-capacity magazines, . . . restrictions on the use and possession of large-capacity magazines are consistent with the Nation's history and tradition of firearm regulation."); *Nat'l Ass'n for Gun Rights v. Lamont*, --- F. Supp. 3d ---, 2023 WL 4975979, at *2 (D. Conn. Aug. 3, 2023) ("Plaintiffs' proposed ownership of . . . LCMs is not protected by the Second Amendment because they have not demonstrated that . . . LCMs . . . are commonly sought out, purchased, and used for self-defense," and because LCM restrictions are "consistent with" the Nation's "longstanding history and tradition of regulating those aspects of the weapons or manners of carry that correlate with rising firearm violence"); *see also Kolbe v. Hogan*, 849 F.3d 114, 144 (4th Cir. 2017) (pre-*Bruen* case holding that "[b]ecause . . . large-capacity magazines are like M16s, in that they are most useful in military service, they are not protected by the Second Amendment"); *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) (pre-*Bruen* case upholding ban on LCMs based on legislature's conclusion they are not "appropriate for self-defense").

      In short, Plaintiffs' challenge is nothing new, and has no merit. Just as court after court

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   has already done, this Court should reject Plaintiffs' dangerous misinterpretation of the Second

2   Amendment and their effort to undermine the common-sense regulation of military-style

3   weapons, which has a negligible (if any) impact on the right to bear arms in self-defense.

## II.   BACKGROUND

### A.   SB 5078 Prohibits the Manufacture and Sale of LCMs

6        The Legislature passed Senate Bill 5078 (SB 5078) to address the epidemic of gun

7   violence and mass shootings that "threat[ens] . . . the public health and safety of

8   Washingtonians." Engrossed Substitute S.B. 5078, 67th Leg., Reg. Sess., § 1 (Wash. 2022). The

9   Legislature found that LCMs—ammunition feeding devices capable of holding more than ten

10  rounds—in particular contributed to "increase[d] casualties by allowing a shooter to keep firing

11  for longer periods of time without reloading." *Id.* Citing the use of LCMs in "all 10 of the

12  deadliest mass shootings since 2009," the Legislature noted that from 2009 to 2018 the use of

13  LCMs in mass shooting events "caused twice as many deaths and 14 times as many injuries,"

14  whereas mass-shooting casualties declined while a federal LCM ban was in effect. *Id.*

15  Accordingly, the Legislature found that "restricting the sale, manufacture, and distribution of

16  [LCMs] is likely to reduce gun deaths and injuries," without interfering with "responsible, lawful

17  self-defense." *Id.*

18       To achieve this goal, SB 5078 prohibits LCMs' manufacture, distribution, import, and

19  sale, with certain exemptions for military and law enforcement. The law does this while

20  "allowing existing legal owners to retain the large capacity magazines they currently own." *Id.*

21  No firearm is rendered inoperable due to SB 5078, because all guns capable of accepting

22  LCMs—even AR-15s, AK-47s, and the like—can fully function with magazines that hold 10

23  rounds or fewer. Busse Rep. at 7–8.[1]

24

25

26

---

[1] Each expert report cited herein is attached as an exhibit to that expert's declaration.

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

**B.      LCMs Are Not Commonly Used in Self-Defense**

"LCMs were originally designed for military use in World War I and did not become widely available for civilian use until the 1980s." *Nat'l Ass'n for Gun Rights*, 2023 WL 4975979, at *24. They achieved wide commercial success after the Sandy Hook Elementary mass shooting in 2008. Busse Rep. at 4. LCMs serve offensive purposes on the battlefield and in certain "highly specialized" law enforcement capacities. Diaz Decl. ¶¶ 10–12. But they are not well-suited or commonly used for self-defense.

The available data makes this clear. In an analysis of "armed citizen" stories collected by the National Rifle Association—stories collected to support the gun lobby's push to undermine gun control—expert Lucy Allen of National Economic Research Associates has shown that "it is extremely rare for a person, when using firearms in self-defense, to fire more than 10 rounds." Allen Rep. at 4. "Out of 736 incidents" in the NRA database analyzed by Ms. Allen, "there were 2 incidents (0.3% of all incidents), in which the defender was reported to have fired more than 10 bullets." *Id.* "On average," individuals fired only "2.2 shots." *Id.* And in 18.2% of incidents, "defenders [were] able to defend themselves without firing any shots." *Id.*

Ms. Allen has replicated these results through an analysis of self-defense stories archived by Factiva, "an online news reporting service and archive . . . that aggregates news content from nearly 33,000 sources." Allen Rep. at 6–10. That analysis—which, as Ms. Allen explains, is likely biased towards more sensational stories in which more shots are fired—similarly "find[s] that the average number of shots fired per [self-defense] incident covered is 2.34." *Id.* at 9. In that same analysis, covering 200 incidents, Ms. Allen found that "97.3% of incidents" involved "the defender fir[ing] five or fewer shots." *Id.* at 10. She found "no incidents where the defender was reported to have fired more than 10 bullets." *Id.*

If anything, LCMs are disadvantageous for self-defense. As Seattle Police Chief Adrian Diaz explains, "firing more than a handful of rounds in self-defense may be dangerous because it increases the odds of a bystander being hit by a stray bullet and because an officer responding

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

to such an incident may perceive the victim as the suspect." Diaz Decl. ¶ 18. Further, "a smaller magazine (standard seven or eight round)" means a lower-profile gun that "is easier to carry, shoot, and conceal." Busse Rep. at 8. Thus, in the sort of "close-quarter shootings" typical of armed self-defense, "shotguns and 9mm pistols are generally recognized as the most suitable and effective choices for armed defense." *Bevis*, 2023 WL 2077392, at *16 (quotation omitted).

## C.     LCMs Are Disproportionately Used in Mass Shootings

On the other hand, large capacity magazines "are often used in public mass shootings." Allen Rep. at 15. And they "are being used with increased frequency to perpetrate gun massacres." Klarevas Rep. at 6. Since 2010, 86% of all mass shootings in which more than five people were killed involved LCMs. *Id.* at 7. Since 2020, that number is *100%. Id.*

Because weapons equipped with LCMs are so much deadlier than other weapons, their use in mass shootings leads to much higher casualty rates. "Of the 80 high-fatality mass shootings since January 1, 1990, in which LCM use can be determined, 62 involved LCMs, resulting in 713 deaths. The average death toll for these 62 incidents is 11.5 fatalities per shooting. By contrast, the average death toll for the 18 incidents in which it was determined that LCMs were not used (which resulted in 132 fatalities) is 7.3 fatalities per shooting. In other words, since 1990, the use of LCMs in high-fatality mass shootings has resulted in a 58% increase in average fatalities per incident." Klarevas Rep. at 9.[2] "LCMs were used in 94% of all mass shootings resulting in more than 10 deaths and 100% of all mass shootings resulting in more than 15 deaths." *Id.* at 8. All seven of the deadliest acts of criminal violence in the United States since the September 11, 2001, terrorist attacks were mass shootings by perpetrators using LCMs. *Id.* at 7–8. For example, in "[t]he deadliest mass shooting event in American history . . . in Las Vegas, Nevada in 2017, . . . [s]ixty people were killed and more than 410 people were

---

[2] Relying on Professor Klarevas' testimony, Judge Immergut in *Oregon Firearms Federation* found that "[t]he average number of shots fired in a mass shooting where an LCM was not used was sixteen. By contrast, the average number of shots fired in a mass shooting where an LCM was used was *ninety-nine*." 2023 WL 4541027, at *13 (emphasis added) (record citations omitted).

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

shot" by a gunman equipped with "100-round LCMs" who was able to fire over 1,000 rounds in "approximately eleven minutes." *Oregon Firearms Fed'n*, 2023 WL 4541027, at *13. And in the Newtown, Connecticut elementary-school massacre, "the shooter used multiple large-capacity magazines to fire 154 rounds in less than five minutes," murdering 26 people, including 20 children. *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 263 (2d Cir. 2015).

LCMs contribute to mass shooting fatalities in at least two ways. First, they enable a gunman to fire more shots, more quickly. Klarevas Rep. at 16–17. Second, LCMs rob victims of critical opportunities to escape or disarm a shooter. *Id.* at 17–18. For example, during the Sandy Hook massacre, six first-graders were able to escape a classroom to safety while the shooter paused to swap out a magazine. *Id.* at 17. By enabling shooters to continue shooting without pause, LCMs reduce these critical windows and lead to more deaths. Diaz Decl. ¶ 9. In short, "LCMs are force multipliers" in the hands of a mass shooter. Klarevas Rep. at 17.

