# Exhibit 1

Expert Report: History of Firearms Regulation in the Anglo-American Legal Tradition

**Prepared for the Washington State Attorney General's Office by**

Saul Cornell, Ph.D.


**In the Matter of:**

GABRIELLA SULLIVAN, *et al.*,

Plaintiffs,

v.

BOB FERGUSON, *et al.*,

Defendants,

and

ALLIANCE FOR GUN RESPONSIBILITY,

Intervenor-Defendant.


Date: 4/28/23

Saul Cornell, Ph.D.

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.    BACKGROUND AND QUALIFICATIONS ...................................................... 1

III.    SUMMARY OF OPINIONS ............................................................................. 2

    A.   The Right to Keep and Bear Arms in Historical Context: Liberty and Regulation in Founding Era Constitutional Thought ................................................................ 5

        1.   The difficulty of a historical inquiry in this context .................................... 5

    B.   From Muskets To Pistols: Change and Continuity in Early American Firearms Regulations .............................................................................................. 10

    C.   America's First Gun Violence Crisis and Arms Regulation............................ 16

    D.   The Police Power And Firearms Regulation .................................................. 18

    E.   Reconstruction And The Expansion Of State Police Power To Regulate Firearms (1863–1877).......................................................................... 24

    F.   The Increased Lethality of Modern Firearms .................................................. 31

    G.   Singular and Curious Weapons: The Irrelevance of Repeaters and Other Exotic Weapons to Bruen's Historical Framework...................................................... 32

IV.    CONCLUSION: THE SCOPE OF PERMISSIBLE REGULATION ..................... 36

## I.     INTRODUCTION

I have been asked by the Office of the Attorney General for the State of Washington to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution. In *N.Y. State Rifle & Pistol Association, Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence.[1] This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past. I have also been asked to evaluate the statute at issue in this case, particularly regarding its connection to the tradition of firearms regulation in American legal history.

## II.     BACKGROUND AND QUALIFICATIONS

I received my BA from Amherst College and MA and PhD from the University of Pennsylvania. I currently hold the Paul and Diane Guenther Chair in American History at Fordham University. The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American History. In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School. I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[2]

---

[1] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).
[2] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit A.

My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*. My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals. I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3] Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined. I have provided expert witness testimony in *Rocky Mountain Gun Owners v. Gessler*, No. 14-cv-02850 (D. Colo.); *Chambers v. City of Boulder*, No. 2:18-cv-30581 (Colo. D. Ct., Boulder Cnty.), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.), and *Miller v. Smith*, No. 3:18-cv-3085 (C.D. Ill.); *Jones v. Becerra*, 3:19-cv-01226-L-AHG (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington*, No. 0:21-cv-01348 (D. Minn.); *Miller v. Becerra*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); *Duncan v. Becerra*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.); *Rupp v. Becerra*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal.); *Capen v. Healey*, No. 1:22-cv-11431-FDS (D. Mass.); *B&L Productions, Inc. v. Newsom*, No. 3:21-cv-01718-AJB-DDL (S.D. Cal.); *National Assocation for Gun Rights v. Lamont*, No. 3:22-cv-0118 (D. Conn.); and *NAGR v. Lopez*, 1:22-cv-00404-DKW-RT (D. Haw.). I am being compensated for services performed in the above-entitled case at an hourly rate of $750 for reviewing materials, participating in meetings, and preparing reports; $1000 per hour for depositions and court appearances. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## III.    SUMMARY OF OPINIONS

Understanding text, history, and tradition requires a sophisticated grasp of historical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to

---

[3] Saul Cornell, *The Right to Bear Arms*, *in The Oxford Handbook of the U.S. Constitution* 739–59 (Mark Tushnet, Sanford Levinson & Mark Graber, eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System, in* 1 *The Cambridge History of Law in America* 518–544 (Christopher Tomlins & Michael Grossberg, eds., 2008).

arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment's original understanding. It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights.

In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas. Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4] Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[5]

The concept of the peace was central to common law.[6] As one early American manual for justices of the peace noted: "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[7] Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[8] The use of Blackstone as an authority on how early Americans understood their inheritance from England has been reiterated by the Supreme Court.[9] Thus, the dominant understanding of the

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. Const. of 1776, Declaration of Rights, art. III § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 Chi.-Kent L. Rev. 937 (2014).

[5] 9 *Statutes at Large of Pennsylvania* 29–30 (Mitchell & Flanders, eds. 1903); Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North-Carolina*, 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[6] Laura F. Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (University of North Carolina Press, 2009).

[7] Joseph Backus, *The Justice of the Peace* 23 (1816).

[8] 1 William Blackstone, *Commentaries*, at *349.

[9] *New York Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128, 2136, 2148 (2022) and *id*. (Kavanaugh, Concurring at 2162); *District of Columbia v. Heller*, 554 U.S. 570, 626−627 (2008); and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms. The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 Fordham Urb. L.J. 1695134

Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period rested on a link between the right to keep and bear arms and the goal of preserving the peace.[10]

The most basic right of all at the time of Founding was the right of the people to regulate their own internal police, which encompassed more than law enforcement, to include the right of the people to legislate for the common good.[11] Although modern lawyers and jurists are accustomed to thinking of state police power, the Founding generation viewed this concept as a right, not a power.[12] The first state constitutions clearly articulated such a right—including it alongside more familiar rights such as the right to bear arms.[13] Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."

Thus, any argument that rights must be understood as they were at the time of founding, such as the right to bear arms, must also apply to the scope of the right of the people to regulate their internal police by enacting laws to promote the security and welfare of the people. The history of regulation, including gun regulations, in the decades after the right to bear arms was codified in both the first state constitutions and the federal bill of rights underscores this important point about the scope of legislative authority in this area.

---

(2012). It seems likely that the phrase was an example of an archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 Virginia L. Rev. 687 (2016). The best modern translation for this term would be "unusually dangerous."

[10] On Founding-era conceptions of liberty, *see* John J. Zubly, *The Law of Liberty* (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S, 319, 325 (1937). For a more recent elaboration of the concept, *see generally* James E. Fleming & Linda C. McClain, *Ordered Liberty: Rights, Responsibilities, and Virtues* (Harvard University Press, 2013). On Justice Cardozo and the ideal of ordered liberty, *see Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 Cardozo L. Rev. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 Geo. J.L. & Pub. Pol'y 569 (2017).

[11] Markus Dirk Dubber, *The Police Power: Patriarchy and the Foundations of American Government* (2005); Gary Gerstle, *Liberty and Coercion: The Paradox of American Government, From the Founding to the Present* (Princeton Univ. Press, 2015).

[12] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 Critical Analysis of L. 64 (2015); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. of Pol'y Hist. 47 (2008).

[13] Pa. Const. of 1776, ch. I, art. III; MD. Declaration of Rights, art. IV (1776); N.C. Declaration of Rights, art. I, § 3 (1776); and Vt. Declaration OF Rights, art. V (1777).

In the years following the adoption of the Second Amendment and its state analogues, firearm regulation increased. Indeed, the people of the individual states exercised their right to regulate to address longstanding issues and novel problems created by firearms in American society. Over the eighteenth and nineteenth century, American regulation increased with the advancement of firearm technology, from the manufacturing, storage, and sale of gunpowder, to regulating where firearms and other dangerous weapons cannot be carried. The Founding generation and their successors sought to create a well regulated society in which ordered liberty, not anarchy, prevailed.[14]

## A.    The Right to Keep and Bear Arms in Historical Context: Liberty and Regulation in Founding Era Constitutional Thought

### 1.    The difficulty of a historical inquiry in this context

The United States Supreme Court's decisions in *Heller*, *McDonald*,[15] and *Bruen* have directed courts to look to text, history, and tradition when evaluating the scope of permissible firearms regulation under the Second Amendment. Legal texts must not be read in a decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past. Similarly, a mechanistic strategy of digital searching for historical gun laws would be incapable of answering the historical inquiries required under *Bruen*. Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts—how firearms technology has changed, how consumer demand has waxed and waned, and how the people, acting through their representatives, respond to societal ills created by those changes.[16]

In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much

---

[14] Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 Am. Pol. Thought 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).
[15] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).
[16] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 Fordham L. Rev. 935 (2015).

more work needs to be done to fill out this picture. [17] Indeed, such research is still ongoing and new materials continue to emerge; and even since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[18]

