# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIAM WIESE, et al.,            )
                                  )
              Plaintiffs,         )
                                  )
       vs.                        ) **CASE NO.**
                                  )    2:17-cv-00903-WBS-KJN
ROB BONTA, et al.,                )
                                  )
              Defendants.         )
_____ )

## DEPOSITION OF
JAMES CURCURUTO

**DATE:**       Thursday, August 3, 2023

**REPORTER:**   Althea L Miller, CSR No. 33553/RPR/CCRR

## VIA REMOTE VIDEO TECHNOLOGY



## HINES REPORTERS
**INTERNATIONAL TOWER**
**888 S. FIGUEROA STREET, SUITE 940, LOS ANGELES, CALIFORNIA 90017**

**866.432.4300; 213.688.7887**

**WWW.HINESREPORTERS.COM**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

WILLIAM WIESE, et al.,         )
                               )
            Plaintiffs,        )
                               )
v.                             )   No. 2:17-cv-00903-WBS-KJN
                               )
ROB BONTA, et al.,             )
                               )
            Defendants.        )
_____)

DEPOSITION OF:  JAMES CURCURUTO

TAKEN ON:        August 3, 2023

APPEARING REMOTELY FROM MIDDLEBURY, CONNECTICUT

STENOGRAPHICALLY REPORTED BY:
ALTHEA L. MILLER
CSR No. 3353, RPR, CCRR No. 149
File No. 107482
APPEARING REMOTELY FROM LOS ANGELES COUNTY,
CALIFORNIA

1  REMOTE DEPOSITION OF JAMES CURCURUTO,
2  taken on behalf of the Defendants, with
3  all parties, by agreement, attending the
4  deposition remotely in Los Angeles
5  and San Francisco counties, California, on
6  Thursday, August 3, 2023, at 9:33 A.M., before
7  Althea L. Miller, CSR No. 3353, RPR,
8  CCRR No. 149.
9
10 APPEARANCES:
11    For the Plaintiffs:
12       SEILER EPSTEIN LLP
         BY:  GEORGE M. LEE, ESQ.
13       Four Embarcadero Center
         14th Floor
14       San Francisco, California 94111
         (415) 979-0500
15       gml@seilerepstein.com
16
17    For the Defendants:
18       OFFICE OF THE ATTORNEY GENERAL
         OF THE STATE OF CALIFORNIA
19       BY:  ROBERT L. MEYERHOFF,
              Deputy Attorney General
20            JOHN D. ECHEVERRIA,
              Deputy Attorney General
21       300 South Spring Street
         Suite 1702
22       Los Angeles, California 90013-1230
         (213) 269-6177
23       Robert.Meyerhoff@doj.ca.gov
         John.Echeverria@doj.ca.gov
24
25 ///

Page 2

E X H I B I T S

DEPOSITION                                    PAGE

EXHIBIT 7  Copy of the deposition of      141
James Curcuruto, taken on
January 24, 2014, 250 pages

EXHIBIT 8.  14-page document titled       155
"Ethical Guidelines for
Statistical Practice"

EXHIBIT 9  Copy of a two-page declaration  164
of James Curcuruto in the
Rocky Mountain Gun Owners
versus The Town of Superior

I N F O R M A T I O N   R E Q U E S T E D
(None.)

Q U E S T I O N S   M A R K E D
(None.)

///
///

Page 4

I N D E X

WITNESS                                    PAGE

JAMES CURCURUTO

   BY MR. MEYERHOFF          5, 180

   BY MR. LEE                172

E X H I B I T S

DEPOSITION                                    PAGE

EXHIBIT 1  Copy of the "Notice of         11
Deposition of James Curcuruto,"
three pages

EXHIBIT 2  Copy of "Plaintiffs'           21
Objections to Defendants'
Notice of Deposition of
James Curcuruto," three pages

EXHIBIT 3  Copy of "Declaration of James  26
Curcuruto in Support of Plaintiffs'
Motion for Temporary Restraining
Order and Issuance of
Preliminary Injunction,"
six pages

EXHIBIT 4  17-page document titled on     74
page 1 "Outdoor Stewards of
Conservation Foundation"

EXHIBIT 5  Two-page document titled       103
"Southwick Associates
Honored for Groundbreaking
Research"

EXHIBIT 6  Copy of the deposition of      115
James Curcuruto, taken on
January 11, 2018, 174 pages

///

Page 3

REPORTED REMOTELY FROM LOS ANGELES COUNTY,

CALIFORNIA

August 3, 2023

9:33 A.M.

-oOo-

JAMES CURCURUTO,

having declared under penalty

of perjury to tell the truth, was

examined and testified as follows:

THE WITNESS:  I do.

THE REPORTER:  Thank you.

THE WITNESS:  You're welcome.

EXAMINATION

BY MR. MEYERHOFF:

Q  Good morning.

My name is Rob Meyerhoff.  I'm a Deputy

Attorney General with the Department of Justice.  I

represent the defendants in this case.

Why don't we just start with some ground

rules relating to the deposition.

You understand you're testifying under oath

Page 5

1 today, Mr. Curcuruto?
2    A  I do.
3    Q  And you understand that even though we're
4 in the informal setting on the Zoom call, the oath
5 that you just took has the same sanctity as if we
6 were in a court of law?
7    A  Yes.
8    Q  And do you understand the same penalties
9 for giving untrue testimony apply?
10    A  Yes.
11    Q  Even though the deposition is proceeding
12 over Zoom, the court reporter won't be able to take
13 down nonverbal responses like head nods or shakes.
14 You'll need to give verbal answers to each question.
15       Do you understand that?
16    A  Yes.
17    Q  If you don't understand a question, please
18 just ask me to clarify and I can try to restate the
19 question.
20       If you answer a question I ask, people
21 reading the transcript later will assume you
22 understood the question.
23       Does that make sense?
24    A  Yes.
25    Q  Also, from time to time, Mr. Lee may make

1 objections.
2       Do you understand that?
3    A  Yes.
4    Q  If you need to take a break, please let me
5 know.  We can take a break whenever you want or
6 whenever Mr. Lee or the court reporter needs one.
7       However, I'll ask if there's a question
8 pending -- I've asked a question -- I just ask that
9 you answer the question before taking a break.
10       Does that make sense?
11    A  Yes.
12    Q  Do you have any questions about the
13 procedures we're going to be following today?
14    A  Not now, no.
15    Q  Is there any reason you feel like you can't
16 give your best testimony today?
17    A  No.
18    Q  Are you suffering from any medical problems
19 that would prevent you from doing so?
20    A  No.
21    Q  Are you under the influence of any
22 prescription medications that would prevent you from
23 doing so?
24    A  I am not.
25    Q  Are you under the influence of drugs or

1 alcohol at this time?
2    A  I am not.
3    Q  You've been deposed before; correct?
4    A  Correct.
5    Q  And you are -- was your first deposition
6 the Wilson versus Cook County case?
7    A  I don't recall the order of them.  I've
8 been deposed maybe a half dozen times, but I don't
9 recall the order.
10    Q  But you recall being deposed in that case;
11 correct?
12    A  Which one was that?
13    Q  Wilson versus Cook County in 2013.
14    A  Sounds familiar, yes, sir.
15    Q  Do you recall the subject matter of that
16 case?
17    A  Not specifically, but for the most part,
18 all the cases I've been deposed in had to do with
19 either the high-capacity magazines or the AR-15
20 model firearm.
21    Q  Do you recall being deposed in the Kolbe
22 versus O'Malley case?
23    A  Yes.  I was deposed in that one.
24    Q  And Friedman v City of Highland Park as
25 well?

1    A  Correct.  Yes.
2    Q  You were also deposed in the Worman case;
3 is that correct?
4    A  Was that Worman --
5    Q  V Healey.
6    A  -- v Healey?
7       Okay.  Massachusetts, I think, yeah.
8    Q  You were also deposed in two California
9 cases; correct?
10    A  I know I've -- Duncan v Becerra was one of
11 them, and I'm not sure if there's another Becerra
12 one, but --
13    Q  Would it refresh your recollection if I
14 told you you were deposed in a case called Miller?
15    A  Okay.
16    Q  Can you recall any other depositions that
17 you had taken?
18    A  Let's see.
19       We covered Worman, Kolbe, Duncan, and you
20 said -- was there a Highland Park one too or did you
21 cover that?
22    Q  The Friedman versus the City of
23 Highland Park?
24    A  I think that's about it.  Six or seven of
25 them.

Q   And in each of those cases, you testified
on behalf of plaintiffs; is that correct?

A   Correct.

Q   And in each of those cases, plaintiffs were
seeking to invalidate a firearms restriction;
correct?

A   The cases were, I think, to show the
commonality of either the AR platform modern
sporting rifle or the high-capacity magazine, I
think defined as holding 11-plus rounds.

Q   But to the best of your recollection, in
each of those cases, plaintiffs were seeking to
invalidate some kind of firearms restriction;
correct?

A   Yeah.

I think they wanted to be able to possess
one or two of those -- either the firearm or the
magazine.

Q   And to the best -- I'm sorry.

A   I'm sorry.  Legally possess, yeah.

Q   And in each of those cases, there was a
local, state, or federal restriction preventing them
from doing so; correct?

A   I believe so, yes.

Q   I'm going to pull up a document that I'd

like to mark as Exhibit 1.

(The document referred to was marked as
Deposition Exhibit 1 by the Reporter.)

BY MR. MEYERHOFF:

Q   And throughout the deposition,
Mr. Curcuruto, I'm going to pull up exhibits.  The
way to work over Zoom is I'll screen-share them.
You are unable to control the scrolling function.
I'll show you the document and you let me know when
you want me to scroll down.

A   Sounds good.

Q   Can you see the document up on the screen?
The first words at the top are on 1 "Rob Bonta,
Attorney General of California"?

A   Yes.

Q   And you see in the middle of the page,
"Notice of Deposition of James Curcuruto"?

A   Correct; yeah.

Q   I'm pronouncing your name correct; is that
correct?

A   Very good.

Q   Thank you.

I'm going to have you review -- this is
just a three-page document.

I'll have you review the whole thing.  I'll

ask you some questions about it.

Please just review it and let me know when
you want me to scroll down.

A   Okay.  Wiese versus Bonta.  He's the
Attorney General, I believe; right?

You can scroll down.  That's good.

I'm at line 14.  If you can scroll up or
down.

Okay.  You can go to the next page up.

Okay.

Q   So that's the end of the document.  I'll
scroll back up to the first page.

So this document is entitled
"Notice of Deposition of James Curcuruto."

Mr. Curcuruto, have you seen this document
before?

A   I have.

Q   When did you see it?

A   I don't know.  Mr. Lee had sent it to me
recently.  I don't know the exact date.

Q   Would you say within the past week?

A   Past week or two probably.  Yeah.  Within
the past week or two.

Q   Have you reviewed this document in full
prior to today?

A   I have read it, yes, sir.

Q   Did you discuss it with Mr. Lee?

A   I did.

Q   What was the substance of your discussion
with Mr. Lee about this document?

A   Just to make sure I had received it and
read it and also the request for documents.

You know, I -- I do not have access to any
past documents after a job change.

Q   And what, if anything else, did Mr. Lee say
about this document?

A   Not much.  Not much in the document.

Q   Did he ask you if you had access to any of
the documents mentioned in the requests?

A   He did.  He asked me to look to see what I
could find.

Q   Let's scroll down to that on page 3.

Do you see where it says "Individual
Requests" 1:

"All non-privileged documents,
data, or information in electronic
form that you received, reviewed, or
relied upon in forming your opinions
in this litigation"?

Do you see that?

Page 14

1    A  Yes.
2    Q  So -- do any documents exist that are
3  responsive to that request?
4    A  I believe the original deposition I had
5  done in 2017 concerning this case.  I had -- Mr. Lee
6  had sent that to me as well and I had reviewed that
7  and that had, I believe, one exhibit which was the
8  Magazine Chart I had helped create back in 2017 or
9  '16.
10     I think it was when I was with the
11  National Shooting Sports Foundation.
12    Q  Are there any documents that exist that are
13  responsive to this request?
14    A  They exist but not in my possession.
15    Q  And what are those documents that exist
16  that are not in your possession?
17    A  Just one -- Request No. 1?  Is that the one
18  we're looking at?
19    Q  That's correct.
20    A  Opinions of this litigation.
21     So materials I had used to create that
22  one-page document, I'm sure there are records of
23  those somewhere but not in my possession.
24    Q  What were those materials that you had used
25  to create the one-page document?

Page 15

1    A  I believe, according to that original
2  declaration or deposition in 2017, to help create
3  that one-page NSSF Magazine Chart, I use sources
4  such as the U.S. ITC, the International
5  Trade Commission's import/export data and the ATF's
6  AFMER reports, which, I believe are --
7     THE REPORTER:  I'm sorry.  What is that?
8     THE WITNESS:  AFMER, A-F-M-E-R.  Annual
9  Firearms Manufacturing Export Reports.
10     So those are -- you know, there's documents
11  of those, I'm sure available somewhere that I used
12  as a basis to create that one pager.
13     I just don't have them anymore.
14  BY MR. MEYERHOFF:
15    Q  And are there any other documents that
16  exist that you received, reviewed, or relied upon in
17  creating the Magazine Chart?
18    A  Not that I'm aware of.
19     I -- I don't have any in my possession.
20    Q  But do any -- do any other documents, other
21  than the U.S. ITC documents, the ATF AFMER
22  documents, exist in your possession or not that you
23  relied upon in creating the Magazine Chart?
24    A  Not that I'm aware of.  You know, it was
25  created whenever it was -- 2016, 2017.

Page 16

1     And I had left the NSSF in 2021; so I
2  assume any documents, you know, that were in my
3  office at the time are probably long gone, but I
4  don't have knowledge if they are there or -- or
5  gone.
6    Q  But to the best of your knowledge in
7  creating the Magazine Chart, you only relied on
8  physical documents from the U.S. ITC and ATF AFMER;
9  correct?
10    A  Correct.
11     For the most part, those documents form the
12  basis and then I created a draft report and
13  discussed that with some coworkers to -- that had
14  expertise in the industry to make sure I was on the
15  right track and wasn't going to put anything out
16  that wasn't as correct as it can be.
17    Q  Looking at Request No. 2:
18     "All opinions, reports, and
19     similar documents that you have
20     provided in other lawsuits,
21     arbitrations, or administrative
22     proceedings, or any other judicial or
23     quasi-judicial proceedings, that
24     involve issues or topics similar to
25     those on which you have provided

Page 17

1     opinions in this case."
2     Do you have any such documents?
3    A  I do not.
4    Q  But other such documents exist; correct?
5    A  Same answer as before.  There may or may
6  not be documents that NSSF -- including that the
7  building that, you know, I had an office in was sold and I --
8  I have a feeling that they have -- you know, they
9  don't have a lot of documents.
10     But I'm 100 percent unaware of what exists
11  or doesn't exist that NSSF -- or aware, if they do
12  exist, where they might be.
13    Q  But to be clear, you filed declarations in
14  other cases; correct?
15    A  I have, yes.
16    Q  And it's fair to say, based on your
17  previous answer, that you haven't retained copies of
18  any of those declarations; correct?
19    A  I have not.
20    Q  Going to Request No. 3:
21     "All non-privileged information
22     and documents received or acquired by
23     you from any source concerning this
24     litigation."
25     Do you have any such documents in your

Case 3:22-cv-05403-DGE   Document 119-1   Filed 09/01/23   Page 8 of 50

Wiese, et al. vs. Bonta, et al.                                        Deposition of James Curcuruto

1 possession?
2    A   The only other document Mr. Lee had sent me
3 was, I think, a memo or memorandum of this case,
4 about a 40-page document.
5    Q   And do you know was this a memo that
6 Mr. Lee prepared?
7    A   I am not sure who prepared it.  It's just
8 kind of a review of the case.
9    Q   Any other documents received from anyone
10 else?
11    A   No.
12    Q   What did you do to prepare for this
13 deposition?
14    A   I did read the three documents we
15 discussed, the original deposition from 2017, the
16 three-page declaration, and then I reviewed the
17 40-page -- I think it was a memo of points, and I
18 had a phone call with Mr. Lee earlier in the week.
19    Q   What did you discuss on that phone call
20 with Mr. Lee?
21    A   Sort of a refresher of, you know, how the
22 day would go.  Again, it'd be an online Zoom meeting
23 and go through the points of the documents received.
24    Q   Did Mr. Lee tell you any questions you
25 should expect?

1    A   We discussed -- yeah.  We discussed that,
2 yes.
3    Q   And what questions did Mr. Lee tell you to
4 expect?
5    A   State your name, your background, what your
6 current position is, and knowledge, then, of the
7 Magazine Chart.
8    Q   Did you discuss the substance of your
9 opinions with Mr. Lee on that phone call?
10    A   Not in depth.
11    Q   But generally?
12    A   Yeah.
13       In regards to the -- the one exhibit, the
14 Magazine Chart.
15    Q   And what did you tell Mr. Lee about the
16 Magazine Chart?
17    A   It was something I had created when I was
18 with the National Shooting Sports Foundation, and we
19 discussed it; it had been updated and if I had any
20 records of that to which I replied I'd look, and I
21 was unable to find any updated documents.
22    Q   And you only had that one phone call with
23 Mr. Lee with regard to this deposition; correct?
24    A   With regard to the deposition -- we had one
25 previously when he asked if I would be interested in

1 helping out.
2    Q   When did that phone call when he asked if
3 you would be interested in helping out occur?
4    A   I'm not sure.  Maybe a month ago.
5    Q   What did you tell Mr. Lee when he asked if
6 you would be willing to help out?
7    A   I said "Sure."  So I'm here.
8    Q   Did you speak with anyone else about this
9 deposition?
10    A   I have not.
11    Q   You haven't spoken to any friends about
12 this deposition?
13       MR. LEE:  Asked and answered.
14       You may answer.
15       THE WITNESS:  Oh.  Not really.  I mean,
16 just -- you know, my -- my main job is keeping me
17 busy and that's my main focus with the company that
18 I'm with now.
19       This is just something that seemingly was
20 going to be a quick request and -- to corroborate
21 what had happened in 2017 with that one exhibit;
22 so --
23 BY MR. MEYERHOFF:
24    Q   You said "Not really."  I just want to be
25 absolutely clear.

1       Have you mentioned this deposition to
2 anyone else other than Mr. Lee?
3    A   I -- about a half hour ago, before -- my
4 17-year-old son woke up and I said "Don't come
5 downstairs."  He asked why I was all dressed up.  I
6 said "I'm going to go do a deposition" but didn't
7 get into any of the details.
8    Q   And I'll take it that that was the only
9 person that you've mentioned it to?
10    A   Correct.
11       MR. MEYERHOFF:  I want to pull up a
12 document that I'll mark as Exhibit 2.
13       (The document referred to was marked as
14       Deposition Exhibit 2 by the Reporter.)
15 BY MR. MEYERHOFF:
16    Q   Do you see this document?  The first line
17 is -- says Number 1 and then it says "George M. Lee"
18 at the top?
19    A   Yes.
20    Q   I will -- it's a three-page document.  I'll
21 just give you a chance to review the whole thing; so
22 if you want to review it and then when you want me
23 to scroll down, just let me know.
24    A   Okay.  You can scroll down a little bit.
25       Okay.

1      Okay.
2      Q  I'm only going to ask you questions about
3 the first two pages.
4      A  Okay.
5      Q  So scroll back up to page 2.
6      Do you see the second sentence on page 2?
7 It says:
8         "Plaintiffs have not yet retained
9         or disclosed Mr. Curcuruto as an
10        expert witness, but reserve the right
11        to so designate and disclose as such
12        within the time provided by
13        Federal Rule of Civil Procedure
14        26(a)(2)(D)(i)."
15      Do you see that?
16      A  I do.
17      Q  Is it an accurate statement that the
18 plaintiffs have not yet retained you as an expert
19 witness?
20      A  Correct.
21      Q  So you have no written agreement with
22 plaintiffs; correct?
23      A  No.
24      Q  And are you being compensated by plaintiffs
25 for your time here today?

Page 22

1      A  I am not.
2      Q  Are you being compensated by anyone for
3 your time here today?
4      A  I am not.
5      Q  So you have not been retained as an expert
6 witness.
7      Is it your understanding that you are
8 giving expert testimony here today?
9      A  I think I'm just providing my opinion and
10 corroborating or -- what had taken place back in --
11 when I submitted that original document and kind of
12 tell you -- answer any questions about how that
13 original document came about.
14      MR. LEE:  And let me just interpose an
15 objection. Lacks foundation. Calls for
16 speculation.
17 BY MR. MEYERHOFF:
18      Q  Have you reviewed the original Complaint
19 filed by plaintiffs in this case?
20      A  Unless it was one of those three documents,
21 no.
22      Q  And just to be -- I'm sorry.  I
23 interrupted.
24      A  Just the three documents I mentioned
25 earlier, just to clarify.

Page 23

1      Q  Just to be clear, the memo, the points and
2 authorities that Mr. Lee provided you, and what were
3 the other two documents?  Sorry.
4      A  The original deposition; I think about a
5 six-page document; and then the declaration, the
6 three-page document about today's declaration [as
7 spoken].
8      Q  To be clear, when you say "the original
9 deposition," do you actually mean the original
10 declaration that you filed in this case in 2017?
11      A  It was a six-page document and it had the
12 one attached exhibit, with the Magazine Chart.  I'm
13 not sure if it was -- getting confused on
14 "declaration" versus "deposition."
15      MR. LEE:  And objection -- I object to the
16 question. Assumes facts. He didn't file anything.
17 BY MR. MEYERHOFF:
18      Q  And then the other document you're
19 referring to, is that the Notice of Deposition that
20 we looked at earlier as Exhibit 1?
21      A  The three-page document?
22      Q  Yeah.  That's correct.
23      A  Yes.
24      Q  Do you recall when you first became
25 involved in this case?

