# Exhibit 1

Expert Report: History of Firearms Regulations in the Nineteenth Century

**Prepared for the Washington State Attorney General's Office by**

Brennan Rivas, Ph.D.


**In the Matter of:**

GABRIELLA SULLIVAN, *et al.*,

Plaintiffs,

v.

BOB FERGUSON, *et al.*,

Defendants,

and

ALLIANCE FOR GUN RESPONSIBILITY,

Intervenor-Defendant.


Date:  April 26, 2023          *Brennan Rivas*
                               Brennan Rivas, Ph.D.

**TABLE OF CONTENTS**

I.  INTRODUCTION.................................................................................................1

II.  QUALIFICATIONS ...........................................................................................1

III.  METHODOLOGY ...............................................................................................2

IV.  SUMMARY OF OPINIONS ...............................................................................2

V.  DEFINING DEADLY WEAPONS ....................................................................4

    A.  Large Knives ...............................................................................................5

    B.  Pocket Pistols Pre-1836 ..............................................................................7

    C.  Revolvers and Pocket Pistols Post-1836 ....................................................9

VI.  ANTEBELLUM VIOLENCE & USE OF DEADLY WEAPONS.................11

VII.  ANTEBELLUM REGULATORY RESPONSES .............................................14

    A.  Public Carry Restrictions ..........................................................................14

    B.  Taxation .....................................................................................................20

    C.  Sales Restrictions ......................................................................................23

VIII.  THE CIVIL WAR AS A NATIONAL TURNING POINT ...........................24

IX.  POST-CIVIL WAR REGULATORY RESPONSES........................................31

    A.  Protecting the Public: Public Carry & Sensitive Place Restrictions...........31

    B.  Taxation .....................................................................................................34

    C.  Sales Restrictions ......................................................................................35

    D.  Licensing....................................................................................................39

X.  DEVELOPMENT OF LARGE CAPACITY MAGAZINES .........................40

    A.  Lever-Action & Semiautomatic Rifles .....................................................41

    B.  Semiautomatic Pistols ...............................................................................44

XI.  CONCLUSION ...................................................................................................46

## I.   INTRODUCTION

I have been asked by the Washington State Attorney General's Office to render an opinion on the history of firearms restrictions enacted in the nineteenth century, especially as it relates to large capacity magazines. I have also been asked to provide information about firearms or other weapons that might have been considered unusual or especially dangerous during that time period. I am being compensated by the Washington State Attorney General's office at a rate of $175/hour for research and consultation, $225/hour for writing and editing materials, and $325/hour for deposition and testimony.

## II.   QUALIFICATIONS

I am a Historian and independent scholar. During the 2021-2022 academic year, I was the Lloyd Lewis Fellow in American History at The Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University. From 2019 to 2020, I was a Lecturer in American History at Texas Christian University (TCU). My educational background includes a Ph.D. in History from TCU, where my dissertation was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

My expertise includes historical weapon regulations in the United States. I have authored multiple publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; in 2022, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study (June 2022), was published in the *UC Davis Law Review*. I am currently completing a book manuscript based upon my dissertation research.

I have provided expert witness testimony in *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C); *Duncan v. Bonta*, 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*, No. 22-cv-03093 (E.D. Wash.); and *Christian v. Nigrelli*, No. 22-cv-00695 (W.D.N.Y.); *Frey v. Nigrelli*, New York, Case No. 21 Civ. 5334 (NSR), S.D. N.Y.;

*Brumback v. Ferguson*, Washington, No. 1:22-cv-03093-MKD, E.D. Wash.; *Siegel v. Platkin*, New Jersey, No. 22-cv-7463 (RMB) (AMD), D. N.J.; *NAGR v. Campbell*, Massachusetts, No. 1:22-cv-11431-FDS, D. Mass.; *Oregon Firearms Federation, Inc. v. Kotek*, Oregon, No. 2:22-cv-01815-IM, D. Ore.; *NSSF v. Jennings*, Delaware, No. 22-cv-01499-RGA, D. Del.; *Jones v. Bonta*, California, 3:19-cv-01226-L-AHG, S.D. Cal. I am currently working on potential expert witness testimony that may be provided in other jurisdictions.

## III.     METHODOLOGY

Historians draw on primary sources while also evaluating them in light of relevant peer-reviewed scholarship. For example, published works on a given time period or subject help historians interpret news articles, laws, testimony, personal letters, and other primary sources. Rather than consider such sources in a vacuum, divorced from their context, historians are trained to contextualize them in order to better understand the subject at hand.

For this report, I relied upon knowledge and research that I have collected over my years working on the history of gun and weapon regulation in the United States. I have supplemented that with additional research into the development of firearms, cartridge, and magazine technologies during the late nineteenth and early twentieth centuries. I have read or consulted many books about the development of firearms and other weapons from the early modern period to the mid-twentieth century. In addition to online repositories like Westlaw, Hein Online, Hathi Trust, Chronicling America, and the Duke Repository of Historical Gun Laws, I have made use of digital collections housing government documents and rare newspapers. I have also reviewed archival resources housed at the McCracken Research Library at the Buffalo Bill Center of the West in Cody, Wyoming, along with digitally preserved issues of *Gun Digest.*

## IV.     SUMMARY OF OPINIONS

This report is about the long arc of weapon regulation across American history, and particularly the ways in which modern large capacity magazine laws—including Washington's—descend from and are analogous to historical regulations that date back at least as far as the early 1800s. This report explains this history by reviewing some of the major developments in firearm

technology and weapon regulation throughout the nineteenth century. It begins by defining the knives and pistols that nineteenth-century Americans generally referred to as *deadly weapons* and singled out for regulation. It then turns to the social problems posed by deadly weapons, and the resulting regulation of them during the antebellum period (through about 1860). Americans of that era condemned the violence and bloodshed associated with knives and pistols, and in response they elected officials who enacted regulations designed to protect the public and discourage the use and carrying of deadly weapons.

The Civil War Era was a significant turning point in the history of guns and their regulation in the United States, as is explained in more detail in this report. The political instability associated with Reconstruction, combined with the tremendous manufacturing capacity for firearms in a rapidly industrializing country, had the tragic effect of creating an unprecedented wave of gun violence. This report then discusses the ways in which post-Civil War regulatory efforts were similar to and grew out of antebellum weapon restrictions.

Even as the United States confronted its first crisis of gun violence in the latter 1800s, technological innovations in the gun-making industry produced a bevy of improvements to firearms and their ammunition. Cap and ball revolvers gave way to cartridge revolvers, repeating rifles (particularly lever-action designs) became commercially successful, and center-fire cartridges increased the range, accuracy, and firepower of guns. And yet, American gun manufacturers—with exceedingly few exceptions—did not produce firearms with a standard magazine capacity greater than ten. This report also explores historical magazine capacities, demonstrating that the few nineteenth-century large capacity magazines were outliers inherently different from the detachable or clip-fed magazines that have become more widely used in recent decades. From the initial development of self-loading firearms near the turn of the twentieth century to at least 1950, American-made semiautomatic firearms as a general rule did not have magazine capacities greater than ten. Because American gun-makers rarely produced large capacity magazines, and because American hunters, target-shooters, and other gun enthusiasts

opted for firearms without large magazine capacities, the American people had no reason to establish rules regarding the subject until well into the twentieth century.

The large capacity magazine restriction put in place by the State of Washington is in line with the historical precedent of firearm and weapon regulation in the United States. Nineteenth-century Americans—who strictly regulated the carrying of weapons, developed the first handgun licensing programs, established minimum age requirements, and sometimes even banned the sale of certain weapons altogether—embraced a view of state police power that would not have objected to restrictions on magazine capacity had that issue posed a problem at the time.

## V.      DEFINING DEADLY WEAPONS

Americans living in the nineteenth century generally distinguished between two types of weapons: arms suitable for militia service or hunting, and concealable weapons associated with interpersonal violence and known as *deadly weapons*.[1] In the decentralized, agricultural environments that characterized early American life, hunting knives, rifles, muskets, and shotguns were important tools present in most rural homes. Men used these firearms for militia service and for the occasions when they were required to participate in local policing efforts through the *posse comitatus*; they would have much more frequently used such weapons for hunting—be it killing predatory animals, driving birds away from their crops, or hunting for meat. Rifles, muskets, and shotguns were not likely to be used in the commission of crimes, especially crimes of passion that resulted in murder or manslaughter. Those offenses were much more likely to be committed with bare hands, blunt instruments, or other types of weapons such as concealable knives and pistols.[2]

---

[1] There are some exceptions to this tendency, such as sales restrictions that applied to all firearms rather than just pistols, or certain sensitive place laws that prohibited all firearms in addition to deadly weapons. *See* Ohio 1880 at 79–80, establishing a minimum age for the sale of "any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or other firearm, of any kind or description whatever, or ammunition for the same." *See also* John A. Hockaday, et al, *Revised Statutes of the State of Missouri* (Jefferson City: Carter & Regan, State Printers, 1879), 224 § 1274, prohibiting the carrying of "any firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon" at "public assemblages." Nonetheless, this distinction between deadly weapons and militia or hunting weapons was foundational to nineteenth-century regulatory policies.

[2] Guns were used in less than half of the murders of unrelated adults, and less than ten percent of marital murders during the seventeenth and eighteenth centuries. See Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 115.

As rates of homicide, violence, and crime rose in tandem with developments in weapon technology during the nineteenth century, American people across the country turned to weapon regulations as a solution. These regulations tended to focus upon readily concealable "deadly weapons" like knives and pistols rather than the firearms used for militia and hunting purposes. Deadly weapons were associated with crime and needless bloodshed, and the people habitually carrying them were presumed to be ruffians, burglars, and assassins—those ready to settle personal difficulties with blood rather than by reason and law. Some states listed and defined deadly weapons by code or statute. An 1892 edition of the Mississippi Penal Code carried forward a public carry law from 1888 as Sec. 1026, entitled "Deadly weapons; carrying of concealed."[3] The other feature shared by deadly weapons was their suitability for concealment; in fact, deadly weapons were often referred to as "concealed weapons" for the straightforward reason that they were designed to be carried concealed.[4] Article 47, Chapter 25 of the Oklahoma Territory Penal Code was titled "Concealed Weapons" and its first two sections enumerated "prohibited weapons" that were not to be carried upon the person or concealed.[5]

During this time "deadly weapons" primarily included large knives, "pocket pistols," and, later, revolvers ranging from 4-shot to 6-shot. Each are addressed below.

## A.    Large Knives

Prior to the widespread availability of revolvers near the mid-nineteenth century, large knives were considered the most dangerous weapon around. There were so many different styles and names of knives that Americans sometimes struggled to define them and distinguish them from one another. The "dirk knife" originated in Scotland as a knife carried into battle or for martial ornamentation by soldiers. It has come to be identified as having a straight blade. "Dagger" is an

---

[3] R. H. Thompson, et al, *Annotated Code of the General Statute Laws of the State of Mississippi* (Nashville: Marshall & Bruce, 1892), 326 § 1026.

[4] For example, see "What They Think of It: The State Press on the Carrying of Concealed Weapons," *Daily Constitution* (Atlanta, Georgia), April 11, 1879, 4; and "Concealed Weapons: What Is Thought of the Practice by the Press of the State," *Daily Constitution* (Atlanta, Georgia), March 27, 1879, 1. The articles quote numerous other newspapers from Georgia which condemn carrying deadly weapons in terms that associate going armed and carrying deadly weapons with the habit of carrying concealed weapons.

[5] 1890, Oklahoma, 1st Reg. Sess., "Of Crimes and Punishments," Ch. 25, Art. 47, "Concealed Weapons," 412 § 1–2.

older word, and generally connotes a double-edged blade. Bowie knives were often associated with long blades that curved and became double-edged near the tip. An "Arkansas toothpick," on the other hand, was more likely to be a knife that was as long as a bowie, double-edged, and sharply tapered. The narvaja was of Spanish origin and tended to refer to a large folding blade. To make matters even more complicated, these definitions might vary geographically, change over time, and were not set in stone during the nineteenth century.[6]

By far the bowie knife became the style most widely known, used, and discussed by Americans in the nineteenth century. The blade took its name from a man named Jim Bowie who was born in Kentucky in 1796 and died at the Alamo during the Texas Revolution in 1836.[7] He began carrying a large hunting knife in a leather scabbard in 1826, after an enemy tried to assassinate him in the street.[8] The following year, Bowie used it to great effect in a duel that turned into a melee and became the subject of nationwide news coverage.[9] His death at the Alamo cemented the legend of his namesake knife, which became one of the most widely denounced deadly weapons of the antebellum nineteenth century.

Fighting knives were certainly not new in the 1830s, and the exact styling of the original Bowie knife remains unknown, but Bowie's life story became a vehicle for Americans to discuss and address the growing problem of knife-violence. As rates of violence rose during the nineteenth century, people were more likely to carry and use large knives; the increased presence of knives— even if ostensibly carried for personal defense—had the regrettable consequence of exacerbating the problem.[10] This was especially notable in southern areas, where "so certain, indeed, is the

---

[6] Worthen, *Arkansas Made*, I:267–268.

[7] William R. Williamson, "Bowie, James," *Handbook of Texas Online*, accessed February 25, 2023, https://www.tshaonline.org/handbook/entries/bowie-james. Published by the Texas State Historical Association.

[8] Clifford Hopewell, *James Bowie, Texas Fighting Man: A Biography* (Austin: Eakin Press, 1994), 25-30.

[9] "Terrible Recontre," *Niles' Register* (Baltimore, Maryland), November 17, 1827, 182: https://archive.org/details/sim_niles-national-register_1827-11-17_33_844/page/182/mode/1up The same article was also reprinted here: https://chroniclingamerica.loc.gov/lccn/sn83045110/1827-10-31/ed-1/seq-2/

[10] *See* "Another Victim of the Bowie Knife," *Cheraw Gazette* (Cheraw, South Carolina), September 6, 1837, 3: https://chroniclingamerica.loc.gov/lccn/sn88084121/1837-09-06/ed-1/seq-3/

bowie-knife to appear in a quarrel, that the great anxiety of a disputant in the South seems to be always to strike the first blow."[11]

The response on the part of Americans confronting knife-violence was the regulation of such weapons. Going back to 1801, nineteenth-century weapon restrictions regulated the presence of knives larger than a regular pocket knife in public places.[12] As homicide rates increased and the popularity of bowie knives grew, so did laws restricting bowie knives.[13]

## B.    Pocket Pistols Pre-1836

Another weapon that came to be associated with lawless violence in the antebellum period was the "pocket pistol." Prior to the mid-nineteenth century, most of the pistols available on the American consumer market were single-shot, muzzle-loading pistols modeled after designs that appeared in the eighteenth century.[14] After being fired, they were useful only as clubs until they could be reloaded through a process that took upwards of fifteen seconds.[15] The largest of these muzzle-loading pistols were called "horse" pistols and had been adapted to cavalry and dragoon[16]

---

[11] "The Bowie-Knife In the South," *San Francisco Evening Bulletin* (San Francisco, California), October 18, 1861.