Unfortunately, "the problem of high-fatality mass shooting violence is on the rise[.]" Klarevas Rep. at 4. Between the 1990s and 2010s, while the U.S. population increased by around 20%, the number of Americans killed in high-fatality mass shootings increased by 260%. *Id.* at 4–5. "In other words, the rise in gun massacre violence has far outpaced the rise in national population—by a factor of 13." *Id.* at 5. High-fatality mass shootings are also a distinctly modern phenomenon. The first mass shooting incident in American history that resulted in 10 or more deaths happened in 1949, the next in 1966, then in 1975. *Id.* at 9–10. But after the 1994 federal Assault Weapons Ban expired in 2004, the average rate of these incidents increased "over six-fold" when compared to the time period of 1949 to 2004. *Id.* at 13.

**D.     This Lawsuit**

Plaintiffs filed this lawsuit in June 2022. Dkt. # 1. Their operative complaint asserts a single claim: a facial challenge to SB 5078 under the Second Amendment, as incorporated against the states. Dkt. # 42.

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    During this litigation, the defendants served 10 separate expert reports, totaling 743 pages

2    of testimony and exhibits from preeminent experts in the fields of history, linguistics,

3    self-defense, and mass shootings. *See generally* Declarations filed herewith.[3] Plaintiffs, by

4    contrast, do not offer any expert testimony—or, indeed, any competent evidence whatsoever—

5    to meet their burden of showing that LCMs are arms in common use for self-defense. Nor have

6    they disclosed any rebuttal experts or filed any *Daubert* motions, leaving the State Defendants'

7    expert testimony wholly unrebutted. Based on the undisputed facts in the record, the State

8    Defendants oppose Plaintiffs' Motion for Summary Judgment and cross-move for summary

9    judgment in their favor.

10                        **III.    ARGUMENT**

11   **A.    The *Bruen* Test**

12   In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court

13   announced a new text-and-history test for evaluating firearm regulations under the Second

14   Amendment. 142 S. Ct. 2111 (2022). Under this new test, a plaintiff challenging a firearm

15   regulation must first show that "the Second Amendment's plain text covers an individual's

16   conduct" as relevant to the regulation. *Id*. at 2126. "*Bruen* step one . . . requires a textual analysis,

17   determining," among other things, "whether the weapon at issue is '"in common use" today for

18   self-defense,' and whether the 'proposed course of conduct' falls within the Second

19   Amendment." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (quoting *Bruen*,

20   142 S. Ct. at 2134–35) (citing *Heller*, 554 U.S. at 580).

21   If a plaintiff can make this showing, the burden then shifts to the defendant to "justify its

22   regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm

23   regulation." *Bruen*, 142 S. Ct. at 2130. "[T]o carry its burden" at step two, "the government must

24   produce representative analogues to demonstrate that the challenged law is consistent with a

25

26   _____
     [3] The State Defendants filing includes each of their seven expert reports. The remaining three experts were
     hired by Intervenor-Defendant Alliance for Gun Responsibility.

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    historical tradition of regulation." *Alaniz*, 69 F.4th at 1128.

2           Plaintiffs' claim fails at both steps. At step one, LCMs are not "arms" within the meaning

3    of the Second Amendment. Rather, LCMs are detachable accessories that are not themselves

4    "arms" or necessary for the functioning of "arms." Moreover, the Second Amendment does not

5    guarantee the right to keep or bear military-style weapons that are not appropriate for lawful

6    self-defense, and Plaintiffs have failed to prove that LCMs are actually in common use for

7    self-defense. Second, Defendants' unrebutted evidence demonstrates that Washington's law is

8    part of a robust historical tradition of states and the federal government restricting the weapons

9    most commonly and destructively used for lawless interpersonal violence.

10   **B.      Plaintiffs' Motion Rests Entirely on a Legally Incorrect Premise**

11          Plaintiffs' argument, boiled down to a single sentence, is that the Second Amendment

12   categorically forbids Washington from restricting the sale of LCMs because a lot of people

13   allegedly own LCMs. But Plaintiffs are wrong on the law, as Judge Bryan pointed out when two

14   of them, and their same counsel, made this same argument in a case challenging HB 1240,

15   Washington's statute restricting the sale and manufacture of assault weapons:

16          The Plaintiffs maintain that they need only show that the "arms" regulated by HB
             1240 are "in common use" today for lawful purposes and so are not "unusual."[4]
17          If they do, they contend, the weapon cannot be banned under *Heller* and *Bruen*.

18          The Plaintiffs misread *Heller* and *Bruen*. *Heller* noted that the right to keep and
             bear arms protected under the Second Amendment is limited to the sorts of
19          weapons "in common use at the time." *Heller* at 627, 128 S.Ct. 2783. It found
             that this limitation is "supported by the historical tradition of prohibiting
20          'dangerous and unusual weapons.' " *Id. Heller* does not hold that access to all
             weapons "in common use" are automatically entitled to Second Amendment
21          protection without limitation. Further, under *Bruen,* if Plaintiffs demonstrate that
             their proposed conduct, that of buying and selling [magazine] regulated by [SB
22          5078], is covered by the Second Amendment, the "Constitution **presumptively**
             protects that conduct." *Bruen* at 2126, 2129-2130 (*emphasis added*). This
23          presumption can be overcome. *Id.*

24   *Hartford v. Ferguson*, --- F. Supp. 3d ---, 2023 WL 3836230, at *2–*3 (W.D. Wash. June 6,

25

26          ⁴ As discussed below, Plaintiffs' error is even graver here because large-capacity magazines are not even
     arms—they are accessories that are not necessary to the functioning of *any* gun.

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

2023) (denying preliminary injunction) (ECF citations omitted); *see also Oregon Firearms Fed'n v. Kotek*, No. 2:22-CV-01815-IM, 2023 WL 3687404, at *2–*3 (D. Or. May 26, 2023) (considering and rejecting identical argument; "[W]hether a weapon is in common use for lawful purposes such as self-defense today is the first question—not the only question—that a court must consider under *Bruen*."). In other words, even if Plaintiffs could establish that LCMs are in "common use" for self-defense—which they have not—this does not end the analysis, because under *Bruen*, weapons that are in "common use" can still be regulated in a manner consistent with our nation's history and tradition. Applying the correct test, Plaintiffs' claim fails at both steps of the *Bruen* analysis.

## C.    LCMs Are Not Covered by the Second Amendment's Text

### 1.    LCMs are not "arms," and limiting their manufacture and sale does not infringe on any protected conduct

The step-one inquiry under *Bruen* is whether the "plain text" of the Second Amendment "covers an individual's conduct." 142 S. Ct. at 2126. Plaintiffs' claim fails at this threshold step for two independent reasons. *First*, LCMs are accessories, not arms, and restricting their sale does not burden Washingtonians' right to self-defense. *Second*, the text of the Second Amendment as understood by our Framers applies to weapons commonly used for self-defense—which firearms equipped with LCMs are not.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court defined "arms" as "'[w]eapons of offence, or armour of defence'" or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. 570, 581 (2008) (quoting Founding-era sources). LCMs are not themselves "[w]eapons of offence, or armour of defence," nor are they used "to cast at or strike another." *See Ocean State Tactical*, 2022 WL 17721175, at *12–*13. Instead, they are merely a subclass of "ammunition feeding

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   device[s]"—accessories that, when added to weapons, make them more capable of mass murder.

2   *Oregon Firearms Fed'n*, 2023 WL 4541027, at *25 ("Magazines are an accessory to firearms,

3   rather than a specific type of firearm.").

4          Plaintiffs contend that because certain types of modern firearms (namely, semiautomatic

5   firearms) require a magazine to function as designed, and because LCMs are magazines, LCMs

6   themselves must therefore be "arms." *See* Dkt. # 101 at pp. 6–7. But this crude formulation is

7   inconsistent with both the historical distinction between "arms" and "accoutrements" as

8   understood by the Framers, and with the way LCMs are still understood by the firearms industry

9   today. *See* Barron Rep. at 1 ("The lexical evidence leads me to conclude that . . . magazines . . .