   As recognized by the Supreme Court, each provision of the Bill of Rights, including the original Second Amendment, was a result of interest-balancing undertaken by the people themselves in framing the federal Constitution and the Bill of Rights. *Bruen*, 142 S. Ct. at 2131; *Heller*, 554 U.S. at 635. A year after the adoption of the Second Amendment, Supreme Court Justice James Iredell, reminded grand jurors in Massachusetts that "liberty itself, in order to be truly enjoyed, must submit to reasonable considerate restraints."[19] Thus, from its outset, and as further detailed in this section, the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state. Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary. [20]

   Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce."[21] Thus, the First Amendment prohibits a diminishment of the rights it protects.The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed."[22] By contrast, in Founding-era American English, the word

---

[17] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & Contemp. Probs. 1 (2017).
   [18] *Symposium—The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. Davis L. Rev. 2495 (2022); *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society* (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller, eds., forthcoming 2023).
   [19] John McRee Griffith, *2 Life and Correspondence of James Iredell: One of the Associate Justices of the Supreme Court of the United States* 365 (1858).
   [20] Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 Law & Contemp. Probs. 31 (2020)
   [21] *See infra* sources cited in notes 22–29.
   [22] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation: "Princes who infringe the law of nations, commit as

"infringement" meant to "violate" or "destroy."[23] In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text. Members of the Founding generation would have understood that the legislature could regulate the conduct protected by the Second Amendment and comparable state arms bearing provisions as long as such regulations did not destroy the underlying right. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment.

John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the common law. Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature. True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted ordered liberty. Regulation was the indispensable correlate of rights in Founding era constitutionalism.[24]

Similarly, Nathan Bailey's Dictionarium Britannicum (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[25] And his 1763 New Universal Dictionary repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[26] Samuel Johnson's Dictionary of the English Language (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[27] Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive of."[28] And Noah Webster's An American Dictionary of the English Language (1828) largely repeats Johnson's

---

great a crime as private people, who violate the law of nature," J.J. Burlamaqui, *The Principles of Natural Law* 201 (Thomas Nugent trans., 1753). This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

[23] *See infra* notes 24–29.
[24] *Liberty*, A New Law Dictionary (1792) *See also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 Law & Contemp. Probs. 31, 32–33 (2020)
[25] *Abridge*, Dictionarium Britannicum (1730).
[26] *Abridge*, New Universal Dictionary (1763).
[27] *Infringe*, Dictionary of the English Language (1755).
[28] *Abridge*, Dictionary of the English Language (1755).

definitions of "infringe" and "abridge."[29] Although today the two terms are conflated by some, the meanings of abridge and infringe were and remain distinct. The Founding generation was far more nuanced in distinguishing between the differences between these two terms.

For the framers, ratifiers, and other relevant legal actors in the Founding era, robust regulation was not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[30] As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution: "True liberty consists, not in having no government, not in a destitution of all law, but in our having an equal voice in the formation and execution of the laws, according as they effect [sic] our persons and property."[31] By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished.[32]

The key insight derived from taking the Founding-era conception of rights seriously and applying the original understanding of the Founding era's conception of liberty is the recognition that regulation and liberty are both written into the Amendment's text. The inclusion of rights guaranteed in constitutional texts was not meant to place them beyond the scope of legislative control. "The point of retaining natural rights," originalist scholar Jud Campbell reminds us "was not to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."[33] Thus, rather than limiting rights, regulation was the

---

[29] *Abridge*, *Infringe*, An American Dictionary of the English Language (1828).

[30] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 Critical Analysis L. 221, 233–34 (2016). *See generally* Gerald Leonard & Saul Cornell, *The Partisan Republic: Democracy, Exclusion, and the Fall of the Founders' Constitution, 1780s–1830s* at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 Yale J.L. & Humanities 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions).

[31] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text available in the Evans Early American Imprint Collection) (emphasis in original).

[32] *See generally* Quentin Skinner, *Liberty Before Liberalism* (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); *The Nature of Rights at the American Founding and Beyond* (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

[33] Jud Campbell, *The Invention of First Amendment Federalism*, 97 Tex. L. Rev. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the*

essential means of preserving rights, including self-defense.[34]

In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order.[35] The individual states also imposed loyalty oaths, disarming those who refused to take such oaths.[36] No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties.[37] Thus, some forms of prior restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[38] The plain text of the Second Amendment not only protects the right to keep and bear arms, it acknowledges that this right is designed to encourage the security of a free state. Actions that undermine this security are clearly not protected by the Amendment.

In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goal of promoting public safety. The

---

*Academic Debate Over the Second Amendment*, 106 J. of Crim. L. and Criminology 203, 206 (2016) (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

[34] *See* Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15 Geo. J.L. & Pub. Pol'y 569, 576–77 (2017). .

[35] H. Richard Uviller & William G. Merkel, *The Militia And The Right To Arms, Or, How The Second Amendment Fell Silent* 150 (2002).

[36] An Ordinance Respecting the Arms of Non-Associators, 1776 Pa. Laws 11 § 1; An Act for . . . disarming such persons as are notoriously disaffected to the cause of America, 1776 Mass. Laws 7; An act describing the disqualifications to which persons shall be subjected who have been or may be guilty of Treason, or giving Aid or Support to the present Rebellion, 1787 Mass. Laws 6. The first two of these laws were targeted at British sympathizers during the Revolutionary War. The third at participants of Shay's Rebellion. *See also* Catie Carberry, *Miniseries, Part II—Disarmament of those Disaffected to the Cause of America*, Duke Center for Firearms Law (2019).

[37] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 228–30 (1999).

[38] *Id.*

proper metric for deciding if such laws were constitutional was and remains the same today: whether a regulation infringes on the core right protected by the Second Amendment.[39]

## B.     From Muskets To Pistols: Change and Continuity in Early American Firearms Regulations

Guns have been regulated from the dawn of American history.[40] At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[41] Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen*.[42]

Situating the Second Amendment in history requires us to distinguish between the actual historical context of weapons and weapons regulations and a series of myths created by later generations to sell novels, movies, and guns themselves.[43] Unfortunately, many of these myths continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[44]

Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment. A combination of factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem. In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment.[45] Limits in Founding-era firearms technology militated against

---

[39] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004).
[40] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Probs. L. & Contemp. 55 (2017).
[41] *Id.*
[42] Ruben & Miller, *supra* note 17 at 1.
[43] Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (2016).
[44] Richard Slotkin, *Gunfighter Nation: The Myth Of The Frontier In Twentieth-Century America* (1993); Joan Burbick, *Gun Show Nation: Gun Culture And American Democracy* (2006).
[45] Randolph Roth, *American Homicide* 56, 315 (2009). Levels of interpersonal gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America.

the use of guns as effective tools of interpersonal violence in this period. Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes. Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge. Indeed, the iconic image of rifles and muskets hung over the mantle place in early American homes was not primarily a function of aesthetics or the potent symbolism of the hearth, as many today assume. As historian Roth notes: "black powder's hygroscopic, it absorbs water, it corrodes your barrel, you can't keep it loaded. Why do they always show the gun over the fireplace? Because that's the warmest, driest place in the house."[46] Similar problems also limited the utility of muzzle-loading pistols as practical tools for self-defense or criminal offenses. Indeed, at the time of the Second Amendment, over 90% of the weapons owned by Americans were long guns, not pistols.[47] As Roth's data makes clear, there was not a serious homicide problem looming over debates about the Second Amendment. Nor were guns the primary weapon of choice for those with evil intent during this period.[48] The skill and time required to load and fire flintlock muzzle loading black powder weapons meant that these types of firearms were unlikely to be used in crimes of passion.

In short, the Founding generation did not confront a gun violence problem similar in nature or scope to the ills that plague modern America. Rather, they faced a different, but no less serious problem: American reluctance to purchase the type of weapons needed to effectively arm their militias. Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces loaded with shot, or light hunting muskets.[49] Killing pests and hunting birds were the main concern of farmers, and their choice of firearm reflected these basic facts of life. Nobody bayoneted turkeys,

---

Roth's data also shows that levels of violence between Americans and Indian nations were very high, a fact that underscored the need to arm militias to protect Americans and their communities.

[46] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, National Institute of Justice (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0.

[47] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, in *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (Jennifer Tucker, et al., eds., 2019).

[48] Roth, *supra* note 45.