Page 24

1      A  Going back to the 2017 filing or --
2      Q  Was the 2017 filing the first time you were
3 involved in this case?
4      A  I'm not sure.  You know, this case is, I
5 think, different than the original 2017 one.  We
6 were talking about that one exhibit.
7      I'm a little confused on, you know, this
8 case versus other cases.
9      Q  To the best of your recollection, has
10 Mr. Lee ever been the plaintiffs' attorney in
11 another case that you participated in?
12      A  Yes.  I believe so.
13      Q  Okay.  Do you recall when the first time --
14 let me rephrase.
15      When was the first time you've heard about
16 this specific case?
17      A  If you want to name this case for me?  This
18 is the Wiese/Bonta one?  Was it known as something
19 previously?
20      Q  When was the first time you heard about the
21 Wiese case, previously known as Wiese v Becerra, now
22 known as Wiese versus Bonta?
23      A  I'm not sure.
24      I know I got refreshed on it with Mr. Lee
25 recently, but I'm not sure if I had dealt with it

Page 25

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  previously.
2      Q  Do you know how you first became aware of
3  this case, the Wiese case?
4      A  I'm not sure specifically how I became
5  aware of this case.
6      Q  Do you recall who you first spoke with
7  about this case?
8      A  I do not.
9          MR. MEYERHOFF:  I want to go ahead and pull
10 up what I'm going to mark as Exhibit 3.
11         (The document referred to was marked as
12         Deposition Exhibit 3 by the Reporter.)
13 BY MR. MEYERHOFF:
14     Q  It's a six-page document entitled
15 "Declaration of James Curcuruto in Support of
16 Plaintiffs' Motion for Temporary Restraining Order
17 and Issuance of a Preliminary Injunction."
18         Do you see that towards the middle of the
19 page?
20     A  I do.
21     Q  Is this the six-page document you were
22 referring to previously?
23     A  If you could just -- I think the one that I
24 had seen had an exhibit at page 6 and dated 2017; so
25 if you could just kind of scroll down so I could see

Page 26

1  the rest of it?
2      Q  Sure.
3      A  They all look the same.
4          Okay.  You can keep going.
5          Okay.  You can keep going.
6          Okay.  Yeah.  2017.
7          So it was just a different defendant, I
8  suppose, at the time; is that correct?  Same
9  plaintiff?
10     A  Yeah.  It's -- Becerra was the
11 Attorney General.
12     A  Okay.  So this, I believe, was the first
13 time I had heard of this and I'm not sure, you know,
14 if -- the process at NSSF, when I was there, if
15 someone needed help, usually -- you know, Mr. Lee
16 probably would have probably went through our
17 government relations team and then they would have
18 contacted me.
19         That was the standard practice back then.
20     Q  So looking at this document on the middle
21 of page 4 of the pdf, it says:
22         "I declare under penalty of
23         perjury that the foregoing is true
24         and correct.  Executed within the
25         United States on June 9, 2017."

Page 27

1          Do you see that?
2      A  Correct.  Yes.
3      Q  And do you see below that, there's a
4  signature?
5      A  That's me, yeah.
6      Q  And that's your signature; correct?
7      A  It is.
8      Q  And do you recall signing this document?
9      A  I do.
10     Q  Did you write this document?
11     A  I believe so.
12     Q  And did plaintiffs' counsel provide you
13 with any edits to this document?
14     A  I do not recall.
15     Q  Do you recall reviewing this document with
16 plaintiffs' counsel before signing it?
17     A  I do not recall, but it, most likely, would
18 have been reviewed by the plaintiffs' side before
19 getting submitted -- being submitted.
20     Q  You submitted declarations in other cases;
21 correct?
22     A  Correct.
23     Q  And is that a similar -- let me rephrase.
24         Is that the general practice with the
25 declarations you have submitted?

Page 28

1      A  There was a very similar process, you know,
2  of requests would come in, again, normally filtered
3  through our government relations team, and then they
4  would reach out to me and ask if, you know, the --
5  we had materials that were available and time
6  available to support any effort.
7          And then I would be in contact with the
8  plaintiffs' attorney and submit a declaration and
9  then go on from there.
10     Q  Did you discuss this declaration with
11 anyone at NSSF?
12     A  Oh, I'm sure, yeah.
13     Q  Who do you think you would have discussed
14 it with?
15     A  We had two associate general counsels
16 during my time at NSSF.  The first one I worked with
17 was Jeff Yue, I think Y-u-e, and then I'm not sure
18 when he left.  Maybe -- might have been before or
19 after this one.
20         And then Benjamin -- can't remember his
21 last name -- was the second associate general
22 counsel that I worked with on declarations like
23 these.
24         Ben -- hmm.  Sorry.  I can't remember his
25 last name.

Page 29

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  Q  Would you have discussed it with anyone
2  other than the associate general counsels at NSSF?
3  A  I'm sure I informed my direct superior, you
4  know, just on -- update on what type of work I
5  was -- had on my plate.
6  Q  And who was your direct superior at the
7  time you wrote this declaration?
8  A  Most likely, Randy Clark.  If not
9  Randy Clark, maybe Chris Dolmack, D-o-l-m-a-c-k.
10     I can't think of Ben's last name, but it
11  will come to me.
12  Q  So is it fair to say that you drafted this
13  declaration within the scope of your employment at
14  NSSF?
15  A  Yes.
16  Q  You drafted it on company time; correct?
17  A  Correct.
18  Q  Were you paid any additional money beyond
19  your salary to draft this declaration?
20  A  I was not.
21  Q  I want to shift gears and ask you --
22  actually, let me ask you another question.
23     You wrote this declaration in 2017;
24  correct?
25  A  Correct.

Page 30

1  Q  And were you aware that this declaration
2  was subsequently filed by the plaintiffs in the
3  Wiese case?
4  A  I believe -- yeah.  That was the process at
5  the time.  I believe that had taken place.
6  Q  You testified previously that you spoke
7  with Mr. Lee approximately a month ago and he asked
8  about your willingness to -- to be deposed in this
9  case; correct?
10  A  Yes.
11  Q  When, previous to that time a month ago,
12  was the last time you had spoken with Mr. Lee about
13  this case?
14  A  May have been back in '17.
15  Q  But it hadn't been the past year; correct?
16  A  I don't believe so.
17  Q  Looking at this document, the top of the
18  page, page 4, do you see the purple writing at the
19  top of the page?
20  A  The share has gone away from my computer.
21     MR. MEYERHOFF:  I'm sorry.  Let me share
22  that again.
23     THE WITNESS:  Good old modern technology.
24     I do see that -- it's back on.  I do see it
25  but it's almost doubled up here.  I can't read that

Page 31

1  blue at the top of the page.  It's got two lines on
2  top of each other.
3  BY MR. MEYERHOFF:
4  Q  Do you have any understanding of what those
5  blue lines represent?
6  A  I believe they are just -- show the -- I
7  can't even read it.
8     But -- maybe just an overview of what the
9  document is.
10  Q  Do you know why there is two lines
11  superimposed over each other?
12  A  I do not.
13     MR. LEE:  Objection.  Calls for
14  speculation.
15     Well, never mind.
16  BY MR. MEYERHOFF:
17  Q  Are you aware that this declaration was
18  filed a second time?
19  A  I don't recall.
20  Q  In your conversations with Mr. Lee -- I
21  believe there's been two conversations within
22  approximately the last month with Mr. Lee; correct?
23  A  Correct.
24  Q  And have you spoken with Mr. Ray DiGuiseppe
25  about this case?

Page 32

1  A  I do not believe so.
2  Q  In either of your conversations with
3  Mr. Lee over the past month, did he tell you that
4  your declaration had been refiled this year?
5  A  I do not recall.
6  Q  So to be clear, at no point within the past
7  year did Mr. Lee contact you and ask you whether the
8  opinions included in this declaration filed in 2017
9  were still your opinions today; correct?
10  A  Did he ask me if they were still my
11  opinions?
12  Q  Yes.  That's correct.
13  A  On the Magazine Chart or this declaration?
14  Q  Yes.
15  A  Yeah.  We discussed that.
16  Q  All right.  You discussed that a month ago;
17  correct?
18  A  Correct.
19  Q  Prior to that, did Mr. Lee ask that
20  question?
21  A  Not to my knowledge.
22  Q  You graduated from college; correct,
23  Mr. Curcuruto?
24  A  I did.
25  Q  You graduated from UNC Wilmington; correct?

Page 33

**H I N E S   R E P O R T E R S**                                        **9 (30 - 33)**

Case 3:22-cv-05403-DGE   Document 119-1   Filed 09/01/23   Page 12 of 50

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1   A  Correct.
2   Q  What degree did you obtain there?
3   A  A Bachelor's in business administration.
4   Q  And did you attend graduate school?
5   A  I did not.
6   Q  At UNC Wilmington, did you take any
7   statistics classes?
8   A  Just the one to help meet the requirements
9   of -- the course requirements for that degree.
10  Q  So it's your testimony today that you took
11  a statistics class at UNC Wilmington?
12  A  I believe so.  It was 1991.  I think it was
13  part of the curriculum.
14  Q  And do you recall specifically what was
15  taught in that class?
16  A  No.  Just general.
17  Q  Okay.  Let me talk a little bit about your
18  employment history.
19     You served as a marketing manager at the
20  Other List Company; correct?
21  A  Correct.
22  Q  And that was from 1996 to 2005; correct?
23  A  It's about -- sounds about right.
24  Q  What did you do as a marketing manager at
25  the Other List Company?

Page 34

1   A  I was responsible -- there was some new
2   client acquisition and transactions between clients.
3   Q  What does "new client acquisition" mean?
4   A  You know, we would try to sign on new
5   clients to add to our -- our existing clients.
6   Q  What did the Other List Company do?
7   A  They were a direct marketing firm focused
8   on direct mail campaigns.
9   Q  Were you successful in your new client
10  acquisition?
11  A  Yes.
12  Q  And then you next were at Scholastic, Inc.;
13  correct?
14  A  Correct.
15  Q  And you were a marketing manager there as
16  well?
17  A  Correct.
18  Q  And you were there from approximately 2005
19  to 2006; correct?
20  A  Yes.
21  Q  And what did you do in your role as
22  marketing manager at Scholastic, Inc.?
23  A  Did some analysis of the programs they had
24  there and worked with their marketing team to test
25  some of the campaigns to see which performed better.

Page 35

1   Q  And is it fair to say that the goal at
2   Scholastic, Inc., was new client acquisition?
3   A  No.  Not from my position.
4   Q  What was the goal of your position?
5   A  Just trying to determine the most
6   cost-effective campaigns.
7   Q  And who were your clients at Scholastic,
8   Inc.?
9   A  I just worked for the company, Scholastic.
10  They were a book publisher.  Like "Harry Potter" was
11  their big book at the time, but I worked in their
12  continuity program division.
13  Q  What does -- what does the continuity
14  division do?
15  A  You may recall offers where, you know, you
16  buy one book for one dollar and then you sign up and
17  you get six free but then you've got to buy, you
18  know, five more at $5.00, and they were children's
19  book titles, "Dr. Seuss," Disney.
20     Golden books were the ones I really worked
21  with.
22  Q  I remember the Scholastic book fair.
23  A  Right.
24  Q  And -- and so the clients of Scholastic,
25  Inc., are end users; right?  Consumers; correct?

Page 36

1   A  Correct.
2   Q  Just going back up a second.
3     Why did you leave the Other List Company?
4   A  Just was looking to increase my revenue
5   and, you know, try something different.
6   Q  You were not terminated from the
7   Other List Company; correct?
8   A  Correct.
9   Q  And then why did you leave Scholastic,
10  Inc.?
11  A  They were going through a transition period
12  and had to reduce payroll.  It was probably the
13  start of people not reading books anymore.  Not a
14  good business decision.
15  Q  So it's fair to say you were laid off;
16  correct?
17  A  Correct.
18  Q  To the best of your knowledge, did that
19  layoff have to do with any performance-related
20  issues on your part?
21  A  I don't believe so.
22  Q  After Scholastic, Inc., you served as
23  executive director at Marketing Memories, LLC;
24  correct?
25  A  Correct.

Page 37

Wiese, et al. vs. Bonta, et al.                Deposition of James Curcuruto

Q   And you did that from approximately 2006 to 2009; correct?

A   Correct.

Q   And you were also the owner of this company; correct?

A   I was.

Q   Were you the sole owner of the company?

A   Yes.

Q   And how many employees did you have at Marketing Memories?

A   Just me.

Q   And is it fair so say that the -- the business of Marketing Memories was about selling personalized engraved products?

A   Yes.

Q   So you were sort of -- I imagine you were a jack-of-all-trades at the -- at the company; correct?

A   Correct.

Q   Did you have any other jobs before you joined NSSF that we haven't previously mentioned?

A   Oh, yeah.  I had plenty of jobs growing up and previous to, I think, the first one you mentioned was -- was the Other List Company.

Q   Were those jobs in the service industry?

Page 38

A   Sure.  Everything from a paper route to landscaping to working at retail stores.

Q   Did any of those retail stores sell firearms?

A   Yes.

Q   Which one or ones?

A   The Sports Authority.

And Track -- I worked at companies that no longer exist.

Q   This deposition is a trip down memory lane. Sports Authority, Scholastic.

Were you -- at the Sports Authority, were you involved in the sale of firearms?

A   I was not.  I had worked there part-time at nights for a couple years.  They brought the firearms toward the end.  They were not there in my store for very long.

Q   When you say they brought them in at the end, you mean at the beginning of your employment, they did not sell firearms and then towards the end of your employment, they did; correct?

A   Correct.

Q   Do you recall what year this was or years when you were employed at the Sports Authority?

A   1995-ish.

Page 39

Q   Do you have an understanding of why the Sports Authority decided to start selling firearms around 1995?

MR. LEE:  Objection.  Lacks foundation. Calls for speculation.

BY MR. MEYERHOFF:

Q   You can answer.

A   Okay.  Then no, I did not.

Q   Do you recall what type of firearms the Sports Authority sold while you worked there?

A   I believe they had long guns, which -- you know, shotguns and rifles.

Q   Do you recall if they sold magazines while you worked there?

A   I do not.

Q   So before your employment at NSSF, is it fair to say that your primary professional focus was marketing?

A   Yes.  Marketing, sales.

Q   Prior to your time at NSSF, have you had any experience with companies in the firearms industry?

A   A few of our clients at the Other List Company were in the outdoor space and then also, obviously, the Sports Authority which we

Page 40

already discussed.

Q   When you say "the outdoor space," what do you mean?

A   Hunting, fishing, camping, shooting.

Q   So in 2009, you started your employment at NSSF; correct?

A   Correct.

Q   What does "NSSF" stand for?

A   The National Shooting Sports Foundation.

Q   And how did you first become aware of the role you were eventually hired for at NSSF?

A   I believe I saw the ad in a -- in a local newspaper or potentially an online website job board.

Q   And why did you decide to apply for this role?

A   Couple reasons:  One, the company that I had owned was, you know -- wasn't as successful as I was hoping it would be.

Second, I had grown up hunting, fishing, camping, and the NSSF was in that space.

So those were the two primary reasons.

Q   And can you describe briefly what the interview and hiring process was like for NSSF for that role?

Page 41

Case 3:22-cv-05403-DGE   Document 119-1   Filed 09/01/23   Page 14 of 50

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1   A  Sure.
2        Best of my recollection, submitted paper
3   interview; mailed it in.
4        Resume.  Cover letter.  Mailed it in.
5        I was contacted by -- I think they had used
6   a third party to kind of sort through all the
7   applicants and I made it past that initial review
8   and then had interviews, several interviews, with
9   staff at NSSF.
10   Q  And you were initially hired as the
11   director of industry research and analysis; correct?
12   A  Correct.
13   Q  And you had testified previously that your
14   main area of professional focus, prior to joining
15   NSSF, was in marketing; correct?
16   A  Correct.
17   Q  To the best of your knowledge, why do you
18   think NSSF hired you for this
19   industry-research-and-analysis role?
20        MR. LEE:  Objection.  Calls for
21   speculation.  Lacks foundation.
22        You can answer.
23        THE WITNESS:  I believe, you know, my
24   knowledge of the industry, my just personal
25   experiences with the industry, my background in

Page 42

1   marketing.
2        Also encompassed when I worked at
3   Scholastic, the analysis part of it.
4   BY MR. MEYERHOFF:
5   Q  The Scholastic you mentioned was the -- you
6   had testified previously about the analysis of
7   programs was something you did at Scholastic?
8   A  Correct.
9   Q  What do you mean by analysis of programs?
10   A  Again, with those continuity programs, we
11   would do some AB testing with different titles and
12   different offers, and I was the person that would
13   then say "Okay.  Offer A outperformed Offer B.
14   Let's now test Offer B versus Offer C."
15   Q  So it was an analysis -- let me just -- so
16   at Scholastic, the analysis of programs was mainly
17   geared towards sales?  Is that a fair statement?
18   A  Yes.  Which offers outperformed others.
19   Looking at numbers and developing a few formulas and
20   projecting overall sales for a campaign and then
21   determining which one was more cost effective than
22   another.
23   Q  And have you done any research in
24   professional roles prior to joining NSSF?
25   A  You know, with my -- the organization I

Page 43

1   formed, the Marketing Memories, framed that
2   movement.  And I had to research which particular
3   market I thought would be best for the personalized
4   products, that sort of stuff.
5   Q  And what sources of information did you
6   look at in making that determination?
7   A  Let me think back.  Just a lot of, I guess,
8   internet searches and looking up -- I remember --
9   you know, the markets we were looking at were birth
10   rate, death rate, number of anniversaries, number of
11   weddings.
12        When you were making -- when we were making
13   personalized products, we wanted to know why people
14   would buy those and they were mainly for birthdays,
15   anniversaries, births, deaths.
16        We kind of analyzed how many people were
17   born a year, how many people died a year.
18   Obviously, birthdays are easy to figure out.  That
19   type of stuff.
20   Q  When you worked at the Other List and at
21   Scholastic, were there research directors at either
22   company?
23   A  I don't recall.
24   Q  Do you recall receiving any research
25   training at either job?

Page 44

1   A  Just standard job training.  Somebody
2   taught me a little bit about getting me up to speed
3   on the spreadsheets at Scholastic, and I was on my
4   own at Marketing Memories.
5   Q  But nothing specific about these are the
6   best practices to engage in in research; correct?
7   A  Correct.
8   Q  And did you work with any statisticians at
9   the Other List Company or Scholastic?
10   A  At Scholastic there were statisticians or
11   at least they had some other analysis staff.
12   Q  And did you receive training from those
13   statisticians?
14   A  I did learn from them.
15   Q  Do you recall what you learned?
16   A  Just, again, some of the formulas -- the
17   Excel formulas to do forecasting so we could make
18   decisions quicker.
19        We didn't have to wait for a program to --
20   to end all the way out.  We would just forecast the
21   ones we thought would make the most money so then we
22   could move on to the next offer.
23   Q  Is it fair to say that that training was
24   mostly related to formulas in Excel?
25   A  Yes.

Page 45

1  Q  And when you ran Marketing Memories, did
2  you employ any -- I guess you testified previously
3  there were no other employees.
4      Did you ever contract with any
5  statisticians with Marketing Memories, LLC?
6  A  I did not.
7  Q  Did you ever contract with any outside
8  research organizations while you were with
9  Marketing Memories, LLC?
10  A  No.
11  Q  So returning to NSSF, when you served as
12  director of administrative research and analysis,
13  you reported to the director of business
14  development; correct?
15  A  Correct.
16  Q  And --
17  A  It might have been the manager of business
18  development.  I'm not sure of the title.
19  Q  And that was Randy Clark; correct?
20  A  Correct.
21  Q  And can you describe what the business
22  development department did at NSSF?
23  A  They had a couple of divisions -- I don't
24  know divisions but parts to it.
25      There were member services.  So NSSF is a

Page 46

1  member-based organization; so they had staff that
2  supported member needs; they had some programs --
3  programs division where they would help try to
4  increase participation in hunting, target shooting;
5  and then the research division was myself and my
6  associate researcher.
7  Q  Do you recall receiving annual reviews for
8  performance at NSSF?
9  A  I do, yes.
10  Q  And those reviews were given by Mr. Clark;
11  correct?
12  A  Correct.
13  Q  And do you recall what the rubrics were for
14  those reviews?
15  A  Just standard forms with, you know, the --
16  maybe ten -- ten questions on poor to excellent.
17  Q  If you recall, generally, what those
18  categories were.
19  A  I do not recall specifically, but generally
20  they would have been, like, you know, works well
21  with coworkers, met goals, that type of stuff.
22      MR. MEYERHOFF:  I see we're past an hour.
23  Mr. Curcuruto, Ms. Miller, Mr. Lee, would you like a
24  break?
25      THE WITNESS:  I'm okay.

Page 47

1      THE REPORTER:  I would like one.
2      MR. MEYERHOFF:  How long?
3      THE REPORTER:  Five minutes is great.
4      (A brief recess was taken.)
5  BY MR. MEYERHOFF:
6  Q  So when we broke, we were discussing your
7  role as director of industry research and analysis
8  at NSSF.
9      Can you briefly describe what that role
10  entailed?
11  A  Sure.
12      I was responsible for most -- conducting
13  most of the research for NSSF, and NSSF is a
14  business-to-business trade association for the
15  firearms industry; so what we tried to do is provide
16  research to our members that would help them make
17  better business decisions.
18  Q  And then in 2016, you became director of
19  research and market development; is that correct?
20  A  Correct.
21  Q  Would that be considered a promotion?
22  A  And some added responsibilities.
23  Q  And added compensation?
24  A  I think it was just a title change.
25  Q  What were the added responsibilities that

Page 48

1  came with becoming the director of research and
2  market development?
3  A  I took over what we call R3, which is
4  recruit new people, retain the ones we have, and
5  reactivate lapsed participants.
6      And that R3 dealt with overall
7  participation in hunting and target shooting; so we
8  tried to increase participation, and that kind of
9  then fell under my responsibilities.
10  Q  Did you -- did you lose any of the
11  responsibilities that you previously had when you
12  took on this new role?
13  A  I -- the only thing that I had taken off my
14  plate was I had ran an executive management seminar
15  at our -- one of our conferences; so somebody else
16  took that responsibility over.
17  Q  What was the -- was it a seminar?
18  A  Correct.  Yeah.
19      I brought in paid speakers that -- NSSF
20  owned and operated a large business-to-business
21  show, which was called the Shot Show, and at that
22  show, we would provide our attendees education; so
23  the education that -- that program that I developed
24  was for executives just to help them, you know,
25  improve their skill set.