[12] Tenn. 1801 ch. 22 § 6 (prohibiting "privately" carrying "any dirk, large knife, pistol or any other dangerous weapon."). Similar laws existed in numerous states during the antebellum nineteenth century, including: Florida, which clearly distinguished between fighting knives and pocket knives, *see* 1846 Fla., ch. 75 ("any dirk, pistol or other arm or weapon, except a common pocket knife . . . ." *See also* 1838 Vir., ch. 101 ("any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue . . ."; 1840 Ala., ch. 7 ("a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of fire arms, or air gun…"; 1819 Ind., ch. 23 ("any dirk pistol, sword in cane, or any other unlawful weapon . . ."); 1821 Miss., ch. 49 ("any pistols, dirk or other such offensive weapons . . ."); 1812 Ken., ch. 89 ("a pocket pistol, dirk, large knife, or sword in a cane . . ."; 1813 La., ch. 5 ("any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon,"; Revised Statutes, Wisconsin, 1849, Title XXXI, Ch. 142, "Of Proceedings to Prevent the Commission of Crime," Sec. 18 ("a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon . . ."); Revised Statutes, Michigan, 1846, Title XXXI, Ch. 162, "Of Proceedings to Prevent the Commission of Crime," Sec. 16 ("a dirk, dagger, sword, pistol, or other offensive and dangerous weapon . . ."). This is not an exhaustive list.

[13] As a general rule, public carry laws included knives within their purview, and some jurisdictions prohibited the sale of bowie knives as well. *See infra*, pp. 17–24; 29; 36–39.

[14] Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 114–116.

[15] For example, see the websites: https://timothyrjeveland.com/how-to-load-and-fire-a-musket-or-flintlock-pistol-explained-briefly-with-appropriate-jargon/; and https://www.quora.com/How-long-did-it-take-to-load-a-flintlock-pistol.

[16] Dragoons emerged in the early modern era as a type of unit that could fight both mounted and dismounted. In many instances, they rode to battle on horseback but fought on foot. Dragoon units within the US Army were organized in 1833 and stationed in the West (initially Fort Smith, Arkansas) where Indian conflicts necessitated mounted warfare. *See* https://www.nps.gov/fosc/learn/education/dragoon5.htm

service in the early modern era. Horse pistols measured a foot or more in length and were carried in holsters that attached to a saddle; they were not designed to be carried on the person.[17] Mid-sized pistols were designed to be carried either on the belt (sometimes attached by a ring on the firearm), in the pocket of a greatcoat, or in a portable case. One of the main uses of these seven-to-ten-inch pistols prior to the nineteenth century was for defensive purposes while traveling.[18] The smallest size, measuring approximately five or six inches in length, was the pocket pistol. As the name suggests, these firearms were purposefully designed to be carried within the pockets of everyday attire.[19] The most famous of these was the deringer pistol, named for its designer, Henry Deringer, and notorious as the gun used to assassinate Abraham Lincoln. Deringers (often misspelled as "derringers") were capable of firing large calibers, which made them exceedingly lethal at close range—often more lethal than mid-sized navy revolvers.[20]

While early pistols were overwhelmingly single-shot weapons, an early repeating pistol existed prior to the development of the revolver in 1836. It was called a "pepper-box" pistol and had multiple barrels rather than just one. Where a revolver has a cylinder carrying multiple shots that turns at each cocking of the hammer, a pepperbox had similarly rotating barrels loaded with shot.[21] In the early nineteenth century, pepper-boxes were not widely available in the United States and appear to have been rarities or curiosities rather than commonly used weapons.[22] For a brief period of time near the 1840s, a competitor to the revolver was a type of pepper-box called an Allen pistol. These weapons were developed in the United States by a Massachusetts gun-maker named Ethan Allen and carried six shots per load (much like a revolver). The popularity the Colt

---

[17] Blair, *Pollard's History*, 104, 119.
[18] *Id.* at 117–118.
[19] *Id.* at 116–118; ("These [pocket pistols] were intended to be carried in the pocket of a person wearing normal civilian attire," pp.117).
[20] Lee A. Silva, "Henry Deringer's Popular 'Pocket Cannons' Packed a Wallop from California to Washington, D.C.," *Wild West* (April 2002), 12–13.
[21] Blair, *Pollard's History*, 210.
[22] Advertisements for multi-barreled pocket pistols can be found in historical newspapers, though the advertisement of them points toward them as rarities and curiosities. See *The Madisonian* (Washington, D.C.), December 22, 1838, 1. This particular example emphasizes their use for travelers, a category of gun-carriers that was generally exempted from public carry regulations during the nineteenth century. The term "pepper-box" is not used. https://chroniclingamerica.loc.gov/lccn/sn82015015/1838-12-22/ed-1/seq-1/.

revolver caused American manufacture of Allen pistols and pepper-boxes to all but disappear during the Civil War Era.[23] Historical newspapers and dictionaries rarely mention "pepper-boxes" or Allen pistols.[24]

Even though pocket pistols were less frequently the targets of popular outrage in the early nineteenth century, they were still regulated alongside other deadly weapons like bowie knives. Small, concealable pistols lent themselves to the same violent ends as fighting knives, and it was a single-shot, muzzle-loading pocket pistol used in the assassination of Abraham Lincoln in 1865. Public carry laws generally included "pistols" within their purview, and other regulatory strategies attempted to discourage their presence in public spaces.

## C.    Revolvers and Pocket Pistols Post-1836

The year 1836 proved to be a turning point in the history of firearm development and a major catalyst for both a proliferation of interpersonal violence and intensification of firearm regulation in the nineteenth century. That was the year that Samuel Colt patented his first revolver design. The patent extended until 1857, by which time his revolvers had received US military contracts and penetrated American consumer markets. Other manufacturers pounced upon the opportunity to manufacture revolvers, and the Civil War Era stretching from 1850 to 1870 saw a dramatic rise in the availability of these weapons. Even though it took several decades, the revolver eventually overtook dirks and bowie knives as the weapon considered most problematic in American communities.[25]

The Colt revolver diverged from pistols widely available at the time in two critical ways. First, it was breech-loading, meaning that ammunition did not need to be inserted through the end

---

[23] On pepper-boxes and Allen pistols in the United States, see S. Basil Haw, "The 'Pepper-Box' Pistol: That Strange Weapon with Revolving Barrels," *Army Ordnance* 17, no. 98 (September-October 1936), 90–94; Lewis Winant, *Pepperbox Firearms* (New York: Greenberg, 1952).

[24] An exploration of digitized newspaper databases showed that "pepperbox," "pepper-box," "pepper box," and plural permutations of these terms were not used to describe firearms; rather, they described a box for keeping pepper, which was a kitchen-related item. The primary definition for "pepperbox" in the *Oxford English Dictionary* is: "A small box with a (usually domed) perforated lid, used for sprinkling pepper on food; a pepper pot." According to *OED*, another term for pepper-box pistols was "Allen pistol," which also does not appear to be in common use in nineteenth-century America.

[25] On the life of Samuel Colt and the history of his firearm manufacturing companies, *see* Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Scribner, 2020).

of the barrel (muzzle-loading). Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds.[26] The earliest revolvers (those manufactured prior to and during the Civil War) were of the "cap and ball" type, which required a delicate and time-consuming reloading process. By about the 1870s, technological developments in the design and functionality of ammunition meant that later-model revolvers could use individual cartridges; these could be inserted fairly quickly into the cylinder, which made the reloading process much more efficient—a boon on the battlefield, but a new danger in other contexts.

Revolvers were produced in the three historical sizes or styles: "horse," "belt," and "pocket" models. By Colt's era, "horse" pistols tended to be called "army" or "holster" pistols because they were used by mounted soldiers and kept in saddle holsters. Army pistols became slightly smaller and more conducive to being worn on the person by officers beginning in the 1870s, and they remained the largest gun in Colt's pistol lineup and carried a higher caliber; they were issued in large numbers by the United States Army and Navy during the Civil War and postbellum eras. The "belt" or midsized pistol would have been worn in a hip holster attached to the belt. Colt's version of it came to be called the "navy"[27] model and may have been the most common type of revolver among civilians around the time of the Civil War. The first pocket pistol produced by Colt was released in 1848 and had five shots.[28] In later decades, pocket revolvers could be purchased in small sizes and calibers and at a relatively low cost. Cheap revolvers, particularly imitation brands of a lesser quality, could be had for a few dollars, with used ones selling for even less.[29]

---

[26] Revolvers' firing capacity could range anywhere from four to seven shots depending on the manufacturer and design of the firearm in question.

[27] The label "navy" may have been derived from the fact that the model featured an engraving of a naval battle. The name may also have been related to its having a smaller size and caliber that were more suited to being used in naval engagements. It is not entirely clear why Colt named the midsized belt pistol the "navy" model.

[28] Haven and Belden, *Colt Revolver*, 63–73.

[29] On size, variability, and manufacture of Colt pistols, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Simon and Schuster, 2021); Martin Rywell, *Colt Guns* 66–67, 84–93 (Harriman, TN: Pioneer Press, 1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* 173 (New York: Simon & Schuster, 1979).

## VI.   ANTEBELLUM VIOLENCE & USE OF DEADLY WEAPONS

Research has shown that homicide rates began rising in the southern states following the War of 1812. Winning that particular conflict coincided with economic prosperity in the United States, particularly in the expansion of farming and commerce into the states that formed the western frontier at that time. And yet in the Old Southwest, stretching from Louisiana to Missouri, Kentucky, and Alabama, financial stability consistently eluded aspiring farmers. Elite planters, rich in assets like cotton, land, and slaves, placed their collective thumb on the scale of state and local politics in ways that stifled the middle class. The presence and pervasive influence of a labor system predicated upon racial slavery had pernicious effects in the slaveholding South, too. Fears of revolts were widespread, and the would-be planters locked out of financial success heaped horrifying abuse upon enslaved Black men and women. One of the equalizers among southern white men was their prerogative to defend their honor through the *code duello*. Where ritualized dueling did not take place, the same motivation of vengeance and vindication resulted in "difficulties" or "recounters" in which men drew concealed weapons for a kill-or-be-killed fight.

It was in this antebellum southern environment that the carrying of weapons became widespread and consequently regulated. Communities situated along the riverside towns of the Mississippi River and its tributaries were particularly beset by transient boatmen transporting goods to and from New Orleans. The boatmen who operated and staffed these vessels tended to be illiterate, hard-drinking, and rowdy, and it was not uncommon for them to settle disputes violently. It is likely that large knives were a favorite among boatmen because they functioned in both dry and wet conditions and (unlike the single-shot pistols of the day) did not need to be reloaded.[30] Fights and fatalities occurred frequently, and boatmen often escaped justice by returning to the river. This coming and going of rough men had negative effects upon riverside communities, and

---

[30] Depictions of flatboat and keelboat operators reprinted in secondary sources sometimes show them with firearms such as rifles and muskets. See Michael Allen, *Western Rivermen, 1763-1861: Ohio and Mississippi Boatmen and the Myth of the Alligator Horse* (Baton Rouge: Louisiana State University Press, 1990), illustrations following p. 113. Revolvers were neither common nor affordable in the pre-steamboat era. Accounts of boatmen's violence refer to their using fists, clubs, and weapons such as knives and pistols. See Allen, *Western Rivermen*, 123–26; Bonnie Stepenhoff, *Working the Mississippi: Two Centuries of Life on the River* (Columbia: University of Missouri Press, 2015), 54–57.

even infiltrated beyond the rivers themselves.[31] The negative influence of boatmen and river life more generally has been noted by historians, and the significant socio-economic importance of riverside cities like St. Louis, Memphis, Natchez, New Orleans, and others made events in even their surrounding areas significant to a state more broadly.[32] For this reason, states deeply engaged in western riverboat traffic were some of the first to enact public carry regulations in the nineteenth century.[33]

Even in settlements well-insulated from riverside violence, the limited access to government institutions could be problematic. County seats were not only the location of county and district courts, but the sites of electoral activity and the only place where official business involving debts and land conveyances could be transacted. A visit to the county seat for such purposes often required overnight travel. District judges, who heard the most important civil and criminal cases, generally rode a circuit and visited the seats of the several counties within their jurisdiction only a few times per year. Relative isolation from county and state governments meant that precinct-level officials, like constables, deputies, magistrates, or justices of the peace wielded significant power and influence by being the first point of contact between the people and the representative governments which they relied upon to protect the peace and ensure order.

This weak reach of rural government combined with a seemingly unshakeable honor culture to make deadly brawls an all-too-common occurrence. The "ruffian," a man bent on

---

[31] "The Murder Case, *The Democratic Sentinel* (Cadiz, Ohio), February 23, 1853, 4; reprinted from *Steubenville Union*, February 21, 1853 ("But he followed the river, and associated with men who drank, until he became a hard drinker, then followed the carrying of deadly weapons, and the conversations about trials of strength between fancy men in which deadly weapons were used and displayed, until he imbibed the idea that an insult or injury had to be atoned for alone by an appeal to physical force or the use of weapons."). https://chroniclingamerica.loc.gov/lccn/sn85025647/1853-02-23/ed-1/seq-3/. *See also* "Manners of the West," *Logansport Canal Telegraph* (Logansport, Indiana) February 18, 1837, 4; reprinted from the *Boston Atlas* (Boston, Massachusetts) ("I am sorry to find that the habit of carrying concealed weapons is very prevalent here and in other places on the river.").

[32] Other scholars who note the influence of boatmen include: Swanne Bennett and William B. Worthen, *Arkansas Made: A Survey of the Decorative, Mechanical, and Fine Arts Produced in Arkansas through 1950*, 2 vols. (Fayetteville: University of Arkansas Press, 2021), 267. Roth, *American Homicide*, 219; On the tendency among easterners to perceive Americans as becoming increasingly uncivilized as they moved west, see Gordon S. Wood, *Empire of Liberty: A History of the Early Republic, 1789-1815* (New York: Oxford University Press, 2009), 395–96.