10  were considered 'accoutrements' or 'accessories' and not 'arms' during the Founding and

11  Reconstruction Eras."); Busse Rep. at 9 ("Because a large capacity magazine is not a required

12  component for a firearm to operate, it is characterized as an accessory by the industry."). LCMs

13  have no function independent of a firearm, nor are they necessary components of firearms—in

14  fact, any firearm capable of accepting an LCM is also capable of accepting a magazine that can

15  hold 10 rounds or fewer. Busse Rep. at 7. For this reason, LCMs—like other firearm

16  accessories—do not fit the Supreme Court's definition of "arms." *Cf. United States v. Cox*, 906

17  F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself

18  (nor is it 'armour of defense'). Accordingly, it can't be a 'bearable arm' protected by the Second

19  Amendment.").

20         Because LCMs are not "arms," for Plaintiffs' claim to survive *Bruen* step one, they must

21  show SB 5078 otherwise interferes with their "right . . . to keep and bear arms." *See* Dkt. # 101

22  at p. 7. They cannot. To be sure, broad-based restrictions on products that are necessary to use

23  firearms for self-defense *may* implicate the Second Amendment. For example, in *Jackson v. City*

24  *and County of San Francisco*, the Ninth Circuit explained that although the Second Amendment

25  "does not explicitly protect ammunition, . . . without bullets, the right to bear arms would be

26  meaningless," and thus "[a] regulation eliminating a person's ability to obtain or use

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    ammunition" would infringe upon the Second Amendment right by "mak[ing] it impossible to

2    use firearms for their core purpose." 746 F.3d 953, 967–68 (9th Cir. 2014). SB 5078, however,

3    does no such thing—it only regulates one particular type of military-style accessory, leaving

4    numerous alternative options available for use with lawfully possessed weapons.

5         While a magazine may be required for some firearms to operate, a *large capacity*

6    magazine never is. Busse Rep. at 7; *see also Oregon Firearms Fed'n*, 2023 WL 4541027, at *26;

7    *Ocean State Tactical*, 2022 WL 17721175, at *12 ("[A] firearm does not need a magazine

8    containing more than ten rounds to be useful."). "This case . . . is not simply about the

9    constitutionality of all magazines generally; it is about magazines that allow the user to shoot

10   eleven or more rounds without reloading." *Oregon Firearms Fed'n*, 2023 WL 4541027, at *26.

11   SB 5078 only prohibits the manufacture and sale of one subclass of magazines commonly

12   associated with mass shootings and other violent crime; it leaves untouched individuals' abilities

13   to buy and sell magazines holding ten rounds or fewer for use with any lawfully possessed

14   firearm. SB 5078 also leaves individuals free to possess and use the LCMs they already own.

15   SB 5078 therefore does not meaningfully limit any individual's ability to use firearms for any

16   lawful purposes. In short, Plaintiffs do not and cannot demonstrate that any firearm they may

17   own or choose to purchase in the future will be rendered inoperable if they are limited to

18   purchasing only lower-capacity magazines—which remain widely available in Washington—

19   going forward. "Accordingly, . . . LCMs are not 'bearable arms' as that term is used in Second

20   Amendment jurisprudence." *Id.*; *see also Ocean State Tactical*, 2022 WL 17721175, at *13.

21        Plaintiffs attempt to stretch the Second Amendment's text to cover LCMs by asserting

22   that what SB 5078 *actually* prohibits is acquiring firearms equipped with LCMs. Dkt. # 101 at

23   pp. 7–8. But Plaintiffs' argument that all accessories that work "in conjunction with a firearm"

24   are themselves firearms elides the legally recognized historical and modern distinction between

25   arms and accessories, and is based solely on a district court decision that is stayed pending

26   appeal. *Id.* (citing *Barnett v. Raoul*, --- F. Supp. 3d ---, 2023 WL 3160285 (S.D. Ill. Apr. 28,

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

2023), *stayed pending appeal*, Order (Dkt. # 26), No. 23-1828 (7th Cir. May 12, 2023)). Indeed, Plaintiffs' insistence that SB 5078 is actually a ban on firearms is easily rebuttable, thus proving the State's point: anyone who wanted to purchase, say, a Glock 17 remains free to do so in Washington.[5] And they can buy this firearm with as many 10-round magazines as they want. *See* Busse Rep. at 38. They are also free to use this firearm with their existing LCMs. They just cannot purchase a new 17-round magazine to go with it. This limitation has no effect on the functioning of the gun. It has no effect on the buyer's right to defend themselves. *See infra* at § III.C.2. It has, in short, no effect on their Second Amendment rights.[6]

### 2.      LCMs are not in common use for self-defense

Plaintiffs' Second Amendment claim fails at *Bruen*'s first step for a second, independent reason: the Second Amendment only covers arms that are commonly used for self-defense. It does not afford a right to keep and bear military-style weapons, including firearms equipped with LCMs.

"'[L]ike most rights, the right secured by the Second Amendment is not unlimited . . . [it] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626); *see also id.* at 2157 (Alito, J., concurring) (*Bruen* does not call into question restrictions on "the kinds of weapons that people may possess"). *Bruen* embraced the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). As the *Heller* Court explained, at the time of the Founding, "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." 554 U.S. at 624. It was "these kinds of weapons (which have changed over the years) [that] are protected by the Second Amendment in private hands, while military-grade

---

[5] Provided they are not otherwise prohibited from acquiring firearms.

[6] Plaintiff Rainier Arms cannot show any infringement of its rights because "the Second Amendment does not independently protect a proprietor's right to sell firearms." *Teixeira v. County of Alameda*, 873 F.3d 670, 690 (9th Cir. 2017); *see also United States v. Tilotta*, No. 3:19-CR-04768-GPC, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022) (post-*Bruen*: "[T]he natural reading of 'keep and bear arms' does not include the ability to sell or transfer firearms unrestricted.").

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

weapons (the sort that would be in a militia's armory), such as machineguns, and weapons especially attractive to criminals, such as short-barreled shotguns, are not." *Friedman*, 784 F.3d at 408 (citing *Heller*, 554 U.S. at 624–25). *Heller* thus acknowledged that "weapons that are most useful in military service—M–16 rifles and the like—may be banned . . . ." 554 U.S. at 627; *see also Kolbe*, 849 F.3d at 131 (same). This "important limitation on the right to keep and carry arms" remains a critical part of the Second Amendment following *Bruen*. *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). And it is fatal to Plaintiffs' core premise in this case, as several courts have recognized. *Hanson*, 2023 WL 3019777, at *12; *Ocean State Tactical*, 2022 WL 17721175, at *15; *Oregon Firearms Fed'n*, 2023 WL 4541027, at *34; *Nat'l Ass'n for Gun Rights*, 2023 WL 4975979, at *26; *see also Kolbe*, 849 F.3d at 144; *Friedman*, 784 F.3d at 412.[7]

Unable to account for or distinguish these cases, Plaintiffs simply ignore them. Instead, they cite to the *single* district court case to date that has enjoined a large-capacity magazine restriction—*Barnett v. Raoul*, --- F. Supp. 3d ---, 2023 WL 3160285, at *8 (S.D. Ill. Apr. 28, 2023), *stayed pending appeal*, Order (Dkt. # 26), No. 23-1828 (7th Cir. May 12, 2023). Dkt. # 101 at p. 7. But they neglect to mention that the Seventh Circuit promptly stayed *Barnett*, and the court's injunction has never taken effect. Order (Dkt. # 26), *Barnett v. Raoul*, No. 23-1828 (7th Cir. May 12, 2023). In any event, the evidence plainly shows that the vast majority of courts got it right: LCMs are not "in common use . . . for lawful purposes like self-defense," *Heller*, 554 U.S. at 624; *see also Bruen*, 142 S. Ct. at 2134, and thus are not covered by the Second Amendment.

To be clear: it is *Plaintiffs*' burden to show that LCMs are in common use for self-defense. This is because *Heller* and *Bruen* make clear that the plain text of the Second

---

[7] The *Kolbe* court held "[i]n the alternative" that even if LCMs were covered by the Second Amendment's plain text, as informed by its history, Maryland's LCM ban was justified under intermediate scrutiny. *Kolbe*, 849 F.3d at 138. While this alternative holding was abrogated by *Bruen*, the court's primary holding anticipates and survives *Bruen*.