[49] Sweeney, *supra* note 47.

and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates.[50]

Despite repeated efforts to exhort and legislate to promote this goal, many states were failing to adequately equip the militia with suitable firearms that could withstand the rigors of the type of close-quarters hand-to-hand combat required by the military tactics of the time. A gun had to be able to receive a bayonet and serve as a bludgeon if necessary. The light-weight guns favored by the overwhelmingly rural population of early America were well designed to put food on the table and rid fields of vermin but were not well suited to eighteenth-century ground wars. When the U.S. government surveyed the state of the militia's preparedness shortly after Jefferson took office in 1800, the problem had not been solved. Although Massachusetts boasted above 80% of its militia armed with military quality weapons, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[51]

As a result, the government took an active role in encouraging the manufacturing of arms and had a vested interest in determining what types of weapons would be produced.[52] The American firearms industry in its infancy was thus largely dependent on government contracts and subsidies. One important form of government regulation of the firearms industry, a practice that began in the era of the Second Amendment and persisted throughout the nineteenth century included inspection of weapons and Government-imposed safety standards on the firearms industry. Indeed, without such interventions it is likely that the industry would never have survived. The danger posed by defective arms, or poorly manufactured ones could be catastrophic. A burst barrel of a musket or fowling piece could turn a firearm into a pipe bomb, maiming or killing an unfortunate user.

In 1805 Massachusetts enacted a law requiring all guns to be inspected before they could

---

[50] Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (2001).

[51] *Id.*

[52] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 Hastings Const. L.Q. 523, 524 (2019); Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 New Eng. Q. 526, 526 (2014).

be sold in the Commonwealth.[53] As stated in the law's preamble, the law's purpose was to prevent harm to residents from the sale of unsafe firearms. The law required the appointment of inspectors, up to two per county, who would "prove," i.e. test and inspect, all musket barrels and pistol barrels. The law detailed the manner in which these inspections were to be conducted. Firearms were tested to ensure that they met government standards for safety and effectiveness. If the firearm passed inspection, then the inspector would stamp it with the inspector's initials and the year onto the barrel so that the stamp could not be erased or disfigured. Only firearms that passed inspection and were stamped could be sold, and the sale of firearms without a stamp was subject to a fine. The standards that all muskets and pistols had to meet to pass inspection were updated in 1814.[54]

Maine imposed a similar requirement on firearms in 1821, and continued the practice through the end of the century.[55] Similar to the Massachusetts proving law, the Maine law required the governor to appoint inspectors of firearms who would then ensure that firearms met certain safety standards and were stamped prior to their sale. The Maine and Massachusetts laws persisted throughout the nineteenth century.[56]

In 1780, George Washington ordered that the Continental Army ensure all gun barrels were proved.[57] The federal armory in Springfield, Massachusetts, began producing muskets in 1794. The presence of the armory served as a spur to innovation among local gun smiths. In fact, this confluence of factors helped Western Massachusetts become the leading small arms producer in

---

[53] An Act to Provide for the Proof of Fire Arms Manufactured Within this Commonwealth,1804 Mass. Acts. 111, ch. 81.

[54] 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1 ("All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . ."); § 2 ("That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.")

[55] An Act to Provide for the Proof of Fire Arms, 2 Laws State of Maine 685–6 (1821).

[56] 1 *The General Statutes of the Commonwealth of Massachusetts: Enacted December 28, 1859, to Take Effect June 1, 1860* at 255 (2d ed., William A. Richardson & George P. Sanger, eds., 1873).

[57] Letter from George Washington to Henry Knox (Nov. 30, 1780), *in* The Writings of George Washington from the Original Manuscript Sources 1745-1799 (John C. Fitzpatrick, *ed.*) ("I think it will be best for you to give orders to the Officer superintending the Laboratory to have the Barrels sufficiently proved before they are delivered to Mr. Buel, as I suspect that they are most of them of the trash kind which Mr. . . . Lee charges Mr. Deane[']s Agent with purchasing.")

America on the eve of the War of 1812. The Springfield armory, a federal entity, was governed by federal law (not Massachusetts law) but it nonetheless extensively scrutinized and inspected all arms made at its facilities and any arms produced by local gunsmiths under government contract. This quality of these weapons, literally being stamped with government approval, made these guns particularly valuable in the civilian arms market when government surplus guns were sold to consumers.[58]

Enforcing manufacturing standards and protecting the public from defective weapons was one purpose of proving laws. The stamping of weapons also served important public safety functions, making it more difficult for firearms to be diverted to illegal sales to groups prohibited from possessing weapons. In 1776, George Washington complained about guns being "filched."[59]

> And to prevent, in future, the scandalous abuses arising from embezzlement & Other dirty Causes, All Arms under the latter denomination with their Accoutrements, are to be stamped, with the Words, United States on the Barrel and such places as will receive the Impression. This is by a Resolve of Congress, 3 & being founded in the most evident necessity, must be minutely attended to.[60]

All Continental Army firearms stamped with an insignia: "U.S.XIII." Government marked weapons in this fashion to make it easier to identify cases where arms were being "filched"illegally sold, in some cases to persons prohibited from possessing guns, including loyalists and hostile Indian nations.[61]

Despite these policies, the militia continued to be plagued by a shortage of high-quality arms. Recent scholarly examinations of probate inventories between 1770 and 1798 sheds light onthe continuing problem of militia armament in the early Republic. About half of the households inventoried during probate reported having a workable firearm. While probate inventories are an imperfect measurement of gun ownership in a society (among other issues, not all firearms owned

---

[58] Lindsay Schakenbach Regele, *Manufacturing Advantage: War, the State, and the Origins of American Industry, 1776–1848* at 63–65 (2019).
[59] From George Washington to Lieutenant Colonel Benjamin Flower, 31 March 1777," Founders Online, National Archives, https://founders.archives.gov/documents/Washington/03-09-02-0028.
[60] George Washington to Brigadier General Samuel Holden Parsons, 23–25 April 1777," Founders Online, National Archives, https://founders.archives.gov/documents/Washington/03-09-02-0236.
[61] E. Wayne Carp, *To Starve The Army At Pleasure: Continental Army Administration And American Political Culture, 1775–1783* at 66–67 (1984).

by a decedent passed into probate, sometimes guns were transferred to family members through extra-judicial avenues), they can provide a rough gauge of how common firearm ownership was and the sorts of firearms typically owned. Thus, as a relative measure of the types of guns Americans owned, the new research is illuminating, and the evidence clearly shows that the number of military muskets in private hands was still too low to fully arm the militia in most parts of America.

**Table One: Types of Firearms in New England Probate Inventories
in Select Periods During the Founding Era[62]**

| Years | % Inventories with any type of firearm | % Inventories with muskets | % Inventories with pistols |
|---|---|---|---|
| 1783-1786 | 46% | .5% | 2.5% |
| 1795-1798 | 32% | 1.5% | 1.5% |

Despite repeated legislative efforts by federal and state governments to compel citizens to procure the types of military quality weapons needed to arm the militia, in many parts of the new nation the militia remained without adequate arms. When the U.S. government surveyed the state of the militia's preparedness shortly after President Jefferson took office in 1800 things had improved slightly but the problem of fully arming the militia had not been solved. Although Massachusetts boasted above 80% of its militia armed with military quality weapons, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[63]

Finally, one must acknowledge the differences between the small face to face rural communities of early America and modern American society.  It would be impossible to overstate the significance of these differences in terms of their impact on gun cultures and gun policy. Sellers and buyers of firearms in early America were typically members of the same community. And apart from the wealthiest Americans, most households could not afford to own multiple weapons.

---

[62] Probate data on arms adapted from table number 3.5 in Sweeney, *supra* note 71 at 61. On the utility and limits of this type of data, *see* Gloria Main, *Many Things Forgotten: The Use of Probate Records in 'Arming America'*, 59 The William And Mary Quarterly 211 (2002); Paul G. E. Clemens, *The Consumer Culture of the Middle Atlantic, 1760-1820*, 62 William And Mary Quarterly 577 (2005); James Lindgren and Justin L. Heather, *Counting Guns in Early America*, 43 WM. & Mary L. Rev. 1777 (2002).

[63] Sweeney, *supra* note 47.