Page 49

1 Q And these are executives of firearms
2 companies?
3 A Correct.
4     The attendees of Shot Show were primarily
5 firearm manufacturers, ammunition manufacturers, and
6 any businesses that had to do with that market.
7 Retailers, ranges, parts manufacturers.
8 Q Who did you report to in your role as
9 director of research and market development?
10 A At the time I believe it was still
11 Randy Clark and I'm not sure of the time.
12     He had left the organization and then I had
13 reported to Chris Dolmack, and I'm not sure how --
14 how long I had reported to Randy in my new role and
15 then transferred over reporting to somebody else.
16 Q Is it fair to say that the whole time you
17 were at NSSF, you were within the business
18 development division?
19 A Correct.
20 Q When was your last day of employment at
21 NSSF?
22 A Early January 2021. I don't recall the
23 specific date.
24 Q Why did you leave NSSF?
25 A They had staff reductions due to losing --

Page 50

1 during COVID, the -- the show that they held, the
2 Shot Show, was canceled and that was a big chunk of
3 their revenue; so they had to have some staff
4 reductions and budget reductions.
5     So I got caught up in that.
6 Q Is that the reason they told you you were
7 being let go?
8 A Correct.
9 Q Did they mention any other reasons that
10 they told you you were being let go?
11 A They did not.
12 Q Who took over your responsibilities, to the
13 best of your knowledge, after you were let go?
14 A I had a research assistant that, I assume,
15 most of the responsibilities went to and then I
16 think they had divvied up a lot of other
17 responsibilities among the remaining staff there.
18 Q Who was that research assistant?
19 A Dianne, with two n's, Vrablic,
20 V-r-a-b-l-i-c.
21 Q Do you know why you were let go and
22 Miss Vrablic was not?
23     MR. LEE: Objection. Calls for
24 speculation.
25     THE WITNESS: Most likely financially. I

Page 51

1 had a larger salary and -- and controlled a few
2 budgets that she did not.
3 BY MR. MEYERHOFF:
4 Q Do you know that -- do you know if NSSF
5 ever hired another director of research and market
6 development?
7 A I do not believe they have.
8 Q Are you familiar with an individual named
9 Salam Fatohi?
10 A He was a coworker at the time. I'm not
11 sure. Maybe we were there for two years together.
12     He had worked, I believe, in the government
13 relations division, but at the time we were all home
14 officed to -- due to COVID; so I didn't really have
15 many in-person interactions with Salam.
16 Q Have you had any interactions with him, in
17 person or otherwise, since you've left NSSF?
18 A I have not.
19 Q Do you know what Mr. Fatohi's role was in
20 the government relations division?
21 A I believe he was an assistant researcher on
22 the government side of things, politics.
23     But I didn't really delve too much into
24 that. I was busy with my own responsibilities to
25 learn what his were.

Page 52

1 Q What -- so I take it that NSSF has a
2 government relations division?
3 A Correct.
4 Q And what does that division do?
5 A They -- they mostly focus on the political
6 side of things.
7 Q When you say "focus on the political side
8 of things," what do you mean?
9 A I know that they had started a government
10 relations office in Washington, D.C., to try to help
11 the industry side of politics and, again, I didn't
12 get too involved in that.
13 Q Did you ever discuss -- did you ever
14 discuss the declaration that you submitted in this
15 case with anyone in the government relations
16 division?
17 A The original declaration from 2017?
18 Q That's correct.
19 A Sure.
20     That's where I would have worked with that
21 associate general counsel who was part of the
22 government relations team. Ben Erwin. Ben Erwin.
23     THE REPORTER: What was -- I'm sorry. What
24 is it?
25     THE WITNESS: E-r-w-i-n.

Page 53

Wiese, et al. vs. Bonta, et al.                          Deposition of James Curcuruto

1  He was the associate general counsel that I
2  worked with on some of the declarations after the
3  original one left.
4  Sorry.
5  BY MR. MEYERHOFF:
6  Q  And when you say you worked with the
7  associate general counsels on these declarations,
8  what do you mean?
9  A  They would, you know, help walk through the
10 process with me and, you know, I would -- I had all
11 the research and filled out the declarations and
12 they would be, you know, kind of the liaison between
13 folks like Mr. Lee.
14 Q  Did the associate general counsels at NSSF
15 ever provide comments on these declarations?
16 A  I know we discussed them and they probably
17 provided some comments, general comments, on
18 grammar, that type of stuff.
19 Q  To the best of your recollection, did NSSF
20 oppose California's restrictions on large-capacity
21 magazines while you were there?
22 A  To the best of my knowledge, I know NSSF
23 overall would be opposed to anything seen as, you
24 know, I guess anti-gun or anti-industry; so things
25 like the high-capacity magazine bans or bans on what
Page 54

1  provided with any other rationales as to why NSSF
2  opposed the restrictions on large-capacity
3  magazines?
4  A  No.  That was the premise of it, you know,
5  helping our members stay in business.
6  Q  So after you left NSSF in 2021, you formed
7  a company called Outdoor Insights, LLC; is that
8  correct?
9  A  Correct.  Yeah.  Just kind of did some
10 consulting.  Just -- and then decided to try to
11 figure out what I want to do.
12 Q  What you want to do when you grow up.
13 A  Exactly.
14 Q  And what kind of companies did you consult
15 for?
16 A  A few companies within the firearms
17 industry.
18  I did some -- wrote some articles.  Some
19 folks paid me to write some articles.  The U.S. Fish
20 and Wildlife Service was a company that asked me to
21 write articles, you know, focused on the outdoors
22 and conservation.
23 Q  Did any of the firearms companies that you
24 consulted with -- do any of them sell large-capacity
25 magazines?
Page 56

1  they called modern sporting rifles, which was the AR
2  platform, they would have been opposed to.
3  I don't know, again, if they -- how -- how
4  in depth or what they did to oppose them, but I know
5  that was discussed.
6  Q  Do you recall if they ever told you why
7  NSSF opposed restrictions on large-capacity
8  magazines?
9  MR. LEE:  Objection.  Vague.  Vague as to
10 the term "they."
11 You may answer.
12 THE WITNESS:  Okay.  Yeah.  I think there
13 were discussions.
14 From what I recall, I had discussions on,
15 you know, getting rid of a product that our members
16 sold was bad for our members and we are a
17 member-based trade association; so we would do what
18 is best for our members and that would be the --
19 keep allowing them to sell -- make the products that
20 they were selling.
21 MR. MEYERHOFF:  Can you read back that last
22 answer for me, Ms. Miller?
23 (The record was read.)
24 BY MR. MEYERHOFF:
25 Q  To the best of your recollection, were you
Page 55

1  A  I do not believe so, no.
2  Q  Did any of the articles you've written
3  while at Outdoor Insights, LLC, concern
4  large-capacity magazines?
5  A  I don't believe so.
6  Q  You're also the executive director of
7  Outdoor Stewards of Conservation Foundation; is that
8  right?
9  A  Correct.
10 Q  And you -- is it fair to say that you
11 formed that organization?
12 A  I did.
13 Q  And you formed it in 2021 as well?
14 A  Correct.
15 Q  What does that organization do?
16 A  We are a 501(c)(3) nonprofit organization,
17 and our mission is to help recruit the next
18 generation of what we call HATS, which are hunters,
19 anglers, trappers, and shooters, and promote the
20 fact that HATS are primary funders and stewards of
21 land, fish, and wildlife conservation in America.
22 Is that too long?
23 Q  No.  That's -- thank you.
24 Does Outdoor Stewards of Conservation
25 Foundation have a position on legality of
Page 57

1 large-capacity-magazine restrictions?
2    A  We do not.
3       We're conservation focused and we've got
4 some programs that we're -- which is our primary
5 focus.
6    Q  And I'm sorry.  You told me this already,
7 but what is the -- what is the mission of
8 Outdoor Stewards of Conservation Foundation?
9    A  That's to use the research-based
10 communication and engagement programs to help
11 recruit the next generation of hunters, anglers,
12 trappers, and shooters and promote the fact that
13 they are the primary funders of land, fish, wildlife
14 conservation in America.
15    Q  Do you think that restrictions on
16 large-capacity magazines interfere with recruiting
17 the next generation of hunters and anglers?
18    A  I have not thought too much about that,
19 but, you know, the less options you have to do
20 anything, I suppose would -- would hurt recruitment
21 efforts.
22    Q  But it's not something you spent time
23 thinking about; correct?
24    A  I have not.
25    Q  Prior to your time at NSSF, you had never

1 conducted any research on firearm magazines;
2 correct?
3    A  Correct.
4    Q  And -- and in your prior employment we
5 mentioned prior to NSSF, you hadn't designed or
6 conducted studies as part of those positions, had
7 you?
8    A  I had not.
9    Q  And you mentioned briefly -- and if you
10 could just refresh my recollection.  In your
11 positions prior to NSSF, what had been your
12 professional involvement with firearms'
13 manufacturers?
14    A  No direct contact with the manufacturers.
15    Q  Other than your salary from NSSF, in the
16 past five years, have you received any payments or
17 funds or income from the firearms industry?
18    A  A few of my clients with the consulting
19 business, I had -- I had received some compensation
20 for work I had done after NSSF.
21    Q  And anything beyond that?
22    A  Directly from the firearm manufacturers?
23    Q  That's correct.
24    A  With Outdoor Stewards of Conservation
25 Foundation, one of our programs is called "Fill a

1 bag while filling your tag," and we provide
2 biodegradable bags to people that hunt, fish, and
3 shoot so when they are outdoors they can take trash
4 out of the woods and waters, and we sell those bags
5 to state wildlife agencies, outdoor organizations.
6       Some of the folks that have bought those
7 bags are firearm manufacturers.
8    Q  Do you own any shares or stocks in any
9 firearms manufacturing companies?
10    A  I have a retirement account that has, you
11 know, the different funds, and I have -- I don't
12 know if any of them have shares in that.
13       You know, my -- my son has an account to
14 kind of -- I teach him to play with and in that
15 account, he owns shares of Smith & Wesson, yes.  I
16 think.  I'm not sure of the symbol.
17    Q  But you personally don't own any shares of
18 Smith & Wesson or any other firearms manufacturer,
19 independent of what may be in your retirement fund?
20    A  Correct.
21    Q  Do you personally own any large-capacity
22 magazines?
23    A  So is that -- that's 11-plus?  Is that --
24 just to define it?
25    Q  A magazine capable of holding more than

1 10 rounds.
2    A  Okay.  I do.
3    Q  Approximately how many do you own?
4    A  I believe three.
5    Q  Do you own any standard-capacity magazines
6 or magazines capable of holding 10 rounds or less?
7    A  I do.
8       MR. LEE:  Well, hang on a second.
9       THE WITNESS:  Oh, sorry.
10       MR. LEE:  Counsel, which is it?
11 Standard-capacity magazine or magazines capable of
12 holding 10 or fewer rounds?
13       MR. MEYERHOFF:  I mean, I'm calling it a
14 standard-capacity magazine.  I think the witness
15 knows what I mean.
16       MR. LEE:  Standard -- you said do you own
17 any standard-capacity magazines or magazines capable
18 of holding 10 rounds or less.
19       Did you not apply that 10 -- that
20 standard-capacity magazines are magazines that hold
21 10 or fewer rounds?
22       So the question is vague and ambiguous.
23       MR. MEYERHOFF:  That's your objection?
24       MR. LEE:  Yes.
25 ///

Case 3:22-cv-05403-DGE   Document 119-1   Filed 09/01/23   Page 19 of 50

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

BY MR. MEYERHOFF:

Q   Mr. Curcuruto, do you own any magazines capable of holding no more than 10 rounds?

A   I do.

Thanks for the clarification.

Q   You do know for purposes of this deposition, when I say "standard-capacity magazine," I mean a magazine capable of holding 10 rounds or less?

A   And I do understand that.

MR. LEE:  I object to the question --

THE WITNESS:  Oh, sorry.

MR. LEE:  That -- that's not a term that I recognize, and the term that has been used in this litigation, standard-capacity magazine, by others including plaintiffs, including General Youngman, including just about anyone else that you would talk to in the country -- a standard-capacity magazine is a magazine that typically holds more than 10 rounds.

So to the extent you're trying to mislead this witness by getting him to adopt the idea that a standard-capacity magazine as that term has been used in this litigation means a California legal magazine, I'm going to have to object to that.

MR. MEYERHOFF:  Ms. Miller, can you read

Page 62

back the last question and answer.

(The record was read.)

BY MR. MEYERHOFF:

Q   How many magazines, approximately, do you own that are capable of holding no more than 10 rounds?

A   Approximately 10.

Q   For the large-capacity magazines that you own, what is the maximum number of rounds that those are capable of holding?

A   15.

Q   And are all 3 of those magazines capable of holding 15?

A   Yes.

Q   What state do you live in, Mr. Curcuruto?

A   Connecticut.

Q   Do you know if Connecticut has any restrictions on large-capacity magazines?

A   They do.

Q   Do you know what -- do you know what that restriction is?

A   I believe no more than 10.

Q   Do you know if there is some kind of grandfather provision that makes your possession of those magazines legal?

Page 63

A   There is.

I believe back in early 2022, '23, I had to sign some sort of paperwork that said how many do you own?

Q   Is it your understanding that under Connecticut law, you cannot acquire more capacity magazines?

A   I believe that's correct.

It's hard to keep up with the laws in Connecticut.

MR. LEE:  Object to the question as calls for a legal opinion, legal conclusion.

BY MR. MEYERHOFF:

Q   If Connecticut's law were invalidated, would you go purchase more large-capacity magazines?

MR. LEE:  Objection.  Lacks foundation. Calls for speculation.

You may answer.

THE WITNESS:  So I would -- if I had the legal ability to buy a magazine that held more than 11 -- 11-or-more rounds, I, most likely, would.

BY MR. MEYERHOFF:

Q   Why would you buy another magazine capable of holding more than 10 rounds?

A   A lot of firearm manufacturers, when you

Page 64

buy a gun, they come with that.

In other states, I believe, they come with 11-plus and if I were to go buy a new gun and it came with that magazine, I would be purchasing it, I guess.

Q   Any other reasons?

A   You know, I -- hopefully, when I have some free time, I'll do some target shooting.  Right now, I'm just focusing on getting the business up and running, and it's just -- when you do do target shooting, it's easier to load one magazine, you know, with 15 rounds than 3 magazines with 10, you know -- 2 15-round magazines versus 3 10-round magazines.  Just makes it easier, more enjoyable when you're at the target-shooting range.

Q   I take it you do a -- you like to target shoot; correct?

A   I do.

Q   Are there any other reasons, other than the fact that if you purchased another firearm, it may come with a large-capacity magazine and the fact that large-capacity magazines make target shooting easier, that you would want to purchase a large-capacity magazine?

A   Again, just to clarify the "large capacity"

Page 65

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  being an 11-plus, you know, I do have a conceal
2  carry license, and right now the maximum in
3  Connecticut is that under-10 capacity; so if I
4  were -- if the law allowed it and I was legally
5  allowed to do it and carry a firearm concealed, I
6  would carry one with 11 or more rounds, most likely.
7      Q   There are 30-round magazines commercially
8  available for sale in other states.
9          Do you know if that's true?
10     A   I believe so, yes, sir.
11     Q   And would you want to purchase a 30-round
12 magazine?
13     A   I don't -- I -- I haven't really thought
14 about it, but I would if they weren't illegal.
15     Q   How many firearms do you own?
16     A   Approximately 20.
17     Q   Do you own any revolvers?
18     A   I do.
19     Q   And why do you own revolvers?
20     A   I just -- I just like all different types
21 of guns.
22     Q   But no specific reason that you -- that you
23 own revolvers?
24     A   Just collecting, target shooting, personal
25 protection.

Page 66

1          Those are some of the reasons I own all
2  types of guns.
3      Q   So it's fair so say that you own revolvers
4  for, among other reasons, personal protection;
5  correct?
6      A   Correct.
7      Q   And when you say "personal protection," is
8  it fair to say you mean that if someone were to
9  confront you and you had a revolver, you would
10 potentially use that for self-defense; correct?
11     A   Correct.
12     Q   Do you own any guns that are -- that are
13 fixed-magazine systems?
14     A   So not attachable?  Just to clarify.
15     Q   Yeah.
16         Not -- that have a magazine that is not
17 detachable.
18     A   I do not.
19     Q   Do you have any firearms that are capable
20 of accepting magazines capable of holding more than
21 15 rounds?
22     A   More than 15?
23     Q   For example, are -- do you possess any
24 firearms that are capable of holding magazines which
25 can accept 30 rounds?

Page 67

1      A   I believe so, yes.
2      Q   What is one of those firearms?
3      A   Well, like, you know, a Ruger 10/22, which
4  is a rifle, has a little box magazine which most of
5  them are -- are 10 rounds but they have other
6  magazines that would hold more -- 11-plus.
7          I'm not sure up to 30, but certainly 15.
8      Q   Do you know if any -- do you know if the
9  Ruger 10/22 you could purchase a magazine capable of
10 holding more than 15 rounds?
11     A   I'm not familiar with that.
12         I would -- if I had to venture a guess, I
13 would say yes.
14     Q   Do you own any firearms which are referred
15 to alternatively as assault weapons or modern
16 sporting rifles?
17     A   I have one AR platform rifle that we used
18 to call, at NSSF, a modern sporting rifle.
19 Connecticut-compliant edition.
20     Q   And when did you purchase that AR platform
21 rifle?
22     A   I'm not sure of the exact date but several
23 years ago.
24     Q   Did you purchase that rifle, to the best of
25 your knowledge, before Connecticut's restrictions on

Page 68

1  large-capacity magazines went into effect?
2      A   I believe after because I -- I do -- I
3  couldn't -- I don't have any magazines that hold
4  more than 10 rounds for that firearm; so I would
5  assume at the time, if I could have bought more than
6  10 rounds, I would have or it would have come with
7  it.
8      Q   You testified previously, I believe, that
9  the Ruger 10/22 firearm is capable of accepting a
10 magazine holding more than 10 rounds; correct?
11     A   Correct.
12     Q   Do you own any other -- do you own any
13 detachable magazine firearms for which you only have
14 a magazine capable of holding more -- no more than
15 10 rounds?
16     A   Yes.
17         I own several firearms with magazines that
18 are 10 or less.
19     Q   What do you use those firearms for?
20     A   Mostly target shooting, collecting,
21 personal home defense.
22         I don't think any of them are -- they are
23 not hunting related.  Those aren't my hunting
24 firearms.
25     Q   So is it fair to say that you believe that

Page 69

those firearms are appropriate for home defense?

MR. LEE: Objection. Misstates testimony.

You may answer.

THE WITNESS: They -- they can be used for home defense.

BY MR. MEYERHOFF:

Q  I believe -- and correct me if I'm wrong -- but I believe one of the reasons you possess one of the revolvers you have is for home defense; correct?

A  Correct.

Q  And did you also say for personal protection?

A  For the revolvers, home defense, personal protection, yes.

Q  For the revolvers you have, what is the maximum number of rounds you can fire before you need to reload?

A  The maximum in the revolvers I own, there are 6.

Q  Do you know what I mean firearms for which -- start again.

Do you own any firearms that you can only shoot 5 or fewer rounds before you need to reload?

A  Well, I do have some -- for -- for when you water fowl hunt and you duck hunt in Connecticut and

I think most places, the most you are allowed to have is 3 bullets in the gun; so you have to -- if the gun would -- is capable of holding more, you have to include what they call a plug; so, you know, you have to just take the gun apart to be able to put more than 3 bullets in it.

So I have some water fowl guns right now with plugs in them; so the maximum amount of shells I can put in them are 3.

Q  Do you know, to the best of your knowledge, why Connecticut has that restriction?

MR. LEE: Objection. Lacks foundation. Lacks foundation. Calls for speculation. And calls for a legal opinion.

You may answer.

THE WITNESS: It's just a federal regulation for duck hunting, the maximum is 3. For most types of duck hunting, there is a lot of different regulations. Snow geese, you can have a lot more than 3 and -- but they go down a rabbit hole.

BY MR. MEYERHOFF:

Q  Do you think that restriction on the number of rounds you can fire without reloading while duck/fowl hunting interferes with hunting?

MR. LEE: Objection. Calls for an opinion.

You may answer.

THE WITNESS: You know, it's always been that way since I've been hunting. I'm sure there's times if I had a fourth bullet, I would have been able to get more dinner, but, you know, it's -- it's just the way it is and I follow the regulations.

BY MR. MEYERHOFF:

Q  It sounds like -- and obviously correct me if I'm wrong -- you've discharged a firearm before; correct?

A  Correct.

Q  Why have you discharged firearms in the past?

A  For target shooting and hunting.

Q  Have you ever discharged a firearm for any other reason?

A  Not that I can recall.

Q  Have you ever discharged a firearm at another person?

A  I have not.

Q  We discussed previously depositions you had given in other cases; correct?

A  Yes.

Q  Have you ever testified at trial in any

case?

A  I did -- I believe it was a California case, and it was during COVID; so it was virtual.

I took the virtual stand.

Q  Have you ever testified at trial in any non-firearms cases?

A  I have not.

Q  Have you ever been deposed in any non-firearms cases?