[33] These included: Tennessee (1801), Kentucky (1813), Louisiana (1813), and Indiana (1820). Tenn. 1801 ch. 22 § 6; 1813 Ky. Acts 100, ch. 89 § 1; 1813 La. Acts 172 § 1; Ind. 1819 ch. 39. *See also infra* at 20–21.

imposing his will through force or intimidation, engaged in unforgivably brutal behavior with a knife or pistol concealed in his pocket.[34] Men feeling empowered by their secret weapons could risk violent aggression. As a result, southern and southwestern governments became some of the first to enact new statutes in the early 1800s that discouraged the carrying, possession, or use of deadly weapons posing significant risks to safety.[35]

Even though frontier areas and the slaveholding South were more violent places than the North and Midwest, a rising level of violence and crime proved to be a problem of national proportions. Northern states were relatively *less* violent than southern ones, but they were not free of all violence and crime. The turning point there came in the 1840s, when the effects of burgeoning industrialization led to conflict along ethnic, class, and political lines. Ruffianism was present in northern life as well, and in the 1850s became associated with the gang-like activities of nativist political factions.[36] Urban violence associated with nativist unrest was attributed to devotees of anti-Catholicism, each one of which was expected "to arm himself with bowie knife, and revolver or other deadly weapons, and follow their leaders even to the shedding of blood."[37] When rates of violence rose in northern communities after 1840, residents reacted in much the

---

[34] For example, *see* "The 'Science of Defence,'" *Public Ledger* (Philadelphia, PA) August 5, 1840 (carrying swords as "refined ruffianism."); "The Ruffian Foote," *Barre Patriot* (Boston, MA) April 26, 1846 (Sen. Henry S. Foote of Mississippi as a "ruffian" for being armed in the Senate chamber, bullying an enemy, and pulling a knife on him in the presence of the full Senate); "Shocking Outrage," *The Miners' Express* (Dubuque, Iowa) September 24, 1851, 2 ("some ruffian or ruffians unknown" stabbed a pair of stabled horses, killing one). *See* https://chroniclingamerica.loc.gov/lccn/sn86083363/1851-09-24/ed-1/seq-2/

[35] New enactments during the 1840s regarding public carry and taxation (some of which are municipal ordinances) came from the states: *public carry*, Maine, Alabama, Louisiana, Michigan, Virginia, Wisconsin, California, and Florida; *registration/taxation*, Iowa (Burlington) and Mississippi. In the 1850s: *public carry*, Massachusetts, Pennsylvania, Minnesota, Delaware, New Mexico, Oregon, Wisconsin, Kansas, Ohio, Indiana, Kentucky, New York (Central Park) and Washington, D.C.; *registration/taxation*, Rhode Island (Newport), California (San Francisco), North Carolina, Alabama, Louisiana. See Duke Repository of Historical Gun Laws, https://firearmslaw.duke.edu/repository/search-the-repository/. I selected "carry" and "registration/taxation" categories and listed the states with new enactments during each decade of the antebellum nineteenth century. The number of such enactments grew over the decades, and ceased to be exclusively southern beginning in the 1820s (2 of 3 total states), and by the 1850s, northern/midwestern states accounted for 9 of 15 jurisdictions, western ones accounting for 4, and southern ones (including Washington, D. C.) accounting for 4. On antebellum public carry and taxation regulations, *see infra* at 17–27.

[36] Mark E. Neely, "Apotheosis of a Ruffian: The Murder of Bill Pool and American Political Culture," in *A Political Nation: New Directions in Mid-Nineteenth-Century American Political History*, eds. Gary W. Gallagher and Rachel A. Shelden (Charlottesville: University of Virginia Press, 2012), 36–63.

[37] "An Exposition of the Principles and Power of the Know Nothing Order of Connecticut," *Cadiz Democratic Sentinel* (Cadiz, Ohio) July 11, 1855, 1; reprinted from the *Hartford Times* (Hartford, Connecticut). https://chroniclingamerica.loc.gov/lccn/sn84028794/1855-07-11/ed-1/seq-1/.

same way as their southern counterparts had—by enacting regulations designed to discourage the possession, carrying, and use of deadly weapons.[38]

## VII.   ANTEBELLUM REGULATORY RESPONSES

The greater availability and lethality of deadly weapons (resulting from technological innovations) acted in conjunction with their greater likelihood of being used (resulting from generalized increases in rates of violence) to make them a target of increasing government regulation during the antebellum nineteenth century. Americans recognized that large numbers of weapons were circulating in public, and that this had bloody consequences for their own communities. In response, American state and local leaders enacted various types of regulatory statutes and ordinances to discourage the use, possession, and habitual carrying of deadly weapons. The three main approaches involved: public carry restrictions, taxation, and sales restrictions.

### A.   Public Carry Restrictions

The most prevalent response to the rising levels of violent crime in antebellum America was the enactment of new public carry restrictions that targeted deadly weapons—especially knives and pistols. The English common law inherited by the colonies had provided an avenue for disarming public spaces rooted in the Statute of Northampton.[39] Nonetheless, the nineteenth

---

[38] *See supra*, n. 35.

[39] Scholarly historical research has shown that, under common law, courts considered the act of carrying deadly weapons in public spaces to be inherently terrifying and therefore a breach of the peace. *See* Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *U.C. Davis Law Review* 55 (June 2022), 2555–56 ("There was no requirement that one establish an intent to terrify or that the armed travel terrorized any specific person, the injury was to the King's Peace and sovereignty."); Mark Anthony Frassetto, "To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment," *Southern Illinois University Law Journal* 43 (2018), 65 ("Those who take a textual approach to interpreting the Statute of Northampton…argue that carrying weapons in populated public places was intrinsically terrifying and that the discussion of public terror in judicial opinions and legal treatises was an explanation for the prohibition, rather than a separate element of the crime."); Patrick J. Charles, "The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters," *Cleveland State Law Review* 64, no. 3 (June 2016), 381–82 ("But those that subscribe to the Standard Model view of the Second Amendment proclaim the Statute of Northampton can only be read as applying to the 'carrying arms in ways that caused public terror.' In making this claim, Standard Model writers have never provided sufficient evidence, at least in total historical context, to support it."); see also Patrick J. Charles, "The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (forthcoming), draft pp.12 ("What [English jurists'] restatements inform is that by the early-to-mid-seventeenth century, England's preeminent legal minds understood that the act of carrying dangerous weapons was sufficient to amount to an affray, 'strike a feare' or 'striketh a feare.' ").

century witnessed a wave of new criminal enactments regarding deadly weapons rather than a commitment to enforcing public disarmament through common law means.[40]

An early example of an American state government translating a common law violation of the Statute of Northampton into a state-level statute occurred in Massachusetts in 1795. Justices of the peace were empowered to "cause to be staid and arrested" anyone who disturbed the peace, engaged in assault or affray, or "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[41] Much of the statute's text repeated phrasing and clauses from within the Statute of Northampton, and prohibited the carrying of arms into public spaces without a justifiable reason. Anyone violating this rule would have been subject to questioning by local officials and "bound" to the peace through a peace bond or surety, which was itself part of the common law inheritance.[42] Decades later, Delaware adopted a nearly identical policy.[43]

The 1795 Massachusetts law, which addressed going armed within the context of riot, affray, and disturbing the peace, was translated into a penal code edition published in 1836, and in that process the "going armed" portion was isolated into its own section. It read: "If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without

---

[40] On the codification movement and the early nineteenth-century preference for statutory enactments over the common law, see Steven J. Macias, *Legal Science in the Early Republic: The Origins of American Legal Thought and Education* (Lanham: Lexington Books, 2016), 1–19.

[41] 1795 Mass. Ch. 2, 436; from *Acts and Laws Passed by the General Court of Massachusetts: Begun and held at Boston, in the County of Suffolk, on Wednesday the Twenty-eighth Day of May, Anno Domini 1794; and from thence continued by adjournment, to Wednesday, the Fourteenth of January, 1795.* The act was passed on January 29, 1795.

[42] The peace bond was one of many processes inspired by America's common law heritage. *See* Laura Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009), 73–74, 96; Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Scholarship: Limits on Armed Travel under Anglo-American Law, 1688-1868," *Law and Contemporary Problems* 83, no. 3 (Summer 2020), 73-95; Saul Cornell, "Right to Carry Firearms outside of the Home: Separating Historical Myths from Historical Realities," *Fordham Urban Law Journal* 39, no. 5 (October 2012), 1719-1723. Edwards's passage on peace bonds is worth quoting at length: "Peace bonds threw enforcement back on the community, summoning family, friends, and neighbors to police the troublemakers. Bonds required one or more other people to put up the amount, making them liable if the accused broke the peace again. That economic obligation represented the signers' promise to keep the offender in line. Peace bonds put everyone else in the community on notice as well, investing them with the responsibility of policing the peace until the end of the probation period."

[43] *Revised Statutes of the State of Delaware, to the Year of Our Lord 1852* (Dover: S. Kimmey, 1852), Title XV, ch.97, 333 § 13. "Any justice of the peace may also cause to be arrested and bind to surety of the peace all affrayers, rioters, breakers and disturbers of the peace, and all who go armed offensively to the terror of the people, or are otherwise disorderly and dangerous."

reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided."[44] The statute clarified the law by showing that "going armed" was a separate offense from disturbing the peace, riot, and affray.

The early nineteenth century was a time when many states were drafting legal codes—making the law known and accessible to the people, which was part of the democratic spirit of the age. In undertaking that process, numerous states adopted verbatim the penal code version of the Massachusetts public carry law. It was repeated in Wisconsin (1839), Maine (1840), Michigan (1846), Virginia (1847), Minnesota (1851), and Oregon (1853).[45] Much like Massachusetts, Maine had a preexisting statute vesting justices of the peace with necessary powers to arrest and penalize affrayers and disturbers of the peace.[46] But for Wisconsin, Michigan, Minnesota, and Oregon, this was their first public carry law.

Virginia, like Maine, had previously enacted a public carry law; but unlike Maine, that statute was not identical to the Massachusetts approach adopted in 1836. In 1838, Virginia had enacted a different type of law—one that explicitly prohibited the carrying of concealed weapons and punished such behavior by fine and/or jail time.[47] The extent to which this 1838 statute

---

[44] *Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835* (Boston: Dutton & Wentworth, 1836), ch.134, 70 § 16. This section cites "Persons who go armed may be required to find sureties for the peace &c., 1794, 26 § 2," which appears to be a reference to 1795 Mass. Ch.2, 436; *see also supra*, n. 41.

[45] 1838-1839, Wisconsin, *Statutes of Wisconsin*, "An Act to Prevent the Commission of Crimes," 381 § 16; *Revised Statutes of the State of Maine, Passed October 22, 1840* (Augusta: W. R. Smith, 1841), ch. 169, "Of Proceedings for the Prevention of Crimes," 709 § 16; *Revised Statutes of the State of Michigan, Passed and Approved May 18, 1846* (Detroit: Bagg & Harmon, 1846), Title 31, ch. 162, "Of Proceedings to Prevent the Commission of Crime," 692 § 16; 1847 Virginia, 1847-1848 Session, Title 3, ch. 14, "Of Proceeding to Prevent the Commission of Crimes," 129, §16; *Revised Statutes of the Territory of Minnesota, Passed at the Second Session of the Legislative Assembly, Commencing January 1, 1851* (St. Paul: J. M. Goodhue, 1851), ch. 12, "Of Proceedings to Prevent the Commission of Crimes," 528 § 18; 1853 Oregon, General Laws, 5th Regular Session, 220 § 17.

[46] 1821 Maine ch. 76, "An Act describing the power of Justices of the Peace in Civil and Criminal Cases," 285, §1.

[47] 1838 Virginia ch. 101, "An Act to prevent the carrying of concealed weapons," 76 § 1. "That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation . . . ."

coexisted and overlapped with the 1847 statute remains unknown[48], but the example of Virginia highlights the fact that there were different approaches to public carry legislation during the antebellum nineteenth century. The other approach—which was more common in southern states—also grew out of the Statute of Northampton, but tended to prohibit *concealed* weapons and require criminal penalties for violation rather than sureties to keep the peace.

A good example of the southern, concealed-carry approach to public carry legislation comes from Tennessee. An 1801 public carry law made use of longstanding common law language and phrases providing that anyone who "shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person" would be required to post a bond, go to jail, or "be punished as for a breach of the peace, or riot at common law."[49] An updated statute from 1821 read: "Every person so degrading himself by carrying a dirk, sword cane, Spanish stiletto, belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offence."[50] The language had been simplified substantially, and the list of prohibited weapons (a deviation from the traditional Statute of Northampton and common law phrasing) formed the basis for the statute.

Tennessee was not the only state to adopt this language to regulate public carry during the early nineteenth century. Corresponding weapon restrictions were enacted in Louisiana and Kentucky in 1813, at a time when both states were experiencing dramatic population growth and economic expansion as a result of river transportation.[51] Like Tennessee, their statutes provided a

---

[48] It is unclear whether the 1847 Virginia penal code section pertaining to going armed effectively repealed the statute put in place in 1838.

[49] Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821), The Making of Modern Law: Primary Sources.

[50] Robert Looney Caruthers, A Compilation of the Statutes of Tennessee, of a General and Permanent Nature, from the Commencement of the Government to the Present time: With References to Judicial Decisions, in Notes, to Which is Appended a New Collection of Forms Page 100, Image 105 (1836) available at The Making of Modern Law: Primary Sources.

[51] Louisiana (1813): "any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view . . ."; Kentucky (1813): " any person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined in any sum, not less than one hundred dollars . . . ." See 1813 Ky. Acts 100, An Act to Prevent Persons in this

list of prohibited deadly weapons that could not be concealed on the person and penalized violators with a fine and/or jail time.[52] States and territories following this model included: Indiana (1819), Florida (1835), Georgia (1837), Virginia (1838), Alabama (1839), Ohio (1859), and New Mexico (1859).[53]

The language employed by these concealed carry laws invites contemporary readers to recognize the distinction between carrying weapons openly versus concealed—if the laws prohibited concealed carry, then they de facto allowed open carry. The problem with this line of reasoning is that everyday open carrying of deadly weapons was not particularly common in the nineteenth century. Deadly weapons like knives and pistols were designed to be carried concealed, so concealed carry regulations struck at the primary, preferred mode of carrying them. A commentator writing in 1877 said, "The very fact that men are careful to conceal their revolvers argues that they are doubtful as to the propriety of carrying them," and that if a young man were to walk along the street "with his silver-mounted deringer hanging from his waist belt, he would expose himself to unlimited ridicule."[54] The tendency toward concealing deadly weapons rather than carrying them openly was in fact so strong that in the latter nineteenth century, men's trousers were often sold with a *pistol pocket* sewn into the rear hip.[55]

---

Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89 § 1; 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unneccessary Manner § 1.

[52] Kentucky mandated a fine of not less than $100, half of which to go to the informer. Louisiana provided for a fine of $20 to $50, with half to go to the informer; violations occurring before a court received a find of not less than $100 and imprisonment up to six months. *See supra*, n. 51.

[53] 1819 Indiana ch. 23, "An Act to prohibit the wearing of concealed weapons," 39; 1835 Florida ch. 860, "An Act to prevent any person in this Territory from carrying arms secretly," 318; 1837 Georgia, "An Act to guard and protect the citizens of this State, against the unwarrantable and too prevalent use of deadly weapons," 90; 1838 Virginia ch. 101, "An Act to prevent the carrying of concealed weapons," 76; 1838 Alabama ch. 77, "An Act to suppress the evil practice of carrying weapons secretly," 67-68; 1859 Ohio "An Act to prohibit the carrying or wearing of concealed weapons," 3:56; 1859-1860 New Mexico "An Act prohibiting the carrying of Weapons, concealed or otherwise," 94–99 (English and Spanish).

[54] "Carrying Concealed Weapons: True Comment on an Almost Universal American Custom," *Daily Constitution* (Atlanta, Georgia), May 23, 1877, 1. Reprinted from *Baltimore American*. Some of the manners and etiquette books of the nineteenth century also addressed the impropriety of carrying deadly weapons. For example, see William A. Alcott, *Advice to a Young Gentleman on Entering Society* (Philadelphia: Lea and Blanchard, 1839), 147-149. https://books.google.com/books?id=430_rAHEPn8C&newbks=1&newbks_redir=0&source=gbs_navlinks_s.