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

Amendment, as understood by the Founders, only covers "weapons 'in common use' today for self-defense." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 554 U.S. at 624 (explaining that the Second Amendment only covers "arms in common use at the time for lawful purposes like self-defense") (quotation omitted) and 627 ("recogniz[ing] another important limitation on the right to keep and carry arms," namely, "that the sorts of weapons protected were those in common use at the time") (quotation omitted). Thus, in *Bruen*, the Court confirmed that "handguns are weapons 'in common use' today for self-defense" *before* shifting the burden to New York to show that the challenged restriction was "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2119, 2130. Following *Bruen* and *Heller*, the Ninth Circuit recently confirmed that "*Bruen* step one involves a threshold inquiry. In alignment with *Heller*, it requires a textual analysis, determining," among other things, "whether the weapon at issue is 'in common use' today for self-defense." *Alaniz*, 69 F.4th at 1128 (quoting *Bruen*, 142 S. Ct. at 2134–35). If, but only if, a plaintiff can satisfy this burden, does a court "proceed to *Bruen* step two, at which the 'government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2130).[8]

Plaintiffs cannot carry this burden. LCMs undeniably serve combat functions—not self-defensive functions. They "are designed to enhance a shooter's capacity to shoot multiple human targets very rapidly"—a consummately, and uniquely, military function. *Kolbe*, 849 F.3d at 125 (quotation omitted). "LCMs were originally designed for military use in World War I and did not become widely available for civilian use until the 1980s." *Nat'l Ass'n for Gun Rights*, 2023 WL 4975979, at *24; *see also Hanson*, 2023 WL 3019777, at *9. Still today, LCMs "are particularly designed and most suitable for military and law enforcement applications." *Kolbe*,

---

[8] To the extent Plaintiffs might respond that *Teter v. Lopez*, No. 20-15948, 2023 WL 5008203, at *9 (9th Cir. Aug. 7, 2023), placed the burden of proving common use on the State Defendants, they are incorrect. *Teter* does not—and cannot—overrule *Alaniz*, *Bruen*, and *Heller*. Rather, as noted below, *Teter's* discussion of burden-shifting came not in a discussion of common use under *Bruen* step one, but in the distinct analysis of considering whether butterfly knives were "dangerous and unusual." *Id.* at *9. As shown below, to the extent this separate burden is properly placed upon the State Defendants, they more than carry it. *Infra* at § III.C.3.

STATE DEFENDANTS' RESPONSE AND CROSS-MOTION FOR SUMMARY JUDGMENT NO. 3:22-cv-05403-DGE

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

849 F.3d at 125. The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has made this determination repeatedly, over decades, in reports on the importability of certain weapons. *See* ATF, *Report and Recommendation of the Importability of Certain Semiautomatic Rifles*, at 6 (July 6, 1989), https://www.atf.gov/file/61761/download ("[L]arge detachable magazines . . . provide[] . . . soldier[s] with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms."); ATF, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles*, at 18 (Apr. 1998), https://www.atf.gov/resource-center/docs/guide/department-treasury-study-sporting-suitability-modified-semiautomatic/download (it is a "military feature . . . to accept a large capacity military magazine"); ATF, *Study on the Importability of Certain Shotguns* (Jan. 2011), https://www.atf.gov/resource-center/docs/january-2011-importability-certain-shotgunspdf/download. The inherently military nature of LCMs was also a central concern of Congress when it banned the transfer or possession of new LCMs nationwide as part of the 1994 Assault Weapons Ban. As the House Report on the bill explained, "the expert evidence is that the features that characterize a semiautomatic weapon," including use of LCMs, "are not merely cosmetic, but do serve specific, combat-functional ends." H.R. Rep. No. 103-489 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1820. "High-capability magazines, for example, make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent." *Id.* "Furthermore, expended magazines can be quickly replaced, so that a single person with a single assault weapon can easily fire literally hundreds of rounds within minutes." *Id.* It is no wonder, then, that today LCMs are widely marketed to civilians not as tools of self-defense, but as "tactical" military accessories. Busse Rep. at 22–24 (explaining how "[t]he recent shift to focus on tactical, offensive, higher capacity handguns [and other firearms] has resulted in a competitive trend that is . . . creating an 'arms race' within the industry).

Befitting their role as tools of war, designed to kill as many enemies as possible, LCMs have limited—if any—utility for self-defense. *See Duncan v. Bonta*, 19 F.4th 1087, 1104–05

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    (9th Cir. 2021), *cert. granted, judgment vacated on other grounds*, 142 S. Ct. 2895 (2022), and

2    *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022). As Lucy Allen has shown—and court

3    after court has found—individuals almost never fire more than ten rounds in self-defense. Allen

4    Rep. at 4; *see also, e.g., Oregon Firearms Fed'n*, 2023 WL 4541027, at *12 ("[I]t is exceedingly

5    rare (far less than 1 percent) for an individual to fire more than ten shots in self-defense.").

6    Rather, the data shows that individuals on average fire only 2.2 shots in self-defense. Allen Rep.

7    at 4; *see also Kolbe*, 849 F.3d at 127; *see also Hanson*, 2023 WL 3019777, at *10 ("[T]he 2.2

8    figure has remained exceptionally stable over time."). Even the NRA has acknowledged the point

9    "that most civilian situations happen so quickly, with only a few rounds fired (an average of

10   three), that handgun capacity is a moot point."[9]

11       According to Seattle Police Chief Adrian Diaz, while LCMs may be appropriate for

12   certain law enforcement functions in "extremely rare" cases, "there is no place for large-capacity

13   magazines in civilian self-defense." Diaz Decl. ¶¶ 11–15; *see also id.* at ¶ 18 ("In fact, firing

14   more than a handful of rounds in self-defense may be dangerous because it increases the odds of

15   a bystander being hit by a stray bullet[.]"); *see also* National Law Enforcement Partnership to

16   End    Gun    Violence,    *2010-2021    Partnership    Report*,    at    70–71    (July    2021),

17   https://www.policinginstitute.org/publication/national-law-enforcement-partnership-to-prevent

18   -gun-violence-nleppgv-2010-2021-partnership-report/. Indeed, in 25 years with the Seattle

19   Police Department, Chief Diaz could recall only *one* instance in which a civilian fired more than

20   three rounds in what was even arguably self-defense. Diaz Decl. ¶ 16[10]; *see also Ocean State*

21   *Tactical*, 2022 WL 17721175, at *14 (relying on similar testimony from law enforcement

22

23       [9] B. Gil Horman, *Why Choose A Wheelgun?*, NRA American Rifleman (Oct. 8, 2015), https://www.americanrifleman.org/content/why-choose-a-wheelgun/; *see also* Elwood Shelton, *Top Four*

24   *Remington 870 Tactical Shotgun Options*, Gun Digest (Aug. 10, 2019), https://gundigest.com/gun-reviews/shotguns/top-four-remington-870-tactical-shotgun-options (describing a shotgun's "6-round tubular magazine " as "giv[ing] you more than enough firepower to handle anything outside a Hunnish siege").

25       [10] A single, highly questionable instance of more than ten shots fired in so-called self-defense does not save Plaintiffs' claim. "A weapon may have *some* useful purposes in both civilian and military contexts, but if it is *most* useful in military service, it is not protected by the Second Amendment." *Hanson*, 2023 WL 3019777, at *8

26   (emphasis in original).

STATE DEFENDANTS' RESPONSE AND                16                ATTORNEY GENERAL OF WASHINGTON
CROSS-MOTION FOR SUMMARY                                        Complex Litigation Division
JUDGMENT                                                        7141 Cleanwater Dr SW
NO. 3:22-cv-05403-DGE                                           PO Box 40111
                                                                Olympia, WA 98504-0111
                                                                (360) 709-6470

1  official); *Hanson*, 2023 WL 3019777, at *8 (favorably quoting the "D.C. Chief of Police's

2  observation that 'magazines holding[ ] over 10 rounds are more about firepower than

3  self-defense'"). As summed up by William B. Ruger, founder of gun industry giant Sturm Ruger:

4  "No honest man needs more than 10 rounds in any gun." Busse Rep. at 15.[11]

5         By contrast, LCMs are routinely used in mass shootings and other high-profile criminal

6  activity to devastating effect, as the Legislature found. SB 5078, § 1; *see also* H.R. Rep. 117-346,

7  at 21–22 (2022) (discussing, in detail, how "[l]arge capacity magazines have been used in many

8  high-profile mass shootings"); *see also* Klarevas Rep. Table 2, Ex. C. According to Dr. Klarevas,

9  one of the foremost experts on mass shootings, LCMs are "force multipliers when it comes to

10  kill potential." Klarevas Rep. at 17. LCMs have been used in at least two-thirds of gun massacres

11  since 1990, "result[ing] in a 58 % increase in average fatalities per incident" compared to mass

12  shootings that did not involve LCMs. *Id.* at 9.

13         In short, LCMs are not commonly used for self-defense. Rather, consistent with their

14  purpose of "enhanc[ing] a shooter's capacity to shoot multiple human targets very rapidly,"

15  *Kolbe*, 849 F.3d at 125, LCMs are dangerous accessories "that are most useful in military

16  service," *Heller*, 554 U.S. at 627, and therefore not protected by the Second Amendment.

17         Plaintiffs' contrary arguments lack merit. Despite the combat-specific functions of

18  LCMs, Plaintiffs suggest they should be shielded by the Second Amendment simply because

19  there are a lot of them in the United States. Dkt. # 101 at p. 6. This argument fails in just about

20  every way imaginable. As a legal matter, whether LCMs are commonly *possessed* is not the

21  relevant question. The question under *Heller* and *Bruen* is instead whether LCMs are in

22  "common *use* . . . for lawful purposes like self-defense." *Heller*, 554 U.S. at 625; *Bruen*,

23  142 S. Ct. at 2134; *see also Oregon Firearms Fed'n*, 2023 WL 4541027, at *29 ("[T]he standard

24  requires consideration of not only the commonality of the firearm or firearm accessory in

25

26         [11] From context, it appears clear that Mr. Ruger was referring specifically to civilian needs—not calling soldiers and law enforcement officers who might need more than ten rounds dishonest.