Local gun smiths, not big box stores such as Walmart, were responsible for selling most firearms. Moreover, today's Americans have a myriad of choices of the type and style of weapon when they wish to acquire a firearm. Gun shows, gun supermarkets, and internet sales are a few of the many ways Americans acquire firearms today. Although estimates vary, it is likely that there are now more guns than people in contemporary America.[64] Early American firearms production in the era of the Second Amendment, in contrast, was dominated by artisan production and guns were in need of frequent repair.[65] Gun owners needed to maintain an on-going relationship with their local gun smith to keep their guns in good working order. The informal ties of kin and community that defined the close-knit communities of early America meant that individuals were monitored by their neighbors. This world shares little with the largely anonymous world of modern firearms commerce.[66]

## C.    America's First Gun Violence Crisis and Arms Regulation

The early decades of the nineteenth century witnessed a revolution in the production and marketing of guns.[67] The same technological changes and economic forces that made wooden clocks and other consumer goods such as Currier and Ives prints common items in many homes also transformed American gun culture.[68] These same changes also made handguns and a gruesome assortment of deadly knives, including the dreaded Bowie knife, more common. This gradual evolution in both firearms and ammunition technology was given a jolt by the development of Samuel Colt's pistols around the time of the Mexican-American War, and their proliferation during and after the Civil War.[69] Changes in technology and consumer demand seldom lead to dramatic changes in society instantaneously. Nor did government regulations act pre-emptively to

---

[64] Terry L., Schell, *et. al., State-Level Estimates of Household Firearm Ownership* (2020) https://www.rand.org/pubs/tools/TL354.html.

[65] Sweeney, *supra* note 47.

[66] Scott Paul Gordon, *The Ambitions of William Henry*, in 136 *Pennsylvania Magazine Of History And Biography* 253 (2012). Pennsylvania was one of the main regions of early American gunsmithing, M.L. Brown, *Firearms In Colonial America: The Impact On History And Technology*, 1492–1792 (1980).

[67] Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 93 Bus. Hist. Rev. 57 (2018).

[68] Sean Wilentz, *Society, Politics, and the Market Revolution*, in *The New American History* (Eric Foner, ed., 1990).

[69] William N. Hosley, *Colt: The Making of an American Legend* (1st ed. 1996).

anticipate new problems before they manifested themselves. There was typically a time lag between technological change, market penetration, and government regulation.[70]

As cheaper, more dependable, and easily concealable handguns proliferated in large numbers, Americans, particularly southerners, began sporting them with alarming regularity. The calculus of individual self-defense changed dramatically as a result.[71] The economic and social transformations in gun culture and commerce gradually intensified and gave rise to America's first gun violence crisis. [72]

The response of states to the emergence of new firearms that threatened the peace was more regulation. When faced with changes in technology and consumer behavior, as well as novel threats to public safety, the individual states enacted laws to address these problems. Antebellum courts typically upheld such limits on the unfettered exercise of the right to keep and bear arms. The primary limit identified by courts in evaluating such laws was the threshold question about infringement: whether the law negated the ability to act in self-defense.[73] In keeping with the clear imperative hard-wired into the Second Amendment itself, states singled out weapons that posed a particular danger for regulation or prohibition. Responding in this fashion was entirely consistent with Founding-era conceptions of ordered liberty and the Second Amendment. The proliferation of unusually dangerous weapons led states to use their police power authority to regulate them in a manner consistent with public safety.[74]

---

[70] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017).

[71] Cornell, *supra* note 3, at 745.

[72] Cornell, *supra* note 9, at 716.

[73] *E.g.*, *Nunn v. State*, 1 Ga. 243, 251 (1846) ("A statute which, under the pretence of *regulating*, amounts to a *destruction* of the right, or which requires arms to be so boren as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."). On antebellum regional patterns of regulation and judicial recognition of a robust right to regulate firearms, *See* Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. F. 121, 125-28 (2015).

[74] Although several modern commentators have treated the phrase "dangerous and unusual" as conjunctive, the term was more likely an example of hendiadys and therefore the best gloss would be "unusually dangerous." American justice of the peace manuals from the Founding era typically employ the alternative formulation, "dangerous or unusual." For examples of this usage, see Henry Potter, *The Office And Duty Of A Justice Of The Peace, And A Guide To Sheriffs, Coroners, Clerks, Constables, And Other Civil Officers: According To The Laws Of North Carolina* 39 (1816); John Milton Niles, *The Connecticut Civil Officer* 16 (3rd ed. 1839).

### D.    The Police Power And Firearms Regulation

The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[75] The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[76] By the early nineteenth century, the term "police" was a fixture in American law.[77] Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness, &c."[78] The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local municipalities, and the federal government when it was legislating conduct on federal land and in buildings.[79] The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers. Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today. Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority,

---

[75] Pa. Const. of 1776, Ch. I, art iii.

[76] For other examples of constitutional language similar to Pennsylvania's provision, N.C. Const. of 1776, Declaration of Rights, art. II; Vt. Const. of 1777, Declaration of Rights, art. IV. For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 New York Laws 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* Laws Passed in the Territory Northwest of the River Ohio 29 (1791). For later examples, *see* 1 Statutes of the State of New Jersey 561 (rev. ed. 1847); 1 Supplements to the Revised Statutes. Laws of the Commonwealth of Massachusetts, Passed subsequently to the Revised Statutes: 1836 to 1849, Inclusive 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[77] Ernst Freund, *The Police Power: Public Policy and Constitutional Rights* 2, n.2 (1904).

[78] 10 *Encyclopedia Americana* 214 (Francis Lieber ed.).

[79] Harry N. Scheiber, *State Police Power*, 4 Encyclopedia of the American Constitution 1744 (Leonard W. Levy et al., eds., 1986).

including the authority to regulate guns and gun powder.[80]

Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible. Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."[81] Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress." States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[82]

State police power authority was at its pinnacle in matters relating to guns or gun powder.[83]Every aspect of the manufacture, sale, and storage of gun powder was regulated due to the substance's dangerous potential to detonate if exposed to fire or heat. This was so even though gunpowder was essential to the operation of firearms at that time and gun powder regulations necessarily affected the ability of gun owners to use firearms for self-defense, even inside the home. Firearms were also subject to a wide range of regulations, including laws pertaining to the manufacture, sale, and storage of weapons.[84]

Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[85] New York City even granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

it shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city,

---

[80] Saul Cornell, *The Other Founders: Antifederalism and the Dissenting Tradition in America*, 1788–1828 (1999).

[81] Brutus, *Essays of Brutus VII*, reprinted in 2 The Complete Antifederalist 358, 400–05 (Herbert J. Storing ed., 1981).

[82] Tench Coxe, *A Freeman*, Pa. Gazette, Jan. 23, 1788, reprinted in Friends of the Constitution: Writings of the "Other" Federalists 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[83] Cornell, *supra* note 39.

[84] *Id.*, public carry by contrast was limited by common law and criminal statutes.

[85] An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, § 2.

and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[86]

New Hampshire further enacted a law in 1825 penalizing the sale or offer to sell "by retail any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common."[87]

Other examples of state laws delegating authority to local governments to regulate the sale of gunpowder for public safety include but are not limited to:

a.   1845 Iowa Laws 119, An Act to Incorporate and Establish the City of Dubuque, ch. 123, § 12 (delegating authority to cities "to regulate by ordinance the keeping and sale of gunpowder within the city");

b.   An Act Incorporating the Cities of Hartford, New Haven, New London, Norwich and Middletown, 1836 Conn. Acts 105 (Reg. Sess.), ch. 1 § 20 (delegating authority to "prohibit[] and regulat[e] the bringing in, and conveying out" of gunpowder);

c.   An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto Into One Act, and to Amend the Same, 1847 Ind. Acts 93, ch. 61 § 8, pt. 4 (delegating authority "[t]o regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder").[88]

The purpose of these gunpowder regulations was to promote public safety. Early American governments recognized the danger posed by gun powder and regulated every aspect of its

---

[86] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, 2 Laws Of The State Of New-York, Comprising The Constitution, And The Acts Of The Legislature, Since The Revolution, From The First To The Fifteenth Session, Inclusive at 191–2 (Thomas Greenleaf, ed., 1792).