A  The magazines, I -- I would assume, would fall under that, but nothing other than firearms and magazines.

Q  What is your definition of a sportsman?

A  A sportsman.

Let's see. I don't really have a definition handy, but I assume someone that enjoys going outdoors hunting, fishing, trapping, shooting.

Q  Would you consider yourself a sportsman?

A  I would under that definition.

Q  Do you consider California's restriction on large-capacity magazines to be anti-sportsman?

MR. LEE: Objection. Calls for an opinion.

You may answer.

THE WITNESS: You know, since I live in a state that has similar restrictions on the amount of

1 capacity in a firearm in a magazine, you know, I
2 would assume it's -- if I had to define if it's
3 pro-sportsman or anti-sportsman, I guess it would be
4 anti-sportsman just because you couldn't -- you
5 know, it just restricts what you can do as a
6 sportsman.
7     MR. MEYERHOFF:
8     Q   And any restriction on what you can do as a
9 sportsman is anti-sportsman?
10    A   I'm sure -- maybe it restricts, you know,
11 our ability to do the things that we should be able
12 to do or may want to do; so --
13    Q   Please. I interrupted you.
14    A   No. Go ahead. I'm sorry. Just getting my
15 water.
16        MR. MEYERHOFF: I'm going to pull up
17 another doc- -- document I'll mark as Exhibit 4.
18        And let me figure out how to screen share.
19        (The document referred to was marked as
20        Deposition Exhibit 4 by the Reporter.)
21    BY MR. MEYERHOFF:
22    Q   Can you see the document that I have on my
23 screen now? The icon in the upper left-hand corner
24 has the LinkedIn logo?
25    A   Correct. Yeah.

Page 74

1     Q   And the document is 17 pages.
2         So I'll just start with -- I'll just have
3 you look at page 1 and if you -- well, I'll ask
4 specific questions and obviously if at any time you
5 want to review the whole thing, just let me know.
6         Does that work?
7     A   Sure.
8     Q   So do you recognize the first page of this
9 document?
10    A   I do.
11    Q   What do you recognize it to be?
12    A   It appears to be a screenshot of my
13 LinkedIn profile.
14    Q   And do you maintain your LinkedIn profile?
15    A   I do.
16    Q   I'm going to scroll down.
17        Do you see where I've scrolled to? It says
18 "President Outdoor Insights, LLC."
19    A   Correct.
20    Q   And do you see maybe ten lines down, there
21 is a carat? It says "Available as Expert
22 Witness..."?
23    A   Correct.
24    Q   And it says "Available as Expert Witness
25 for the firearms industry"; correct?

Page 75

1     A   Yes.
2     Q   And I believe we discussed this earlier,
3 but correct me if I'm wrong, it's fair to say that
4 you have -- in firearms cases that you've been a
5 part of, you've only submitted declarations or been
6 deposed on behalf of the plaintiffs; correct?
7     A   Correct.
8     Q   And reading this statement from your
9 LinkedIn page, is it fair to say that you would not
10 be available as an expert witness for defendants in
11 cases where firearms restrictions are being
12 challenged?
13        MR. LEE: Objection. Calls for
14 speculation.
15        THE WITNESS: No.
16        I don't -- I would -- I don't think that's
17 true.
18        I could be an expert witness, I think, on
19 either side, depending on the -- the content.
20    BY MR. MEYERHOFF:
21    Q   But here you're advertising your services
22 as an expert witness specifically for the firearms
23 industry; correct?
24    A   Correct.
25    Q   And do you see here where it says in the

Page 76

1 middle of the page, "National Shooting Sports
2 Foundation"?
3     A   I do.
4     Q   And do you see the -- the third carat down
5 in there? It says:
6         "Serve as an expert witness in
7         depositions representing industry
8         against anti-sportsman legislation"?
9     A   Yes.
10    Q   So is it fair so say that you believe that
11 restrictions on magazines capable of holding more
12 than 10 rounds are anti-sportsman?
13    A   Well, as we discussed before, it kind of
14 limits what you can do; so that would be
15 anti-sportsman.
16    Q   Is it your opinion that a restriction on
17 magazines capable of holding more than 30 rounds
18 would be anti-sportsman?
19        MR. LEE: Objection. Calls for an opinion.
20        THE WITNESS: I have -- yeah. I don't have
21 any experience with magazines holding more than 30;
22 so I haven't really -- I don't really have a
23 personal opinion on using them or others using them.
24    BY MR. MEYERHOFF:
25    Q   So you don't have a strong opinion that

Page 77

1  those should be unrestricted?
2      A  I do not have a strong opinion on that.
3      Q  Do you have a strong opinion on whether --
4  I'll just rephrase.
5      Do you have any opinion on whether
6  magazines capable of holding more than 100 rounds
7  should be restricted?
8      A  Again, I haven't really had any experience
9  with that, no personal or professional experience
10  firing or using that product or much knowledge of
11  that at all; so I don't have much of an opinion on
12  magazines holding more than 100 rounds.
13      Q  Do you have any opinion on them?
14      A  I -- I -- from the limited experience I
15  have with them, I -- I don't really -- I don't
16  really have an opinion at this time on those.
17      Q  In your opinion, would it be fair to
18  describe magazines as a firearm accessory?
19      A  Yes.
20      Q  Are you familiar with what are called
21  silencers?
22      A  Suppressor, silencer, I believe that just
23  gets connected to the top of the barrel for noise
24  abatement.  If so -- if that's your definition of
25  what you're talking about, yes, I do have knowledge

Page 78

1  of those.
2      Q  Do you own any silencers?
3      A  I do not.
4      Q  Why not?
5      A  It is just a complicated process to
6  purchase and own them here in Connecticut, and I
7  just haven't taken the time to go through that.
8      Q  Do you think restrictions on silencers
9  would be anti-sportsman?
10      A  I think so.
11      When you're hunting, you know, and use ear
12  protection without a silencer, you know, is a smart
13  move; but, you know, in other countries, it's kind
14  of -- they want you to use silencers for -- for the
15  noise, not disturb, you know, anybody close by
16  and -- and to protect your hearing.
17      So not allowing silencers is kind of
18  anti-sportsman.
19      Q  You've been deposed in a number of cases;
20  correct?
21      A  Yes.
22      MR. LEE:  Asked and answered.
23  BY MR. MEYERHOFF:
24      Q  Do you know if you've ever been found
25  qualified as an expert by any court?

Page 79

1      A  I don't -- I'm not sure I understand that.
2      I haven't heard that I'm qualified or
3  unqualified, I believe, by any court.
4      Q  Have you personally ever been a party to a
5  lawsuit?
6      A  I have not.
7      Q  Have any of the entities that you've
8  controlled been a party to a lawsuit?
9      A  Can you just specify which entities?
10      Q  I believe previously we discussed --
11  have -- so I believe that you exercise control over
12  Outdoor Stewards of Conservation Foundation and
13  Outdoor Insights; correct?
14      A  Correct.
15      Q  And I believe previously you testified that
16  you were the owner of Marketing Memories, LLC;
17  correct?
18      A  Yes, sir.  Yes.
19      Q  Have you ever owned any other businesses?
20      A  No.
21      Q  Have you ever run any other nonprofits?
22      A  I have not.
23      Q  So have any of those three entities either
24  been -- have any of those three entities ever been a
25  party to a lawsuit?

Page 80

1      A  They have not.
2      Q  One more question on Exhibit 4.
3      Do you see where it says "Executive
4  Director, Marketing Memories, LLC" in bold?
5      A  Yes, sir.
6      Q  And then the dates it lists October 2006 to
7  November 2012; correct?
8      A  Correct.
9      Q  So is it fair to say that your employment
10  with NSSF overlapped with your role as executive
11  director at Marketing Memories, LLC?
12      A  It did.
13      Q  And so how did you manage both roles at the
14  same time?
15      A  The Marketing Memories was the business I
16  had started after Scholastic and prior to NSSF, it
17  was my full-time job.
18      When I started at NSSF, that was my
19  full-time job and -- and Marketing Memories was just
20  kind of residual.  If an order came in, I would fill
21  it, but not a lot -- unfortunately, not a lot of
22  business came in during the time it overlapped with
23  NSSF.
24      Q  Have you ever been charged with a crime?
25      A  I have not.

Page 81

1  Q  Have you ever been the victim of a crime?

2  A  Not that I know of.

3  Q  I'm going to return to what's been marked

as Exhibit 3, which is your declaration.

5     Do you see in paragraph 2, you write that

the NSSF's:

7     "... mission is to promote,

8     protect and preserve hunting and the

9     shooting sports"?

10  A  Correct.

11  Q  How does NSSF do that?

12  A  When I was with NSSF, and I'm not sure if

their mission has changed -- but to promote,

protect, preserve hunting and the shooting sports,

they -- you know, I think one of the best things

they did was provide research to learn how to

increase participation in the activities of hunting

and shooting sports.

19     And as a trade association, if we could

grow new customers that are members, which were

business based, you know, it would increase their

sales and -- and customer bases as well.

23  Q  So was the ultimate goal to increase sales?

24  A  Well, the goal for the NSSF for at least,

you know, what I thought was there, was to provide

Page 82

1  retailers and the ranges; but I don't have any

specifics.

3     I wasn't in the membership.  It wasn't part

of my responsibilities to determine the numbers of

members or the individual types of memberships.

Just knowledge of the overall numbers of members we

had.

8  Q  Do you know how NSSF funded its operations?

9     MR. LEE:  Objection.  Lacks foundation.

Calls for speculation.

11     You can answer.

12     THE WITNESS:  To the best of my knowledge,

NSSF funded their operations primarily by the

ownership of the Shot Show that was a

business-to-business consumer trade show.  That

brought in a lot of revenue for them.

17     They also were able to bring in revenue via

memberships.  Since it was a, you know,

business-to-business-based organization, they had

members as outlined here.

21     Manufacturers would pay a membership fee as

well as retailers, ranges.

23     Also, NSSF made a little bit of money

selling some research products but it wasn't a huge

chunk of their overall budgets.

Page 84

1  them, you know, with better -- our members with

better information so they could make better

decisions and for them to increase, you know, their

businesses, grow their businesses.

5  Q  And when you say "grow their businesses,"

you mean increase revenue; correct?

7  A  It means -- you know, it could be increase,

you know, the amount of employees that they have to,

you know, pay some new people; bring some new people

into hunting and shooting sports, new customers; and

then also, you know, sell -- sell more products,

sell to more customers.

13  Q  And in your declaration, you write at the

time:

15     "... NSSF has a membership of

16     12,000 manufacturers, distributors,

17     firearms retailers, shooting ranges,

18     sportsmen's organizations and

19     publishers."

20     Do you know the approximate breakdown in

terms of number of members within those different

categories?

23  A  I do not.

24     I think the -- the biggest portion of the

membership at the time that I was there was the

Page 83

1  BY MR. MEYERHOFF:

2  Q  How did NSSF make money with the Shot Show?

3  A  Again, I wasn't on the Shot Show team, but

it's my understanding that exhibitors, and they had

a couple thousand exhibitors, would pay to exhibit

at the Shot Show and then attendees would pay to

attend the Shot Show.  That's how they made money

during the trade show.

9     THE REPORTER:  May I take a little break?

My doorbell rang and there is nobody else here and I

need to check.

12     THE WITNESS:  I'll take a chance to go to

the restroom.

14     MR. MEYERHOFF:  Why don't we take a

five-minute break.

16     (A brief recess was taken.)

17  BY MR. MEYERHOFF:

18  Q  Mr. Curcuruto, are you ready to proceed?

19  A  Yes, sir.  I am.

20  Q  I believe you testified previously that

members of NSSF paid membership dues; is that

correct?

23  A  Yes.

24  Q  And do you -- to the best of your

understanding, did all 12,000 members pay the exact

Page 85

Wiese, et al. vs. Bonta, et al.                                  Deposition of James Curcuruto

1 same amount in dues?
2        MR. LEE: Objection. Lacks foundation.
3     THE WITNESS: No. I was not in membership,
4 but I know there were different levels of
5 membership; different pricing tiers. I don't know
6 the specifics of them, though.
7        Sorry.
8 BY MR. MEYERHOFF:
9   Q  Would it be fair to say that, to the best
10 of your knowledge, the larger firearms manufacturers
11 paid more than the other members?
12   A  I believe that was the case.
13   Q  And to the best of your knowledge,
14 manufacturers, distributors, and firearm retailers
15 all have the primary goal of selling more firearms
16 and firearms-related accessories; correct?
17   A  I -- you know, I did not work for a retail
18 or range or manufacturers, so I'm not sure what
19 their goals were, but I assume any business that
20 wants to stay in business would like to sell -- sell
21 to their customers and have more customers.
22   Q  And do you think it's fair to say that
23 shooting ranges, sportsmen's organizations, and
24 publishers all benefit from more firearm and
25 firearm-accessory sales?
                                           Page 86

1 question. It's compound many times over.
2        You may answer.
3     THE WITNESS: Yeah.
4        Just what we wanted to do, at least my
5 division, we wanted to grow our own ranks which
6 was -- or membership; right? We wanted to have more
7 members as a trade organization which, I think, is
8 standard for any trade organization.
9        And of course we want our members to be
10 successful; so, you know, I assume if they went out
11 of business, they would no longer be members of the
12 NSSF.
13 BY MR. MEYERHOFF:
14   Q  Did you know -- during the time you were at
15 NSSF, did you know who any members of the board of
16 directors were?
17   A  I did.
18   Q  At the time you were at NSSF, was the chair
19 of the board of directors Robert L. Scott?
20   A  I believe so.
21   Q  And did you know -- do you know if
22 Mr. Scott is also the chairman of Smith & Wesson?
23   A  At the time that I was with NSSF and
24 Mr. Scott was on our board, I believe he worked in
25 some capacity with Smith & Wesson, but I do not know
                                           Page 88

1   A  Well, I'm not sure.
2        Again, on an individual level, sportsman
3 organizations -- sometimes those are, you know,
4 private clubs that don't want more. They like to
5 have their own amount or even less sometimes.
6        So I don't know if that statement is true
7 for all -- everybody.
8   Q  Do you think it's fair to say that the main
9 purpose of NSSF was to promote the sale of firearms
10 and firearm accessories?
11   A  No.
12        You know, in my opinion, when I was there,
13 our main goal was just to, you know, grow overall --
14 the overall market which includes participation and
15 the amount of people purchasing anything from the
16 firearm to, you know, targets and ear protection and
17 all the accessories that go with it, all the hunting
18 decoys and stuff.
19        We just wanted to grow the overall market.
20   Q  So would it be fair to say that the goals
21 of NSSF, in your opinion, were to increase the sale
22 of firearms and firearm accessories, increase
23 participation, and increase the purchasing of
24 firearm accessories such as targets, et cetera?
25        MR. LEE: Objection to the form of the
                                           Page 87

1 what capacity.
2   Q  Do you know if Smith & Wesson manufactures
3 large-capacity magazines?
4   A  If Smith & Wesson manufactures
5 large-capacity magazines?
6        I'm not sure. I don't believe they do. I
7 think they are a firearm manufacturer, but I'm
8 unaware if they do or do not manufacture magazines
9 that would go in firearms that they make.
10   Q  Smith & Wesson -- would you just consider
11 Smith & Wesson to be a large firearms manufacturer?
12   A  Yes.
13   Q  Is it your testimony that you're not sure
14 whether Smith & Wesson manufactures magazines that
15 go along with the firearms themselves?
16   A  Right.
17        I'm not sure if they manufacture them or if
18 they bought them from another manufacturer to
19 include them, you know, with a firearms they sold.
20   Q  But it's your understanding that
21 Smith & Wesson typically sells firearms -- typically
22 sells magazines along with the individual firearm
23 they sell?
24   A  I believe when you purchase a firearm from
25 Smith & Wesson or, you know, any other manufacturer
                                           Page 89

1  that makes a firearm that needs a detachable
2  magazine, that manufacturer is going to not just
3  sell the firearm but the firearm will come with
4  either one or two detachable magazines, whether it's
5  Smith & Wesson or another manufacturer.
6      Q   At the time you were at NSSF, was the
7  co-vice chairman of the board Stephen Hornady?
8      A   So Stephen Hornady was on NSSF's board
9  while I was working at NSSF.  I'm not sure what
10 capacity he was there.
11     Q   And are you aware if he is the president of
12 Hornady Manufacturing Co.?
13     A   When I was with NSSF, and, to my knowledge,
14 Steve Hornady was working with Hornady
15 Manufacturing.  I don't know what his capacity was
16 there.
17     I believe he was an owner.  His name is on
18 it; so --
19     Q   Do you know what that company manufactures?
20     A   Primarily ammunition.
21     Q   At the time you were at NSSF, was the other
22 co-vice chairman of the board Jeff Reh, R-e-h?
23     A   Mr. Reh.  Or Reh, R-e-h.  He was on NSSF's
24 board.  I'm not sure what his title was.
25     I did not have a lot of direct contact

Page 90

1  with, you know, board meetings or anything like
2  that.
3      Q   And are you aware if Mr. Reh is affiliated
4  in any way with Beretta USA, Corp.?
5      A   I believe, you know, during the time I was
6  with NSSF, Mr. Reh was with Beretta.
7      Q   What does Beretta do?
8      A   They are a manufacturer of firearms.
9      Q   And at the time you were at NSSF, were you
10 aware that Josh Dorsey was on the board?
11     A   Yes.
12     When I was with NSSF, I believe Mr. Dorsey
13 was on NSSF's board.
14     Q   And are you aware that Mr. Dorsey at the
15 time was affiliated with GLOCK?
16     A   Yes.  When I was NSSF, Mr. Dorsey was on
17 our board and, to my knowledge, he was working for
18 the company GLOCK at the time.
19     Q   And what does GLOCK do?
20     A   They are a firearm manufacturer.
21     Q   Sitting here today, do you recall any other
22 members of the NSSF board of directors at the time
23 you worked there?
24     A   I do.
25     Q   Were any of those individuals affiliated

Page 91

1  with firearms manufacturers?
2      A   You know, the one that just popped into my
3  head was a retail owner or worked at a retail shop,
4  but I don't want to use my memory to try to recall
5  who else was on the board.
6      If you had a list there, I might be able to
7  remember them, but I know the board was primarily
8  made up of larger organizations from firearms,
9  ammunition and accessory and I think publishing
10 companies.
11     Q   Would it be fair to say, based on your
12 recollection of the board's composition today, that
13 the NSSF board was controlled by firearms
14 manufacturers?
15     MR. LEE:  Objection.  Argumentative.  Lacks
16 foundation.  Calls for speculation.
17     THE WITNESS:  I believe they had a mix of
18 representatives from firearms, ammunition, retail.
19     I think maybe -- shooting ranges and, at
20 one point, media.  I'm not sure how their make-up is
21 today.
22 BY MR. MEYERHOFF:
23     Q   Would it be fair to say that, at NSSF, your
24 role is to support the member organizations in
25 generating revenue?

Page 92

1      A   My primary thought process was to, you
2  know, provide our members with as much quality
3  information as possible so they could make the best
4  business decisions.
5      MR. MEYERHOFF:  I'm going to go ahead and
6  share my screen.
7  BY MR. MEYERHOFF:
8      Q   Can you see what's on my screen now,
9  Mr. Curcuruto?  It appears to be a YouTube page and
10 below the video it says "NSSF research -
11 Jim Curcuruto 2016 Shot Show TV Studio"?
12     A   I do see it, yeah.
13     Q   And did a Shot Show convention take place
14 in 2016?
15     A   Yeah.
16     The Shot Show is -- the trade show is every
17 year, usually January, once a year.
18     Q   And what would the Shot Show TV studio be?
19     A   That was run by the NSSF media department
20 and they would do kind of on-site interviews of
21 people attending the show.
22     Q   And do you recall ever participating in the
23 TV studio?
24     A   I did, yes.
25     I did several interviews over the years.

Page 93

1  Q  I'm going to play this video and then ask
2  you a few questions about it or I'm going to play a
3  segment of the video.
4       "MS. KOPCZYK:  Welcome back to Shot Show
5       TV.  I'm your host, Rachel Kopczyk,
6       coming to you live from the Shot Show TV
7       studio, and I'm joined now by Jim
8       Curcuruto.  He is the director of
9       industry research for NSSF.
10      MR. CURCURUTO:  Thank you for having me.
11      MS. KOPCZYK:  It's great to have you
12      here and speak about this.  So your
13      research and analysis and sometimes our
14      eyes kind of glaze but you guys are
15      actually doing really important work.
16      MR. CURCURUTO:  Thank you.
17      MS. KOPCZYK:  And it's actually very
18      important for business success.
19      MR. CURCURUTO:  Right.
20      MS. KOPCZYK:  So what's your most
21      popular research elements that you have?
22      Publications?
23      MR. CURCURUTO:  We have a ton of
24      research every year.  And now some of
25      the big more popular ones are our

1  industry reference guide.  We actually
2       call it our Bible.  It's 200 pages worth
3       of source material that will give you a
4       real good idea of what's happening in
5       the industry from the background check
6       data that the FBI puts out on a monthly
7       basis, to firearm production every year,
8       how many hunting licenses are sold
9       and -- and, of course, the all-important
10      economic data on the -- you know, the
11      size of the industry.
12      MS. KOPCZYK:  All right.  Give us a --
13      give us some stats.  Give us some info.
14      MR. CURCURUTO:  Sure.  Well, we've had a
15      good run here the last couple years as
16      the 60,000 goers here will tell you and
17      we finished the year strong.  The FBI
18      background checks; had a good November
19      and December and that is up 8.8% over
20      the year.  We were expecting about a 5%
21      increase, but that -- that strong finish
22      really helped push us over the edge."
23  BY MR. MEYERHOFF:
24  Q  That was you in the video that we just
25  played; correct?