[55] Scott Way, "A Few Random Remarks about Pockets," *Puck* 16 (January 1885), 294 ("We will merely glance at the pistol-pocket, in which a concealed deadly weapon is often carried, especially in Prohibition districts, and then pass on to the coat-tail pocket."); "The Pistol Pocket," *Chicago Daily Tribune* (Chicago, Illinois), February 11, 1885, 3 ("An important step toward securing an abolition of the practice of pistol-carrying, a Galveston (Tex.)

Some of the statutes explicitly carving out open carry exceptions went into some detail to describe the kind of open carry that was permissible, and the requirements did not comport with the way middle-class men dressed at that time. The 1813 Louisiana statute, for instance, criminalized the carrying of weapons "in his bosom, coat, or in any other place about him that do not appear in full open view."[56] The weapon-carrier would have had to make the entire weapon visible, not just the handle; and if he were a middle-class man, he would have to do so over the coat which he would be expected to wear in public. The 1835 Florida statute included a proviso excepting people who chose to carry weapons "openly, outside of all their clothes."[57] Again, the weapon would need to be fully exposed outside of the articles of clothing required of middle-class men.

The carving out of legal space to carry pistols and knives openly was designed for unusual or emergency situations.[58] In a case from 1840, the defendant argued that he needed to conceal a weapon in order to defend himself from an attack; the court disagreed, stating that, "If the emergency is pressing, there can be no necessity for concealing the weapon, and if the threatened violence, will allow of it, the individual may be arrested and constrained to find sureties to keep the peace, or committed to jail."[59] A Louisiana case from 1856 presented the question of whether a partially visible weapon could be considered a violation of the concealed weapon law. The court believed that it did, and its reasoning rested upon the fact that partially exposed weapons were "the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon, and not the extremely unusual case of the carrying of such weapon in full open view, and partially

---

paper suggests that the pistol-pocket should be prohibited by law."); "The Hygiene of Pockets," *Phrenological Journal and Science of Health* (March 1886), 176 ("It is common now-a-days for trousers to be made with a pocket placed little below the band in the back part of the garment. It is commonly termed the hip or pistol pocket.").

[56] 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1 ("That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine…"). See supra, n. 51.

[57] 1835 Florida ch. 860, 318, "An Act to prevent any person in this Territory from carrying arms secretly." See supra, n. 53.

[58] Mark Anthony Frassetto, "The Myth of Open Carry," *U.C. Davis Law Review* 55 (June 2022), 2517–18, 2539–43.

[59] *State v. Reid*, 1 Ala. 612 (1840).

covered by the pocket or clothes."[60] An Arkansas case from 1879 upheld the idea that a partially exposed weapon constituted an attempt at concealment.[61]

Concealed carry laws did not automatically protect open carry as a mode of being preemptively armed in public. In fact, preemptive arming is precisely what nineteenth-century Americans condemned. The 1838 Virginia statute prohibited "habitual" carrying the purpose of the statute was to penalize those who carried weapons as an everyday matter of course.[62] The 1813 Louisiana statute included a lengthy preamble explaining why the legislature was taking this action. It is worth quoting in full:

> Whereas assassination and attempts to commit the same, have of late been of such frequent occurrence as to become a subject of serious alarm to the peaceable and well disposed inhabitants of this state; and whereas the same is in a great measure to be attributed to the dangerous and wicked practice of carrying about in public places concealed and deadly weapons, or going to the same [public places] armed in an unnecessary manner . . . .[63]

An appellate judge in North Carolina went so far as to say that "there is scarcely a man in the community who does not own and occasionally use a gun of some sort," but that "No man amongst us carries it about with him, as one of his every day accoutrements—as a part of his dress—and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment."[64] Public carry laws, whether they used the terms "concealed" or "open," were fundamentally about protecting public spaces by keeping deadly weapons away from them.

## B.   Taxation

Another mode of regulating weapons during the antebellum nineteenth century involved taxation. The taxing power exists to raise revenue, but it has also historically been exercised as part of the police power. Some taxes are more about discouraging certain behaviors, such as modern day taxes on tobacco and alcohol, deemed harmful to society rather than simply to raise

---

[60] *State v. Smith*, 11 La. Ann. 633 (1856).
[61] *Carr v. State*, 34 Ark. 448 (1879).
[62] *See supra*, n. 47.
[63] *See supra*, n. 51.
[64] *State v. Huntley*, 25 N.C. 418 (1843).

revenue.[65] Americans living in the antebellum period sometimes turned to taxes upon the sale, possession, and use of deadly weapons as a mode of regulating them.

Sometimes taxes were straightforward attempts to prohibit the carrying of weapons without saying so explicitly. This approach was practiced in Florida during its territorial phase and remained a policy option for much of the nineteenth century.[66] In 1835, the territorial government enacted a public carry law with a steep fine of $50 to $500 for violations and an exemption for "carrying arms openly, outside of all their clothes."[67] Unsatisfied with the public carry law, leaders established a new series of prohibitive taxes designed to further reduce the presence of deadly weapons in public. This 1838 enactment held that anyone who chose "to vend dirks, pocket pistols, sword canes, or bowie knives" had to first pay an annual tax of $200, "and all persons carrying said weapons openly shall pay…a tax of ten dollars annually."[68] In 2023 dollars, the annual occupation tax would amount to approximately $6,300, and the annual open carry tax would amount to approximately $320.[69] In a sparsely populated, rural environment, these taxes were clearly designed to discourage trade in and public carry of deadly weapons. The architects of the statute saw it as intrinsically connected to the previously enacted concealed carry restriction—as a way of more effectively reducing the number of weapons carried in public spaces.[70]

Some southern states also placed annual taxes upon the owners of deadly weapons. Prior to the Civil War, taxation of property was the primary vehicle for states to raise revenue. In the

---

[65] For historical understandings of the taxing power, see Thomas M. Cooley, *A Treatise on the Law of Taxation: Including the Law of Local Assessments* (Chicago: Callaghan, 1876), 396; Ernst Freund, *The Police Power: Public Policy and Private Rights* (Chicago: University of Chicago Press, 1904), 33–34.

[66] In some ways, possession taxes came close to being carry taxes or even proto-licensing policies. Taxation as a form of public carry regulation was considered in Texas in 1866 as well as in Tennessee in 1893. See infra, n. 124; "Tennessee State News," *Bolivar Bulletin* (Bolivar, Tennessee) February 10, 1893, 1. https://chroniclingamerica.loc.gov/lccn/sn89058007/1893-02-10/ed-1/seq-1/.

[67] John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources. *See supra*, n. 53, n. 57.

[68] 1838 Fla., ch. 24This tax is not included within the Duke Repository, indicating that that database captures only a portion of the occupation and personal taxes in force, even at the state/territorial level, during the nineteenth century. More research remains to be done on the subject.

[69] The amounts reach $319.14 and $6,382.73. *See:* https://www.in2013dollars.com/us/inflation/1838?amount=200.

[70] The title of the 1838 tax was "An Act in addition to An Act, (approved January 30, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly." *See supra*, n. 68.

South, taxes upon slave property made up the lion's share of contributions, with other ad valorem taxes or poll taxes making up the difference.[71] Real property exceeding certain thresholds would be taxed, "intangible" property like investments were taxed, and moveable property (especially luxury goods or items associated with vices) could be taxed at standard rates as well.[72] Bowie knives, dirks, and pistols sometimes made their way into the lists of taxable items.[73]

A North Carolina revenue measure from 1850 provides an example of moveable property taxes in the antebellum South. The law spanned nine pages and included nineteen sections spelling out which forms of property could be taxed, at what rates, how they were to be paid, the manner in which tax information should be reported, and the penalties for failure to comply with the law.[74] Section 5 provided for ad valorem taxes upon "plate, jewelry, vehicles, &c.," a category that included items like buggies, pianofortes, watches, billiard tables, and playing cards alongside pistols and bowie knives.[75] The items on the list were decidedly *not* necessities, and they included accoutrements associated with gambling, drinking, sumptuous living, and the reckless carrying of weapons—in other words, items associated with extravagance, vice, and irresponsibility.[76] The rate of tax upon pistols and knives was relatively high: $1 on all pistols ("except such as shall be used exclusively for mustering") and bowie knives, and $0.50 on all dirks and sword canes.[77] One dollar was the same rate of taxation as that for buggies and carriages valued at $100-200. The relatively high tax rate on knives and pistols seems to have prompted the addition of a proviso that

---

[71] Robin Einhorn, *American Taxation, American Slavery* (Chicago: University of Chicago Press, 2006); Peter Wallenstein, "Rich Man's War, Rich Man's Fight: Civil War and the Transformation of Public Finance in Georgia," *Journal of Southern History* 50, no. 1 (February 1984), 15–42.

[72] Brian Sawers, "The Poll Tax before Jim Crow," *American Journal of Legal History* 57, no. 2 (June 2017),175–78.

[73] For example, see 1850 NC, ch. 121; 1856 NC, ch. 34; 1866 NC ch. 21; Anderson Hutchinson, Code of Mississippi: Being an Analytical Compilation of the Public and General Statutes of the Territory and State, with Tabular References to the Local and Private Acts, from 1798 to 1848, Page 182, Image 182 (1848) available at The Making of Modern Law: Primary Sources. This is not an exhaustive list. Mississippi repealed its tax upon "Bowie-knives, Sword-canes and Dirk-knifes" during the first year of fighting the Civil War. 1861 Miss. Ch. 125.

[74] 1850 NC, ch. 121.

[75] *See id.* § 5.

[76] Law and policy scholars writing about taxation have historically understood the tax power as being invoked sometimes for the raising of revenue and at other times for the discouragement of problematic activities or behaviors. *See supra*, n. 65.

[77] There was an exception for these weapons that were "kept in shops and stores for sale." *See supra*, n. 75.

limited its scope to "only such pistols, bowie knives, dirks, and sword canes, as are used, worn or carried about the person of the owner."[78] In other words, a person wanting to avoid the tax upon these deadly weapons need only leave them at home rather than carry them habitually. This North Carolina tax was not necessarily prohibitive, but it certainly incentivized public disarmament through potential tax savings. In this way, the 1850 North Carolina possession tax functioned much like the 1835 Florida open carry tax in its purpose of discouraging the public carry of deadly weapons.

Local governments also pursued occupation taxes and licensing requirements for certain business enterprises, which often included dealers in firearms and owners of shooting galleries. Charters issued by state governments bestowed upon American city governments immense power over the lives and economies of their residents. City leaders often taxed shooting galleries along with other venues of entertainment, and sometimes they taxed dealers in firearms.[79]

## C.   Sales Restrictions

In the antebellum nineteenth century, some states enacted restrictions that applied to the point of sale. These laws held dealers accountable to refuse service to persons under a state-specified age and to refuse to sell certain types of deadly weapons. Statutes focusing on the point of sale became an increasingly important mode of regulating firearms and deadly weapons as the century wore on, and indeed they are fundamental to the regulation of firearms even today.

---

[78] *Id.*

[79] The Duke Repository of Historical Gun Laws identifies more than one hundred "taxation/registration" laws across the colonial period to 1930. There are doubtless many more that have not been captured in the database, as evidenced by the personal taxes upon weapons identified by Dave Kopel in his article on bowie knife statues that do not appear in the Repository. Dave Kopel, "Bowie Knife Statutes," *The Volokh Conspiracy* (November 20, 2022), https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/. My conclusions about antebellum weapon taxes, therefore, are likely to be refined in future when scholars have done more research into the subject. Some example regulations from the Repository include: Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 149–50, Image 149–150 (1856) available at The Making of Modern Law: Primary Sources (taxing shooting batteries within the city); 1851 R.I. Pub. Laws 9, An Act In Amendment Of An Act Entitled An Act Relating To Theatrical Exhibitions And Places Of Amusement §§ 1, 2 (levying an annual tax of no more than $200 on anyone owning rifle galleries or pistol galleries in the city); John W.A. Sanford, The Code of the City of Montgomery, Prepared in Pursuance of an Order of the City Council of Montgomery Page 7–9, Image 12 (1861) available at The Making of Modern Law: Primary Sources (levying an annual tax of unspecified value upon pistol galleries within the city).

The movement to restrict the sale of deadly weapons to minors accelerated in the late nineteenth century, but it began in earlier decades. The age of legal majority has historically been twenty-one years, and any male under that age was considered an "infant" by law and subject to his father or guardian.[80] In 1836, Alabama declared it unlawful to "sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol." Violators, including dealers in dry goods, weapons, and hardware, were fined anywhere from $300 to $1,000, which amounts to approximately $10,000 to $35,000 in 2023 dollars.[81] The same year, Tennessee adopted a similar measure that prohibited selling, loaning, or giving to "any minor" a "pistol, bowie-knife, dirk, or Arkansas tooth-pick, or hunter's knife." The minimum fine was dramatically lower—only $25, or about $800 today—and there was a proviso allowing the sale, loan, and gift of hunting firearms to minors.[82] The town of Harrodsburg, Kentucky, also adopted a minors law during the antebellum era. It prohibited "any person, other than the parent or guardian" to "sell, give, or loan, any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro." The penalty was a fine of $50, or about $1,800 today.[83]

---

[80] Saul Cornell, "'Infants' Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record," *Yale Law and Policy Review: Inter Alia*, October 26, 2021, https://ylpr.yale.edu/inter_alia/infants-and-arms-bearing-era-second-amendment-making-sense-historical-record. The rules for women were quite different, with them never achieving the kind of legal emancipation that men obtained at age twenty-one. According to the law of coverture, unmarried women fell under the authority of their fathers or guardians, and married women fell under the authority of their husbands. *See* Linda K. Kerber, *No Constitutional Right to Be Ladies: Women and the Obligations of Citizenship* (New York: Farrar, Straus & Giroux, 1999).

[81] 1856 Alabama ch.26, "An Act to amend the criminal law," 17. The current value of $300 in 1856 is $10,653.04, and $1,000 is $35,510.12. *See* https://www.in2013dollars.com/us/inflation/1856?amount=300 and https://www.in2013dollars.com/us/inflation/1856?amount=1000.

[82] 1856 Tennessee ch.81, "An Act to amend the Criminal Laws of this State," 92 § 2. The Tennessee fine of $25 (1856) amounts to $887.75 in 2023 dollars. *See* https://www.in2013dollars.com/us/inflation/1856?amount=25.