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

question, but also the *use* of that firearm or firearm accessory.") (emphasis in original); *Nat'l Ass'n for Gun Rights*, 2023 WL 4975979, at *13 ("*Bruen* requires that common use to be specifically for self-defense."); *Ocean State Tactical*, 2022 WL 17721175, at *15 ("[Plaintiffs] argue vociferously that LCMs were in common use, but their argument is untethered from the concept of self-defense.") (quotation omitted). Again, the evidence shows LCMs are not commonly used for self-defense. Allen Rep. at 2–12.

Plaintiffs' popularity-contest argument is not the law under *Heller* and *Bruen*, and with good reason. Limiting regulation to rare weapons would be nonsensical because rare weapons are not the ones causing problems. As the Seventh Circuit pointed out in *Friedman*, Tommy guns were "all too common" during the Prohibition era, but this "popularity d[oes]n't give" dangerous military weapons "constitutional immunity." 784 F.3d at 408. Indeed, it is precisely because machineguns—and now LCMs—became increasingly prevalent and increasingly associated with horrific crimes that governments stepped in to regulate them.[12] Moreover, *Heller* makes clear that "[t]here is no Second Amendment protection for . . . 'weapons that are most useful in military service'"; it does not "make[] an exception for such weapons if they are sufficiently popular." *Kolbe*, 849 F.3d at 142 (quoting *Heller*, 554 U.S. at 627); *see also Nat'l Ass'n for Gun Rights*, 2023 WL 4975979, at *16 ("[I]t cannot be the case that a grenade launcher or a flamethrower becomes constitutionally protected even if it becomes commonly used for self-defense.") (cleaned up). Plaintiffs' argument also leads to the absurd conclusion that a firearm accessory's constitutionality turns on whether the gun industry chooses to engage in mass campaigns to flood the market. *See* Busse Rep. at 9–11, 33–35; *see also Oregon Firearm Fed'n*, 2023 WL 4541027, at *28 (explaining how "firearm manufacturers and dealers make decisions that both limit consumer choice and magnify the commonality of LCMs"). Finally, "relying on how common a weapon is at the time of litigation would be circular" because a weapon's

---

[12] As detailed below, this same pattern applies to a whole host of historical weapons regulations, from Bowie knives, to slingshots, to modern assault weapons.

STATE DEFENDANTS' RESPONSE AND CROSS-MOTION FOR SUMMARY JUDGMENT NO. 3:22-cv-05403-DGE

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

popularity (or not) often depends on whether it is banned or not. *Friedman*, 784 F.3d at 409; *see also Kolbe*, 849 F.3d at 141. By focusing the inquiry on an objective analysis of whether "modern instruments . . . facilitate armed self-defense," *Bruen* largely avoids these obvious pitfalls. *Bruen*, 142 S. Ct. at 2132; *see also Nat'l Ass'n for Gun Rights*, 2023 WL 4975979, at *13.

Leaving aside the law, Plaintiffs' argument also fails as a factual matter. By Plaintiffs' own estimate, fewer than 12% of Americans—39 million Americans in a nation of over 330 million—have ever owned an LCM. Dkt. # 101 at p. 13. And only some of those LCM owners— less than 8% of all Americans—claim to have owned LCMs for home defense. *Id.* at 14. This pales in comparison to the more than one-third of all Americans who live in states that restrict LCMs. Klarevas Rep. at 19.

Moreover, Plaintiffs' estimates—insufficient though they are—are baseless. Plaintiffs first rely heavily on a report from National Shooting Sports Foundation (NSSF), the primary trade group of the gun industry. Dkt. # 101 at p. 13. But that report is inadmissible hearsay. It was published by a trade group with an obvious financial stake in the outcome of LCM litigation, and the creator of the study, James Curcuruto, was unable to recall in a deposition whether the study was conducted for any non-litigation purpose. Hughes Decl., Ex. 1 (Deposition of James Curcuruto (Curcuruto Dep.)) at 82:3–83:4; 108:20–109:23. *See Blevins v. Gaming Ent. (Indiana) LLC*, No. 4:17-cv-00083-TWP-DML, 2019 WL 2754405, at *3 (S.D. Ind. July 1, 2019) ("[R]eports created in anticipation of litigation are not covered by the 803(6) hearsay exception.") (collecting cases).

Even were it admissible, the NSSF report does not provide evidence about how many magazines are actually possessed by private individuals. Curcuruto Dep. at 126:5–8. Rather, as the report's author explained, the report is based primarily on what *firearms*—not *magazines*— were *manufactured* and *imported*—not *possessed*. *Id.* at 124:15–125:25; 127:23–25 ("Q [ATF manufacturing] data does not track numbers of magazines at all; correct? A Correct."); 128:1– 5; 129:10–11 ("Q And ITC doesn't track [imports of] magazines, does it? A I don't believe so.").

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

And because data Mr. Curcuruto used only shows which firearms were manufactured and imported, not what was actually possessed, it includes firearms that are never sold, firearms that were sold to law enforcement or private security organizations, and the huge number of firearms that were manufactured or imported in the United States and then illegally trafficked to other countries.[13] *Id.* at 126:9–129:17. And to the extent the NSSF report purported to rely on "industry estimates," NSSF Rep. at 7, Mr. Curcuruto admitted that the only industry source he consulted was his boss, NSSF's then-president. Curcuruto Dep., 133:3–134:19; 136:5–137:9. In any event, once Mr. Curcuruto and his boss arrived at their overestimation of the number of guns in America, their method for estimating magazines was to simply "determine[]"—i.e., to assume without any basis—that there were probably about twice as many magazines as firearms. *Id.* at 146:16–148:11. As a result, NSSF's numbers are—at best—a crude guesstimate of the number of LCMs produced or imported based on the number of firearms produced or imported. *Id.* at 137:10–14 ("Q So to be clear on the process, you essentially told [then-NSSF President] Mr. Sanetti 'There is X number of pistols out there. How many do you think come with a magazine holding more than 10 rounds' Is that a fair assessment? A Yeah."); *see also* Fed. R. Evid. 803(6) (providing that business records are admissible hearsay only when they are "kept in the course of a regularly conducted activity" and "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness").

---

[13] *See, e.g.*, United States Government Accountability Office, *Firearms Trafficking: U.S. Efforts to Disrupt Gun Smuggling into Mexico Would Benefit from Additional Data and Analysis* (Feb. 2021), https://www.gao.gov/assets/gao-21-322.pdf ("Trafficking of U.S.-sourced firearms into Mexico is a national security threat, as it facilitates the illegal drug trade and has been linked to organized crime. The Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) found that 70 percent of firearms reported to have been recovered in Mexico from 2014 through 2018 and submitted for tracing were U.S. sourced."); Violence Policy Center, *Gun Trafficking in Mexico*, https://vpc.org/regulating-the-gun-industry/gun-trafficking/ (last accessed Aug. 31, 2023) ("New semiautomatic assault weapons are trafficked across the border from the United States because it is the easiest and cheapest place in the world to purchase them, thanks to weak gun laws and a deliberate strategy by the U.S. gun industry to design and sell military-style weapons to civilians."); United Nations Office on Drugs and Crime, *Haiti's Criminal Markets: Mapping Trends in Firearms and Drug Trafficking*, at 1–2 (Feb. 2023), https://www.unodc.org/documents/data-and-analysis/toc/Haiti_assessment_UNODC.pdf ("[I]llegal firearms and drug trafficking [are] fuelling Haiti's deepening security dilemmas. . . . Most weapons are sourced in the US and make their way to gang members and private residents . . . ."); Bryan Passifiume, *Most of the Crime Guns Seized in Toronto Are Smuggled into Canada from U.S.: Police*, National Post (Sept. 2, 2022), https://nationalpost.com/news/canada/most-of-the-crime-guns-in-toronto-this-summer-were-smuggled-into-canada-from-u-s.