[87] 1825 N.H. Laws 74, ch. 61 § 5

[88] *See also* table at Exhibit 6.

production, sale, and storage. Early American governments also regulated shooting galleries for similar reasons.[89]

In 1809, Massachusetts established requirements for the quality and composition of gunpowder; authorized the appointment of provers to inspect gunpowder before it was placed in any public magazine; required inspectors to place gunpowder that passed inspection in casks marked with the inspector's initials; authorized inspectors to mark as "condemned" gunpowder that failed inspection; and forbade the sale of gunpowder that was marked condemned or that had not yet passed inspection.[90] Four other states, Rhode Island, New Jersey, New Hampshire, and Pennsylvania, adopted similar gunpowder inspection laws in the late eighteenth and early nineteenth centuries.[91]

In light of this comprehensive approach to regulation, it is no wonder Chief Justice John Marshall singled out laws governing firearms and ammunition as the quintessential example of state police power in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland*.[92] Nor was Chief Justice John Marshall unique in highlighting the centrality of this idea to American law. [93] The ubiquity of the police power framework for evaluating the constitutionality of

[89] John C. White, *Digest of the Laws and Ordinances of the Parish of East Feliciana, Adopted by the Police Jury of the Parish* Page 80 (1848); Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220 (1854); Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 149–150 (1856); Rhode Island: 1851 R.I. Pub. Laws 9, An Act In Amendment Of An Act Entitled An Act Relating To Theatrical Exhibitions And Places Of Amusement §§ 1–2; Samuel Ames, *The Revised Statutes of the State of Rhode Island and Providence Plantations: To Which are Prefixed, The Constitutions of the United States and of the State* 204–205 (1857); William H. Bridges, *Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix* 148–49 (1863); Henry Jefferson Leovy, *The Laws and General Ordinances of the City of New Orleans, Together with the Acts of the Legislature, Decisions of the Supreme Court. And Constitutional Provisions Relating to the City Government. Revised and Digested, Pursuant to an Order of the Common Council.* New Edition, 257 (1870).
[90] An Act Providing for the Appointment of Inspectors, and Regulating the Manufactory of Gun-Powder, 1808 Mass. Acts 444, ch. 52.
[91] 1776 R.I. Pub. Laws 25 (Oct. Sess.); 1776–77 N.J. Laws 6–7, ch. 6; 1820 N.H. Laws 274, ch. 25; 1794 Pa. Laws 764, ch. 337.
[92] 25 U.S. 419, 442–43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power"). A slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning with the Marshall Court and continuing with the Taney Court.
[93] In the extensive notes he added as editor of the 12th edition of James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power. *See* 2 James Kent, *Commentaries on American Law* (340) 464 n.2 (Oliver Wendell Holmes, Jr., ed., 12 ed. 1873).

legislation regarding firearms reflected the centrality of this approach to early American law.[94] Massachusetts Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger,* a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power. Shaw described the police power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise. There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[95]

In short, there was unanimous agreement among leading antebellum jurists, at both the federal and state level, that the regulation of arms and gun powder was a paradigmatic police power enjoyed by legislatures. Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history.[96] A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gun powder:

> Be it further enacted, That it shall, and may be lawful for any one or more of the selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefore according to law.[97]

No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance. Rather, it was well understood that the exercise of this

---

[94] Freund, *supra* note 72, at 2, n.2 (1904); William J. Novak, *The People's Welfare: Law and Regulation in Nineteenth-Century America* (1996); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 Buff. L. Rev. 1215 (2005).

[95] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851). For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

[96] Novak, *supra* note 94.

[97] An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, 1821 Me. Laws 98, ch. 25 § 5. A copy of this law is attached hereto as Exhibit 6.

power would need to adapt to changing circumstances and new challenges as they emerged. This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking and analysis.[98] Throughout the long sweep of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[99] This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote this about the scope of state police power:

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[100]

One of the most important early American gun-related cases discussed in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[101] The case is a classic example of antebellum police power jurisprudence. The Supreme Court of Alabama evaluated the statute by focusing on the scope of state police power authority over guns. "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[102] In the court's view, the regulation of arms was at the very core of state police power.[103] The judicial determination was straightforward: was the challenged law a

---

[98] Kunal M. Parker, *Common Law, History, and Democracy In America, 1790–1900: Legal Thought Before Modernism* (2013).

[99] William J. Novak, *A State of Legislatures*, 40 Polity 340 (2008).

[100] *Thurlow v. Com. of Massachusetts (License Cases)*, 46 U.S. 504, 5 How. 504, 592 (1847).

[101] *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

[102] *Id.* at 616.

[103] Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate claims about the scope of state power to regulate arms. For a useful discussion of *Bliss* in terms of the police power, *see* Freund, *supra* note 72, at 91.

legitimate exercise of the police power or not? Concluding that it was, the Court upheld the conviction of Mr. Reid.

## E.  Reconstruction And The Expansion Of State Police Power To Regulate Firearms (1863–1877)

Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms. These two rights were separate in the Founding era but were mutually reinforcing: both rights were exercised in a manner that furthered the goal of ordered liberty. Reconstruction-era constitutions adopted a new textual formulation of the connection between these two formerly distinct rights, fusing the two together as one single constitutional principle. This change reflected two profound transformations in American politics and law between 1776 and 1868. First, the judicial concept of police power gradually usurped the older notion of a police right grounded in the idea of popular sovereignty. As a result, state constitutions no longer included positive affirmations of a police right. Secondly, the constitutional "mischief to be remedied" had changed as well.[104] Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military.[105] By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart Kings using their standing army to oppress American colonists. In place of these older fears, a new apprehension stalked Americans: the proliferation of especially dangerous weapons and the societal harms they caused.[106]

The new language state constitutions employed to describe the right to bear arms enacted during Reconstruction responded to these changed circumstances by adopting a new formulation of the venerable right codified in 1789, linking the right to bear arms inextricably with the states

---

[104] The mischief rule was first advanced in *Heydon's Case*, (1584) 76 Eng. Rep. 637 (KB)—the legal principle that the meaning of a legal text was shaped by an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and legislation had intended to remedy—continued to shape Anglo-American views of statutory construction, and legal interpretation more generally, well into the nineteenth century. For Blackstone's articulation of the rule, *see* 1 Blackstone, *supra* note 8, at *61. The relevance of common law modes of statutory construction to interpreting antebellum law, including the mischief rule, is clearly articulated in 1 Zephaniah Swift, *A Digest of the Laws of the State of Connecticut* 11 (New Haven, S. Converse 1822). For a modern scholarly discussion of the rule, *see* Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967, 970 (2021).

[105] Noah Shusterman, *Armed Citizens: The Road From Ancient Rome To The Second Amendment* (2020).

[106] *See McDonald*, 561 U.S. at 767–68

broad police power to regulate conduct to promote health and public safety.[107] For example, the 1868 Texas Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns. "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[108] Texas was not an outlier in this regard. Sixteen state constitutions adopted during this period employed similarly expansive language.[109] Millions of Americans living in the newly organized western states and newly reconstructed states of the former confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms. Thus, millions of Americans were living under constitutional regimes that acknowledged what prior constitutions (including the Second Amendment) had recognized implicitly: that the individual states' police power authority over firearms was at its apogee when regulating guns.[110]

This expansion of regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and their Republican allies. The goals of Reconstruction were therefore intimately tied to the passage and enforcement of racially neutral gun regulations.[111]

Reconstruction ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a states' police powers were rooted in the people's right to make laws to protect the peace and promote public safety. Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gun powder. In fact, the

---

[107] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. Davis L. Rev. 65 (2022).

[108] Tex. Const. of 1868, art. I § 13; for similarly expansive constitutional provision enacted after the Civil War, see Idaho Const. of 1889, art. I § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); Utah Const. of 1896, art. I § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

[109] Cornell, *supra* note 107, at 75–76.

[110] *Id.*

[111] Eric Foner, *The Second Founding: How the Civil War and Reconstruction Remade the Constitution* (2019); Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. Davis L. Rev. 2603 (2022).

Republicans who wrote the Fourteenth Amendment were among the most ardent champions of an expansive view of state police power. As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[112]

Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not cede their police power authority to the federal government. The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[113] As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good.[114]

It would be difficult to understate the impact of this new paradigm for gun regulation on post-Civil War legislation. Across the nation, legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms. Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[115] Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[116] An Evanston ordinance prohibited carrying a variety of weapons in public:

> It shall be unlawful for any person within the limits of the city of Evanston to carry
> or wear under his clothes or concealed about his person, any pistol, colt or slung
> shot, cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk,
> dagger, or any other dangerous or deadly weapon. . . § 537. The Mayor may grant

---

[112] Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 Harv. J. On Legis. 187 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 Buffalo L. Rev. 1215 (20052006).

[113] John Bingham, Speech, Cincinnati Daily Gazette (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 Santa Clara L. Rev. 1043, 1058 (2010).

[114] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* William E. Nelson, *The Fourteenth Amendment: From Political Principle To Judicial Doctrine* (Harvard Univ. Press 1998).

[115] Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, 80 L. & Contemp. Probs. 55 (2017)., at 59–61 tbl. 1.