1  A  I believe, yes.
2       That suit I would not fit in anymore.
3  Q  And do you recall giving this interview?
4  A  I do.
5  Q  And this was at the 2016 Shot Show;
6  correct?
7  A  Correct.
8  Q  And you were representing NSSF at that
9  Shot Show; correct?
10  A  Yes.
11  Q  When you say in the video -- a moment ago
12  you said "we finished the year strong."
13      What did you mean by that?
14  A  It was -- you know, one of the indicators
15  that we rely on is firearm sales and participation;
16  so those two -- I believe 2016 was a good year for
17  both increasing participation and hunting in the
18  shooting sports and overall sales increases.
19  Q  How would you have measured increased
20  participation?
21  A  Each year, we conducted several studies on
22  participation.
23      We also reviewed data from sources like --
24  I'm speaking slow now.  I heard myself speaking
25  slow.  U.S. Fish and Wildlife Service had certified

1  hunting license sales.
2       We had done a couple of studies on target
3  shooting participation.
4       We purchased data from other sources like
5  the National Sporting Goods Association.
6       They had an annual report on a bunch of
7  different activities, including hunting and
8  target-shooting participation; so we tried to
9  monitor, the best we could, how participation rates
10  were and used other sources to monitor, the best we
11  could, sales data as well.
12  Q  And then later in the video, you said we
13  "had a good November and December."
14      What did you mean by that?
15  A  Probably focusing on, from my
16  recollection -- and what I know -- the best -- one
17  of the best indicators we had or more current was
18  every month the FBI would release their unadjusted
19  background check data on firearm sales; so we would
20  look at that, and each month, we would keep a tally
21  and measure it versus, you know, year-over-year and
22  keep historical records of that.
23      And 2016 had a strong, I guess, holiday
24  season -- October, November, December end-of-year
25  season for the background check data.

1  Q  And when you say there was "a strong finish
2  really helped push us over the edge," is that
3  firearm sales as well?
4  A  Oh, I don't really know what I was
5  referring to, "push us over the edge."
6     Most likely, what I was referring to was
7  the firearms sales because that, you know --
8  January, 2020 -- or 2016, we would have had just
9  received the December data; so we would have had the
10 full year and be able to say that 2016 was stronger
11 than 2015 in -- in looking at the background check
12 data.
13    Q  When you were saying "we," did you mean
14 NSSF?
15    A  I'm sure I -- "we" -- I -- I might have
16 spoken for NSSF as saying "we," yeah.  Or -- or the
17 industry.
18    I think I had referenced the 60,000 people
19 there; so maybe I was all-encompassing.
20    Q  I'm going to return to your declaration
21 now.
22    In paragraph 3 of your declaration, you
23 write that you directed:
24    "... the activities of an
25    internal research coordinator...."

1     Do you see that?
2  A  Yes.
3  Q  Who was that internal research coordinator?
4  A  That was Dianne Vrablic who we referenced
5  earlier.
6  Q  And did Miss Vrablic ever assist you with
7  research on firearm magazines?
8  A  Most likely, I handled the bulk of that and
9  then, you know, the -- the analysis or the data
10 collection on firearm magazines, and she would help
11 create the charts and promote that type of stuff,
12 but I think I did most of the data-crunching on
13 that.
14    Q  Do you know if Miss Vrablic created the
15 Magazine Chart that was attached as an exhibit to
16 your declaration in this Wiese case?
17    A  She may have created it in, you know, Excel
18 or PowerPoint but the data to create it was under my
19 responsibilities.
20    Q  And to the best of your knowledge, is
21 Miss Vrablic still with NSSF?
22    A  I believe she is.
23    It's been a while since we've spoken, but
24 the last time we spoke, within the last six months,
25 she was still there.

1  Q  And in your discussions with her, did you
2  discuss large-capacity magazines?
3  A  We did not.
4  Q  In paragraph 3, you also state that you
5  directed:
6     "... outside companies retained
7     to conduct research and gather market
8     and consumer information useful to
9     NSSF members."
10    Which outside companies did you retain to
11 do that?
12    A  Well, we worked with several companies.
13 Southwick Associates, Responsive Management,
14 Sports Marketing Surveys, InfoManiacs were some of
15 the top organizations that we would contract to help
16 us conduct market research.
17    MR. MEYERHOFF:  Miss Miller, can you just
18 read back his answer for me.
19    (The record was read.)
20    MR. MEYERHOFF:  Thank you.
21 BY MR. MEYERHOFF:
22    Q  Did Southwick Associates ever assist you
23 with research on firearm magazines?
24    A  They did.  I believe so, yes.
25    Not on this chart that's in -- that's in

1  the exhibit on this, but --
2  Q  How did they assist you?
3  A  I believe we contracted them to do a quick
4  survey or a study on consumers' ownership of -- of
5  magazines.
6     They also ran an internal survey of
7  consumers, and they tracked a lot of different
8  purchases from people that purchased firearms,
9  ammunition, magazines.
10    I believe magazines may have been one of
11 the things they tracked, but I'm not sure at the
12 time if -- if that was one that we had, you know,
13 purchased from them or not.
14    Q  Did you ever contract with Responsive --
15 did -- did Responsive Management ever assist you
16 with research on firearm magazines?
17    A  Responsive Management we hired several
18 times to do participation studies and -- and several
19 other studies -- we would contract them a few times
20 a year.
21    I don't recall anything specific to
22 magazine ownership, but there may have been a
23 question in -- in some of the surveys that we had
24 contracted them out that had to do with magazine
25 ownership or purchasing or usage.

Case 3:22-cv-05403-DGE   Document 119-1   Filed 09/01/23   Page 29 of 50

Wiese, et al. vs. Bonta, et al.                           Deposition of James Curcuruto

1  Q  What about Sports Marketing Surveys?
2  A  Sports Marketing Surveys -- I believe we
3 contracted to do a study on the modern sporting
4 rifle consumer, and in that study, there was
5 questions on purchases of firearms and accessories
6 and, I believe, some of the accessories were
7 magazines; so I believe they were involved in that.
8  Q  And what about InfoManiacs?
9  A  We used them quite often on specific
10 projects -- first-time gun buyers, women gun owners.
11  But I don't think we ever got too deep
12 involved in specifics on any of their projects, but
13 we had done so many things over 10, 11 years, I
14 don't want to say we did not, but I don't believe we
15 used InfoManiacs to do anything specific to magazine
16 ownership.
17  Q  Can you describe what kind of -- can you
18 describe what Southwick Associates does as a
19 company?
20  A  They are a market research organization; so
21 they -- their services -- they would get contracted
22 out by folks or companies, like NSSF, to do specific
23 market research products, for the most part, and
24 they had internal data as well that you could
25 purchase from them.

Page 102

1  Q  Would it be fair to say that you have a
2 high opinion of Southwick Associates?
3  A  Yeah.
4  We -- we wouldn't work with companies that
5 we didn't have a good opinion on; so all -- all four
6 of those companies I mentioned, I had a high opinion
7 on.
8  Certainly would not have hired them if I
9 didn't.
10  MR. MEYERHOFF:  I'm going to pull up what I
11 want to mark as Exhibit 5.
12  (The document referred to was marked as
13  Deposition Exhibit 5 by the Reporter.)
14 BY MR. MEYERHOFF:
15  Q  It's just a two-page document.  I'll give
16 you a moment to review it.  You can tell me when to
17 scroll down.
18  A  2011?
19  You can scroll down.  Hmm.
20  Scroll up a little bit, please.
21  Q  Up or down?  I'm sorry.
22  A  Oh, down.  Yeah.  Okay.  That's good.
23  All right.  Let's see what Rob said here.
24 Helping --
25  Report.  Yeah.  They did a lot.

Page 103

1  Q  Have you ever seen this press release
2 before, Mr. Curcuruto?
3  A  I recall giving them the award and I know
4 that we had some media ad on it.
5  This looks like it came directly from
6 Southwick.
7  I normally just tracked NSSF releases on
8 it; so I'm aware of the award, but I may not have
9 seen this particular release 12 years ago.
10  Q  And you're quoted as saying:
11  "'The awards are well deserved.
12  NSSF's research would not be where it
13  is today without them.'"
14  Do you recall saying that?
15  A  Yes.
16  Q  And is that statement true?
17  A  It is.
18  Q  Why did you not hire Southwick Associates
19 to create the Magazine Chart attached to your
20 declaration as Exhibit 1?
21  A  That was something that, you know, I could
22 do internally; so there were certain things that we,
23 you know -- with two people on staff, we could only
24 do a certain amount internally; so we would hire
25 those organizations to do -- help us with other

Page 104

1 things.
2  When we could do things in-house, we did
3 them in-house and the Magazine Chart is one we did
4 in-house.
5  Q  To be clear, you testified earlier that
6 Southwick tracked the purchases of accessories
7 including magazines; correct?
8  A  Again, I believe I said -- I was pretty
9 sure they tracked magazines, but I wasn't sure, but
10 they tracked a lot of consumer purchases in the
11 firearms industry.  Not -- not sure if magazines was
12 part of them, but I think they were.
13  Q  Did -- at the time you were there, did NSSF
14 track magazine purchases?
15  A  Not internally.  We would use outside
16 sources for, like -- if Southwick had that data, we
17 would use them or contract them to see if we could
18 learn a little bit more about a particular product.
19  Q  I'm going to go back to your declaration.
20  In paragraph 4 you state that the purpose
21 of the research you conducted at NSSF was for NSSF
22 members "use in their business decisions"; correct?
23  A  For use in their business decisions, yes.
24  Q  How would the members use the data you
25 provided to them in their business decisions?

Page 105

1  MR. LEE: Objection. Lacks foundation.
2  THE WITNESS: Well, so overall, you know,
3  when I first started in 2009, there wasn't a lot of
4  data for -- for the outdoor industry for hunting and
5  target shooting; so we tried to, you know, figure
6  out what holes needed to be filled and, you know,
7  participation data was a big one; so if we could
8  have trend data that showed our members, "Well,
9  hunting is increasing" or "target shooting is
10  increasing" or "hunting is decreasing," those are
11  the types of things we felt would help them make
12  better business decisions.
13  You know, if sales of firearms were going
14  up or sales of firearms were going down, we wanted
15  to try to provide that information as quickly and
16  accurately as we could to our members, thinking that
17  they would be able to use that data to make better
18  decisions, you know, contracted out some of those
19  companies we talked about.
20  We would get the consumer opinions and, you
21  know, the more you know about your consumer, we felt
22  our customers could then -- or NSSF members could
23  make better decisions when they understood their
24  customers a little bit more.
25  ///

1  BY MR. MEYERHOFF:
2  Q  Do you know if NSSF members used the
3  Magazine Chart in their decisions?
4  A  I do not know specifically or don't recall.
5  I do remember thinking that people should
6  use our data. Our members should use our data more
7  than they did because I would get questions from
8  some members, "Hey. Do we have any information on
9  this?" and something that we had done previously,
10  like, "Yes. We have it. We haven't used it
11  before," but that -- just personally, I thought
12  that, you know, we should have our research being
13  used more than it was.
14  But going back to your original question
15  there, I'm not -- I would hope that the research we
16  provided them on magazines was used by some of our
17  members, but I don't recall specifically any of them
18  stating that their -- their use of it.
19  Q  How would an NSSF member use the
20  Magazine Chart in their business decisions?
21  MR. LEE: Objection. Lacks foundation.
22  Calls for speculation.
23  You can answer.
24  THE WITNESS: The way I tried to look at it
25  is what would I like to know? And I would want to

1  know as much as possible if I was, you know --
2  whether somebody that was writing articles on, you
3  know, the outdoor industry or somebody owned a
4  shooting range or somebody that owned a retail shop,
5  to better understand, you know, what kind of
6  products I should carry.
7  And if they can see in the trends are one
8  way for a certain product, whether that's magazines,
9  and maybe they would know better what to carry in
10  their stores.
11  If they see that, you know, magazines under
12  10 rounds were more popular than magazines over
13  10 rounds, you know, they would -- they would make
14  decisions like that.
15  I never made those decisions because I
16  wasn't working at those companies, but I tried to
17  think like them and provide them with as much
18  information as I could.
19  BY MR. MEYERHOFF:
20  Q  The Magazine Chart was submitted as an
21  exhibit to your declaration. Is that -- would it be
22  fair to say that?
23  A  Correct.
24  Q  And would it be fair to say that your
25  declaration was submitted in this case as part of an

1  effort to invalidate California's restrictions on
2  magazines capable of holding more than 10 rounds?
3  Would it be fair to say that?
4  A  I think, you know, the primary reason that
5  I conducted research for NSSF was, you know, for our
6  members and then when lawsuits started to happen and
7  people realized do we have any information on
8  magazines or -- or modern sporting rifles, then
9  that's when they, you know, became used for -- as
10  exhibits for these cases to, you know, show the
11  other side or -- or try to prove whatever NSSF's
12  were -- or the plaintiffs were trying to prove.
13  Q  Is it your testimony, sitting here today,
14  that the Magazine Chart was created prior to any
15  litigation regarding large-capacity magazines?
16  A  I'm not sure. When you say "any
17  litigation," I really don't know when it started but
18  I know the purpose of all the research that NSSF or
19  at least under -- when I was there, the primary
20  reason was not for legislation issues or lawsuits
21  but to provide our members with information so they
22  could just make their best business decision.
23  Q  I want to focus specifically on the
24  Magazine Chart.
25  A  Okay.

1    Q  So sitting here today, what is your best
2  recollection of why the one-page Magazine Chart
3  attached to your declaration was created?
4    A  Probably -- again, going off my memory of
5  what I think at the time, we had done a couple of
6  studies on the modern sporting rifle consumer and I
7  want to say maybe we had done them in 2013, but
8  maybe the first one, and in that -- whenever you do
9  one bit of research, there is always, you know,
10 questions about "Hey.  Did you learn anything about
11 X, Y, or Z?" and then my assumption was somebody --
12 one of our members said "Hey.  Do you have any more
13 information on magazines that," you know, "go into
14 the firearms?"
15    So that's -- that would have been why we
16 created it in the first place.
17    Q  Do you recall any specific member asking
18 you to create this chart?
19    A  I do not.
20    We had created so many things for so many
21 reasons that, unfortunately, I don't know the exact
22 reason why we created all this stuff again.
23    Q  Do you have -- to the best of your
24 knowledge, has this chart been disseminated to
25 members of NSSF?

Page 110

1    A  Yeah.
2    I believe -- you know, when you played that
3  video and I referenced our industry reference guide
4  which was 200 pages, that was kind of our catch-all.
5    We would put as much stuff as we could into
6  that one document -- you know, the background check
7  data, the participation data, economic impact of
8  hunting and target shooting, and then we would have
9  put things like this Magazine Chart in there.
10    You mentioned silencers earlier.  We
11 tracked 4 and 4 -- I think they were 4 and 4's --
12 for, you know, the amount of suppressors.
13    We had a lot of things that we tracked so
14 that we, again, just tried to provide as much
15 information to our members as possible.
16    Q  So is it fair to say you may -- NSSF may
17 have included this chart in some kind of year-end
18 report to -- to members?
19    A  Correct.
20    I would assume -- it wasn't given to them.
21 It was a product that was sold and it was kind of
22 behind a firewall.
23    We would put out dozens of pieces of
24 information a year from full reports from those
25 outside agencies, like the Southwick Associates, and

Page 111

1  we would pay them to do those reports.
2    So sometimes we would charge our members
3  for certain reports.
4    And then, again, I mentioned there were
5  different levels of membership; so some -- the
6  highest levels of membership got a lot of free
7  research, and different levels had to pay different
8  amounts for some of the research we provided.
9    Q  Do you know when -- do you know when the
10 Magazine Chart was first included in NSSF's year-end
11 report?
12    A  I would -- if it was included, it probably
13 would have been around 2016 or 2017.
14    We tried to update that report as much as
15 possible on an annual basis, but there were years we
16 skipped it just because, you know, two people,
17 200-page report, there was a lot in there and we
18 couldn't -- just couldn't manage everything to
19 update every single page.
20    A lot of times we would just update what we
21 had available to us.
22    So earliest it would have been in there
23 would have been 2017, if it was in there.
24    Q  But sitting here today, you can't be
25 positive of whether or not it was in there?

Page 112

1    A  I cannot.
2    Q  And NSSF distributed this year-end report
3  prior to 2016; correct?
4    A  Yeah.
5    We -- I guess we called it the industry
6  reference guide and we tried to update it every --
7  at the end of every year; so I guess you could call
8  it a year-end report.
9    But, yeah, it was on an annual basis as
10 best as we could.
11    Q  And do you have any understanding of why,
12 prior to 2016, this Magazine Chart, or a version of
13 it, was not included in that industry reference
14 guide year-end report?
15    A  Just from my recollection, you know, doing
16 that modern sporting rifle consumer study, if that
17 was in '13 and people had questions and -- we might
18 have just done it for the first time in '15.
19    I'm not sure.  I don't recall, you know,
20 the first time I ever created that chart, but it was
21 probably in the vicinity of 2015.
22    Q  To be clear, are you aware of any other use
23 of this Magazine Chart outside of litigation
24 involving large-capacity magazines?
25    A  Well, I'm not aware, but I would hope its

Page 113

Wiese, et al. vs. Bonta, et al.                                        Deposition of James Curcuruto

1  intended purpose of helping some of our 10- or
2  12,000 members at the time -- hopefully some of them
3  used it.
4      Q   Going to paragraph 4, the last sentence
5  says:
6          "Research conducted by the NSSF
7       and under my direction demonstrates
8       that detachable ammunition magazines
9       are very popular and are commonly
10      owned by millions of persons in the
11      United States for a variety of lawful
12      purposes, including, but not limited
13      to, recreational and competitive
14      target shooting, home defense,
15      collecting and hunting."
16      Do you see that?
17     A   Yes.
18     Q   Do you have a breakdown of the number of
19 persons in the United States who -- who commonly own
20 large -- who commonly own detachable ammunition
21 magazines for each of those purposes?
22     A   I do not.
23     MR. MEYERHOFF:  I'm going to pull up what
24 I'll mark as Exhibit 6.
25 ///

Page 114

1      (The document referred to was marked as
2      Deposition Exhibit 6 by the Reporter.)
3      MR. MEYERHOFF:  And I'm going to screen
4  share it.
5  BY MR. MEYERHOFF:
6      Q   Do you see the document that we marked as
7  Exhibit 6?  At the very top it says
8  "James Curcuruto, January 11, 2018."
9      Do you see that?
10     A   I do.
11     Q   Do you recall giving a deposition in
12 White Plains, New York, on January 11, 2018?
13     A   I'm sure I did, but I don't recall for some
14 reason.  White Plains which isn't too far from where
15 I was.  I'm trying to think of where that was.
16     I'm sure I did.  I just don't recall being
17 in White Plains in January of 2018.
18     Q   I'm going to scroll down to what in the
19 document itself is page 117.
20     And I'll start at line -- could you read
21 from line 8 to line 25 of that page.
22     A   Is there any way you could make it a little
23 bigger?  Get rid of that stuff on the left.  My
24 eyes -- ah.  Much better.
25     Where am I starting?

Page 115

1      Q   Line 8, where it says:
2          "Q  Have you conducted any
3       study...."
4      A   Okay.
5      Q   Through the end of the page, please.
6      A   All right.  Wait one second here.  I'm
7  losing track of it.
8      Okay.
9      Q   So is it fair to say in paragraph 4, when
10 you talk about common ownership for "lawful
11 purposes," that's an extrapolation from the total
12 number of magazines in your Magazine Chart?
13 Correct?
14     A   You know, obviously, you're not using a
15 magazine by itself.  You're using it within the
16 firearm, and I know we had some discussion on, you
17 know -- there's -- we had done a study on consumers
18 on modern sporting rifles which told us, I think,
19 within that study that they used magazines with the
20 firearm; so I don't want to say that it was only
21 from that Magazine Chart that we were saying they
22 were popular, the magazines that can hold 11 more
23 rounds, but there was, you know -- pretty clear-cut
24 that there are millions of them owned out there and
25 being used for a lot of legal, lawful purposes or

Page 116

1  several legal, lawful purposes.
2      MR. LEE:  Counsel, may I ask you to
3  represent whether that Exhibit 006 -- I'm sorry --
4  may I ask you to represent whether defense Exhibit 6
5  constitutes the entire transcript of the deposition?
6      MR. MEYERHOFF:  Yeah.  Looks like it.
7      MR. LEE:  In other words, it wasn't
8  excerpted?
9      MR. MEYERHOFF:  Yeah.  It's the whole
10 thing.
11 BY MR. MEYERHOFF:
12     Q   So, I mean, is it fair to say that your
13 conclusion that millions of Americans use detachable
14 ammunition magazines for a variety of lawful
15 purposes is based on the fact that -- never mind.
16 I'll -- I'll strike that.
17     In paragraph 6, you state that you are:
18         "... not aware of any singular
19      public source providing reliable
20      figures identifying exactly how many
21      ammunition magazines are manufactured
22      or imported for sale within the
23      United States each year."
24      Is that -- is that true?
25     A   Yeah.

Page 117

**HINES REPORTERS**                                    30 (114 - 117)

Page 118

1    MR. LEE:  Sorry.  Are you asking the
2  witness whether that was true then or true now?
3  BY MR. MEYERHOFF:
4    Q  Was that true at the time that you made the
5  statement?
6    A  Yes.
7    Q  And since that time, have you become aware
8  of any singular public source providing such
9  reliable figures?
10    A  I have not.
11    Q  Are there any singular public sources
12  providing unreliable figures?
13    A  No.  Not that I'm aware of.
14    Q  Are there any private public sources that
15  would provide those reliable figures?
16    A  Not that I'm aware of then or now.
17    That's why I created the Magazine Chart and
18  did some of the studies on usage, just to get that
19  information since we didn't have a reliable source
20  for it.
21    Q  I believe you testified earlier that
22  Southwick Associates tracked the sale of accessories
23  and including, to the best of your knowledge,
24  magazines.
25    A  I believe they -- I believe they did.