[83] 1859 Kentucky ch.33, "An Act to amend an act, entitled 'An act to reduce into one the several acts in relation to the town of Harrodsburg," 245 § 23. The text of this local law underscores the degree to which "deadly weapons" like knives and pistols were associated with concealment and concealed carry. If the popular interpretation of concealed carry laws (that they de facto protected open carry) were applied to this particular statute, it would be read to prohibit only the sale of weapons intended for concealed carry on the part of minors, slaves, and free Blacks while implicitly protecting the sale of weapons to be openly carried by them. Of course, that is not what the statute meant. Its purpose was to prohibit the sale to minors, slaves, and free Blacks the kinds of deadly weapons that were designed for and conducive to being carried concealed. The $50 fine from 1859 would amount to $1,818.29 in 2023 dollars. *See* https://www.in2013dollars.com/us/inflation/1859?amount=50

Antebellum lawmakers also restricted the sale of certain problematic weapons. As bowie knives, pocket pistols, and other deadly weapons were becoming more popular and more prevalent, Tennessee and Georgia prohibited their sale. In 1837, Georgia passed a statute combining a public carry law with a sales restriction. It was unlawful "for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence."[84] The statute further held that "pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used, as horseman's pistols."[85] The following year (1838), Tennessee lawmakers did much the same with an updated public carry law that included a section prohibiting "any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person" to sell "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or knives, or Arkansas tooth pick."[86] In 1849, Vermont lawmakers prohibited the manufacture and sale of slung shots, which were makeshift weapons associated with organized crime and street gangs.[87] New York did the same.[88] Kentucky lawmakers enacted a law that prohibited "vending, buying, selling, or dealing in the weapons popularly known as colts, brass knuckles, slung-shots, or any imitation or substitute therefor,"—essentially adopting the policies all these states into one catch-all statute.[89]

---

[84] Ga. 1837 ch. 90; https://dlg.usg.edu/record/dlg_zlgl_16741934#text.

[85] *Id.*

[86] Tenn. 1838 ch. 137. This law was temporarily suspended during part of the Civil War. *See* Tenn. 1862 ch. 23.

[87] 1849 Vermont ch.36, 26 § 1. Slung shots were not like slingshots as we understand the term today. The *Oxford English Dictionary* identifies this as a nineteenth-century American phrase referring to "a shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon."

[88] Hiram Denio, et al., *Revised Statutes of the State of New York* (Albany: Gould, Banks, & Co., 1852), Part IV, Title 6, "Misdemeanors," 880 § 52. The code section cites 1849 New York ch. 278.

[89] Kentucky 1855 ch.636, 96 § 1.

These sales restrictions were not challenged in the antebellum era the way that public carry laws sometimes were.[90] The public carry portion of the Georgia statute was challenged in 1844, when a man named Hawkins Nunn appealed his conviction. Nunn had been seen carrying a pistol (not a horseman's pistol) openly in his hand, and a grand jury issued a presentment against him. The Georgia Supreme Court ultimately struck down the portions of the law in question that prohibited keeping and openly carrying certain kinds of weapons and criticized the poor construction of the statute. But the decision in the case did not actually address the constitutionality of the sales restriction.[91] The *Nunn* decision, far from a full-throated defense of limitless gun rights, in fact reiterated states' authority to prohibit the concealed carrying of deadly weapons in the name of public safety and set no precedent regarding weapon-specific sales bans.

## VIII.   THE CIVIL WAR AS A NATIONAL TURNING POINT

The American Civil War was a time of violence, turmoil, and political instability. It coincided with the United States's divergence from the rest of the Western world in terms of homicide rates. When the nations of Western Europe were becoming less violent and homicidal, Americans were becoming more so. The most severe violence occurred in the former Confederate States, where military defeat, emancipation, and reconstruction inflamed white supremacism and set the stage for racist paramilitaries, lynchings, and widespread electoral fraud. Even northern and midwestern areas that had previously been relatively peaceful saw more murders and violent assaults during the era of the war than earlier in the century. A lack of faith in governing institutions and a failure to become a cohesive citizenry drove both the war itself and the coinciding

---

[90] Some southern appellate courts weighed the constitutionality of public carry laws in light of their view of the Second Amendment and particularly in light of their state analogues. The regional understanding that emerged was that legislatures could prohibit the concealed carrying of deadly weapons, but not the open carrying of them. This understanding coexisted with a general disdain for the habitual carrying of weapons in public spaces, and was likely a way of protecting the open carrying of deadly weapons at times of emergency rather than carte blanche to carry openly at all times. Eric Ruben and Saul A. Cornell, "Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," *Yale Law Journal Forum* (Summer 2015), 121–35. For more on the distinction between open and concealed carry, see *supra*, pp. 21–24.
[91] *Nunn v. State*, 1 Ga. 243 (1846).

bloodshed.[92] The proliferation of revolvers during the same time period exacerbated these problems, rendering armed encounters even more deadly than they had been before.

By the Civil War, Samuel Colt had finally achieved the kind of commercial success that he had been working toward since the 1830s. Beginning in 1848, his company began receiving military contracts to outfit mounted units (like dragoons and cavalry) with repeating horse pistols, and War Department patronage grew exponentially during the war. In the 1850s and 1860s Colt's company finally received an opportunity to produce repeating rifles and carbines based upon the same revolver design. Nearly 14,000 such weapons were produced, though other repeater designs proved to be more reliable and ultimately overshadowed revolving rifles.[93]

Colt's revolver design had a much more significant impact upon pistols, and during the Civil War the company sold tens of thousands of them to the United States military.[94] Other manufacturers produced imitation Colts as well as revolvers of their own design, which dramatically increased the number available for provision to armed forces.[95] Southern states had already begun stockpiling arms ahead of the 1861 attack on Fort Sumter, and many southerners themselves owned pistols prior to the conflict. Confederate states and southern entrepreneurs tried to produce firearms, including pistols, for use in the war, but their productive capacity was outstripped by that of the United States forces.[96] When considered in conjunction with the greater availability of pistols and revolvers in the wider consumer market, it is clear that many Civil War soldiers on both sides of the conflict likely had access to handguns as either military issue or personal weapons. The question of how long they carried those pistols during the war itself is more

---

[92] On homicide in American history, particularly as broken down into northern and southern regions, see Roth, *American Homicide*, 297–326, 386–388 (for trends in northern areas); 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); 184 (complicating data from pp. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

[93] Approximately 13,700 Colt revolving rifles and carbines were produced for the United States military during the Civil War. The gun "had a distressing tendency to discharge all of its cylinders at once, which led to some horrific injuries to their users, and they were gladly handed in when the Sharps were introduced in 1862." *See* Graham Smith, *Warman's Civil War Weapons* (Iola, WI: KP Books, 2005), 205.

[94] On Colt revolvers used during the Civil War, see Smith, *Warman's Civil War Weapons*, 23–40. More than half of the approximately 200,000 Colt 1860 New Model Army revolvers produced between 1860 and 1873 were purchased by the United States military—at least 127,156 of the 200,500 total (*see* p.27).

[95] *See* Smith, *Warman's Civil War Weapons*, 46, 51.

[96] On the stockpiling of arms by southern states, see Rasenberger, *Revolver*, 374–375.

challenging to pin down; some officers forced their men to turn them over, and others discarded them as unnecessary weight on long marches.[97]

At the close of the Civil War, gun-makers like Colt, Smith & Wesson, and Remington had achieved a tremendous capacity to manufacture firearms in staggering numbers. Some of their factories were producing thousands of guns per month.[98] But when the armies stopped fighting, their chief buyer—the United States military—no longer needed such a large supply. Manufacturers turned to the civilian market, promoting revolvers to potential buyers across the country. They marketed pocket pistols heavily. For instance, Colt's produced both a "ladies' model" as well as a "house" pistol—though the latter became more widely known as a "Fisk" for its use in the infamous murder of the robber baron Jim Fisk in 1872.[99] The explosion in production was all the more pronounced by the entry of imitation brands that used lower quality metals with less sophisticated workmanship to sell pocket pistols at much lower prices than the competition.[100] These cheap revolvers could be had for a few dollars, with used ones selling for even less.

In the post-Civil War period, the structural forces driving Americans to be more violent and homicidal did not go away. Northern states experienced brief reduction in homicide rates immediately following their victory (inspired largely by renewed faith in the American experiment), but socio-economic forces subsequently turned the tide once again toward instability, violence, and homicide. Industrialization, class stratification, urban living conditions, labor unrest, and ethnic division all combined to make American cities and manufacturing centers more

---

[97] On pistols and other arms issued during the Civil War in addition to *Warman's Civil War Weapons*, see Katelyn Brown, "Armed to the Teeth," *Military Images* 33, no. 4 (Autumn 2015), 32-36; Joseph G. Bilby, *Civil War Firearms: Their Historical Background and Tactical Use* (Conshohcken, PA: Combined Books, 1996); Jack Coggins, *Arms and Equipment of the Civil War* (New York: Fairfax Press, 1982); *Arms and Equipment of the Union* (Alexandria, VA: Time-Life Books, 1999); Ken Bauman, *Arming the Suckers: A Compilation of Illinois Civil War Weapons* (Dayton, OH: Morningside House, 1989).

[98] Bridesburg, a smaller company, produced 5,000 muskets per month during a part of the war. *See* Smith, *Warman's Civil War Weapons*, 128–29. On firearms and revolvers as critical to industrialization and the American System of Manufacture, see Rasenberger, *Revolver*, 113–15, 287–88.

[99] For example, *see The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It* (1875), 23 (referring to pocket pistols, including "the house pistol brought out some years ago by the Colt Arms Company, and rendered famous by the fact that it was the pistol used by [Edward] Stokes in the murder of Fisk").

[100] *See supra*, n. 29.

dangerous places than in the antebellum era. Poverty begat crime, and the ease with which the criminally inclined could acquire pocket pistols led to more armed robberies and armed assaults.[101] North and South, pocket revolvers became the preferred weapon for revenge killings, particularly those carried out by spurned lovers and cuckolded husbands.[102] In the southern states, rates of violence and homicide remained high throughout the Reconstruction and the Jim Crow eras.[103] "Difficulties" such as shootouts at bars still erupted on a regular basis due to the persistence of manly honor culture as well as flippant and habitual pistol-toting while under the influence of alcohol.

The introduction of pocket revolvers into these political, racial, personal, and criminal conflicts was profound. The causes and kinds of violence were largely the same—racism, classism, desperation, manly honor, etc.—but the ease with which pocket pistols could be acquired made these conflicts more likely to be *armed* conflicts. Low prices, easy access, and pocket sizes also acted to encourage men to carry a revolver (often contrary to law) even when they had not done so previously; having it about one's person was a great temptation to use it in a moment of anger, which ruined the lives of the combatants as well as their families.[104] The situation had a significant impact upon the justice system by forcing jurists, lawmakers, and even jurors to reevaluate the law of self-defense and the "heat of passion" defense.  Eventually, legal opinion coalesced around the idea that having deadly weapons upon one's person "raises a presumption of guilt"[105] whether the carrier intended to use them in an assault or not.[106]

---

[101] Roth, *American Homicide*, 386–88.

[102] Hendrick Hartog, "Lawyering, Husbands' Rights, and 'the Unwritten Law' in Nineteenth-Century America," *Journal of American History* 84, no. 1 (June 1997), 67–96.

[103] Roth, *American Homicide*, 386–88.

[104] *See* "The Deadly Revolver," *Stephenville Empire* (Stephenville, Texas) April 5, 1884, 2; reprinted from *Houston Post* (Houston, Texas) (That "the law of the land cannot afford to make the distinction" between "a murderer with a malice aforethought, and a homicide, whose hand in an unguarded moment pulls the trigger and discharges the contents of a deadly weapon into an adversary, even before the nature of the act is realized.").

[105] *State v. Reams* 121 N.C. 556 ("The offence of carrying a concealed weapon about one's person and off his own premises consists in the guilty intent to carry it concealed and not upon the intent to use it; and the possession of the weapon raises the presumption of guilt, which presumption may be rebutted by the defendant.").

[106] Some legal guidebooks asserted that intent or motive for carrying deadly weapons was immaterial, while other commentators advocated inferring malicious intent from the act of carrying weapons in much the same way that carrying lockpicks and other tools of burglary were evidence of intent to burglarize. See "Concealed Weapons," *Criminal Law Magazine and Reporter* 8, no. 4 (October 1886), 412; "Entirely Too Many Revolvers," *Albany News*

The post-Civil War period became the country's first experience with rampant gun violence, leading Americans to discourage the carrying and use of guns through state and local regulations. A rallying cry beginning in 1879 was, "The revolver must go!"[107] Denunciations of carrying deadly weapons were widespread, with critics comparing the practice to "barbarism" and evil intent.[108] Commentators opposed the idea of preemptively arming oneself—the "vicious custom of going armed so as to be 'ready for an emergency'."[109] In the words of a Georgia resident: "The habitual carrying of deadly weapons on the ground of self-defense in a peaceful and enlightened community of the nineteenth century is simply nonsense. The thousands who do not choose to load themselves down with weapons need protection on the other hand from the few who are at once a terror, a disgrace and a nuisance to the community."[110] To the retort that the right to bear arms protected such behavior, the response was that "it is certain that in no sense was that provision [the Second Amendment] intended to authorize a wanton disregard of the sacredness of human life and defiance of the laws and peacefulness of an orderly and well-disposed community," and that "such a construction of the necessary right to bear arms in defense of home and country should not be tolerated."[111]

---

(Albany, Texas), August 22, 1884, 5 ("The man who, while drunk, shoots and kills another may not be hanged, because he was not competent to premeditate. He was, however, competent to premeditate against all mankind when he armed in sober moment with a weapon which could be intended for no other purpose than to kill or seriously injure."); "Toy Pistols and Concealed Weapons," *The Sun* (Baltimore, Maryland), July 19, 1881, 2 ("but the mayor contends that any man carrying a concealed deadly weapon in Philadelphia 'carries it for a purpose not self-defense'."); "War on the Pistol," *Philadelphia Enquirer* (Philadelphia, Pennsylvania), July 25, 1881, 2 (Mayor's proclamation stating, "Whosoever carries *concealed* deadly weapons carries also the *concealed* thought of murder.").

[107] See "The Revolver Must Go," *Clarksville Weekly Chronicle* (Clarksville, Tennessee) May 24, 1884, 1 (reprinted from *Gainesville Register*, Gainesville, Texas). https://chroniclingamerica.loc.gov/lccn/sn88061082/1884-05-24/ed-1/seq-1/; "Personals," *Chicago Daily Tribune* (Chicago, Illinois) March 29, 1879, 5 (mocking the movement developing in the South by saying, "Southern papers say the revolver must go—go off?"). https://chroniclingamerica.loc.gov/lccn/sn84031492/1879-03-29/ed-1/seq-5/; "Current Opinion," *Rocky Mountain News* (Denver, Colorado) March 26, 1879 ("If the west and south would rally around the sentiment, 'The revolver must go,' it would be one more step n the interests of civilization.").

[108] For example, *see* "A Remnant of Barbarism," *The Sun* (Baltimore, Maryland) March 22, 1879, 2; "Carrying Deadly Weapons," *The Independent* (New York, New York), August 18, 1881, 17, ("The man who arms himself with a concealed weapon and carries it with him as he mingles with others assumes a quasi-belligerent position toward human society. He prepares himself for a combat beforehand.").

[109] "Carrying Deadly Weapons," *Washington Post* (Washington, D.C.) January 20, 1887, 2.

[110] "Carrying Deadly Weapons," *Daily Constitution* (Atlanta, Georgia) February 13, 1879, 2. The author associates weapon carrying with barbarism saying, "Let the cowardly barbaric practice be stamped out."