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

Plaintiffs next rely on an unpublished paper—again, clear hearsay—authored by Professor William English to claim that 39 million Americans have owned 542 *million* LCMs. Dkt. # 101 at pp. 13–14. Professor English's unpublished paper suffers from significant defects, perhaps none more serious than its flagrant disregard of the Code of Professional Ethics and Practices of the American Association for Public Opinion Research (AAPOR). AAPOR Code of Professional Ethics and Practices (Apr. 2021), https://aapor.org/standards-and-ethics/. Among other problems, Professor English refuses to identify who funded his study or to publish the actual survey instrument itself. *See id.*, Rules III.A.2–3. As a result, it is impossible to evaluate the potential bias of Professor English's methodologies or conclusions—a real concern here, especially since the first version of Professor English's survey appeared on SSRN[14] just four days before amicus briefs were due in *Bruen*, and was cited by multiple *amici*. *Compare* William English, *2021 National Firearms Survey*, SSRN (Jul. 16, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887145 *with* Docket, *Bruen*, 142 S. Ct. 2111 (No. 20-843). Unsurprisingly, these methodological lapses lead to results that are not credible on their face. To take one telling example, Professor English concludes that 53.8% of California gun owners have owned an LCM, despite the fact that the sale of LCMs has been banned in California for all but one week since 1994. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, SSRN, at 27 (May 13, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494; Christopher Salas, *Judge Again Halts "High-Capacity" Sales in California*, KSBW (Apr. 6, 2019), https://www.ksbw.com/article/judge-again-halts-high-capacity-magazine-sales-in-california/27060929; Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 1101103, 108 Stat. 1998.[15] To take another example, Professor English's research purportedly shows that "[g]un owners

---

[14] SSRN is the Social Science Research Network which describes itself as "devoted to the rapid worldwide dissemination of research." *See* www.ssrn.com, About SSRN (last accessed Aug. 31, 2023).

[15] For context, this 53.8% figure exceeds Professor English's estimates of LCM ownership in Alabama, Alaska, Arkansas, and Arizona, among many others.

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

engage in approximately 1.67 million defensive uses of firearms per year," 18.1% of which allegedly involve shots fired. *Id.* at 9. If true, this would amount to 302,270 defensive shootings in America per year, or roughly 828 *per day*. But this is more than the total number of *all* shootings each year, according to the non-partisan Gun Violence Archive. Gun Violence Archive, https://www.gunviolencearchive.org/ (last visited Aug. 31, 2023). And it exceeds the highest number of defensive gun uses ever recorded by Gun Violence Archive (2,118 in 2017) by a factor of almost *143* times. *Id.*

In short, even were Plaintiffs' statistics relevant to the question whether LCMs are in common use for self-defense, they are inadmissible and they are simply not credible.

Finally, Plaintiffs' citation to *Fyock v. Sunnyvale* is of no help to them. *Contra* Dkt. # 101 at p. 8. There, the court—while upholding a ban on LCMs—noted that "to the extent that certain firearms capable of use with a magazine . . . are commonly possessed by law-abiding citizens for lawful purposes, . . . there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable." *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015). Here, though, Plaintiffs do not allege that *any* firearms are rendered inoperable by SB 5078's restrictions. Nor could they, for the reasons discussed above. *Supra* at § III.C.1. Further, *Fyock* explicitly notes that any right to possess magazines is "not unfettered." 779 F.3d at 998 (echoing *Heller*, 554 U.S. 626). By limiting only the manufacture and sale of only the most dangerous magazines, while otherwise leaving individuals free to possess as many standard-capacity magazines and as much ammunition as they desire, Washington's law plainly does not infringe any right to keep or bear arms.

**3.    LCMs are "dangerous and unusual" firearm accessories**

Plaintiffs' argument fails for yet another reason: as the Supreme Court said in both *Bruen* and *Heller*, the Second Amendment incorporates "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627; *Bruen*, 142 S. Ct. at 2128. Courts have differed on whether this question is addressed at *Bruen* step one or step two—

1   i.e., whether plaintiff bears the burden or defendant. *Compare, e.g.*, *Fyock*, 779 F.3d at 997

2   (considering question as part of whether Second Amendment covered LCMs) *with Teter v.*

3   *Lopez*, No. 20-15948, 2023 WL 5008203, at *9 (9th Cir. Aug. 7, 2023) (considering question as

4   part of *Bruen* step two).[16] But it ultimately does not matter because the evidence points

5   unmistakably to the conclusion that LCMs are dangerous and unusual.

6          "To determine [whether a firearm is dangerous and unusual], [courts in the Ninth Circuit]

7   consider whether the weapon has uniquely dangerous propensities and whether the weapon is

8   commonly possessed by law-abiding citizens for lawful purposes." *Fyock*, 779 F.3d at 997

9   (citation omitted). As discussed above, although many Americans own LCMs (although almost

10  certainly not as many as Plaintiffs suggest), they are not commonly used for self-defense. And

11  they unquestionably have "uniquely dangerous propensities." As Professor Klarevas explains—

12  and numerous courts have held—LCMs' ability to facilitate the killing of multiple human targets

13  rapidly, without the need to reload, while also robbing potential victims of opportunities to

14  escape, makes them force multipliers in the hands of mass shooters. Klarevas Rep. at 16–18; *see*

15  *also Oregon Firearms Fed'n*, 2023 WL 4541027, at *34; *Bevis*, 2023 WL 2077392, at *15;

16  *Herrera*, 2023 WL 3074799, at *7. The numbers speak for themselves: The average mass shooter

17  equipped with an LCM fires more than six times as many bullets, and kills 58% more people,

18  than one without. Klarevas Rep. at 9; *Oregon Firearms Fed'n*, 2023 WL 4541027, at *13.

19         "Even in the hands of law-abiding citizens, large-capacity magazines are particularly

20  dangerous" because "when inadequately trained civilians fire weapons equipped with

21  large-capacity magazines, they tend to fire more rounds than necessary and thus endanger more

22  bystanders." *Kolbe*, 849 F.3d at 127; *see also* Diaz Decl. ¶ 7 ("Every round a civilian fires has

23  the potential to inflict lethal harm, and when more shots are available, more shots are fired,

24  resulting in the possibility of greater number of injuries and deaths.").

25

26  ───────────────

        [16] *Teter* is awaiting *en banc* review, and we will likely have an answer to this question soon.

STATE DEFENDANTS' RESPONSE AND               23          ATTORNEY GENERAL OF WASHINGTON
CROSS-MOTION FOR SUMMARY                                        Complex Litigation Division
JUDGMENT                                                            7141 Cleanwater Dr SW
NO. 3:22-cv-05403-DGE                                                    PO Box 40111
                                                                     Olympia, WA 98504-0111
                                                                        (360) 709-6470

Because LCMs are dangerous and unusual weapons that facilitate mass violence without meaningfully enhancing individual self-defense, they are not shielded from regulation by the Second Amendment.

**D.    SB 5078 Fits Well Within the Robust History and Tradition of Regulating Weapons Used in Interpersonal Violence in the United States**

Even if LCMs were covered by the Second Amendment's text, Plaintiffs' challenge would fail at *Bruen* step two because SB 5078 "is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129–30. In a case like this, where government regulation responds to technological change and unprecedented social concerns, this analysis requires a "nuanced approach," focusing on "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132–33. The "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133.

SB 5078 responds to the recent proliferation of LCMs, driven primarily by aggressive gun-industry marketing over the past decade. This proliferation has increased the rate of mass shootings and, even more dramatically, increased mass shootings' lethality. The undisputed evidence in the record shows that the history and tradition of the United States includes restricting the use of weapons disproportionately used in criminal violence. Thus, courts around the country have repeatedly concluded that even if LCMs were protected by the text of the Second Amendment (which they are not), prohibiting their manufacture, import, and sale is well within the historical tradition of the United States. Plaintiffs entirely fail to grapple with this historical tradition. *See* Dkt. # 101 at pp. 9–15.

**1.    SB 5078 responds to dramatic technological change and unprecedented social concerns**

Obviously, LCMs did not exist in 1791 when the Second Amendment was ratified, or in 1868 when the Fourteenth Amendment was ratified. *See* Spitzer Rep. at 24–29 (documenting history of firearms development from the Reconstruction era through to the early 1900s).

1    Semi-automatic weapons, which typically use magazines, were not commercially viable until

2    the early 1900s. Rivas Rep. at 43 (rifles), 45 (pistols). Even then, the size of the magazines was

3    typically no more than 10 rounds. *Id.* at 43–47. It was not until the late 2000s, and after the

4    massacre at Sandy Hook Elementary, that firearms dealers sold LCMs in large numbers. Busse

5    Rep. at 4. "While there were pistols with LCMs sold and marketed prior to the mid-2000s, they

6    were far less common and certainly not highlighted as a central focus for gun industry growth

7    prior to 2008." *Id.* This proliferation was the direct result of marketing efforts by gun

8    manufacturers and retailers to sell "offensive" and "tactical" firearms as opposed to those

9    typically used in previous decades for self-defense. *Id.* at 4 (LCMs were "far less common and

10   certainly not highlighted as a central focus for gun industry growth prior to 2008.").