[116] *Id.*

to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all such licenses at his pleasure. § 538. Applications for such licenses shall be made to the city clerk, and when granted, the applicant therefor shall pay to the said clerk, for the use of the city, the sum of two dollars. § 539. Every such license shall state the name, age and occupation and residence of the person to whom it is granted.[117]

Florida took aim at unusually dangerous weapons:

In each and every county of this State, it shall be unlawful to carry or own a Winchester or other repeating rifle or without taking out a license from the county commissioner of the respective counties, before such persons shall be at liberty to carry around with him on his person and in his manual possession such Winchester rifle or other repeating rifle. § 2. The County Commissioners of the respective counties in this State may grant such licenses at any regular or special meeting. § 3. The person taking out such license shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the county commissioners, and at the same time there shall by kept by the County Commissioners granting the same a record of the name of the person taking out such license, the name of the make of the firearm so licensed to be carried and the caliber and number of the same.[118]

Nebraska limited possession of guns by minors:

No person shall sell, loan, or furnish, to any minor, any gun, fowling-piece, or other fire-arm, within the limits of the city, under penalty of a fine of fifty dollars for each offense. § 5. It shall be unlawful for any parent, guardians, or other person having the care and custody of any minor, to purchase for or give to any such minor or knowingly to permit any minor to have any toy pistol, toy guns, or other toy arms or arms or sling shot, out of which any leaden or other dangerous missiles may be discharged . . . .[119]

Some localities adopted taxing schemes to achieve their goal of regulating weapons

deemed to pose a particular danger to public safety:

[A] tax of not less than five dollars or more than fifteen dollars shall be levied and assessed annually by the board of Police of Washington county upon every gun and pistol which may be in the possession of any person in said county, which tax shall be payable at any time on demand, by the Sheriff, and if not so paid, it shall be the duty of the Sheriff to forthwith distrain and seize such gun or pistol.[120]

The scope of police power regulation after the adoption of the Fourteenth Amendment did

not contract from the pre-war years. Instead, states made expanded use of the authority they held

---

[117] *Concealed Weapons*, George W. Hess, *Revised Ordinances of the City of Evanston: Also Special Laws and Ordinances of General Interest* § 531131–132 (1893).

[118] An Act to Regulate the Carrying of Firearms, 1893 Fla. Laws 71–72, ch. 4147 §§ 1–4.

[119] Laws of Nebraska Relating to the City of Lincoln, An Ordinance Regulating and Prohibiting the Use of Fire-arms, Fire-works and Cannon in the City of Lincoln . . . Prescribing Penalties for Violation of the Provisions of This Ordinance, and Repealing Ordinances in Conflict Herewith, 1895 Neb. Laws 237, art. XXVI, §§ 1, 3.

[120] An Act To Tax Guns And Pistols in The County Of Washington, 1867 Miss. Laws 327–28, ch. 249 § 1.

since the Founding to regulate firearms. States and localities adopted new administrative mechanisms, including permitting and licensing schemes, to address the continuing problems posed by firearms. These new administrative methods simply carried forward the ideas that had defined firearms regulation since the colonial era. Regulation and rights continued to be seen as inextricably linked with one another.

**Table Two**
**Examples of State Firearms Laws Passed Between 1865 and 1900**

| State | Year | Category | Source | Statutory Text |
|---|---|---|---|---|
| Texas | 1866 | Carry on the lands of others | Act of Nov. 6, 1866, ch. 92, § 1, 1866 Tex. Gen. Laws 90, 90. | That it shall not be lawful for any person or persons to carry fire-arms on the enclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of a civil or military duty and any person or persons so offending shall be fined . . . or imprison[ed] . . . or both . . . . |
| Arizona | 1867 | Brandishing | Act of Sept. 30, 1867, § 1, 1867 Ariz. Sess. Laws 21, 21–22. | That any person in this Territory, having, carrying or procuring from another person, any . . . pistol, gun, or other deadly weapon, who shall in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry or threatening manner, not in necessary self-defense, or who shall in any matter unlawfully use the same in any fight or quarrel, the person or persons so offending upon conviction thereof in any criminal court in any county of this Territory, shall be fined . . . or imprison[ed] in the county jail . . . or both such fine and imprisonment, together with the cost of prosecution. |
| Montana | 1873 | Firing Weapons | Act of Apr. 26, 1873, § 1, 1873 Mont. Laws 46, 46. | That it shall be unlawful for any person to fire any gun, pistol or any fire-arm, of whatever description, within the limits of any town, city, or village in this territory, or within the limits of any private enclosure which shall contain a dwelling house. |

| Indiana | 1875 | Brandishing | Act of Mar. 13, 1875, ch. 17, § 1, 1875 Ind. Acts 62, 62. | That if any person shall draw or threaten to use any pistol, dirk, knife, slung-shot, or any other deadly or dangerous weapon upon any other person, he shall be deemed guilty of a misdemeanor . . . Provided, That the provisions of this act shall not apply to persons drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law. |
|---|---|---|---|---|
| Mississippi | 1878 | Prohibitions on Persons Deemed Irresponsible | Act of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 175, 176. | [A]ny student of any university, college or school, who shall carry concealed, in whole or in part, any [pistol or other concealable deadly weapon], or any teacher, instructor, or professor who shall, knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor . . . . |
| Missouri | 1879 | Sensitive Places (courts, church, schools, colleges) | Act of Apr. 30, 1879, § 1, 1879 Mo. Laws 90, 90. | Hereafter it shall be unlawful for any person in this State, except he be a sheriff or other officer, in the discharge of official duty to discharge or fire off any gun, pistol or fire-arms of any description in the immediate vicinity of any court house, church or building used for school or college purposes. |
| Arkansas | 1881 | Prohibitions on Pistols, (exception for military weapons) | Act of Apr. 1, 1881, no. 96, § 3, 1881 Ark. Acts 191, 192. | Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person any person [sic] . . . any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor. |
| Nevada | 1881 | Penalty for carry while intoxicated | Act of Jan. 28, 1881, ch. 7, § 1, 1881 Nev. Stat. 19, 19-20. | Any person in this State, whether under the influence of liquor or otherwise, who shall, except in necessary self-defense, maliciously, wantonly or negligently discharge or cause to be discharged any pistol, gun or any other kind of firearm, in or upon any public street or thoroughfare, or in any theater, hall, store, hotel, saloon or any other place of public resort, shall be deemed guilty of a misdemeanor. . . . |

| | | | | |
|---|---|---|---|---|
| Vermont | 1884 | Prohibitions on Certain Types of Weapons (spring loaded traps) | Act of Nov. 25, 1884, no. 76, § 1, 1884 Vt. Acts & Resolves 74, 74–75. | A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined . . . and shall be further liable to a person suffering damage to his own person or to his domestic animals by such traps, in a civil action, for twice the amount of such damage. |
| Maryland | 1890 | Sensitive Times (Sabbath) | Act of Apr. 3, 1890, ch. 290, § 1, 1890 Md. Laws 297, 297. | No person whatsoever shall hunt with dog or gun on the Lord's day, commonly called "Sunday," nor shall profane the Lord's day by gunning, hunting, fowling, or by shooting or exploding any gun, pistol or firearm of any kind, or by any other unlawful recreation or pastime. . . . |
| Florida | 1899 | Sensitive Places (Trains) | Act of May 29, 1899, ch. 4701, § 1, 1899 Fla. Laws 93, 93. | That it shall be unlawful for any person to discharge any gun, pistol, or other fire-arm, except in self defense, while on any passenger train in this State; or to recklessly handle any fire-arm or other weapon in the presence of any other person or persons on any train carrying passengers in this State. |
| Indiana | 1875 | Sell, barter, or give a pistol to a minor | Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Acts 59, 59 | (making it unlawful to sell, barter, or give a pistol or other deadly weapon to any person under twenty-one). |

States fulfilled their role as laboratories of democracy by implementing a range of regulations aimed at curbing the problem of gun violence.[121]

Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the determination of its limits was best left to courts on a case-by-case basis.[122] Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that the "police power of the State extends to the

---

[121] *See* Robert F. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 59–61, table 1 (2017).

[122] Henry Campbell Black, *Handbook Of Constitutional Law*, 334–344 (2d ed., 1897).

protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[123]

In keeping with the larger goals of Reconstruction, Republicans sought to protect the rights of African Americans to bear arms but were equally insistent on enacting strong racially neutral regulations aimed at public safety. Violence directed against African Americans, particularly the campaign of terror orchestrated by white supremacist para-military groups prompted Republican dominated legislatures in the Reconstruction South to pass a range of racially neutral gun regulations.[124] The racially neutral gun laws enacted by Republicans were in part a reaction to the discriminatory black codes passed by neo-confederate legislatures earlier in Reconstruction. The Black Codes violated the Second Amendment, but the wave of firearms legislation passed by Republican controlled state legislatures in the South were consciously crafted to honor the Second Amendment and protect individuals from gun violence.[125]

The laws enacted during Reconstruction underscore the fact that robust regulation of firearms during this period was not a novel application of the police power, but an expansion and continuation of antebellum practices. Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns. American states had regulated arms since the dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.