Page 119

1  Perhaps not at the time when we were collecting all
2  of this.  You know, Southwick Associates had the
3  ability to add, you know, products that they were
4  tracking at the request of their clients.  It made
5  sense for them because if they had the information
6  and somebody wanted it, they could then sell it.
7    So I would assume that Southwick Associates
8  added products and categories to their consumer
9  questionnaire as they were going so they could, you
10  know, reach whatever demand they were wanting.
11    And I don't recall, unfortunately, if they
12  did track it.  It would have made my life easier if
13  I had a reliable source for it so I wouldn't have to
14  create it myself.
15    I assume they did not have it; therefore, I
16  had to create one myself.
17    Q  Are you aware of any obstacle they would
18  have faced if NSSF had paid them to gather that
19  information?
20    MR. LEE:  Objection.  Lacks foundation.
21  Calls for speculation.
22    THE WITNESS:  No.  I'm not aware of any
23  obstacle.
24  BY MR. MEYERHOFF:
25    Q  Was the reason NSSF did not ask

Page 120

1  Southwick Associates to gather this information
2  because of cost?
3    A  No.
4    I -- I like to do things like this when I
5  have -- I'm familiar with the data sources
6  available, and I have the means and the time to do
7  it.
8    I just kind of like to dig in and figure
9  out things like this; so just at the time I must
10  have had the time and the -- the sources -- enough
11  sources where I felt I could create something
12  reliable.
13    Q  And I don't want to misstate your
14  testimony, but to -- correct me if I'm wrong -- but
15  I believe what you testified previously was that you
16  synthesized the information contained in the
17  Magazine Chart and then Mrs. Vrablic
18  [pronunciation] --
19    A  Vrablic.
20    Q  -- Vrablic created the actual document
21  itself; is that right?
22    A  I'm not sure.  I think I stated I wasn't
23  sure if she created the document or I did or we both
24  did.
25    I mean at the time, you know, I was the

Page 121

1  primary one that conducted how to come up with the
2  Magazine Chart and get all the data and look at the
3  sources and come up with the reliable estimates and
4  then I would have supplied that either to her to
5  make a chart or myself to make the chart, but one of
6  the two of us would have made the -- the chart that
7  you see that you have here as an exhibit.
8    Q  Who else, if anyone, helped you develop
9  this chart?
10    A  Well, I did -- I was responsible for the
11  bulk of the concept in creating it and digging
12  through all the sources that we had and then when I
13  came up with what I thought was a good plan and had
14  to do it or came up with a number, one of my go-to
15  sources to check with things was the president of
16  NSSF, Steve Sanetti.  He has, you know, a wealth of
17  knowledge on the industry; one of the smartest or
18  most well-informed folks I've known in my 14 years
19  in the industry.
20    So I might have created the initial chart
21  but before releasing it to anybody, I wanted to run
22  it by him and give him my methodology and
23  corroborate and see if it needed any tweaks, but he
24  was somebody I relied on to help with it.
25    Q  Did you rely on anyone else to help with

Wiese, et al. vs. Bonta, et al.                                   Deposition of James Curcuruto

1  it?

2      A   No.

3      You know, nobody that I can remember having

4  detailed conversations, but, you know, I'm -- you

5  know, part of my process was to double-check and

6  triple-check and have, you know, reliance on people

7  that I -- I don't recall if I had done so with this

8  Magazine Chart, but it's -- there is a possibility I

9  might have ran it by a few others, say "Hey. Here's

10  what I did. Here's how I do it. Here's what I got.

11  What do you think?"

12      But not as in depth as with Mr. Sanetti.

13      Q   And what was Mr. Sanetti's role at NSSF?

14      A   He was the president of NSSF when I was

15  there.

16      Q   Is he still the president, to the best of

17  your knowledge?

18      A   I believe he retired four years ago.

19  Three, four years ago.

20      THE REPORTER:  Do you have the spelling on

21  his name, please?

22      THE WITNESS:  S-a-n-e-t-t-i.

23      THE REPORTER:  Thank you.

24      THE WITNESS:  You're welcome.

25  ///

Page 122

1  BY MR. MEYERHOFF:

2      Q   Did Mr. Sanetti ever express his opinion to

3  you, if any, on laws restricting large-capacity

4  magazines?

5      A   I don't recall any discussions, but it's

6  possible that we did have some.

7      Q   Sitting here today, are you aware of

8  Mr. Sanetti's position, if any, on restrictions on

9  large-capacity magazines?

10      A   I cannot speak for him, unfortunately. I'm

11  not a mind reader, but -- and I know he was -- owned

12  firearms and, worked for fire- -- in the industry

13  for a long time, but I don't want to guess at what

14  his positions are.

15      Q   In paragraph 8, you state that:

16      "The NSSF Magazine Chart

17      estimates that 230 million pistol and

18      rifle magazines were in the

19      possession of United States consumers

20      between 1990 and 2015."

21      Was that statement accurate, to the best of

22  your knowledge, when you made it in 2017?

23      A   It was.

24      Q   And then you also -- do you see where it

25  says in 8:

Page 123

1      "... the Chart further shows

2      magazines capable of holding more

3      than 10 rounds of ammunition

4      accounted for approximately

5      115 million or approximately half of

6      all magazines owned"?

7      Do you see that?

8      A   I do.

9      Q   And then in paragraph 9, you mention the

10  sources of information you used to reach that

11  conclusion; correct?

12      (The record was read.)

13      THE WITNESS:  Yes. That is correct.

14  BY MR. MEYERHOFF:

15      Q   And the three sources of information you

16  used for this data are, 1, the ATF's AFMER report;

17  2, documents from the International Trade

18  Commission; and, 3, the opinions of firearm industry

19  professionals. Correct?

20      A   Not documents from the ITC, but they had

21  a -- a data web that was -- so you could query the

22  system; so they weren't documents. They were a

23  query system.

24      Q   Okay. So the three sources of information

25  you relied on were the ATF AFMER report, information

Page 124

1  from the U.S. ITC, and opinions of firearm industry

2  professionals; correct?

3      A   Correct.

4      Q   And in paragraph 10, you state:

5      "The ATF AFMER" report "data

6      provide historical figures for

7      pistols by caliber (i.e., the

8      specific ammunition cartridge for

9      which a firearm is chambered) and

10      rifles produced in the United States

11      for consumer purchase."

12      Do you see that?

13      A   Yes.

14      Q   So is it fair to say that AFMER data

15  includes the number of firearms by category that are

16  manufactured in a given year?

17      A   They do provide different categories.

18      U.S. manufacturers are required to report

19  their production to the ATF, and I believe the

20  categories are pistols, revolvers, shotguns, rifles,

21  miscellaneous. I think those are the primary

22  categories within the AFMER reports.

23      Q   And the AFMER report deals specifically

24  with manufacture; correct?

25      A   U.S. manufacture; correct.

Page 125

Wiese, et al. vs. Bonta, et al.                                                    Deposition of James Curcuruto

1    Q   And so it doesn't tell you how many
2  firearms were actually purchased in a given year;
3  correct?
4    A   Correct.
5    Q   And it doesn't tell you how many firearms
6  were actually purchased by private individuals, does
7  it?
8    A   It does not.
9    Q   So firearms that are manufactured in a
10  given year and cataloged in AFMER could come into
11  the possession of law enforcement agencies; correct?
12    A   I believe the AFMER report does not
13  include, like, military, but it would include some
14  law enforcement, but I'm a little -- I don't recall
15  if there was a threshold now, if they included all
16  firearms that could be purchased by law
17  enforcement -- certainly by an individual law
18  enforcement person -- but I'm not sure if it
19  included firearms produced for law enforcement
20  offices.
21    Q   So is it fair to say that firearms
22  manufactured in a given year and cataloged in AFMER
23  could come into the possession of some law
24  enforcement agencies; correct?
25    A   I believe so, yes.

Page 126

1    Q   And firearms that are manufactured in a
2  given year and cataloged in AFMER could come into
3  the possession of private security organizations;
4  correct?
5    A   Yes.
6    Q   And firearms that are manufactured in a
7  given year and cataloged in AFMER could come into
8  the possession of firearms wholesalers; correct?
9    A   Correct.
10    Q   And firearms that are manufactured in a
11  given year and cataloged into AFMER could come into
12  the possession of firearms retailers; correct?
13    A   Correct.
14    Q   AFMER data does not track how many firearms
15  are -- are illegally trafficked from the
16  United States into other countries, does it?
17    A   I'm sorry.  Can you repeat that one?  I
18  want to make sure --
19    Q   AFMER data does not track how many
20  firearms, if any, are illegally trafficked from the
21  United States to another country; correct?
22    A   Correct.
23    Q   AFMER data does not track numbers of
24  magazines at all; correct?
25    A   Correct.

Page 127

1    Q   The ITC data that you relied on -- it
2  doesn't tell you how many firearms were actually
3  purchased by private citizens in a given year;
4  correct?
5    A   Correct.
6    Q   And it doesn't tell you how many firearms,
7  if any, were imported in a given year, cataloged by
8  ITC and then came into the possession of some law
9  enforcement agencies; correct?
10    A   Correct.
11    Q   And firearms that are imported in a given
12  year and cataloged by ITC could come into the
13  possession of private security organizations;
14  correct?
15    A   Correct.
16    Q   Firearms that were imported in a given year
17  and cataloged by the ITC could come into the
18  possession of firearm wholesalers; correct?
19    A   Correct.
20    Q   Firearms that are imported in a given year
21  and cataloged by ITC could come into the possession
22  of firearms retailers; correct?
23    A   Correct.
24    Q   And the ITC does not track how many
25  firearms, if any, are illegally trafficked from the

Page 128

1  United States into another country; correct?
2    A   To the best of my knowledge, they do not.
3    Q   Does AFMER data track firearm attrition
4  rates, meaning the rate of firearms that cease to be
5  functional due to loss, destruction, or
6  deterioration?
7    A   It does not.
8    Q   Does ITC data track that?
9    A   It does not.
10    Q   And ITC doesn't track magazines, does it?
11    A   I don't believe so.  They have hundreds and
12  hundreds of codes and, you know, for the purpose of
13  this one, we were just looking at the firearms
14  imported minus exported, and, you know, I don't
15  recall that they -- the ITC tracks magazines or, at
16  least at the time, we didn't identify a code that
17  did.
18    Q   Are you aware of anyone in the firearms
19  industry who tracks how many people actually own
20  LCMs?
21    A   Just to confirm, LCM, large capacity
22  magazine, referring to 11-plus?
23      No.  I'm not aware of anybody.  That
24  doesn't mean that somebody doesn't.
25    Q   So in paragraph 11, you state:

Page 129

**H I N E S   R E P O R T E R S**                                33 (126 - 129)

1    "The ATF AFMER and ITC data
2    provided estimates of approximately
3    67.7 million pistols and 42.6 million
4    rifles capable of holding a magazine
5    were available to United States
6    consumers between 1990 and 2015."
7    Do you see that?
8    A  Correct.  Yeah.
9    Q  What do you mean when you say "were
10   available to United States consumers"?
11   A  That are available for purchase.
12   Q  These numbers of 67.7 million pistols and
13   42.6 million rifles -- does that account for
14   firearms that may have been purchased by law
15   enforcement agencies?
16   A  It may -- does it account for them?  Are
17   they included in it?  Or could they be included?
18   If you could rephrase that.
19   Q  Sure.
20   So the number of "approximately
21   67.7 million pistols and 42.6 million rifles capable
22   of holding a magazine were available to
23   United States consumers between 1990 and 2015" -- do
24   you think it's likely that some of the firearms
25   imported into the United States were purchased by

Page 130

1    law enforcement agencies?
2    A  I believe it's possible.  I'm not sure
3    likely, but possible, yeah.
4    Q  And do these figures for pistols and rifles
5    account for any magazine -- excuse me -- any
6    firearms that were purchased by law enforcement
7    agencies and thus would not be available to
8    United States consumers?
9    A  I guess I just want to confirm.  Like, you
10   know, an off-duty law enforcement that purchased a
11   firearm, that's a consumer.
12   But other than that, you know, there is a
13   possibility that -- you know, that that service
14   weapon is only used, you know, by that law
15   enforcement professional for work purposes, I
16   suppose.
17   Q  Let me ask the question a different way.
18   So previously when I asked you about the
19   AFMER data and ITC data, I asked you about firearms
20   that could have come into the possession of some law
21   enforcement agencies, private security
22   organizations, firearm wholesalers, firearm
23   retailers, and firearms that were illegally
24   trafficked from the United States.
25   Do you recall me asking those questions?

Page 131

1    A  I do.
2    Q  And so the figures in paragraph 11, the
3    67.7 million pistols and 42.6 million rifles, do
4    those numbers account for any of those
5    possibilities?
6    A  Well, these numbers, you know, came from
7    the AFMER and ITC; so they could have had law
8    enforcement purchase some of these firearms.
9    Obviously the wholesalers and the retailers
10   would.
11   Q  To be clear, the 67.7 million pistols and
12   the 42.6 million rifles is -- the data you
13   obtained -- is the data you obtained based on your
14   analysis of the AFMER and ITC data; correct?
15   A  Right.
16   For the -- yeah.  Adding up the U.S.
17   production from ATF AFMER and International Trade
18   Commission data, that's how we came up with the 67
19   million pistols and the 42 million rifles capable of
20   holding a magazine available to the U.S. consumer
21   market between those -- 1990 and 2015, yeah.
22   Q  And you didn't make any adjustments to
23   that?
24   A  No.
25   Those were the hard numbers coming from the

Page 132

1    AFMER and the ITC on the firearm production and
2    imports.
3    Q  Thank you.
4    And then in the second sentence of
5    paragraph 11, you write:
6    "Firearm industry professionals
7    with knowledge of the pistol and
8    rifle magazine market then allocated
9    magazines to the totals to complete
10   the data provided in the NSSF
11   Magazine Chart."
12   Who were the firearm industry professionals
13   you're mentioning there?
14   A  Myself and Steve Sanetti were the two that
15   I can recall.
16   There may or may not have been some others
17   that I asked to take a quick look at the data.
18   Again, we're not going to put out anything
19   to our members that we don't think is going to be as
20   accurate as possible.
21   And as referenced earlier, without a direct
22   source for this, we had to merge the ATF and the ITC
23   data and then discuss, you know -- apply how many
24   magazines for pistols and how many for firearms that
25   we think would be the best estimate to create the

Page 133

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  Magazine Chart.
2      Q  I'm sorry.  Just to clarify.
3          Why do you believe that
4  Southwick Associates did not have that accurate
5  source?
6      A  They were just not somebody that I needed
7  to use at the time.  I felt confident that using the
8  ATF data and the ITC data -- we could get some hard
9  numbers and, you know, applying a percentage between
10 Steve and myself, and if any others were involved, I
11 felt we didn't need to go outside and -- and hire
12 anybody to do it.  It was one of the things we could
13 do inside.
14     Q  At the time you consulted with Mr. Sanetti,
15 he was your boss; correct?
16     A  He was the president.  I didn't directly
17 report to him.  I was a couple levels below him, but
18 he was very open and willing to assist, you know,
19 any time I needed help.
20     Q  What, if anything, do you recall
21 Mr. Sanetti saying about the Magazine Chart you
22 created?
23     A  You know, he was -- you know, I told him
24 the purpose was, you know, to get us outdoor members
25 and make sure they had a reliable source, and I

Page 134

1  but I don't know if they manufactured them
2  themselves or if -- if they purchased them from an
3  outside manufacturer to include with the sale of
4  their firearms.
5      Q  I'm going to draw your attention to
6  Exhibit A of your declaration.
7          Is this the Magazine Chart that you created
8  with Mr. Sanetti's input?
9      A  It is.
10     Q  Did you list Mr. Sanetti anywhere on this
11 Magazine Chart?
12     A  I did not.  I always like to try to put a
13 source line and it looks like the source line says
14 "ATF AFMER, International Trade Commission figures
15 combined with NSSF and fire industry estimates."
16         So he would be part of that last portion of
17 it but not specifically naming him, no.
18     Q  Do you recall why you didn't specifically
19 name him?
20     A  I just -- I don't know if people would have
21 known who -- who he was if I put him on there.
22         I never put an individual person as a
23 source.  I would always use that kind of tag line.
24         If it was Southwick Associates or whoever
25 helped me conduct the study, I always liked to put

Page 136

1  didn't want to put anything out that, you know, I
2  didn't think was inaccurate or he didn't think was
3  inaccurate; so he was fine with the conclusions that
4  we came up with.
5          Again, the last thing we want to do is give
6  incorrect data to the people that are paying us to
7  be our members, and if they make the wrong decision
8  based on that data, they wouldn't be happy with us,
9  you know.
10     Q  Did Mr. Sanetti tell you what specific
11 sources of data he relied on in allocating magazines
12 for the Magazine Chart?
13     A  I think it was just his personal knowledge.
14         He had worked for one of the larger
15 manufacturers.  I think he was the president of
16 Sturm, Ruger, which is a large firearm manufacturer,
17 for many years and just had a very good knowledge of
18 firearms and components and parts that go in and
19 around the firearm, including magazines.
20         Someone I had a high trust in.
21     Q  Do you know if Sturm, Ruger produces large
22 capacity magazines?
23     A  Again, similar to Smith & Wesson, you know,
24 they produce firearms that would be capable of
25 holding all different types of detachable magazines,

Page 135

1  some sort of information on there, but I don't think
2  I've ever put an individual's name specifically on a
3  source.
4      Q  But would it be fair to say, when on the
5  sources you list firearm industry estimates, you
6  really mean Mr. Sanetti's estimates, don't you?
7      A  Myself, his, and, like I said, it's very
8  possible I had to ask others but just not in the
9  capacity that I had asked Mr. Sanetti.
10     Q  So to be clear on the process, you
11 essentially told Mr. Sanetti "There is X number of
12 pistols out there.  How many do you think come with
13 a magazine holding more than 10 rounds?"
14         Is that a fair assessment?
15     A  Yeah.
16         The conversation I recall "Here is what I
17 had done so far.  Used the AFMER and the ITC data.
18 Here's the numbers I came up with for the amount of
19 pistols that will hold the magazine."  Doesn't
20 matter what, you know quantity, and "Here is the
21 number of rifles."
22         And then we -- we tried to break that down.
23         The AFMER does give some information on
24 caliber and -- and obviously, you know, long guns,
25 we -- we didn't include shotguns or lever-action

Page 137

1 guns or pump-action guns.
2      You know, we just counted the guns that
3 could hold the magazine and then Mr. Sanetti and I
4 went out and figured out, "Okay. How many of
5 those," you know, "magazines that are in that type
6 of firearm would be under 10," you know, "10 or
7 over," and then for the -- there's only really the
8 two categories for pistols.
9      For the rifles, we decided to do 10 and
10 under, 11 to 29, and then that 30-plus.
11      You know, I'm just recalling, you know,
12 when I would put stuff out, sometimes I would get
13 called on it and somebody would say "That doesn't
14 look right," but when we put this out, I don't
15 recall anybody ever saying to take another look at
16 it.
17      So, you know, including those industry
18 estimates are -- whoever had seen that -- right? --
19 they would have said "Give me a call. That doesn't
20 look right, Jim. How the heck did you come up with
21 that number?"
22      If that had ever happened, I would have
23 went back and revised it with their input, but we
24 did not receive any such feedback on this one.
25      So pretty confident that this was a good

Page 138

1 estimate that our members could use to make a decent
2 business decision.
3      Q  Would it be fair to say that the expertise
4 employed in creating this chart was really with the
5 allocation of magazines to a particular firearm?
6 Correct?
7      A  I would like to think that not too many
8 people could do what I've done with the ATF and the
9 ITC data unless it would have been done and saved me
10 all the trouble; so I think that's my expertise.
11      And then being able to, you know, know the
12 right people to run it by and, you know, takes a
13 certain amount of expertise.
14      And certainly Mr. Sanetti's -- I considered
15 him very knowledgeable about that, but it wasn't --
16 wasn't easy to do any -- any of the three parts of
17 it or -- you know, from start to finish, it was
18 something that was a challenge and I -- I like
19 digging into those type of things and looking at
20 numbers probably more than I should.
21      Q  Would it be fair to say that the
22 allocations of magazines to the firearms identified
23 in the AFMER and ITC reports was based on
24 Mr. Sanetti's expertise?
25      A  Yeah.

Page 139

1      A combination of his and mine. We were on
2 the same page, from what I recall.
3      Like, I wasn't thinking it's, you know, two
4 per firearm and he was thinking 10 per firearm. I
5 think we were on the same page, ballpark, when we
6 did discuss this.
7      Q  But would it ultimately be fair to say that
8 you deferred to Mr. Sanetti in allocating the number
9 of magazines for the firearms reflected in the AFMER
10 and ITC data?
11      A  I don't recall deferring because, like I
12 said, we were on the same page.
13      Now, if we were way off, I would have taken
14 his opinion over mine, but on this one, I think we
15 were in pretty good agreement.
16      MR. MEYERHOFF: I want to mark --
17      THE WITNESS: Maybe after this line of
18 questioning, we can take a break. I just need to
19 hit the restroom. Are we near the end?
20      MR. MEYERHOFF: We're just a couple minutes
21 away if that's --
22      THE WITNESS: Okay. Keep going if that's
23 okay with everybody else.
24      MR. MEYERHOFF: So I want to go ahead
25 and -- let's see -- mark as Exhibit 7 the following

Page 140

1 document.
2      (The document referred to was marked as
3      Deposition Exhibit 7 by the Reporter.)
4 BY MR. MEYERHOFF:
5      Q  Can you see this document on your screen?
6 It's entitled "Transcript of James Curcuruto," Date:
7 January 24, 2014. Case Kolbe, et al., versus
8 O'Malley, et al."
9      Do you see that?
10      A  I do.
11      Q  Do you recall giving a deposition in this
12 case?
13      A  I do, yes.
14      Q  Okay. I'm going to scroll down.
15      MR. MEYERHOFF: And I will represent to
16 plaintiffs' counsel that this is the entire -- the
17 entire deposition transcript.
18 BY MR. MEYERHOFF:
19      Q  So we can start at paragraph -- excuse me.
20 We can start at page 40, line 10.
21      Do you see that, Mr. Curcuruto?
22      A  I do.
23      I mean, if you can, make the screen bigger.
24 I don't know if you can. I can see it pretty good.
25      Q  Yeah. Let me see.