[111] "A Remnant of Barbarism," *The Sun* (Baltimore, Maryland) March 22, 1879, 2. This writer also stated that: "It is simply inexcusable for men in civilized communities, and where they have police authorities, courts and

IX.    POST-CIVIL WAR REGULATORY RESPONSES

Americans found themselves in a situation where the same structural forces that produced high levels of violence and easy access to pocket pistols made altercations more deadly than they would have been otherwise. Rather than do nothing or throw up their hands as unable to stem the bloody tide, Americans committed to harnessing the police power to regulate deadly weapons. They built upon the antebellum policies and approaches that had worked in the past, and they also implemented new strategies that promised to more effectively accomplish the goals of previous deadly weapon regulations.

A.    Protecting the Public: Public Carry & Sensitive Place Restrictions

A first step against rising gun violence in the United States was to enact or strengthen public carry laws. Jurisdictions that did not already have such laws began enacting them, and those using the older mechanism of sureties to keep the peace often transitioned toward the implementation of criminal statutes mandating fines and/or jail time for violators.[112] The closing third of the nineteenth century saw a flurry of this activity as states and municipalities tried new penalties, added new weapons to the lists of prohibited weapons, and generally attempted to eliminate small, easily concealable weapons from the public sphere.[113] By the turn of the twentieth century, no fewer than sixteen more states and territories had enacted public carry laws—in other

---

juries, and intercourse with newspapers and railroads and telegraphs . . . to wear pistols or bowie-knives as part of their daily raiment."

[112] The Repository of Historical Gun Laws, a database maintained by the Duke Center for Firearms Law, reflects that American state and local governments enacted statutes and ordinances specifically relating to "carrying weapons" in large numbers during the period from the close of the Civil War in 1865 through the end of the nineteenth century. *See* https://firearmslaw.duke.edu/repository/search-the-repository/.

[113] In the second half of the nineteenth century, items like metal knuckles and razor blades became targets for proscription alongside bowie knives, pistols, and sword canes. For example, see 1883 Ariz., ch. 36 ("dirk, dirk-knife, bowie-knife, slung-shot, brass-knuckles, or pistol . . ."); 1882 W. V., ch. 85 ("revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of the like kind or character . . ."); 1871 Tex., ch. 34 ("any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense . . ."; 1886 Mar., ch. 375 ("any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted) . . ."); 1873 Penn., ch. 810 ("any pistol, dirk-knife, slung-shot or deadly weapon . . ."); 1879 N. C., ch. 127 ("any pistol, bowie-knife, dirk, dagger, slung-shot, loaded cane, brass, iron or metallic knuckles, or other deadly weapon of like kind . . ."); 1866 N. Y., ch. 716 ("any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword cane or air gun . . ."). This is not an exhaustive list.

words, at least 35 of the 50 states and territories (including the District of Columbia) in existence as of 1899 had public carry laws.[114] Hawaii, which became a territory in 1900, had enforced public carry regulations since 1852.[115] Those states which did not have public carry laws generally had local ordinances on the subject in the larger towns or had other statutes pertaining to carrying weapons with intent to assault, burglarize, etc.[116]

Americans in the post-Civil War period also protected public spaces by writing expansive statutes to protect large gatherings and assemblies. Statutes disarming certain sensitive places date to the colonial era and were already longstanding by the 1870s, but the escalating gun violence prompted an overt expansion of that policy to meet the needs of the day. Where historical laws had protected polling places and court buildings (which were the major occasions for public gatherings in rural early America—not just sites of government activity), updated laws added theaters, open-air presentations, and even private parties to the assemblies protected through disarmament. In 1869, Tennessee lawmakers prohibited the carrying of deadly weapons

---

[114] *See supra*, pp. 17–24 and corresponding citations; 1862 Colorado ch. 4, "An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of this Territory," 56; 1863 California ch. 485, "An Act to prohibit the Carrying of Concealed Weapons," 748-749; 1864 Montana ch. 43, "An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of this Territory," 355; 1864 Dakota Territory *Penal Code* § 455; 1871 Texas ch. 34, "An Act to Regulate the Keeping and Bearing of Deadly Weapons," 25–27; Harvey B. Hurd, editor, *Revised Statutes of the State of Illinois* (Springfield: Illinois Journal Co., 1874), ch. 38 § 56, "Disturbing the Peace"; 1878 Mississippi ch. 46, "An Act to prevent the carrying of concealed weapons, and for other purposes," 175–76; Guy A. Brown, compiler, *Compiled Statutes of the State of Nebraska* (Omaha: Gibson, Miller & Richardson, 1881), ch. 5, "Offenses Against Public Peace and Justice," § 25; Washington (State), *Code of Washington* (Olympia: C. B. Bagley, 1881), 181 § 929; 1882 West Virginia ch. 110, 317 § 8; 1883 Missouri 76; 1888 Idaho "An Act Regulating the Use and Carrying of Deadly Weapons in Idaho Territory," 23; 1889 Arizona ch. 13, "An Act Defining and Punishing Certain Offenses Against the Public Peace," 30–31; 1890 Oklahoma "Crimes and Punishment," ch. 25, Art. 38, "Of Crimes Against the Public Health and Safety," 476 § 20; "To Punish the Carrying or Selling of Deadly or Dangerous Weapons within the District of Columbia, and for other Purposes," ch. 159, 52 Congress, Public Law 52–159, 27 Stat. 116 (1892), 116-117; *Revised Codes of the State of North Dakota* (Bismarck: Tribune Co., 1895), "Penal Code: Public Health and Safety," 1293 § 7313; Fred F. Barker, *Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867 to March 3, 1905* (Washington, D.C.: U.S. Gov. Print. Off., 1906), "Appendix A.," ch. 6, "Offenses Against the Public Peace," 139–140 § 118.

[115] "An Act to Prevent the Carrying of Deadly Weapons," *Hawaii: Kingdom of Kamehameha*, III-V, Regular Sessions (1852), 19.

[116] Jersey City, New Jersey had local public carry and registration laws, illustrating the approach of using ordinances in the larger cities of states without a public carry statute. See *Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871* (1874), 41, 86–87. California also pursued what was essentially a local option for license-to-carry programs. See infra, pp. 47–48 and corresponding citations. New York used the approach of penalizing being in possession of certain weapons with intent to commit a crime. See John W. Edmonds, editor, *Statutes at Large of the State of New York* (Albany: Weed, Parsons & Company, 1874), ch. 716, "An Act to prevent the furtive possession and use of slung-shot and other dangerous weapons," 810–811.

"concealed or otherwise" at elections or "any fair, race course, or other public assembly of the people."[117] Similarly in 1870, Georgia lawmakers prohibited the carrying of deadly weapons "to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds."[118] A law from Texas prohibited all deadly weapons, including "fire-arms, wither known as a six shooter, gun or pistol of any kind" at a host of events ranging from churches to polling places "or other social gathering composed of ladies and gentlemen."[119] Laws in effect in Missouri in 1879 and Oklahoma Territory in 1890 were nearly identical to it.[120] Vermont and Mississippi both prohibited weapons inside schools, with the Mississippi legislature prohibiting students at colleges from possessing deadly weapons on campuses or within two miles of them (effectively disarming college students within the limits of college towns).[121] Other laws prohibited the carrying of weapons within the general vicinity of polling places, churches, and parks.[122]

---

[117] Ch. 22, 1869 Tenn. Pub. Acts 23[22] (36th Assembly, 1st Sess.), "An Act to Amend the Criminal Laws of the State," § 2 (Ex. M). The section read in full: "That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon." The following section (§ 3) stated: "That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court."

[118] Act No. 285, 1870 Ga. Laws 421 (Ex. N). The list of prohibited weapons included "any dirk bowie-knife, pistol or revolver, or any kind of deadly weapon." There was also no implicit or explicit exception for open carry. Violators convicted received a fine ($20–50), imprisonment (10–20 days), or both.

[119] 1870 Tex. Gen. Laws 63, ch. 46 § 1.

[120] *Revised Statutes of the State of Missouri* (1879), ch.24 § 1274; 1890 Okla. Stat. 495–96.

[121] *Annotated Code of the General Statute Laws of the State of Mississippi* (1892), "Crimes and Misdemeanors," § 1030. "A student at any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought, received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both." *Laws of Vermont*, Special Session (1891), No. 85 § 2. "A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars." It is worth noting that disarmament laws and policies had been in effect at both public and private colleges long before this time. For example, *see* The Minutes of the Senatus Academicus of the State of Georgia, 1799–1842, at 86 (1810); University of Virginia Board of Visitors Minutes, 6–7 (October 4–5, 1824); Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina, Laws for the Government of the University, at 15 Chapter V (1838). This is not an exhaustive list.

[122] 1870 La. Acts 159–60, "An Act to Regulate the Conduct and to Maintain the Freedom of Party Election," § 73 (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); George Washington Paschal, *A Digest of the Laws of Texas*, 3rd ed. (1873) II: 1317–1318 (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days

B.      **Taxation**

By the post-Civil War period, taxation policies generally focused upon occupation or other dealer taxes rather than taxes upon personal use or possession of deadly weapons as some states had done in the antebellum era. Alabama was one exception, where taxes of $2 and $3 on pistols, revolvers, and bowie knives "in the possession of private persons not regular dealers" was in effect as of 1867.[123] Georgia lawmakers enacted a firearms possession tax in 1866, and their counterparts elsewhere considered similar measures. Still, taxation as a form of regulation came to be applied to the point of sale rather than fall upon the weapon owner.[124]

Occupation taxes and sales taxes were one method employed by postbellum lawmakers. For instance, an occupation tax in Alabama applied to "dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not." The dealer had to pay an annual licensing fee of $300 in order to legally conduct business, which amounts to nearly $10,000 today.[125] In 1894, Georgia enacted a new occupation tax law that applied to "dealers in pistols and other weapons." A dealer in "pistols, toy pistols shooting cartridges, pistol or rifle cartridges, dirks,

---

of voter registration); John Prentiss Poe, *The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888* (Vol. 2, 1888), 1457 (no carry by any person in Kent County on days of an election); 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, ch. 189 § 1 (no carry by any person in Calvert County within 300 yards of polls on election day); 1877 Va. Acts 305, Offenses Against The Peace § 21 (no weapons in church during services, or anywhere beyond one's on premises on Sundays); Oscar F. Greene, *Revised Ordinances of the City of Boulder* (1899), 157 (no one save city police officers shall carry weapons into public parks).

[123] *Revised Code of Alabama* (1867), 169, "Taxation," § 10. This citation is drawn from the Duke Repository of Historical Gun Laws. It remains unclear when the tax went into effect and when it was removed, but it was part of the code in 1867. The tax was assessed at $2 for pistols and revolvers and $3 for bowie knives and "or knives of the like description." These taxes amount to $40.79 and $61.18 in 2023 dollars . *See* https://www.in2013dollars.com/us/inflation/1867?amount=2 and https://www.in2013dollars.com/us/inflation/1867?amount=3.

[124] 1866 Georgia 27-28 § 3–4 (assessing a tax of $1 for each "gun or pistol, musket or rifle over the number of three kept or owned on any plantation" in select counties.). Texas lawmakers, also acting during Presidential Reconstruction, considered a public carry tax but could not agree on the details. Brennan Gardner Rivas, "An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900," *Southwestern Historical Quarterly* 121, no. 3 (January 2018), 290.

[125] *See* 1892 Alabama ch. 95, 183; and Robert C. Brickwell, et al, *Code of Alabama, Adopted by Act of the General Assembly Approved February 28, 1887* (Nashville: Marshall & Bruce, 1887), ch. 9, Art. I § 629. The $300 licensing fee was in effect some time prior to 1887, and an 1892 amendment closed a loophole for dealers in "pistol cartridges." The subsequent Article specifies that all licenses expire annually; *see* ch. 9, Art. II § 634.

bowie-knives, or metal knucks" had to pay twenty-five dollars per place of business—which would be nearly $900 today.[126]

In the early twentieth century, members of the Texas legislature put in place a 50% tax on the gross receipts from the sale of pistols. All dealers had to report quarterly the number sold along with payment, which functioned as an occupation tax for them to remain in business.[127] The intention of the measure was to make pistols prohibitively expensive. Dealers and buyers found loopholes, which the lawmakers did not attempt to close. But a trade organization representing gun dealers opposed the law and challenged it in state court. A Texas appellate court upheld the stringent sales tax, describing the business of selling pistols as one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society." As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any one from engaging therein."[128]

## C.      Sales Restrictions

Sales restrictions enforced against dealers in deadly weapons grew significantly after the Civil War. Occupation and sales taxes were certainly part of that approach, but lawmakers enacted yet more statutes—building upon regulatory approaches employed in the antebellum era—which established a minimum age for purchase of deadly weapons, prohibited the sale of certain weapons, and required the registration of all pistol sales.

Between the Civil War and the turn of the twentieth century, no fewer than twenty-two states enacted age-based weapon restrictions. Two of those criminalized the carrying of deadly

---

[126] Acts of the General Assembly of the State of Georgia (1894) available online from the Digital Library of Georgia; *see* https://dlg.usg.edu/record/dlg_zlgl_75343012/fulltext.text and https://dlg.usg.edu/collection/dlg_zlgl?range%5Byear_facet%5D%5Bbegin%5D=1880&range%5Byear_facet%5D%5Bend%5D=1899&sort=year+desc. Also, there were likely many more occupation taxes, though they have not been comprehensively indexed as of yet. Twenty-five dollars in 1894 would be $874.53 in 2023 dollars. *See* https://www.in2013dollars.com/us/inflation/1894?amount=25

[127] 1907 Texas ch. 18, "An Act providing for the levy and collection of an occupation tax . . .[]" 485 § 12.

[128] *Caswell & Smith v. State*, 148 SW 1159 (Tex. App. 1912).

weapons by minors.[129] But the standard approach was for states to assess fines and other penalties upon the dealers who provided weapons to underage buyers.[130] Unlawful sales, gifts, or transfers of deadly weapons to minors were misdemeanors punishable by a fine (most of them ranging from $25 to $200). Some jurisdictions provided for jail time in lieu of or in addition to the fine.

Some states provided exceptions for minors that allowed parents or guardians to purchase deadly weapons on their behalf, and that permitted the sale of hunting firearms to minors. Illinois, Texas, and Missouri, for instance, barred selling or giving a whole host of deadly weapons to minors without the permission of a parent or guardian.[131] This entailed the presence of such a guardian or his agent at the place of purchase, or his written consent.[132] Maryland excepted hunting firearms from its age restriction, stating that no one, "be he or she licensed dealer or not," was permitted to "sell, barter or give away any firearm whatsoever or other deadly weapons, except shot gun, fowling pieces, and rifles, to any person who is a minor under the age of twenty-one

[129] Ariz. 1883 ch. 36 § 3 p. 66 "An Act Supplemental to and amendatory of an Act entitled 'An Act to prevent the improper use of deadly weapons, and the indiscriminate use of firearms in the towns and villages of the Territory," (Sec. 3: "Any person in this Territory over the age of ten and under the age of seventeen years, having or carrying, concealed or unconcealed,…shall, upon conviction thereof…be fined in any sum not more than fifty dollars, or be imprisoned in the County Jail not more than one month, or be punished by both such fine and imprisonment, in the discretion of the Court trying the case."); Nev. 1885 ch. 51 p. 51. ("Every person under the age of twenty-one (21) years who shall wear or carry…concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment.").