11        These developments, which enabled civilians to wield weaponry capable of killing more

12   people more quickly than ever before, contributed directly to unprecedented increases in the

13   frequency and lethality of mass shootings. Klarevas Rep. at 6–13; *see also supra* § II.C.

14        The creation of LCM-equipped weapons in the 20th century, their proliferation in the

15   civilian market through gun industry efforts, and the consequent prevalence of mass shooting

16   deaths that now terrorize Americans are the kind of technological and social changes that warrant

17   a "nuanced approach" under *Bruen.* 142 S. Ct. at 2132. *Oregon Firearms Fed'n*, 2023 WL

18   4541027, at * 39 (holding that because mass shootings are an unprecedented social problem and

19   because LCMs represent a dramatic technological change "analysis of . . . restrictions on LCMs

20   must therefore use the more nuanced approach called for in *Bruen*."); *Oregon Firearms Fed'n,*

21   *Inc. v. Brown*, --- F. Supp. 3d ---, 2022 WL 17454829, at *12–*13 (D. Or. Dec. 6, 2022) (same);

22   *Hanson*, 2023 WL 3019777, at *13–*14 (same); *Herrera*, 2023 WL 3074799, at *7 (same); *Del.*

23   *State Sportsmen's Ass'n, Inc.*, 2023 WL 2655150, at *10 (same); *Nat'l Ass'n for Gun Rights*,

24   2023 WL 4975979, at *29 (same); *see also Hartford*, 2023 WL 3836230, at *6 (applying the

25   "nuanced approach" to assault weapons regulation).

26

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1      **2.**    **States have long regulated weapons used for lawless violence**

2      SB 5078 follows a long American tradition of regulating weapons associated with

3  interpersonal violence. Since the Founding, the same basic pattern has repeated itself. First,

4  someone invents a weapon, which initially has no significant impact on society. Spitzer Rep.

5  at 2 (outlining "a pattern seen repeatedly throughout United States history."). If the technology

6  can be readily manufactured and works as intended, the military will often adopt it. *Id.*

7  Afterward, military-style weapons often wind up on the commercial market and pass into civilian

8  use. *Id.* If so, they sometimes contribute to criminal violence that terrorizes the public. *Id.* Here

9  is where, time and again, states decide to regulate the weapons. *Id.* at 36–42 (firearms capable

10  of automatic and semi-automatic fire), 5–11 (Bowie knives), 12–15 (clubs and other blunt

11  weapons); 15–16 (pistols); 16–17 (trap guns).

12      This pattern shows how weapons have typically been regulated when their proliferation

13  leads to widespread societal problems. Weapons regulations that follow this pattern are useful

14  analogues because they are "comparably justified" as a response to changing technology and

15  new threats of violence and terror, and they "impose a comparable burden on the right of armed

16  self-defense" by regulating especially dangerous weapons while leaving law-abiding citizens

17  free to possess other weapons appropriate for self-defense. *Bruen*, 142 S. Ct. at 2133.

18      **a.**    **Regulations on trap guns and clubs**

19      Some of America's earliest weapons regulations concerned "trap guns," which were

20  "devices or contraptions rigged in such a way as to fire when the owner need not be present."

21  Spitzer Rep. at 16. New Jersey prohibited setting trap guns in 1771, and 15 more states followed

22  between then and 1925. *Id.*, Ex. F. New Jersey enacted its early law because the "most dangerous

23  Method of setting Guns has too much prevailed in this Province," and set a penalty of six pounds

24  or six months' incarceration for violating the law. *Id.* at 16.

25      Even older are laws regulating clubs and other bludgeoning instruments. Perhaps the

26  simplest weapon technologically, these sorts of arms include billy clubs (a heavy hand-held rigid

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   club), slingshots (a flexible strap with a rock or piece of metal at one end), and sandbags (a

2   fabric bag filled with sand or rocks). *Id.* at 12–15. American restrictions on these sorts of

3   weapons date to 1664 at the latest, when the Colony of New York prohibited their public carry.

4   *Id.* at 13; Ex. C at 4. In the following centuries, "every state in the nation had laws restricting

5   one or more types of clubs," owing to their widespread use in criminality and interpersonal

6   violence. *Id.* at 12 (noting widespread opprobrium for bludgeoning instruments); *see also id.*

7   Ex. C. Slungshots in particular "were viewed as especially dangerous or harmful when they

8   emerged in society, given the ubiquity of state laws enacted after their invention and their

9   spreading use by criminals and as fighting implements." *Id.* at 14.

10      These laws regulating trap guns and clubs "are relevantly similar" to modern regulations

11   restricting the sale, manufacture, and import of LCMs. *Oregon Firearms Federation*, 2023 WL

12   4541027, at *40–*41.

13                  **b.      Regulations on Bowie knives and pistols**

14      The history and tradition of regulating weapons associated with interpersonal violence

15   continued into the 19th and 20th centuries with regulations of Bowie knives and pistols, among

16   others.

17      Knives are obviously very old, with a wide variety of knives having been utilized

18   throughout human history for various purposes. *See Teter*, 2023 WL 5008203, at *12. But in the

19   1830s, the "Bowie knife" became popular after Jim Bowie used the distinctive knife to kill one

20   man and injure another "in a duel that turned into a melee and became the subject of nationwide

21   news coverage." Rivas Rep. at 6; *see also* Spitzer Rep. at 5. The knives "were widely used in

22   fights and duels, especially at a time when single-shot pistols were often unreliable and

23   inaccurate." Spitzer Rep. at 6; *see also* Rivas Rep. at 6–7. Like LCMs today (Busse Rep. at 12),

24   the demand for Bowie knives was partly fueled by their notorious reputation (Spitzer Rep. at 6).

25   The proliferation of the knives, and their subsequent widespread criminal usage, "gave rise to

26   the widespread adoption of laws barring or restricting these weapons." Spitzer Rep. at 7. Starting

STATE DEFENDANTS' RESPONSE AND              27           ATTORNEY GENERAL OF WASHINGTON
CROSS-MOTION FOR SUMMARY                                       Complex Litigation Division
JUDGMENT                                                            7141 Cleanwater Dr SW
NO. 3:22-cv-05403-DGE                                                    PO Box 40111
                                                                    Olympia, WA 98504-0111
                                                                        (360) 709-6470

in the 1830s and ending around the start of the twentieth century, "every state" except New Hampshire "restricted Bowie knives." *Id.* Fifteen states "all but banned the possession of Bowie knives outright (by banning both concealed and open carry)," while others taxed their acquisition or possession, often prohibitively. *Id.*; *see also id.*, Exs. C, E, H. "[T]hese taxes were clearly designed to discourage trade in and public carry of" Bowie knives. Rivas Rep. at 21. Alabama, for example, required a $100 tax ($3,184.28 today)[17] for each Bowie knife transfer, including gifts. Spitzer Rep., Ex. E at 2–3. Still other jurisdictions entirely banned the sale or possession of Bowie knives. Georgia, for example, made it unlawful "to sell, offer to sell, or to keep, or to have about their person or elsewhere" a Bowie knife. Spitzer Rep., Ex. E at 22 (1837 Ga. Acts 90, § 1). Tennessee made it a misdemeanor to "sell, or offer to sell . . . any Bowie knife." *Id.* at 77 (citing 1837–1838 Tenn. Pub. Acts 200, ch. 137 § 1).

The regulatory pattern repeated when multi-shot revolvers appeared. While Colt's revolver achieved the technological capability of firing multiple shots without reloading as early as the 1830s, the gun did not become popular until after the Civil War, once it reached the civilian market. Spitzer Rep. at 24 ("[O]nce revolvers began to spread from the military to the civilian market following the Civil War, and became associated with lawless violence, they were swiftly met by laws and regulations aimed at curbing their possession and use."); Rivas Rep. at 28 ("[After the Civil War] [m]anufacturers turned to the civilian market, promoting revolvers to potential buyers across the country."). When that happened, and Colt revolvers ushered in "the country's first experience with rampant gun violence," state and local governments responded with regulations "to discourage the carrying and use of guns[.]"Rivas Rep. at 30; *see also* Spitzer Rep. at 27. Tennessee and Arkansas completely prohibited the sale of easily concealed pistols in the late 1800s, complementing the public-carry restrictions, prohibitive tax rates, and other laws regulating pistols that were common throughout the United States. Rivas Decl. at 31–40; *see also* Spitzer Decl. Ex. B.

---

[17] *See* Inflation Calculator, www.in2013dollars.com (last visited Aug. 31, 2023).