## F.    The Increased Lethality of Modern Firearms

Another important change relevant to understanding firearms regulation in the Reconstruction era derives from changes in firearms technology, specifically the profoundly increased lethality of weapons manufactured at that time. By the ratification of the Fourteenth

---

[123] Christopher G. Tiedeman, *A Treatise on the Limitations of the Police Power in the United States* 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149–50 (1854)).

[124] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 Tex. A&M L. Rev. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 Southwestern Quarterly 284 (2020).

[125] *See* Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 Harv. L. Rev. 238, 241 (2014); *see also* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 Harv. J. on Legis. 187, 205 (2005) (discussing Republican use of federal power to further their aims, including to enforce the Fourteenth Amendment).

Amendment, firearms became more deadly, lighter, easier to use, more accurate, and required far less training to be effective than did the muskets of the eighteenth century. Although comparisons of weapons from different eras is inherently subjective, one effort to compile a comparative lethality index for military weapons is instructive.

Military historian and defense analyst Trevor DuPuy's theoretical lethality index (Figure 3) captures the exponential growth in the lethality of battlefield firearms between the era of the Second and Fourteenth Amendments and beyond. Of course, the lethality index, an intellectual construct developed to compare weapons on the battlefield offers an imperfect gauge for the increased lethality of modern weapons in a civilian context. The improvements associated with weapons in the Civil War era were significant, but they pale in comparison to the carnage that modern semi-automatic weapons can inflict in densely populated areas and sensitive places. Nevertheless, Depuy's innovative and useful scale, designed for battlefield comparisons invariably understates the increase in the level of destruction today's weapons can inflict upon a civilian population.[126] The expansion of gun laws after the Civil War, in part, reflects the improvements in firearms lethality and their wider availability to the civilian population. The ease of use of these weapons compared to earlier firearms also increased their popularity. The rise of easily concealed weapons, especially pocket pistols, contributed to rising urban crime and violence. The expansion of arms in the post-Civil War era made these and other arms more readily available for use in crimes of violence so states and localities enacted laws to regulate the baneful consequences of arms proliferation.[127]

G.    **Singular and Curious Weapons: The Irrelevance of Repeaters and Other Exotic Weapons to *Bruen*'s Historical Framework**

Virtually all firearms in common use in the era of the Second Amendment were single-shot, muzzle-loading black powder weapons. Guns capable of firing more than a single round, repeaters, could best be described as exceedingly rare and exotic. Thus, the claim that firearms

---

[126] Darrell Miller and Jennifer Tucker, *Common Use Lineage, and Lethality*, 55 U.C Davis. L. Rev. 2495, 2509 (2022).
[127] Roth, *supra* note 45 at 343–53.

capable of firing more than ten rounds without reloading "are nothing new" and the related claim that such weapons were familiar to Americans in the Founding era is deceptive at best. The existence of such weapons did not mean that they were common, nor did it mean that the average American would have understood that such weapons were generally understood to fall within the protection of the Second Amendment. There is no evidence to support such a conclusion.

Moreover, the claim that "repeaters" and other rare weapons were widely believed to be protected by the Second Amendment is not consistent with the originalist framework employed in *Bruen*. An analysis of history, text, and tradition requires a contextually sensitive assessment of what types of weapons were in common use at the time and which weapons were singled out by governments for heighted forms of legal protection or treated simply as property subject to the normal range of regulation.[128] Thus, the relevant historical question is not what firearms technology existed at the time of the Second Amendment. The constitutionally pertinent question is: did the average reader of the Constitution and the first ten amendments understand repeaters to be among those weapons the Second Amendment was intended to protect.[129]

Few if any Americans would have ever encountered these types of weapons and even fewer owned such weapons, an indisputable fact that makes the argument that these types of weapons were encompassed by the Second Amendment highly improbable.[130]

The best way to understand the historical importance (or irrelevance) of these weapons is to analyze the discussion of arms in the print culture of the period, paying close attention to how repeating weapons were discussed in newspapers, books, and to a lesser extent private correspondence.[131] If one consults the standard sources associated with originalist scholarship and jurisprudence the silence is deafening. These types of weapons were rarely mentioned and when

---

[128] Kevin Sweeney and Saul Cornell, *All Guns Are Not Created Equal Chronicle Of Higher Education*, (January 28, 2013); Priya Satia, *What Guns Meant in Eighteenth-century Britain* 5 Palgrave Commun. 104 (2019)

[129] William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 Law And History Review 809–820 (2019).

[130] *See* discussion below *infra* pp. 33–35.

[131] Saul Cornell, *Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning*, 37 Law and History Review 821 (2019).

they were discussed they were described as rare and "curious."[132] Founding era newspapers often contained advertisements for the sale of firearms. Although one must approach data gained from this type of digital searching with some historical sophistication and caution, the evidence clearly shows that "repeating" weapons were neither common nor readily available in the period between the American Revolution and enactment of the Second Amendment. Given this fact it strains credulity to claim that such weapons were originally understood to be encompassed within the protections afforded by the Second Amendment. During the almost two decade period between the Declaration of Independence and the adoption of the Second Amendment there were a total of five advertisements for the sale of air rifles in American newspapers.[133] In the same period there were over four thousand advertisements for the sale of guns of various types, most notably muskets of one type or another. The advertisement reproduced in Figure Two below illustrates the exotic nature of these weapons, which were described as "singular" and "curious."[134]

**Figure Two**[135]



To be Sold, at Private Sale,
At No. 60, in Smith-Street, the following curious
and singular Collection of Fire-Arms:
THREE Air Guns and a Case of Air Pistols,—a
gun which can be fired twelve times from one
single loading.
Ditto, thirty times in a minute, with Pistols, and
many others on the latest and most curious construc-
tion, that is now extant in Europe.
Twelve small Brass Pattararoes, proper for a Plea-
sure-Boat, or a Gentleman's country-seat.
New-York, Sept. 27, 1783.

These guns were so rare and expensive that a New York Museum from the period decided to showcase an air gun alongside other curiosities such as mammoth bones and a full-size working guillotine. For an additional fee beyond the price of admission one could purchase an opportunity to fire one these "singular" weapons.[136]

---

[132] *To be Sold at Private Sale*, [New York] Royal Gazette, October 1, 1783 at 3; Pennsylvania Packet July 21, 1789 at 3; *id.*, July 28, at 1; *id.*, July 31 at 1; *id.*, August 13, at 1.

[133] [New York] Royal Gazette October 1, 1783 at 3.

[134] *Supra* note 132.

[135] *Id.*

[136] Lawrence W. Levine, *Highbrow/Lowbrow: The Emergence of Cultural Hierarchy in America* 149 (2009).

Figure Three[137]



To the Curious,

AN AIR GUN, made by a young man, a native of Rhode-Island, but now resident in this city, and which has been purchased by the subscriber, at a very considerable price, with a view eventually to make it the property of the American museum but wishes to reimburse himself in the following manner, viz:

He will exhibit it to the examination of all persons desirous of viewing it, and of discharging a shot, for which they shall pay six-pence This gun, when properly filled with air, will do execution twenty times, without renewing the charge, and for several times will send a ball thro' an inch board, at the distance of sixty yards, to be seen at the subscribers, No. 13 Maiden lane, every day in the week, from 10 to 12 o'clock in the forenoon, and from three to five in the afternoon, Tuesday and Friday afternoons excepted, at which times it may be seen at the Museum.

GARDINER BAKER,
February 9.            Keeper of the Museum.

The notion that the Second Amendment was widely understood to protect weapons that were rarely advertised for sale and that generally recognized to be of a "singular" and "curious" nature is not credible; nor is such a claim consistent with *Bruen*'s originalist methodology which requires that texts be interpreted according to their ordinary meaning. Weapons described as "singular and curious" are a poor choice for understanding the ordinary meaning of the term arms in the Founding era English.