Page 141

Case 3:22-cv-05403-DGE   Document 119-1   Filed 09/01/23   Page 39 of 50

Wiese, et al. vs. Bonta, et al.                                              Deposition of James Curcuruto

1  Can you see it now?
2  A  It just cut it off.  I don't know if you
3  can get rid of that arrow on the left or get rid of
4  that part of it.
5  Q  Yes.  I wish I was more tech savvy.
6  Let's see.
7  Okay.  How about that?
8  A  That may be just -- if you can make the
9  font bigger now, we should be good.
10  Oops.  Wrong way.
11  Q  Can you see it now?
12  A  Perfect.
13  Starting at line 10, is that where you
14  want?
15  Q  Yes.
16  A  Okay.  Okay.  Yeah.
17  Q  And I'll just stop at line 6 where it says:
18  "Well, it's something of a
19  hypothetical because, again, I relied
20  on Mr. Sanetti's so I didn't question
21  his."
22  A  Yes.  I see the line above that.  I would
23  consider myself an expert, not as much as
24  Mr. Sanetti, which is true.
25  Q  Okay.  So do you see at line 3 where it

Page 142

1  Q  I'm just a little confused because when you
2  were deposed in 2014 and you were asked how did you
3  go about estimating how many pistol magazines there
4  would be, you said "Well, it's somewhat hypothetical
5  because I relied on Mr. Sanetti's so I didn't
6  question his."
7  MR. LEE:  Objection.  Misstates testimony.
8  THE WITNESS:  Again, you're correct.
9  As we read before, I consider myself an
10  expert but not as much as Mr. Sanetti and it even
11  said before that, I was part of a process that got
12  it going.
13  So it does seem like you're just trying to
14  cherrypick over and over which, you know, I don't
15  think that's, you know, the right thing to do in
16  this instance, but I think you know that too.
17  BY MR. MEYERHOFF:
18  Q  Well, I guess I'm wondering what you mean
19  by "it's somewhat hypothetical."
20  A  In 2014, I have no idea what I meant by
21  that at this point.  Probably answering the same
22  question four times and got a little tired, maybe.
23  MR. LEE:  I'll also state for the record
24  that that answer also seemed like it was cut off.
25  ///

Page 144

1  says:
2  "Q  So, with respect to your
3  expertise, then, how would you go
4  about estimating how many pistol
5  magazines there will be?  We'll start
6  there."
7  "A  Well, it's somewhat
8  hypothetical because, again, I relied
9  on Mr. Sanetti/s so I didn't question
10  his."
11  Do you see that?
12  A  Yes.
13  Q  Was that testimony accurate when you gave
14  it in 2014?
15  A  Yeah.
16  Everything that I just read that included
17  I'd consider myself an expert but not as much as an
18  expert as Mr. Sanetti's; correct.
19  Q  But in this case -- excuse me, not in this
20  case.
21  With regard to the Magazine Chart, you
22  relied on Mr. Sanetti's expertise as to allocating
23  the number of magazines per firearm; correct?
24  A  Along with my own, yes.  I relied on his,
25  and luckily we came to the same conclusion.

Page 143

1  BY MR. MEYERHOFF:
2  Q  We can go down further.  The question says:
3  "Q  Let me make sure I
4  understand.  You're saying that you
5  never considered yourself what you
6  would estimate that breakdown to be;
7  is that right?"
8  And then you say:
9  "A  I did, I'm sure at the time,
10  but, again, I referred it to
11  Mr. Sanetti because I knew his
12  opinion on this or estimation on it
13  would be more accurate than mine.
14  But I can't recall, you know, what I
15  thought, if I looked at the
16  100 million and said, well, let me
17  ask him first, and then there's
18  really no need for me to supercede
19  his estimate."
20  Do you see that there?
21  A  I do.
22  Q  And was that testimony accurate in 2014?
23  A  It looks to be again we met.  I had given
24  him what I had so far.  He probably had a little
25  tweak to it and I'm going to take his ideas over

Page 145

Case 3:22-cv-05403-DGE   Document 119-1   Filed 09/01/23   Page 40 of 50

Wiese, et al. vs. Bonta, et al.                              Deposition of James Curcuruto

1  mine.
2      But from what I recall, we were on the same
3  page. We were not way off or anything near there.
4      Q  And I think that portion of the deposition
5  transcript that we just looked at was referring to
6  pistol magazines.
7      Did you engage in the same process for
8  rifle magazines that you did for pistol magazines?
9      A  Correct. At the same time.
10     MR. MEYERHOFF: We can take a break now. I
11 don't want to hold you longer.
12     THE WITNESS: All right. I only need a
13 couple minutes.
14     (A brief recess was taken.)
15 BY MR. MEYERHOFF:
16     Q  I'm going to put your declaration back up
17 on the screen, Mr. Curcuruto.
18     And so in paragraph 11, you provide the
19 number of "67.7 million pistols and 42.6 million
20 rifles capable of holding a magazine" that "were
21 available to United States consumers between 1990
22 and 2015."
23     Do you see that?
24     A  I do.
25     Q  And the total number of magazines that you

Page 146

1  per firearm that's capable of holding a magazine and
2  whether that's, you know -- that comes with the
3  purchase or bought after market where the firearm --
4  most firearms would come with either 1 or 2 and then
5  there's the option for the consumer to purchase
6  additional magazines from firearm retailers and
7  other sources.
8      Q  Do you recall why you didn't just say
9  2 magazines per firearm and reach a total of
10 approximately 220 million magazines?
11     A  I do not recall.
12     Q  Do you recall, was there a specific formula
13 you used to reach the 230 million magazine number?
14     A  If you go to that chart again, I think we
15 had certain -- we didn't just say 2 per firearm. We
16 looked at -- I believe there's 5 categories on
17 pistols. We had 2 categories, 10 and under,
18 11-plus, and then on the rifles, we had the 3
19 categories. I believe it's 10 and under, 11 to 29,
20 and 30-plus.
21     So we looked at those 5 different breakouts
22 and tried to apply what number we thought was best
23 and, you know, came up with that total of
24 230 million that we put out to our members, again,
25 without wanting to provide them with anything that

Page 148

1  estimated were in possession of United States
2  consumers during that period were 230 million
3  magazines; correct?
4      A  Correct.
5      Q  So would you agree with me that
6  67.7 million pistols and 42.6 million rifles would
7  total 110.3 million firearms? Correct?
8      A  Sounds right.
9      Q  So would you agree that to get to
10 approximately 230 million magazines based on that
11 data, you would need to allocate 2.085 magazines per
12 rifle and pistol?
13     A  Correct.
14     Q  So was there a specific formula you used
15 when creating the chart to -- let me step back.
16     So the numbers you provided in your
17 declaration, there was approximately 120 million
18 more magazines available to American consumers
19 during that time period than firearms; correct?
20     A  Correct.
21     Q  So how did you allocate that approximately
22 additional 120 million magazines to, you know, the
23 110 million firearms?
24     A  To the best of my recollection, Mr. Sanetti
25 and I determined that it would be about 2 magazines

Page 147

1  we didn't think accurate, and we did not receive any
2  feedback from any of our members that may or may not
3  have seen this and said that they didn't think that
4  it looked correct to them [as spoken].
5      Q  Do you recall receiving any type of
6  feedback from your members with regard to this
7  Magazine Chart?
8      A  I do not recall any specific feedback on
9  this.
10     Q  Is that -- was that unusual with -- with
11 information you put out to your members?
12     A  We put out dozens, if not hundreds, of
13 pieces of information on an annual basis; so if one
14 did not receive any feedback, it was not unusual.
15     We did receive a lot of feedback on reports
16 and data that we put out thanking us for it putting
17 it out, because, you know, we requested that our
18 members not just solely rely on what we put out, but
19 they also use it with their internal sources.
20     You know, there are professionals that work
21 with each one of our member organizations and they
22 would take the data that they had and the data we
23 had and any outside information to help them make
24 those best-informed business decisions.
25     Q  So looking at the chart for pistol

Page 149

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  magazines, there's two bars.  One is for pistol
2  magazines, 10 rounds or less, and another is for
3  pistol magazines, 11-plus rounds.
4        Do you see that?
5     A   Yes.
6     Q   And would it be fair to say the total
7  numbers, 81,240,000 and 54,160,000 -- those numbers
8  combined are essentially the number of pistols
9  available to consumers between 1990 and 2015 as you
10 ascertained from AFMER data and ITC data multiplied
11 by 2?
12    Q   Can you make the chart bigger?  I can't
13 read the numbers there.
14       So you were referencing the pistol
15 magazines, 10 rounds or less, 81.2 million, and the pistol
16 magazines, 11-plus, 54.1 million?
17    Q   That's right.
18    A   And then what was the question after that?
19    Q   The question is I have that total being
20 135,400,000.
21       Is it fair to say that overall number was
22 obtained simply by multiplying the number of pistols
23 that you determined were available to American
24 consumers during the time period by 2?
25    A   I do not recall specifically if that's how

Page 150

1  I had done that at the time.
2     Q   And do you recall specifically how you
3  allocated, among that 135,400,000 pistol magazines
4  you estimated -- how you allocated how many were
5  10 rounds or less and how many were more than --
6  11 rounds or more?
7     A   That was with a conversation I had with
8  Mr. Sanetti and these were the numbers that we came
9  up with and put out in good faith to our members to
10 help them make better business decisions.
11    Q   And moving over to the right, there's three
12 columns for rifle magazines.
13       Do you know how you came up with the total
14 number of rifle magazines in U.S. consumer
15 possession 1990 to 2015?
16    A   That would have been with the conversation
17 with Mr. Sanetti and anybody else that I may have
18 spoken with on the topic.
19    Q   And do you have any formula for how you
20 allocated the total number of rifle magazines within
21 these three categories, 10 rounds or less, 11 to 29
22 rounds, and 30-plus rounds?
23    A   I don't recall specifically, but I know
24 Mr. Sanetti and I came up with the allocation that
25 we thought would be best to be able to put out

Page 151

1  accurate data to our membership.
2     Q   Do the numbers contained in this
3  Magazine Chart reflect attrition in the number of
4  magazines due to loss, destruction, or deterioration
5  that may have occurred?
6     A   Not to my knowledge, it does not.
7     Q   This Magazine Chart doesn't contain any
8  information on why someone would purchase an LCM,
9  does it?
10    A   On why somebody would purchase?
11       No, it does not.
12    Q   And would it be fair to say that this chart
13 tracks sales of magazines, not possession of them?
14    A   It -- let's see.  The chart is labeled
15 "Consumer Possession 1990 - 2015."
16       So the chart makes the assumption that
17 these are in consumer possession during that time
18 period.
19    Q   And the data that you relied on to
20 determine the overall number of magazines in
21 possession was the AFMER and ITC data; correct?
22    A   Correct.
23       Which is the firearm production in the U.S.
24 and the import data from the ITC, assuming that, you
25 know, companies aren't going to manufacture

Page 152

1  something each year without selling it.
2     Q   Does this chart account for magazines that
3  may have been exported from the United States?
4     A   It does not include any export of
5  magazines.
6     Q   If you had to do the chart over again,
7  would you include an analysis of how many -- or what
8  an analysis of magazines that had fallen into disuse
9  or been exported be a part of that analysis?
10    A   This chart is seven years old.  There would
11 be -- I would probably look at any new source data
12 that's out there.
13       I know whenever we put out things that are
14 estimates and it does say "Estimated" on the chart,
15 that we erred on the side of caution and put out a
16 lower number than what, quite possibly, could be --
17 could be more.
18       This is the minimum amount that we felt
19 comfortable with.  We didn't want to overstate
20 anything, but it's possible that there are more than
21 230 million.  Just to be cautious, we didn't want to
22 overshoot anything.
23    Q   Would it be fair to describe the NSS- --
24 NSSF Magazine Chart -- would it -- sorry.  I'll
25 rephrase.

Page 153

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1      Would it be fair to describe your work on
2 this chart, in part, as involving statistical
3 analysis?
4    A  Not complex statistical analysis but
5 certainly math involved.
6    Q  Would it be fair to say it's simple
7 statistical analysis?
8    A  I don't, as I referenced before.
9      Maybe not everybody could have understood
10 the process and the resources available or the
11 sources available to come up with it, but it is
12 certainly not complex.
13    Q  Would you describe the number of total
14 magazines in consumer possession from 1990 to 2015
15 as a statistic?
16    A  The 230 million total magazines available
17 for consumer possession between 1990 and 2015 could
18 be considered a statistic, sure.
19    Q  And the same thing with the subcategories
20 of rifle magazines and pistol magazines; correct?
21    A  As referenced in the chart?
22    Q  Sure.
23    A  Correct.
24    Q  Are you familiar with an organization
25 called the American Statistical Association?

Page 154

1    A  I am not.
2    MR. MEYERHOFF:  I'm going to mark as
3 Exhibit 7, I believe --
4    THE REPORTER:  No.  8 is next.
5    MR. LEE:  8.
6    (The document referred to was marked as
7    Deposition Exhibit 8 by the Reporter.)
8 BY MR. MEYERHOFF:
9    Q  Do you see a document on a screen called
10 "Ethical Guidelines for Statistical Practice"?
11    A  Is it dated February 2022?
12    Q  Yes.  That's correct.
13    A  I do see it, yes.
14    Q  And you just testified a moment ago that
15 you're not familiar with this organization; correct?
16    A  Correct.
17    Q  So it would be fair to say you're not a
18 member; correct?
19    A  Not to my knowledge.  Unless they offer
20 free membership for everybody.
21    Q  So would it be fair to say you've never
22 seen this document, "Ethical Guidelines for
23 Statistical Practice" prepared by the Committee on
24 Professional Ethics of the American Statistical
25 Association?

Page 155

1    A  Correct.
2    Q  I'm going to direct your attention to
3 page 4 [as spoken]," and I'll zoom in at
4 paragraph 2.
5    Do you see where it says "The ethical
6 statistical practitioner"?
7    A  Yes.
8    Q  And do you see Number 2 where it says:
9      "Uses methodology and data that
10    are valid, relevant, and appropriate
11    without favoritism or prejudice, and
12    in a manner intended to produce valid
13    interpretable, and reproducible
14    results"?
15    Do you see that?
16    A  I do.
17    Q  Do you agree with the position taken by
18 this document, namely, that an ethical statistical
19 practitioner should use "methodology and data that
20 are valid, relevant, and appropriate without
21 favoritism or prejudice, and in a manner, intended
22 to produce valid, interpretable, and reproducible
23 results"?
24    MR. LEE:  I will object to the question.
25 It lacks foundation.

Page 156

1    This witness has indicated he's never seen
2 this document.  There is -- so he can't authenticate
3 this document and without foundation, you're asking
4 him to agree or disagree with something that he's
5 never seen before.
6    So I'm going to object on the grounds that
7 it lacks foundation.
8 BY MR. MEYERHOFF:
9    Q  You can answer the question.
10    A  I'm going to have to review the document in
11 more detail.
12    Q  Let me ask a question not about the
13 document.
14    Do you believe that an ethical statistical
15 practitioner should use methodology and data that
16 are valid, relevant, and appropriate without
17 favoritism or prejudice and in a manner intended to
18 produce valid and interpretable and reproducible
19 results?
20    MR. LEE:  Objection.  Lacks foundation.
21 And it's compound many times over.
22    THE WITNESS:  I believe, you know,
23 statisticians should put out accurate and timely
24 data that's going to help support their members'
25 needs and that's what I did at NSSF whenever we put

Page 157

1  out any report, whether internal or external.

2       We're not going to give it out to our

3  members.  The last thing we're going to do is give

4  our members bad data.  If we put out data that said

5  230 million magazines, why would we give them

6  information that we don't believe is valid?  That

7  would be very hurtful to our members and they

8  wouldn't be members and we wouldn't have an

9  organization anymore.

10      So doesn't make much sense what you're --

11 what you're trying to get at, I don't think.

12 BY MR. MEYERHOFF:

13      Q  Would it be possible for another individual

14 to reproduce the statistical analysis that you did

15 in the magazine chart?

16      A  Not in the same exact way that I had done.

17      Q  NSSF is a membership-based organization

18 that includes manufacturers of magazines; correct?

19      A  They most likely do.

20      I don't know the -- every -- the make-up of

21 every member of -- out of the 12,000 when I was with

22 the organization.

23      I don't know all of them, but there is a

24 good possibility that manufacturers of magazines

25 were members of NSSF.

1       Do you believe that an ethical statistical

2  practitioner discloses conflicts of interest?

3       MR. LEE:  Still calls for an opinion.

4       THE WITNESS:  My opinion is everybody

5  should be -- should be ethical, not just

6  statisticians.

7  BY MR. MEYERHOFF:

8       Q  Do you believe --

9       A  Lawyers included.

10      Q  I'm sorry.  I interrupted you.

11      A  I said lawyers included.

12      Q  Do you believe there were any conflicts of

13 interest involved in creating the Magazine Chart?

14      A  I do not.

15      Q  Your position at NSSF was funded, in part,

16 by firearms manufacturers.  Would it be fair to say

17 that?

18      A  I suppose it would.

19      They were dues-paying members and that's

20 how we got -- NSSF had received revenue; so that's

21 how they paid their staff.

22      Q  Would it be fair to say that at least some

23 of NSSF's members would benefit financially from the

24 ability to sell large-capacity magazines into states

25 such as in California?

1       Q  Are you aware if any were at the time?

2       A  I am not.

3       Q  Do you think it's in the business interests

4  of NSSF members to have California's restrictions on

5  large-capacity magazines invalidated?

6       MR. LEE:  Objection.  It calls for an

7  opinion well beyond the scope of what he was asked

8  to do.

9       You may answer.

10      THE WITNESS:  I haven't really thought that

11 through.  I don't have much of an opinion on that

12 right now.

13 BY MR. MEYERHOFF:

14      Q  Would you agree with the statement that an

15 ethical statistical practitioner discloses conflicts

16 of interest, financial or otherwise, and manages or

17 resolves them according to established policies,

18 regulations, and laws?

19      MR. LEE:  Objection.  Lacks foundation.

20      Object to the form of the question.

21      You can answer.

22      THE WITNESS:  What was the question?

23 BY MR. MEYERHOFF:

24      Q  Do you believe that an ethical -- I'll

25 simplify the question.

1       MR. LEE:  Objection.  Calls for

2  speculation.

3       THE WITNESS:  I would assume that if a

4  manufacturer of magazines that holds more rounds,

5  had more customers that they could legally sell to,

6  then it would benefit and if they were members of

7  NSSF, that would, then, benefit NSSF members.

8  BY MR. MEYERHOFF:

9       Q  So why is that not a conflict of interest?

10      MR. LEE:  Objection.  Lacks foundation.

11 Calls for speculation.

12      THE WITNESS:  I think we talked about

13 ethics; about the last thing that I'm going to do is

14 put out misinformation.

15      If that number was wrong and a member made

16 a decision and went out of business, that doesn't

17 help NSSF at all; so -- probably helps you guys if

18 it ever went out of business, but we weren't in the

19 business of providing misinformation to our member

20 base.

21      MR. LEE:  Also object to the question on

22 the grounds that it lacks foundation.

23      I mean ethical -- conflict of interest

24 presumes or assumes that -- implies that there is a

25 duty of some type.  Duty to whom?  Some type of

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1 legal duty?
2      So I'm going to object to the question that
3 it calls for a legal opinion as to conflict of
4 interest.
5      I'm not aware that you've identified a
6 duty, specific duty, that he has, and, if so, to
7 whom.
8      So I don't think the question makes sense.
9      MR. MEYERHOFF:  Can you read back the
10 answer, Ms. Miller.
11      (The record was read.)
12 BY MR. MEYERHOFF:
13   Q  So based on that answer -- and correct me
14 if I'm wrong -- that only -- that conflicts of
15 interest should only be disclosed when the person
16 releasing the information believes that it may be
17 incorrect?
18      MR. LEE:  Objection.  Misstates testimony.
19      THE WITNESS:  I mean, I -- can you -- I'll
20 pass on that question.
21      Your conflict of interest, you know, goes a
22 lot of ways for a lot of different things.
23 Different -- you'll have to clarify that question.
24 BY MR. MEYERHOFF:
25   Q  So you believe there is no conflict of

                                               Page 162

1 interest request NSSF putting out a chart -- let me
2 rephrase.
3      So you believe there were no conflicts of
4 interest implicated by NSSF's release of this chart;
5 correct?
6   A  We put out that chart to help our members
7 make better business decisions.  That was our
8 primary goal of all the research we put out there.
9   Q  I'm going to return to your declaration.
10      In paragraph 13, you state:
11      "While the figure of 115 million
12      magazines with a capacity greater
13      than 10 rounds in circulation is an
14      estimation based on extrapolation
15      from indirect sources and cannot be
16      confirmed as unequivocally accurate,
17      it is safe to say that whatever the
18      actual number of such magazines in
19      United States consumers' hands, it is
20      in the ten of millions, even under
21      the most conservative estimates."
22      Do you see that?
23   A  I do.
24   Q  The first part of that sentence:
25      "While the figure of 115 million

                                               Page 163

1      magazines with a capacity greater
2      than 10 rounds in circulation is an
3      estimation based on extrapolation
4      from indirect sources and cannot be
5      confirmed as unequivocally
6      accurate" --
7      Do you recall why you included that phrase
8 in your declaration?
9   A  Just to clarify that, again, this was not
10 an absolute number that came from one source that
11 was indisputable, but I wanted to clarify that, you
12 know, it was an estimate and we're not saying that
13 it's an exact figure at all, just an estimate, and
14 we came up with it in the best way we could, using
15 the best sources, and put it out to our members so
16 they could make informed decisions.
17      MR. MEYERHOFF:  I'm going to go ahead and
18 pull up something that I'll mark as --
19      THE REPORTER:  Exhibit 9.
20      MR. MEYERHOFF:  -- Exhibit 9.  Thank you.
21 Thank you.
22      (The document referred to was marked as
23      Deposition Exhibit 9 by the Reporter.)
24 BY MR. MEYERHOFF:
25   Q  Do you see the top of the document?  It

                                               Page 164

1 says "In the United States District Court for the
2 District of Colorado"?
3   A  I do, yeah.
4   Q  And I'll just give you a moment to review
5 this document.  You can let me know when to scroll
6 down.
7   A  Can you just make the font bigger, please?
8   Q  Sure.
9   A  Scroll down a little bit.
10      Okay.
11      Okay.
12   Q  In this declaration, you did not include
13 the line "While the figure of X million magazines
14 with a capacity greater than 10 rounds in
15 circulation is an estimation based on an
16 extrapolation from indirect sources and cannot be
17 confirmed as unequivocally accurate"; correct?
18   A  I did not see it.
19   Q  Did you use the same process for making
20 this determination that you did in the Wiese case?
21   A  Can you repeat that?
22   Q  I'll just ask a simpler question.
23      Why did you not include that -- that line
24 in this declaration?
25   A  I don't recall.