[130] Alab. 1856 ch. 26 p. 17; Tenn. 1856 ch. 81 p. 92 § 2; Ind. 1875 ch. 40 p. 59; Geo. 1876 ch. 128 p. 112; Miss. 1878 ch. 46 p. 175; Ohio 1880 S.B. 80 p. 79; Penn. 1881 ch. 124 p. 111; Dela. 1881 ch. 548 p. 716; Flor. 1881 ch. 3285 p. 87; Ill. 1881 "Criminal Code" § 2 p. 73; Mary. 1882 ch. 424 p. 656; W. V. 1882 ch. 135 § 7 p. 421; Kan. 1883 ch. 105 p. 159; MO 1883 p. 76 "An Act to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled 'Of Crimes and Criminal Procedure,'"; Wisc. 1883 ch. 329 p. 290; Iowa 1884 ch. 78 p. 86; Okla. 1890 ch. 25 art. 47 § 3 p. 496; Lou. 1890 ch. 46 p. 39; Va. 1890 ch. 152 p. 118; Wyo. 1890 ch. 73 § 97 p. 140; N. C. 1893 ch. 514 p. 468; Tex. 1897 ch. 154 p. 221.

[131] Ill. 1881 "Criminal Code" § 2 p. 73 ("Whoever, not being the father, guardian or employer of the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person . . ."); Tex. 1897 ch. 154 p. 221 ("if any person in this State shall knowingly sell, give, or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear, or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of some one standing in lieu thereof . . .") (of note, this regulation was one chapter away from a law preventing billiard owners from allowing minors inside without parental consent, indicating these laws were part of a broader effort to protect public safety by regulating the behavior of minors); MO 1883 p. 76 "An Act to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled 'Of Crimes and Criminal Procedure,'" ("If any person . . .shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon [any kind of fire arms, bowie knife, dirk, dagger, slung-shot or other deadly weapon], without the consent of the parent or guardian of such minor . . .").

[132] Id.

years."[133] In Georgia, the prohibition against selling, giving, lending, or furnishing deadly weapons to minors contained a proviso asserting that "nothing herein contained shall be construed as forbidding the furnishing of such weapons under circumstances justifying their use in defending life, limb or property."[134]

Another approach pursued by some states in the post-Civil War period was the prohibition of the sale of certain specified weapons. Tennessee and Georgia had enacted such restrictions in the antebellum period, and in the following decades Tennessee recommitted to the policy while some other states followed suit.

By the 1870s, Tennessee had long prohibited the sale of bowie knives and Arkansas toothpicks,[135] but in 1879 lawmakers strengthened their sales restriction by placing pistols within its purview.[136] The statute in question criminalized the sale of "belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol."[137] When a Tennessee merchant named Burgoyne challenged the law, the state supreme court decided that it was well within the police powers of the legislature to "put down the pernicious habit of going armed"[138] by declining to issue licenses to firearm dealers. When the justices considered whether the law deprived Burgoyne of his property rights, they determined that the state's allowance for licensed dealers to dispose of

---

[133] Mary. 1882 ch. 424 p. 656.

[134] Geo. 1876 ch. 128 p. 112.

[135] 1837-1838 Tennessee ch. 132, "An Act to suppress the sale and use of Bowie Knives and Arkansas Toothpicks in this State," 200-201 (supra, n. 86). There was a brief period in which the law was not enforced during the Civil War. Tennessee was the first Confederate state to be reconquered and begin the process of political reconstruction (in 1863), so it is likely that this wartime hiatus of enforcement lasted less than two years. Tenn. 1862 ch. 23.

[136] Between 1871 and 1879, Tennessee lawmakers made substantial changes to their state weapons policy, of which the 1879 sales restriction forms only a part. An 1870 statute prohibited "publicly or privately" carrying "a dirk, sword cane, Spanish stiletto, belt or pocket pistol or revolver." When the state supreme court struck the measure down as unconstitutional for prohibiting the open carrying of militia arms known as "repeaters" (referring to army-sized revolvers), lawmakers quickly added an exception for army/navy pistols carried "openly in his hands." In 1879, lawmakers prohibited the sale of "belt or pocket pistols, or revolvers, or any other kind f pistols, except army or navy pistols." See 1870 Tenn. 13, p. 28-29; 1871 Tenn. 90, p.81-82; *Andrews v. State*, 50 Tenn. 165 (1871); 1879 Tenn. 96 p.135-136.

[137] Tenn. 1879 ch. 96. (Sec. 1: "That it shall be a misdemeanor for any person to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away, or otherwise disposing of belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol; *Provided*, that this Act shall not be enforced against any person now having license to sell such articles until the expiration of such present license,"). The associated fine was $25 to $100 and imprisonment at the court's discretion.

[138] *State v. Burgoyne*, 75 Tenn. 173 (1881).

their stock prior to the expiration of their licenses was sufficient protection. In explaining that the harm posed by the traffic in pistols justified the sales restriction, the court quoted Thomas Cooley, one of the more influential legal scholars of the time. Cooley wrote that sometimes a tax "has not for its object the raising of revenue, but looks rather to the regulation of relative rights, privileges and duties, as between individuals, to the conservation of order in the political society, to the encouragement of industry, and the discouragement of pernicious employments."[139] The legislation was "being made in the exercise of that authority which is inherent in every sovereignty, to make all such rules and regulations as are needful to secure and preserve the public order, and to protect each individual in the enjoyment of his own rights and privileges by requiring the observance of rules of order, fairness and good neighborhood, by all around him."[140] The Tennessee justices summed up the concept by saying that "the private interests of the few must yield to the welfare of the many and good order in society."[141]

Arkansas lawmakers followed the pattern set by their peers in Tennessee by enacting a statute in 1881 that combined an updated public carry law with a similar sales restriction.[142] Not only did it prohibit carrying pistols, knives, swords, spears, metal knuckles, and razors, but also provided that anyone "who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to *any person*" said weapons also faced prosecution.[143] When the Arkansas law faced a constitutional challenge, it was also upheld by an appellate court.[144]

Vermont had prohibited the sale of slung shots in 1849, and continued to do so throughout the rest of the century.[145] Several other states followed suit, and some also banned the sale of metal knuckles, which were similarly associated with gang activity. By 1868, the sale and manufacture

---

[139] Thomas M. Cooley, *A Treatise on the Law of Taxation: Including the Law of Local Assessments* (Chicago: Callaghan, 1876), 396. *See* https://archive.org/details/atreatiseonlawt01coolgoog/page/896/mode/1up.

[140] *Id.*

[141] *Supra*, n. 138.

[142] Ark. 1881 ch. 96.

[143] *Id., see* especially § 2-3. It is worth noting that the Arkansas policy was almost identical to that of Tennessee in that the public carrying of deadly weapons was strictly illegal with the exception of army/navy pistols carried "uncovered" and in the hand.

[144] *Dabbs v. State*, 39 Ark. 353 (1882).

[145] *Vermont Statutes, 1894: Including the Public Acts of 1894* (Rutland, VT: Tuttle Co., 1894), Title 32, "Crimes and Offenses," ch. 212, "Offenses against the person," 879 § 4920.

of them was punishable by fine or jail time in Florida.[146] Illinois did the same in 1881[147], and so did Massachusetts in 1882,[148] Oklahoma Territory in 1890,[149] and Florida in 1893.[150] Manufacturing and selling a slung shot was a misdemeanor in the Dakota Territory, and using or attempting to use one was a felony.[151] That particular law remained in force in the state of North Dakota.[152]

Some jurisdictions also required firearm dealers to register and track their sales. The aforementioned Texas tax upon pistols functioned to some extent as a registry by tracking the quantity of pistol sales, but it did not mandate a registry of purchaser names or pistol types.[153] Illinois, however, adopted such a policy in 1881 by requiring every dealer to keep a register of all sales of deadly weapons—which included "any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person." The law went so far as to specify the form of the register and require the serial number of the weapon.[154] The District of Columbia had a similar registration requirement, which was approved by the United States Congress in 1892. Among other things, the law required all dealers in deadly weapons to be

---

[146] *Florida, 1st Session* (1868), "Laws of Florida," ch. 7, "Of Offenses against the Public Peace," 95 § 11. The law was reiterated in the subsequent penal code revision. *See* Allen H. Bush, *Digest of the Statute Law of Florida of General and Public Character, in Force up to the First Day of January, 1872* (Tallahassee: C. H. Walton, 1872), ch. 49, 253 § 12.

[147] *Illinois, 32nd General Assembly, 1st Session* (1881), "Criminal Code–Deadly Weapons: Regulates Traffic and Prevents Sale to Minors," 73 § 1.

[148] *Public Statutes of the Commonwealth of Massachusetts, Enacted November 19, 1881, to Take Effect February 1, 1882* (Boston: Wright & Potter, 1886), ch. 206, "Offenses against the Public Peace," 1164 § 11. (This appears to be a reiteration of a previously existing law in Massachusetts; citation is G. S. 164 § 11).

[149] *Oklahoma, 1st Regular Session*, (1890), ch. 25, "Crimes and Punishment," Art. 38, "Of Crimes against the Public Health and Safety," 475–76 § 18.

[150] 1893 Fla. 4124. Sec 1.

[151] *Revised Codes of the Territory of Dakota, Comprising the Codes and General Statutes Passed at the Twelfth Session of the Legislative Assembly* (1883), ch. 38, "Of Crimes against the Public Health and Safety," 684, § 455–56.

[152] *Revised Codes of the State of North Dakota* (Bismarck: Tribune Co., 1899), ch. 40, "Crimes against the Public Health and Safety," 1461 § 7311.

[153] *Supra*, n. 127.

[154] *Illinois, 32nd General Assembly, 1st Session* (1881), "Criminal Code–Deadly Weapons: Regulates Traffic and Prevents Sale to Minors," 73–74 § 2–3 (*supra*, n. 146). There was some critique of the law as insufficiently effective, at least in part due to the fact that dealers were not required to verify the identity of the buyer and some deadly weapons were not manufactured with serial numbers. See "Sale of Pistols," *Chicago Daily Tribune* (Chicago, Illinois), July 7, 1881, 8.

properly licensed, and to "keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon."[155]

**D.    Licensing**

As structural forces like industrialization and urbanization propelled the growth of more sophisticated governmental administration in the United States, gun policies evolved in ways that increased official oversight of weapon sales and carrying. The sales registries enumerated above placed special requirements on dealers, but their intention was to empower police and other officials to solve crimes by providing them with information.[156] In a similar way, licensing either for purchase of a pistol or for public carry of one grew out of American traditions of regulating deadly weapons.

One of the earliest proponents of licensing as a way of regulating the carrying of pistols was California. The state had enacted a public carry law that prohibited concealed deadly weapons, but residents grew frustrated that it did not seem to be effective. In 1866, members of the state legislature divided over what to do about the problem.[157] One camp proposed issuing licenses to people who needed a pistol for personal protection. The state did not adopt their proposal and instead repealed the public carry law. In the aftermath of that decision, California municipal governments began passing ordinances that provided for licensing in order to carry a pistol in public.[158] The policy proved popular, and by the turn of the twentieth century a majority of California residents lived in municipalities that had implemented a permitting process for the

---

[155] "To Punish the Carrying or Selling of Deadly or Dangerous Weapons within the District of Columbia, and for other Purposes," ch.159, 52 Congress, Public Law 52-159, 27 Stat. 116 (1892), 117 § 5 (*supra*, n. 114; *infra*, n. 159).

[156] The examples cited above (*supra*, n. 151, n. 152) included requirements that registries be open for the review of police and others.

[157] Theodore Henry Hittell, *The General Laws of the State of California, from 1850 to 1864, Inclusive* (1868), "An Act to prohibit the carrying of concealed weapons," 261 § 1–2. On frustration among the public, see "Concealed Weapons," *Morning Union* (Grass Valley, California), February 20, 1869 ("The object was to prevent indiscriminate shooting among a class about whose welfare there need not have been any extraordinary solicitude; but the result has been to place the law-abiding portion of the community at the mercy of night-prowlers, footpads, and garroters.").

[158] For example, *see* Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons, Apr. 24, 1876, reprinted in R. M. Clarken, editor, *Charter and Ordinances of the City of Sacramento* (1896), 173; Prohibiting the Carrying of Concealed Deadly Weapons, Sep. 17, 1880, reprinted in *General Orders of the Board of Supervisors Providing Regulations for the Government of the City and County of San Francisco* (1884), 8; "Concealed Weapons," *Napa Daily Register* (Napa, California), November 10, 1880, 2. This is not an exhaustive list.

public carry of concealed weapons.[159] Municipalities elsewhere during the nineteenth century implemented licensing policies: Jersey City, New Jersey did so in 1873 and the District of Columbia in 1892.[160]

In 1893, when Florida lawmakers had prohibited the sale and manufacture of slung shots and metal knuckles, they enacted another statute which created a licensing system for the public carrying of repeating rifles, and particularly Winchester lever-action rifles. County Commissioners could issue the licenses to applicants, and licensees were required to post a bond of $100, which amounts to approximately $3,300 today.[161] Winchester and repeating rifles were not generally included in deadly weapon regulations during the nineteenth century, but this statute indicates that when American communities desired to regulate their presence in public through licensing, such a policy was considered permissible.[162] The Florida licensing law treated Winchesters as unique firearms that posed a special danger to the community, and used licensing as a method for limiting the sale and possession of them.

## X.   DEVELOPMENT OF LARGE CAPACITY MAGAZINES

At the same time that the United States faced a crisis of gun violence—driven in large measure by the affordability and availability of pocket revolvers—developments in firearm technology also increased the lethality of rifles. Repeating rifles became commercially available for the first time during the Civil War Era, and the firing capability of long guns increased dramatically. These evolved from muzzle-loading, single-shot weapons to breech-loading repeaters. The most influential among American consumers was the lever-action rifle, which requires pulling a lever between rounds. Semiautomatic rifles and handguns were developed at the

---

[159] Saul Cornell, "The Right to Regulate Arms in the Era of the Fourteenth Amendment," *UC Davis Law Review Online* 55 (September 2021), 84.

[160] *Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871* (1874), "An Ordinance in Relation to the Carrying of Dangerous Weapons," § 3 (*supra*, n. 116); *supra*, n. 115 § 2.

[161] 1893 Fla. 4147.

[162] The Winchester rifle was a lever-action repeater that developed from the Henry rifle, which was used by some US Army soldiers during the Civil War. In 2023 dollars, $100 in 1893 amounts to $3,353.73. *See* https://www.in2013dollars.com/us/inflation/1893?amount=100. For more on the weapon, *see infra*, pp. 48–49.

turn of the twentieth century. As explained below, these firearms rarely featured magazine capacities at or above ten rounds.