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

These laws are also "relevantly similar" to modern LCM restrictions because they "place a comparable burden on the right to armed self-defense" by leaving numerous other weapons and accessories suitable for self-defense available to civilians, and because "[t]he justifications underpinning these regulations are relevantly similar." *Oregon Firearms Federation*, 2023 WL 4541027, at *40 (holding Bowie knife regulations relevantly similar), *43 (same for pistol regulations). SB 5078 is actually less restrictive than many of the historical Bowie knife regulations, because Washington does not prohibit the possession or carry of LCMs that Washington residents lawfully possess—nor does it ban a category of weapons, but only restricts accessories that expand firearms' rapid-fire capacity. SB 5078 is well supported by analogous historical weapon regulations.

<blockquote>

c.    **Twentieth century regulations on automatic and semi-automatic weapons**

</blockquote>

Automatic and semi-automatic weapons were introduced into America's civilian marketplace after being adopted by the military during World War I, and quickly became the subject of a nationwide effort to restrict their possession and use. Spitzer Decl. at 29–42. The Thompson submachinegun (Tommy Gun) was first marketed to civilians in the United States starting in the 1920s, and it was advertised as the "ideal weapon for the protection of large estates, ranches, plantations, etc." *Id.* at 31–32. Despite its marketing as a defensive weapon, though, the Tommy Gun became known for its ability to murder a large number of people quickly, most infamously in the St. Valentine's Day massacre of 1929. *Id.* at 33.

Reacting to these new, dangerous, and suddenly widely available weapons, 32 states enacted anti-machinegun laws between 1925 and 1934. *Id.* at 36. Many of these laws regulated semi-automatic weapons in addition to automatics, often using magazine capacity as the metric to distinguish between regulated and unregulated weapons. *Id.* at 40–42. "In fact, magazine capacity/firing limits were imposed in at least 23 states, representing approximately 58% of the American population at that time." *Id.* at 40. And at the federal level, the National Firearms Act

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    has also banned machineguns since 1934. 18 U.S.C. § 922(o) (2023). These restrictions were

2    and are undoubtedly consistent with the Second Amendment: in *Heller*, the Supreme Court

3    found the hypothetical suggestion that "restrictions on machineguns . . . might be

4    unconstitutional" to be "startling." *Heller*, 554 U.S. at 624.

5         And, of course, responding to the same modern phenomenon of mass shootings that

6    SB 5078 responds to, Congress in 1994 enacted a sweeping ban on assault weapons that included

7    a prohibition on the sale and possession of "large capacity ammunition feeding devices," defined

8    as "a device that has a capacity of . . . more than 10 rounds of ammunition," manufactured after

9    the law went into effect. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No.

10   103-322, § 1101103, 108 Stat. 1998; *see also* Spitzer Rep. at 3. This was the prevailing law in

11   the United States for ten years, before it was allowed to expire. *Id.* at § 110105. Today, "fourteen

12   states plus the District of Columbia have enacted laws to restrict large capacity magazines."

13   Spitzer Rep. at 3. About 34.5% of the United States population—115 million people—live in

14   jurisdictions that restrict LCMs. *Id.* at 3–4.

15        These laws from the twentieth century "confirm[] the historical traditions from the

16   eighteenth and nineteenth centuries" showing that weapons associated with interpersonal

17   violence are subject to reasonable regulation. *See Oregon Firearms Federation*, 2023 WL

18   4541027, at *44. They are, of course, also very closely analogous to SB 5078. *See id* at *45.

19        **3.    SB 5078 is consistent with the historical tradition of weapons regulation**

20        The undisputed evidence shows that SB 5078 is consistent with the history and tradition

21   of the United States. The State Defendants' three expert historians, in their reports totaling 366

22   pages, contextualize and explain the broad contours of weapons regulation in the United States,

23   and show that the above-delineated historical regulations are analogously similar to SB 5078.

24   *See generally* Spitzer Rep.; Rivas Rep.; Cornell Rep. The Intervenor-Defendants' additional

25   experts similarly analyze historical firearms technology and explain that the anti-machinegun

26   and fire-capacity regulations of the 1920s did not come into being much earlier because large

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   firing capacities are relatively young technologies and only started to pose societal problems

2   around the same time. *See generally* Delay Decl.; Sweeney Decl.

3       This unrebutted historical evidence shows conclusively that SB 5078, which prohibits

4   the sale, manufacture, and import of LCMs into Washington State, is consistent with the history

5   and tradition of regulating trap guns, and blunt weapons at the founding, Bowie knives and

6   pistols in the mid-1800s, and machine gun regulations of the Prohibition era. Each of these laws

7   burdened rights of armed self-defense at least as much as SB 5078 by making it impossible, or

8   very inconvenient, to use a particular kind of weapon or accessory, or to fire a weapon more than

9   a certain number of times without reloading. But, like SB 5078, they left numerous weapons and

10  accessories fully available for civilians' use for self-defense. And, also like SB 5078, they

11  targeted only particularly dangerous weapons or weapon uses associated with criminal violence.

12  Thus, SB 5078 both imposes comparable burdens on the right to armed self-defense as these

13  historical analogues and is comparably justified, satisfying *Bruen*'s second step.

14      Multiple courts have reached the same conclusion, relying on the same facts Defendants

15  have proven here, and often relying on the same expert witnesses and other evidence. *Oregon*

16  *Firearms Fed'n*, 2023 WL 4541027, at *46 (upholding nearly-identical Oregon LCM law under

17  *Bruen* step two after trial); *Hanson*, 2023 WL 3019777, at *17 (holding Prohibition-era

18  regulations were appropriate analogue for nearly-identical District of Columbia LCM law);

19  *Bevis*, 2023 WL 2077392, at *10–*16 (relying on Bowie knife laws, blunt-weapon regulations,

20  and machine gun regulations, among others, to find nearly identical LCM regulation was

21  consistent with the history and tradition of the United States); *Herrera*, 2023 WL 3074799, at

22  *7 (same); *Del. State Sportsmen's Ass'n*, 2023 WL 2655150, at *11 (same); *Nat'l Ass'n for Gun*

23  *Rights*, 2023 WL 4975979, at *33 (same); *see also Hartford*, 2023 WL 3836230, at *6 (relying

24  on trap gun, Bowie knife, blunt weapon, pistol, and machine gun regulations in finding challenge

25  to assault weapon sales ban unlikely to succeed at *Bruen* step two).

26      Against this mountain of historical evidence, Plaintiffs offer nothing at all—not even a

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

single rebuttal expert. Nor have Plaintiffs challenged the qualifications or reliability of Defendants' experts' testimony. Instead, their sole argument is that the Supreme Court has already done the historical "spadework,"—a reference to Plaintiffs' erroneous contention that the only question at both steps one *and* two is whether a weapon or accessory is in broad circulation. Dkt. # 101 at p. 11; *see supra* at § III.B. Because *Bruen* asks courts to "follow the principle of party presentation," this Court is "entitled to decide [the] case based on the historical record compiled by the parties," 142 S. Ct. at 2130 n.6—and here, Plaintiffs' failure to rebut Defendants' historical evidence is dispositive.

There is no genuine issue of material fact that SB 5078 is consistent with the history and tradition of firearms regulation in the United States and that it is therefore consistent with the Second Amendment.

## IV.   CONCLUSION

For the foregoing reasons, the State Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment and grant summary judgment in Defendants' favor.

DATED this 1st day of September 2023.

ROBERT W. FERGUSON
Attorney General


*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES, WSBA #49515
R. JULY SIMPSON, WSBA #45869
WILLIAM MCGINTY, WSBA #41868
BRIAN HUNT ROWE, WSBA #56817
Assistant Attorneys General
KRISTIN BENESKI, WSBA #45478
First Assistant Attorney General
Andrew.Hughes@atg.wa.gov
July.Simpson@atg.wa.gov
William.McGinty@atg.wa.gov
Brian.Rowe@atg.wa.gov
Kristin.Beneski@atg.wa.gov
*Attorneys for Defendants Bob Ferguson and*
*John R. Batiste*

I certify that this memorandum contains 11,801

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

32

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

words, in compliance with the Stipulated Motion and Order Extending Deadlines (Dkt. # 100).

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1

## **DECLARATION OF SERVICE**

2

I hereby declare that on this day I caused the foregoing document to be electronically

3

filed with the Clerk of the Court using the Court's CM/ECF System which will send notification

4

of such filing to all counsel of record.

5

I declare under penalty of perjury under the laws of the State of Washington and the

6

United States of America that the foregoing is true and correct.

7

8

DATED this 1st day of September 2023, at Seattle, Washington.

9

10

*/s/ Andrew R.W. Hughes*

ANDREW R.W. HUGHES, WSBA #49515
Assistant Attorney General

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

STATE DEFENDANTS' RESPONSE AND
CROSS-MOTION FOR SUMMARY
JUDGMENT
NO. 3:22-cv-05403-DGE

34

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470