Visitors to today's NRA's museum of firearms may be treated to an impressive exhibit featuring the type of Girondoni air rifle that Lewis and Clark carried on their Expedition of Discovery. [138] Although modern gun rights advocates and antiquarian firearms enthusiasts are well acquainted with this weapon, few Americans in the era of Lewis and Clark could make a comparable claim. Indeed, in the first published account of the Corps of Discovery's mission there are less than a handful of references to the air gun carried by Lewis and Clark. The primary use of the weapon was not for war, hunting, or individual self-defense, but the weapon was a show piece used to impress the different Indian nations the Corps encountered with the superiority of

---

[137] *To the Curious*, [New York] Daily Advertiser (February 9, 1792).
[138] https://www.nramuseum.org/guns/the-galleries/a-prospering-new-republic-1780-to-1860/case-8-romance-of-the-long-rifle/girardoni-air-rifle-as-used-by-lewis-and-clark.aspx (last visited on April 27, 2023).

American technology.[139] But, few Americans at the time of the Lewis and Clark exhibition would have had the opportunity to ever see one of these weapons or any other repeating gun up close.

Under ideal conditions priming the Girardoni air gun required 1500 strokes of a pump. The Austrian military, one of the few armed forces in the world to purchase these types of weapons quickly abandoned them because they were ill suited to battle-field conditions. In 1789, an Austrian officer complained that the weapons were of little military value because of the difficulty of using them and their tendency to malfunction "Due to their construction, these guns were much more difficult to use effectively than normal, as one had to handle them much more cautiously and carefully. In addition, the soldiers using them had to be supervised extremely carefully, as they were unsure about the operation. The guns became inoperable after a very short time—so much so that after a while no more than one-third of them were still in a usable state. We needed the whole winter to repair and replace them."[140] William Duane's popular military dictionary (1810) devoted a short entry to air guns, noting that the gun's performance was so unreliable, "it has long been out of use among military men."[141]

## IV.    CONCLUSION: THE SCOPE OF PERMISSIBLE REGULATION

Sales and possession of weapons have been subject to regulation since before the Founding. The power to regulate and in some cases prohibit dangerous or unusual weapons has always been central to the police power authority of states and localities.[142] Professor Robert Spitzer's overview of the history of firearms regulation underscores a basic point about American law: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[143] States and localities have regulated arms and ammunition since the earliest days of the American Republic. The statutes at issue in this case are part of a long-established tradition of

---

[139] *2 History of the Expedition Under the Command of Captains Lewis and Clarke* 136, 28, 364 (Paul Allen ed., 1814). For a discussion of the Corps of Discovery's use of technology to over-awe Indian peoples and impress upon them the superiority of American technology, *see* James P. Ronda, *Lewis and Clarke among the Indians* 225 (1984).

[140] Frederick J. Chiaventone, *The Girardoni Air Rifle: The Lewis and Clark. Expedition's Secret Weapon* 14 Military Heritage at 19 (2015).

[141] William Duane, *A Military Dictionary* (1810) at 5.

[142] Spitzer, *supra* note 37.

[143] *Id.*

firearms regulation in America, beginning in the colonial period and stretching across time to the present. This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day. The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✱ Bronx, NY 10458 ✱ 203 826-6608 (c) ✱ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| Prizes and Awards |
|---|

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

| Publications, Presentations and Media Appearances |
|---|

### Books:

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000) (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Interviews, Editorials, Essays, Podcasts:

*"*Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*,"* SCOTUSblog (Jun. 27, 2022, 5:05 PM), https://www.scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions/

"Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
SLATE June 24, 2022

"The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022

"The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022

"Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022

"The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021

"'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021

"Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021

"Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021

"Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021

"Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate

"What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18,  2021

"Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019

"Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019

"The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019

"The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.

"Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018

"Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017

"The State of the Second Amendment," National Constitution Center, Podcast October, 2017

"Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017

"Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017

"Half Cocked," *Book Forum* April 2016

"Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016

"Guns Have Always Been Regulated,"  *The Atlantic Online* December 17, 2015

"The Slave-State Origins of Modern Gun Rights" *The Atlantic Online*  30, 2015 [with Eric Ruben]

PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013

"All Guns are not Created Equal"  Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

"What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010

"Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)

"What's Happening to Gun Control,"    To the Point*, NPR. March 11, 2010

"Getting History Right," *National Law Journal*, March 1, 2010

"History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008

"The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008

"Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007

"A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV  ( 2006)

"Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005

"Gun Control," Odyssey, Chicago NPR September 8, 2004

"Loaded Questions," *Washington Post Book World*  February 2, 2003

"The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002

"Real and Imagined," *New York Times*, June 24, 1999

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*,* 89 Fordham Law Review  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in <u>Firearms and Freedom: The Second Amendment in the Twenty-First Century</u> <u>Controversies in American Constitutional Law Series</u> (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 <u>Law and Contemporary Problems</u> (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 <u>Northwestern Journal of Criminal Law</u>  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," <u>Wisconsin Law Review Forward</u>  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  <u>American</u> <u>Journal of Legal History</u> 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," <u>Yale Law Journal  Forum</u>  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" <u>Fordham Law Review</u> *Res Gestae*  84 (2015):  1-10

"The Right to Bear Arms," <u>The Oxford Handbook of the US Constitution</u>,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" <u>Constitutional Commentary</u> 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism" <u>Fordham Law Review</u> 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities" <u>Fordham Urban Law Journal</u> 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" <u>William & Mary  Quarterly</u> 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" <u>William & Mary Quarterly</u> 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," <u>Yale Journal of Law and the Humanities</u> 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," <u>Northwestern University Law Review</u> 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" <u>UCLA Law Journal</u>  56  (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" <u>Ohio-State Law Journal</u> 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the <u>Cambridge</u> <u>History of  A merican Law</u> (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment"  <u>Albany Government Law  Review</u>  2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," <u>Maryland Law Review</u> (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion," <u>Chicago-Kent Law Review</u>  (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," <u>Law and History Review</u>  (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," <u>William and Mary Law Review</u>  47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History,"  <u>Stanford Law and  Policy Review</u>  (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control,"  <u>Fordham Law Review</u> 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in <u>Beyond the Founders: New Essays on the Political</u> History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," <u>Law and History Review</u> 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," <u>Oxford Companion to American Law</u> (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," <u>Northern Kentucky Law Review</u> (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in <u>The Limits of Freedom</u> in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in <u>American Law Ways and Folkways</u> (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed:  The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. <u>Beyond the Great Story"</u> <u>American</u> <u>Quarterly</u> (1998): 349-357

"The Anti-Federalists," in  <u>The Blackwell Companion to American Thought</u>, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in <u>The Blackwell Companion to American Thought</u>, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," <u>American Studies</u> (1995): 57-80

"Canon Wars II:  The Return of the Founders,"  <u>Reviews in American History</u> 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," <u>Law and History Review</u> (1994): 1-28

"Early American History in a Post-Modern Age," <u>William and Mary Quarterly</u> 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:   The Political Thought of the Founders Reconsidered," <u>Reviews in American History</u> 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in <u>New York in the Age</u> <u>of the Constitution</u> (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," <u>Journal of American History</u> (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," <u>Northwestern University Law Review</u> (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," <u>The Pennsylvania Magazine of History and Biography</u> (1988): 103-130


### Invited Lectures:

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment,"
Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell
College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists"
Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture,
Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early
American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of
Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University,
(2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead
Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson
Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional
Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History,
Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment
Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of
Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies
Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British
Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring
Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center,
Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History," American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment" Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy, Albany Law School ( 2007)

"*District of Columbia* v. *Heller* and the Problem of Originalism," University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate," American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's <u>The People Themselves</u>, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History," Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?" University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History," SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate," Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment" "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders," NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

## Other Professional Activities

Editorial Board, Constitutional Study, University of Wisconsin Press (2014-present)
Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)

Program Committee, Annual Conference, Society of the Historians of the Early American Republic, Philadelphia, PA 2008
Editorial Board, American Quarterly (2004-2007)
Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001-2004
Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
Co-Founder Ohio Early American Studies Seminar
NEH Fellowship Evaluator, New Media Projects, Television Projects
Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)


## Book Reviews:

Journal of American History
William and Mary Quarterly
American Studies Journal of the Early Republic
Pennsylvania Magazine of History and Biography
American Quarterly
American Journal of Legal History
Law and History Review

## Journal and Book Referee:

Journal of American History
William and Mary Quarterly
Diplomatic History
Pennsylvania Magazine of History and Biography
Law and History Review
Harvard Law Review
Stanford Law Review
Yale Law Journal
University Press of Virginia
University of North Carolina Press
Stanford University Press
University of Massachusetts Press
Oxford University Press
Cambridge University Press
University of Michigan Press
Harvard University Press