                                               Page 165

1  Q  The -- the Magazine Chart attached as
2  Exhibit -- as an exhibit to your declaration in the
3  Wiese case reflects consumer possession of magazines
4  between 1990 and 2015; is that correct?
5  A  Correct.
6  Q  So it doesn't reflect any data from 2016 to
7  the present; correct?
8  A  Not to my knowledge.
9  Q  And you were not asked in this case to
10  submit a -- an updated version of this chart, were
11  you?
12  A  I was asked to look to see what was
13  available and I did not find anything.
14  Q  You mentioned previously that you hunt; is
15  that correct?
16  A  Yes.
17  Q  And how long have you hunted for?
18  A  Probably 40 years.
19  Q  And -- so would it be fair to say that you
20  began hunting in approximately 1980?
21  A  '82.
22  Q  And when you first started hunting, do you
23  recall what kind of rifle you used?  Or did you use
24  a rifle or a pistol or a shotgun?
25  A  Rifle and shotgun.

Page 166

1  Q  Did those rifles that you used have
2  detachable magazines?
3  A  I don't recall.  Possible.
4  Q  When was the first time you recall hunting
5  with a detachable magazine firearm?
6  A  Probably squirrel hunting with, like, a
7  Ruger 10/22, which had a detachable magazine, and
8  I'm not sure when that would have been.  '80s or
9  '90s.
10  Q  Do you recall what capacity magazine you
11  hunted with that Ruger firearm?
12  A  I believe it was 10.
13  Q  To the best of your recollection, do you
14  recall why you didn't use a larger capacity
15  magazine?
16  A  I do not recall.
17  Q  Do you recall when you first purchased a
18  large-capacity magazine?
19  A  When I purchased -- first purchased a
20  large-capacity magazine?
21  I don't recall if I've ever purchased one.
22  Q  I believe you previously testified that you
23  possess 3 large-capacity magazines; is that right?
24  A  It is correct.
25  Q  How did you acquire those?

Page 167

1  A  My grandfather had served in World War II.
2  He was provided with a service rifle, a 30 Carbine,
3  and that held 15 rounds of 30 caliber Carbine, and
4  he had -- when he got back, I think he either
5  purchased a service rifle or my father ended up
6  getting that, and then I ended up getting that for
7  some time and then I think it's at my cousin's
8  house.
9  Just a family heirloom that's been passed
10  around with those 15-round magazine capacity.
11  So I didn't purchase them.  And I don't
12  recall if I've purchased any other magazine with
13  more than 10-round capacity.
14  Q  So all three of those magazines were
15  initially issued to the original owner by the
16  military.  Is that fair to say?
17  A  I don't know the full story where my
18  grandfather -- if he bought them after he returned
19  home, to have a similar firearm and magazines that
20  he carried, you know, during the war.
21  I don't know the full story, but I know
22  it's kind of a family heirloom.  It's made its way
23  down three generations and soon to be four.
24  Q  But all three large-capacity magazines you
25  possess are all family heirlooms; correct?

Page 168

1  A  There are four that -- the 30 Carbine
2  firearm that my grandfather had carried or
3  been -- similar firearm to what he carried in
4  World War II.
5  Q  I think you had previously testified that
6  Connecticut had some restrictions on magazine
7  capacity; correct?
8  A  I believe the max is 10 and I think that
9  was about 2013 when that came into effect and then
10  we had to sign some sort of paperwork that said "if
11  you own any."
12  Q  And do you -- why did you not purchase any
13  large-capacity magazines prior to 2013?
14  A  I didn't have the need for them.
15  I'm not saying that I didn't because, you
16  know, some firearms that I had purchased may have
17  come with 10-plus or 11-plus, but I don't recall any
18  that did.
19  Q  When you say you "didn't have the need for
20  them," what do you mean?
21  A  I have, you know, plenty of a collection of
22  firearms and magazines and accessories for all the
23  things that I am currently doing now.
24  Q  Correct me if I'm wrong, but that is mainly
25  hunting and target shooting; correct?

Page 169

1  A  Correct.
2  Q  So from the period you first started
3  shooting in 1982 until large-capacity magazines
4  became restricted in Connecticut in 2013, you've
5  never felt the need to purchase a large-capacity
6  magazine; is that correct?
7  A  Again, not to my knowledge.  Some of the
8  handguns may have come with 11-plus capacity, but,
9  you know, they are not in my possession anymore.
10     It wasn't something that was a big deal or
11 tracked.  If you had it, you had it, but it
12 wasn't -- I mean, it wasn't as big of a deal as it
13 is nowadays.
14  Q  So it sounds like -- it sounds like you
15 may, prior to 2013, have come into possession of
16 large-capacity magazines simply by virtue of buying
17 a firearm that came with one; correct?
18  A  Correct.
19  Q  And is that -- do you think that's a common
20 occurrence, that someone purchases a firearm and it
21 happens to come with a large-capacity magazine?
22  A  It's possible and there's aftermarket, as
23 well, where people can pick up additional magazines
24 to go with their firearm.
25  Q  You're educating me, but I'm asking the

1  sell what they were asking for, and if that customer
2  was asking for, you know 2 -- 2 magazines with each
3  purchase or 1 magazine with each purchase or 11-plus
4  magazine, I think just like any -- any business
5  sector, they listen to their customers and try to
6  provide the product that that customer wants.
7  Q  Just to be clear, the Magazine Chart
8  attached to your declaration at Exhibit A does not
9  indicate how many Americans own large-capacity
10 magazines; correct?
11  A  Correct.
12  Q  And it doesn't contain any information on
13 why Americans may own large-capacity magazines;
14 correct?
15  A  Correct.
16     MR. MEYERHOFF:  I've got nothing further at
17 this time.
18     MR. LEE:  I have a few questions.
19
20       EXAMINATION
21 BY MR. LEE:
22  Q  Mr. Curcuruto, when we approached you way
23 back in 2017 and we asked you to do something in
24 connection with this case, what was it that we asked
25 you to do?

1  question do you think your experience is a common
2  one that individuals purchase a firearm and come
3  into possession of a large-capacity magazine simply
4  by virtue of it being included with the firearm?
5  A  I think that happens in several instances,
6  you know, where legal, and I know it's a lot more
7  complicated for retailers and manufacturers to sell
8  in different states.  They have got to make sure
9  they are in compliance so they are not going to get
10 into trouble themselves or their customers in
11 trouble.
12  Q  You have 40 years of experience with
13 firearms; correct?
14  A  Correct.
15  Q  Is it fair to say that large-capacity
16 magazines have become more prevalent over the past
17 40 years?
18  A  I would think so, yes.
19  Q  And is part of the reason they have become
20 more prevalent because, as in your case, they were
21 included with the firearm that was sold?
22  A  I think on the pistol side, in my opinion,
23 manufacturers -- different -- depending on the
24 consumer demand, the manufacturers would then, you
25 know, listen to their customer and -- and make and

1     In other words, what was the scope of what
2  we were asking you to do?
3  A  Look at NSSF data and see if we had
4  anything available to help with your case.
5  Q  And -- and in terms of data, that is to
6  look at the numbers and try to extrapolate the
7  numbers of magazines in Americans' hands as of that
8  time?
9  A  I think, yeah, in regard to the -- what we
10 call large-capacity magazines, which is the 11-plus,
11 to provide any data we may have on that topic.
12  Q  Did we ask you to provide any other
13 opinions in connection with this case?
14  A  I don't believe so.
15  Q  Did we ask you to provide any opinions with
16 regard to the -- the effectiveness -- effectiveness
17 of California's laws?
18  A  I don't recall.  I don't believe so.
19  Q  Did we ask you to provide any opinion with
20 regard to the utility of large-capacity magazines
21 for purposes such as self-defense?
22  A  I don't believe so.
23  Q  Did we ask you to provide any opinions as
24 to the constitutionality of California's
25 large-capacity magazine laws?

1  A  I don't believe so.
2  Q  Is it fair to say that the only opinions
3 that we asked you to provide in this case are
4 summarized in paragraph 8 of your declaration which
5 is that 230 million magazines are in American hands,
6 of which one half of those are approximated to be
7 large-capacity magazines?
8  A  Correct.
9  Q  And that was your opinion in 2017?
10  A  It was.
11  Q  And from 2017 to 2023, has anything
12 occurred in the industry that would change your
13 opinion with regard to the millions of magazines in
14 Americans' hands?
15  A  Nothing has happened that would change my
16 opinion on the chart that we originally put out,
17 but, obviously, in six years, there has been
18 additional firearms and accessories, including
19 magazines of all types that have been manufactured
20 and purchased.
21  Q  And -- and as part of your work in the
22 firearms industry for NSSF, it was your job to keep
23 track of trends in the industry overall in terms of
24 consumer trends?  Is that true?
25  A  It is correct.

Page 174

1  Q  And so did you keep track of trends in
2 general in the firearm industry, consumer trends?
3  A  We did.
4  Q  In general, from 2017 to the present, did
5 firearm sales increase, decrease, or remain the same
6 since you first gave that opinion?
7  A  From 2017 to 2023, where we are now,
8 without looking at, you know, all the -- all
9 the data I had available to me over time, I believe
10 that firearm-accessory sales have increased over the
11 past six, seven years.
12  Q  And what is NICS, N-I-C-S.
13  A  The FBI, the Federal Bureau of
14 Investigation, has NICS, which is National Instant
15 Criminal Background Check System, and they put out
16 data on a monthly basis that records the amount of
17 checks to that system and a check would be when a
18 firearm retailer or a state agency, such as a state
19 police, would log into the FBI NICS system and do a
20 background check or somebody that is looking to
21 purchase or transfer a firearm, whether that's at a
22 retail -- traditional brick-and-mortar retail
23 establishment, and now I think there's, you know,
24 other ways that system is being used as well.
25  When you pawn a gun or redeem a gun at a

Page 175

1 pawnshop, the system catches those as well.
2  Q  You said the FBI puts out NICS data every
3 month?
4  A  Correct.
5  Usually within the first week; so, for
6 example, you know, we're at August 3rd.  July data
7 would be out about now.  July -- you know, the month
8 before, within a week.
9  Q  And NICS data records the number of
10 background checks.  Is that fair?
11  A  Correct.
12  Q  Is NICS data used to extrapolate the number
13 of firearms purchases in any given period of time,
14 such as a month or a year?
15  A  It has been used by several organizations
16 and maybe outlets.
17  You know, at NSSF, we adjusted that FBI
18 data to take out things that we didn't think had to
19 do with the sale or transfer of the firearm to get a
20 little bit more accurate picture, but we used that
21 as an indicator of sales, and since we had been
22 going on for 20-plus years on a monthly basis, it
23 provided pretty good trend data to our members.
24  Q  And so if I wanted to look at the firearm
25 trend in general in terms of firearm purchases from

Page 176

1 2017 to the present, I could look at NICS data as
2 one indicator?
3  A  Correct.
4  And we always tried to caution to just
5 don't look at one thing -- the NICS data, all the
6 other indicators that we provided and their own
7 industry knowledge.
8  Q  Is there anything in -- within the -- your
9 knowledge of the firearm trends in general, since
10 2017, or the NICS data -- is there anything in there
11 that would change your opinion as to the millions of
12 firearms that are held in American hands presently?
13  A  Nothing that changed my opinion on -- on
14 what we had submitted for this case.
15  I would assume there's just -- that number
16 has grown probably substantially over the past seven
17 years.
18  Q  Do you know what percentage of firearm
19 sales from 2017 through the present are
20 semiautomatic firearms?
21  A  I do not know that.  I don't have that
22 offhand.
23  Q  Do you -- did you -- do you have an
24 estimate as to the number -- the breakdown between
25 semiautomatics and other types of firearms?

Page 177

**Wiese, et al. vs. Bonta, et al.**                     **Deposition of James Curcuruto**

1  MR. MEYERHOFF:  Objection.  Asked and
2  answered.
3  THE WITNESS:  I do not have a -- I wouldn't
4  want to provide an incorrect statement there.  I was
5  talking for a couple hours how I always like to put
6  out accurate data; so I don't want to put out
7  anything incorrect right now.
8  Sorry about that.
9  BY MR. LEE:
10  Q  No worries.
11  Now, the NSSF was a trade organization for
12  the firearms industry; correct?
13  A  Correct.
14  Q  And there is no secret that it's a trade
15  industry for the firearm association; right?
16  A  Correct.
17  Q  And we never -- I don't think, to our
18  knowledge, we have ever tried to hide the fact that
19  it's associated with the firearms industry.
20  Have you ever heard anyone try to hide that
21  fact from anybody?
22  A  On the contrary, they like to tout that
23  they are the trade association for the firearm
24  industry.  I think that is their latest tag line.
25  Q  And you were a member of the firearms

1  FURTHER EXAMINATION
2  BY MR. MEYERHOFF:
3  Q  Mr. Lee asked you if your opinions that you
4  were asked for in this case were only those
5  contained in your declaration you filed; correct?
6  A  Correct.
7  The original one from '17; correct.
8  Q  And then he asked you a number of questions
9  about your opinions unrelated to your declaration;
10  correct?
11  A  Correct.
12  Q  He asked about firearm sales; correct?
13  A  Correct.
14  Q  He asked about magazine sales?
15  A  I think we discussed magazines, but I'd
16  have to go back and look at the document to see
17  specifically what he asked.
18  Q  You left NSSF in 2021; correct?
19  A  Yes.
20  Q  And I believe you testified at the
21  beginning of this deposition that after you left --
22  left NSSF, you lacked access to the documents and
23  information that you -- that you used while you were
24  at NSSF; correct?
25  A  Correct.

1  industry for 14 years as a member -- as an employee
2  of NSSF; is that correct?
3  A  11 years.  From '09 to '21, yeah.
4  Q  And you are still part of the firearm
5  industry.  Is that fair?
6  A  Yeah.
7  We're focused on conservation, but
8  obviously when we're dealing with hunters and target
9  shooters, firearms are involved.
10  Q  Because Mr. Meyerhoff, I don't know, spent
11  maybe two hours asking you to verify, I think, that
12  which is not disputed which is that you are
13  affiliated with the firearms industry.
14  Is that fair?
15  A  It is, yes.
16  Q  Are you aware of any other source that the
17  firearms industry relies upon to measure the number
18  of magazines in circulation besides the NSSF data?
19  A  I am not aware.  I would hope that it's out
20  there; that we have evolved a little or somebody
21  else has done it, but I'm not aware of any.
22  MR. LEE:  Thank you very much.  That is all
23  the questions I have.
24  MR. MEYERHOFF:  I'll just ask a few
25  questions on redirect.

1  Q  You -- Mr. Lee mentioned the NICS database;
2  correct?
3  A  He did.
4  Q  But you mentioned when you worked at NSSF
5  that you adjusted the numbers in that database;
6  correct?
7  A  We did.
8  Q  And you cautioned not just to look at the
9  NIS- -- NICS data; correct?
10  A  Standard practice for our members that we
11  would say "There's not just one thing to look at."
12  We want them to, you know, try to get as much
13  information as they could and then make their
14  decisions, which is just helpful -- trying to be
15  helpful if you say "Don't just look at one thing,"
16  but I think most people know that that is not a good
17  business move.
18  Q  Sure.  Sure.
19  And so to do right by your members, you
20  would look at other sources of data other than the
21  NICS; correct?
22  A  Correct.
23  Q  And what other sources of information would
24  you look at?
25  A  Well, that we had referenced a few.  The

**H I N E S   R E P O R T E R S**            **46 (178 - 181)**

1  ATF AFMER data, the International Trade Commission,
2  import/export.
3      ATF also put out a report on the number of
4  FFLs or firearm -- federal firearm retail -- or
5  licenses out there.
6      There was government source data on
7  silencers or suppressors that we talked about.
8      I mean, dozens and dozens of different
9  sources out there in the participation data on
10  hunting and target shooting, economic impact and
11  jobs and all that sort of stuff; so we tried to
12  provide as much as we could but certainly not just
13  one thing.
14   Q  And would it be fair to say that to provide
15  the most accurate data, the most accurate trend
16  lines, that you would want to look at those dozens
17  and dozens of sources?  Correct?
18   A  That's what we would recommend to our --
19  our members, to say, you know, "Here is everything
20  that we have," you know, whatever topic that you're
21  looking at.  "Make sure you utilize all the
22  resources that we have" because, again, we were
23  trying to put out stuff that was timely and accurate
24  for them to make good business decisions.
25      Last thing we wanted to do was put out

1  something that we thought was wrong or didn't think
2  that, you know, was going to help our membership.
3   Q  Would you submit a declaration in this case
4  saying that "Based on NICS data alone, I believe
5  that the number of magazine sales in the
6  United States have increased over the last six
7  years"?
8      MR. LEE:  Objection.  Calls for
9  speculation.
10      THE WITNESS:  You know, the NICS data is --
11  helps people understand the trends in sales of
12  firearms and pistols and long guns.
13      It doesn't really break down too much more
14  into those categories; so it would not just be the
15  sole source to rely on, I don't believe.
16      I would -- if I was doing it, I would use a
17  few other sources as we discussed.
18  BY MR. MEYERHOFF:
19   Q  I just want to be clear on one thing.  Were
20  you aware that your 2017 declaration was refiled in
21  support of Plaintiffs' Motion for Summary Judgment
22  in this case --
23      MR. LEE:  Objection.
24  BY MR. MEYERHOFF:
25   Q  -- in 2023?

1      MR. LEE:  Objection.  Asked and answered.
2  Beyond the scope.
3  BY MR. MEYERHOFF:
4   Q  But you can answer.
5   A  If it was asked and answered, I would have
6  to go back and ask -- to review my answer.
7   Q  I'm just asking, sitting here in this
8  moment, do you recall if you were aware that
9  plaintiffs' refiled your declaration in March of
10  this year?
11      MR. LEE:  Same objections.
12      THE WITNESS:  Same answer.
13  BY MR. MEYERHOFF:
14   Q  So you don't recall.
15   A  I guess we could ask the court reporter to
16  go back and find that question and -- and read the
17  response for you.
18      MR. LEE:  Do you want a stipulation,
19  Counsel?
20      MR. MEYERHOFF:  No.  I just want to know if
21  the witness was aware that his declaration was
22  refiled --
23      MR. LEE:  You asked him.
24      MR. MEYERHOFF:  -- in March of 2023, this
25  year.

1      MR. LEE:  Right.
2  I'll stipulate to that fact.  But if you're
3  trying to establish it for something, you did ask
4  that question already.
5      MR. MEYERHOFF:  Okay.
6      Sorry, Ms. Miller.  Can you go back through
7  the transcript and see if you can find the word
8  refile?
9      (The following question and answer was
10  read:
11      "Q  In either of your
12  conversations with Mr. Lee over the
13  past month, did he tell you that your
14  declaration had been refiled this
15  year?
16      "A  I do not recall.")
17      MR. MEYERHOFF:  I don't have any other
18  questions at this time.
19      MR. LEE:  Thank you.
20      THE REPORTER:  Mr. Lee, are you purchasing
21  a certified copy of the transcript?
22      MR. LEE:  Yes.
23
24      (The deposition concluded at 2:28 P.M.)
25  ///

Wiese, et al. vs. Bonta, et al.                                    **Deposition of James Curcuruto**

1
2          I, JAMES CURCURUTO, declare under
3    penalty of perjury that the foregoing
4    is true and correct, to the best of
5    my ability.
6
7
8
9          Dated this ___ day of
10   _____, 2023, at
11   _____,
12   Connecticut.
13
14
15
16   _____
17          JAMES CURCURUTO
18
19
20
21
22
23
24
25

                                        Page 186

1          I, ALTHEA L. MILLER, CSR NO. 3353, RPR,
2    CCRR NO. 149 certify:  That the foregoing proceedings
3    were taken before me at the time and place herein set
4    forth; at which time the witness, JAMES CURCURUTO, was
5    duly sworn; and that the transcript is a true record of
6    the testimony so given.
7          Witness review, correction, and signature
8    was
9    ( ) by Code.            ( ) requested.
10   ( ) waived.             (X) not requested.
11
12       The dismantling, unsealing, or unbinding of
13   the original transcript will render the Reporter's
14   Certificate null and void.
15       I further certify that I am not financially
16   interested in the action, and I am not a relative or
17   employee of any attorney of the parties, nor of any
18   of the parties.
19
20       Dated this 13th day of August, 2023.
21
22   _____
23   ALTHEA L. MILLER, CSR NO. 3353, RPR, CCRR NO. 149
24
25   ///

                                        Page 187