## A.     Lever-Action & Semiautomatic Rifles

Even though repeating rifles date to approximately the mid-nineteenth century (with a few outliers predating even that time frame), the Henry rifle and Winchester rifles of the 1860s and 1870s were the first repeating rifles with a magazine capacity greater than ten which were produced in sufficient numbers to be readily available for purchase by Americans. Their lever-action design usually featured a fixed, tubular magazine that was loaded through a loading port on the side of the firearm. While there are a handful of examples of these fixed tubular magazines capable of holding more than ten cartridges during that time period, such as the famous Winchester Model 1873 Repeating Rifle,[163] between each shot the user had to engage the lever action to discharge the spent shell and load a fresh cartridge from the magazine into the chamber. And when all rounds had been expended, the user had to individually load cartridges back into the magazine by inserting them through the loading port.

In fact, as the nineteenth century drew to a close, newly designed lever-action rifles tended to be chambered for larger center-fire cartridges—which had the effect of reducing magazine capacity. Where the Henry and Winchester 1866 had been designed for 44-caliber rimfire cartridges, the Winchester 1873 was chambered for the 44-40 Winchester center-fire round.[164] It was slightly longer than the 44 Henry and 44 Rim Fire that the preceding models had used, but it was the beginning of a trend on Winchester's part to develop and produce rifles capable of firing stronger, larger center-fire cartridges.[165] The company was competing for sportsmen as consumers, and sportsmen were drawn to the single-shot rifles designed for large, heavy center-fire cartridges

---

[163] Thomas Henshaw, *The History of Winchester Firearms, 1866-1992* (Clinton, NJ: Winchester Press, 1993), 13-19.

[164] On these rifles, their magazines, and the associated cartridges, see Henshaw, *Winchester Firearms*, 6–8, 10-17; and Frank C. Barnes and Stan Skinner, *Cartridges of the World: A Complete and Illustrated Reference for over 1500 Cartridges* 11th ed. (Iola, WI: Gun Digest Books, 2009), 485, 96.

[165] Subsequent Winchester models, including the Winchester 1883 Hotchkiss Repeater, chambered for the newer 45-70 US Government cartridge, had a magazine in the butt stock that held 6 rounds; and the Winchester Model 1894 Repeating Rifle, chambered for various center-fire cartridges, had a maximum magazine capacity was only 8 rounds. *See* Henshaw, *Winchester Firearms*, 23–24, 41; and Barnes and Skinner, *Cartridges of the World*, 96–97

that were capable of taking down a large target (like deer, grizzlies, and buffalo) with one well-placed shot. For this reason, Winchester developed lever-action rifles for use with larger cartridges and even manufactured its first single-shot rifle in 1885.[166]

Around the turn of the twentieth century, John M. Browning began working on the design of semi-automatic firearms, which functioned through a "blowback" method in which "The recoil from the exploded cartridge ejects the empty shell, cocks the hammer, and throws a fresh cartridge into the chamber."[167] This design was sometimes referred to as "automatic," though its function aligns with our current definition of "semi-automatic"; it was also referred to as "auto-loading" or "self-loading." Winchester released its Model 1903 Automatic Rifle, which employed this method, and featured a 10-round, fixed, tubular magazine for .22 caliber cartridges. According to its product description, "…all that is necessary to do to shoot the ten cartridges that the magazine holds is to pull the trigger for each shot."[168] Winchester did not release a semi-automatic rifle featuring a detachable magazine until its Model 1905 Self-Loading Rifle, and that detachable box magazine held only five cartridges in a single column.[169] The subsequent semi-automatic model, called the Model 1907 Self-Loading Rifle, featured a 5-round detachable box magazine.

A major rival of Winchester was Marlin Firearms, a company that became a highly popular producer of lever-action rifles. Marlin did not begin manufacturing semi-automatic rifles until 1931 when the company (under new leadership) released the 22 Caliber Autoloading Rifle, also called the Model 50 / 50E.[170] It came with a six-round detachable clip magazine.[171]

As the twentieth century wore on, both Marlin and Winchester featured semi-automatic rifles as a part of their regular lineup of hunting firearms, though lever-action, pump action, and

---

[166] On Winchester Repeating Arms Co. designing guns in competition with other manufacturers' single-shot rifles, see Henshaw, *Winchester Firearms*, 25–29.
[167] "Model 1903," Catalogue No. 71 (June 1904), 60. Winchester Repeating Arms Company Catalogs 1904-1908, Rare Books, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.
[168] *Id.*
[169] Henshaw, *Winchester Firearms*, 61.
[170] William S. Brophy, *Marlin Firearms: A History of the Guns and the Company that Made Them* (Harrisburg, PA: Stackpole Books, 1989), 300–301.
[171] Brophy, *Marlin Firearms*, 301.

bolt action designs tended to be more popular.[172] The magazine capacities of their semi-automatic models with detachable magazines remained at or below 10 rounds with very few exceptions.[173] One of those few outliers was the Marlin Model 89C, released in 1948 and chambered for .22 caliber long rifle rounds. It was originally sold with a standard 7-shot clip magazine, but beginning in 1953, new models were sold with two 5-shot clip magazines. In 1957, that changed once again when standard magazines for new manufactures was a 12-shot clip magazine.[174] Marlin ceased production of the Model 89C in 1961, and for the next two decades or more, the company's standard magazine sizes tended to max out at 7 rounds.[175] The Model 89C and its short-lived magazine capacity of twelve rounds was an outlier in Marlin's sales and production catalog.

Even though Winchester produced semi-automatic rifles before Marlin, the company did not sell rifles with a standard clip magazine capacity over 10 rounds to civilians through at least 1996.[176] For a brief period in the 1970s (1974-1978), the company produced the Model 490 Repeating (Autoloading) 22 Rim Fire Rifle. These firearms came with a standard 5-round clip magazine and were shown with that magazine in Winchester catalogs; customers who wish to purchase magazines holding 10 or 15 rounds had to do so as accessories.[177] The dearth of Winchester company records makes it impossible to estimate how many of these accessory magazines were purchased, but it stands to reason that, had a standard capacity at or above ten been popular with consumers, Winchester likely would have sold at least some of their semiautomatic rifles that way.

Records relating to the production and advertisement of rifles manufactured by two of the most popular brands shows that even though detachable clip/box magazines have been in existence

---

[172] *See* the catalogs of Marlin Firearms and Winchester Repeating Arms Company for the 1950s through the 1990s. Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[173] *Id.*

[174] Brophy, *Marlin Firearms*, 306–307.

[175] Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[176] Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[177] Henshaw, *Winchester Firearms*, 174. Winchester Catalogs 1970-1975, Folder 1/3, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

since the early twentieth century, they were not generally sold with a capacity of more than 10 rounds until recently. In fact, these records show that during most of the twentieth century standard clip/box magazine sizes usually ranged from 3 to 7 rounds.[178]

## B.    Semiautomatic Pistols

The technological developments that produced automatic and semi-automatic rifles and shotguns also made possible the automatic and semi-automatic pistol. In the 1890s, a German engineer designed the first fully functional semi-automatic pistol, but its unusual size and shape prevented it from being the financial success its manufacturers wanted.[179] The company commissioned Georg Luger to redesign it, which he did over the course of the 1890s.[180] Meanwhile, the American gun designer John Moses Browning developed various semi-automatic pistol designs. One of his designs, which seemed poised to receive US military contracts, was purchased by Colt's.[181] The company's developments began with a series of handguns chambered for .38 Auto, then .45 caliber rounds, each of which had a magazine capacity of less than ten rounds.[182] Efforts culminated in the development of the Colt Government Model .45 1911 Automatic—the standard-issue sidearm for American armed forces until the 1980s, which featured a magazine capacity of seven rounds.

Browning's other semi-automatic pistol design was purchased by Fabrique Nationale d'Armes de Guerre (FN), a Belgian arms manufacturer. The FN Browning M1900 was released at the turn of the twentieth century and sold quite successfully in Europe. It was chambered for .32 caliber cartridges and had a magazine in the hand-grip which held seven rounds. In Continental

---

[178] *See* the catalogs of Marlin Firearms and Winchester Repeating Arms Company for the 1950s through the 1990s. Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[179] Nathan Gorenstein, *The Guns of John Moses Browning: The Remarkable Story of the Inventor Whose Firearms Changed the World* (New York: Scribner, 2021), 119–120.

[180] The company was Deutsche Waffen- und Munitionsfabriken (DWM), which owned a controlling interest in the Belgian armsmaker Fabrique Nationale d'Armes de Guerre (FN). *See* Gorenstein, *The Guns of John Moses Browning*, 128.

[181] Gorenstein, *The Guns of John Moses Browning*, 123–125.

[182] Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver, and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 205–207, 209, 210–213.

Europe, these "Browning pistols" were associated with a tremendous rise in crimes, accidents, and deaths related to firearms, and particularly the anarchist movement that carried out numerous assassinations there.[183]

FN subsequently approached Browning to design another semi-automatic handgun that might be purchased in large numbers by the French army. One of the requirements for consideration was that the firearm have a magazine capacity greater than ten rounds. Browning was initially reluctant to participate in the endeavor but soon changed his mind. An engineer from FN, Dieudonne Saive, developed a functional "double-stacked" magazine prototype, which offset cartridges in two separate columns to double the capacity.[184] The resulting hand-grip was significantly wider than those of previous models, but it held thirteen 9mm cartridges.[185] The FN Browning M35 Hi-Power pistol went into production after John M. Browning passed away in the 1930s, but FN produced the weapon (even though it was not initially selected by the French military) until 2018. When the Nazis occupied Belgium, they took over the FN factory and produced some of these pistols for their own use during World War II.[186]

Even though American companies and designers proved to be trailblazers in the development of semi-automatic handguns, American consumers were not quickly won over by them. Through at least the World War II era, Americans seem to have preferred revolvers to semi-automatic designs; this was in sharp contrast to Europe, where semi-automatic pistols were favored over revolvers.[187] Browning M35 Hi-Power pistols were sold in the United States and some Americans purchased them with magazine capacities greater than ten rounds, but by far most semi-automatic firearms on the American market maxed out at ten.[188] Brands like Colt's and Smith &

---

[183] Gorenstein, *The Guns of John Moses Browning*, 130–33.

[184] *Id.* at 209–210.

[185] Henry M. Stebbins, Albert J. E. Shay, and Oscar R. Hammond, *Pistols: A Modern Encyclopedia* (Harrisburg, PA: The Stackpole Company, 1961), 140.

[186] Stebbins, Shay, and Hammond, *Pistols*, 139–40.

[187] Gorenstein, *The Guns of John Moses Browning*, 130–33.

[188] My examination of firearms books, catalogs, archival records, and digitized copies of magazines like Gun Digest supports the assertion that most American semiautomatic firearms models produced between 1900 and 1990 had a standard magazine capacity of ten rounds or less.

Wesson produced several semi-automatic models for target shooting, police, military, and personal defense, and these firearms generally had a capacity of six to ten rounds.

By 1940, Colt's still had not produced a handgun with a magazine capacity greater than ten,[189] and by 1944 the inaugural issue of *Gun Digest* (which published advertisements for the best-selling American handguns) did not feature one.[190] By 1951, *Gun Digest* included the Browning Hi-Power in its lineup of "military small arms," but it was an outlier among the other sixteen semi-automatic handguns with magazine capacities of ten or less.[191] The section featuring foreign handguns included two models with magazine capacities over ten out of a total of nine semi-automatic models.[192] By 1969, the selection of handguns featured in *Gun Digest* had grown substantially, but only two models had a capacity of more than ten rounds.[193]

## XI.   CONCLUSION

This report has laid out the history of gun and weapon regulation in the United States during the nineteenth century. During this time frame, Americans adapted the longstanding Statute of Northampton language and provisions to accommodate their preference for regulating weapons through criminal statute. They developed a list of *deadly weapons*, which identified knives and pistols (among others) as non-militia arms and therefore subject to regulation in the name of public health, peace, and safety. Deadly weapons were regulated during the antebellum period through public carry, taxation, and sales restrictions.

---

[189] Haven and Belden, *A History of the Colt Revolver*, 219–25.

[190] *The Gun Digest: Complete Guide to American Rifles, Shotguns, Handguns and Accessories, The Encyclopedia for Shooters, 1944 First Annual Edition* (Chicago: Follett Publishing Company, 1944, repr. 1963), 155-127.

[191] John T. Amber, ed., *The Gun Digest: 5th Edition—1951* (Northfield, IL: DBI Books, Inc., 1950, repr. 1977), 131–32.

[192] These were the Ranger .22 Automatic with a magazine capacity of 11 shots and the Starr Automatic Target Pistol with a magazine capacity of 11 shots. *See* Amber, ed., *The Gun Digest: 5th Edition*, 146–47.

[193] The two models with magazine capacities greater than ten were the Browning M35 Hi-Power (13 rounds) and the Universal Enforcer Auto Carbine (30 shot magazine). All other handguns maxed out at 10 round magazine capacities. *See* John T. Amber, ed., *Gun Digest: World's Greatest Gun Book, The Shooter's Encyclopedia of Handguns, Rifles, Shotguns and Accessories, Twenty-Third Anniversary DeLuxe Edition, 1969* (Chicago: The Gun Digest Company, 1968), 294–306. That year's selection of foreign-made handguns featured only two models that could come with a standard magazine capacity greater than ten rounds. The Luger .22 Auto Pistol had "a 12-shot capacity with one round in the chamber," and the MAB Autoloading Pistol could be purchased with a magazine capacity of either 8 or 15 rounds. *See* Amber, ed., *Gun Digest 1969*, 345, 344–51.

The proliferation of pocket-sized revolvers after about 1850 had a dramatic impact upon American social life and produced the country's first gun violence crisis in the post-Civil War era. The needless bloodshed and development of habits deemed corrosive to morality and public order (namely the habitual carrying of deadly weapons) prompted a strong response from elected representatives. Regulatory policies that had been in place in preceding decades were adopted in new jurisdictions, and some of them were amended or refined to be more effective. Public carry regulations remained the foundational, primary strategy for reducing the number of deadly weapons in public spaces, but additional laws mandating disarmament at places of assembly and entertainment also grew in number. Sales restrictions were nothing new in the postbellum period, but they grew in number and sophistication, placing additional burdens upon dealers in deadly weapons to conduct their business in a way that posed as little harm to the larger public as possible. Lawmakers established minimum ages for buying weapons, required pistol registries, and sometimes even banned the sale of bowie knives, pocket pistols, and other weapons altogether. Licensing for carry or purchase grew out of the longstanding tradition of regulating public carry and weapon sales.

Large capacity magazine restrictions such as the one adopted in the State of Washington are part of this long tradition in American history of regulating deadly weapons even to the point of restricting sales. Moreover, large capacity magazines as they are known and understood today did not exist in the nineteenth century. Lever-action rifles such as the Winchester Model 1873 that were capable of holding more than ten rounds were qualitatively different than semiautomatic firearms, and their higher magazine capacities featured in models from the 1860s and early 1870s were short-lived outliers that disappeared in the face of larger, more powerful center-fire cartridges that emerged by 1880. Even in the early twentieth century, semiautomatic rifles marketed to civilians almost without exception came with standard magazine capacities below ten. It is my opinion that Washington's large capacity magazine restriction aligns with this history.