**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**

GABRIELLA SULLIVAN, et al.,

      Plaintiffs,

         v.

BOB FERGUSON, in his official
capacity as Washington State Attorney
General, et al.

      Defendants.

Civil Action No. 3:22-cv-05403-DGE

**BRIEF OF *AMICI CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE,**
**GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, AND MARCH FOR OUR**
**LIVES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

*Of Counsel:*

Daniel Weltz
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
DWeltz@cov.com

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE
268 Bush St. #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org

Timothy C. Hester (*admitted pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com

*Counsel for Amici Curiae*

Ciara Wren Malone
MARCH FOR OUR LIVES
90 Church Street # 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

### TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................................................... 1

INTRODUCTION ...................................................................................................................... 1

I.   THE CHALLENGED LAW DOES NOT IMPLICATE THE SECOND
     AMENDMENT BECAUSE IT IMPOSES NO BURDEN ON THE RIGHT TO
     SELF-DEFENSE. ............................................................................................................. 2

     A.   The Second Amendment Right as Articulated in *Bruen* and *Heller* Is
          Based on Lawful "Self-Defense." ........................................................................... 3

     B.   Plaintiffs Cannot Establish That the Challenged Law Burdens the Right to
          Lawful Self-Defense. ............................................................................................... 5

II.  THE CHALLENGED LAW IS RELEVANTLY SIMILAR TO HISTORICAL
     FIREARMS REGULATIONS ............................................................................................. 8

III. THE CHALLENGED LAW IS CONSISTENT WITH HISTORICAL LAWS
     REGULATING FIREARMS CAPABLE OF FIRING REPEATEDLY
     WITHOUT RELOADING .................................................................................................. 10

     A.   Modern Firearms Capable of Firing Repeatedly Without Reloading
          Reflect Dramatic Technological Change. .............................................................. 11

     B.   *Bruen* Requires a "More Nuanced Approach" Where Firearms Capable of
          Firing Repeatedly Without Reloading Were Not Widely Available Until
          the 20th Century. .................................................................................................... 12

     C.   The Challenged Law Is "Relevantly Similar" to Early 20th Century Laws
          Restricting Weapons Capable of Firing Repeatedly Without Reloading. ............ 14

CONCLUSION ........................................................................................................................ 17

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Andrews v. State*,
    50 Tenn. 165 (1871).............................................................................................9

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. (ANJRPC) v. Att'y Gen. New Jersey*,
    910 F.3d 106 (3d Cir. 2018) ...............................................................................5

*Bevis v. City of Naperville*,
    No. 22-4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ..............................10, 15

*Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*,
    No. 22-cv-951-RGA, 2023 WL 2655150 (D. Del. Mar. 27, 2023) ................. *passim*

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..................................................................................... *passim*

*Duncan v. Bonta*,
    19 F.4th 1087 (9th Cir. 2021) ...........................................................................5, 6

*English v. State*,
    35 Tex. 473 (1871)..............................................................................................9

*Hanson v. District of Columbia*,
    No. 22-cv-2256, 2023 WL 3019777 (D.D.C. Apr. 20, 2023)......................... *passim*

*Heller v. District of Columbia* (*Heller II*),
    670 F.3d 1244 (D.C. Cir. 2011) ........................................................................15

*Hill v. State*,
    53 Ga. 472 (1874) ...............................................................................................9

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ..............................................................................6

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)............................................................................................4

*Nat'l Ass'n for Gun Rights v. Lamont*,
    No. 3:22-1118, 2023 WL 4975979 (D. Conn. Aug. 3, 2023)......................... *passim*

*New York State Rifle & Pistol Association v. Bruen*,
    142 S. Ct. 2111 (2022)................................................................................. *passim*

*Ocean State Tactical, LLC v. State of Rhode Island*,
   No. 22-cv-246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022) ........................................... *passim*

*Oregon Firearms Fed'n v. Kotek*,
   No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14, 2023) ..................................... *passim*

*Rocky Mountain Gun Owners v. Polis*,
   467 P.3d 314 (Colo. 2020) ....................................................................................... 6

*State v. Jumel*,
   13 La. Ann. 399 (1858) ........................................................................................... 9

*State v. Langford*,
   10 N.C. 381 (1824) ................................................................................................. 9

*State v. Misch*,
   214 Vt. 309 (2021) .................................................................................................. 6

*State v. Mitchell*,
   3 Blackf. 229 (Ind. 1833) ........................................................................................ 9

*State v. Reid*,
   1 Ala. 612 (1840) ................................................................................................... 9

*Worman v. Healey*,
   922 F.3d 26 (1st Cir. 2019) ................................................................................. 5, 6

**Statutes**

Act of Mar. 22, 1923, no. 130, 1923 Vt. Acts & Resolves 130 ..................................... 14

Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256 ........................................... 14

Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887 ............................................ 14

Act of July 8, 1932, Pub. L. No. 72-275, 47 Stat. 650 ................................................. 15

Act of Feb. 28, 1933, ch. 206, 1933 S.D. Sess. Laws 245 ............................................ 15

Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189 ...................................................... 15

**Other Authorities**

*Armed Citizen Stories*, NRA-ILA, https://perma.cc/H9BC-95HF ................................... 6

Christopher Ingraham, *What 'Arms' Looked Like When the 2nd Amendment Was
   Written*, Wash. Post (June 13, 2016), https://perma.cc/H6X5-C2NL ........................... 12

Claude Werner, *The Armed Citizen – A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), https://perma.cc/QTL7-U8EM ........................................................6

Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://perma.cc/4ZJA-5V4M........................................................12

Declaration of Brian DeLay*, Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 128) ....................................................................11

Declaration of Edward Troiano, *Ocean State Tactical, LLC v. State of Rhode Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No. 19-3)............................7

Declaration of James W. Johnson, *Kolbe v. O'Malley*, No. 1:13-cv-02841 (D. Md. 2014) (ECF No. 44-3) ......................................................................................7

Declaration of Lucy P. Allen, *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 123-1)............................................................6

Declaration of Michael Vorenberg, *Ocean State Tactical, LLC*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No. 19-2) ....................................................11

Declaration of Randolph Roth, *Nat'l Ass'n for Gun Rights v. Campbell*, No. 22-cv-11431 (D. Mass. Jan. 31, 2023) (ECF No. 21-9)..........................................9, 16

Declaration of Robert Spitzer, *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 122-1)...........................................9, 14, 15

Declaration of Roger Pauly, *Oregon Firearms Federation, Inc.*, No. 2:22-cv-01815 (D. Or. Feb. 6, 2023) (ECF No. 120) .............................................12

Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://perma.cc/YR7L-PWPS ...........................12

*Firearms History and the Technology of Gun Violence*, UC Davis Library, https://perma.cc/YHZ6-8QPG ....................................................................12

Giffords Law Center, *Large Capacity Magazines*, Giffords, https://perma.cc/3DKL-ZJMS .....................................................................17

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 162–63 (2007)...............................................................9

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are national gun violence prevention organizations.  Their amicus briefs have been cited by numerous courts in litigation involving firearms regulations and constitutional principles affecting gun policy.  Brady Center to Prevent Gun Violence is the nation's most longstanding non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy and political action.  Giffords Law Center to Prevent Gun Violence, a national organization founded more than 30 years ago, promotes and defends the laws and policies proven to reduce gun violence.  March for Our Lives is a youth-led non-profit organization dedicated to promoting civic engagement, education and direct action by youth to achieve sensible gun violence prevention policies.[1]

## INTRODUCTION

Engrossed Senate Bill 5078 (the "Challenged Law"), which restricts the manufacture and sale of large-capacity magazines ("LCMs") capable of accepting more than ten rounds of ammunition, is constitutional under the Second Amendment because it does not impose any burden on the "right of armed self-defense" recognized by the Supreme Court in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2133 (2022) and *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008).  *See* Part I, *infra*.

Beyond that fundamental flaw, Plaintiffs' claim should also be rejected because the Challenged Law is "relevantly similar" to historical regulations that limited *what* weapons could lawfully be possessed, *where* firearms could be carried, and the *manner* in which firearms could

---

[1] No party or counsel to any party in this matter authored this brief in part or in whole, no party or counsel to any party in this matter contributed money intended to fund the preparation or submission of this brief, and no person other than *amici* contributed money intended to fund the preparation or submission of this brief.

be carried.  *See* Part II, *infra*.  In addition, under the "more nuanced approach" to historical analogues that *Bruen* contemplates where there have been "dramatic technological changes" in weaponry, the Challenged Law is "relevantly similar" to restrictions on firearms capable of firing repeatedly without reloading, which proliferated in the early 20th century once civilians began to gain widespread access to these weapons.  142 S. Ct. at 2132; *see* Part III, *infra*.

The Challenged Law is also constitutional because (i) LCMs are not required to use a firearm and therefore are not subject to constitutional protection as "arms" under the Second Amendment,[2] and (ii) "'weapons that are most useful in military service' fall outside of Second Amendment protection," *Hanson v. District of Columbia*, No. 22-cv-2256, 2023 WL 3019777, *8 (D.D.C. Apr. 20, 2023), *appeal docketed*, No. 23-7061 (D.C. Cir. May 17, 2023) (quoting *Heller*, 554 U.S. at 627).  This brief does not address these separate bars to Plaintiffs' claims.

## ARGUMENT

### I.    THE CHALLENGED LAW DOES NOT IMPLICATE THE SECOND AMENDMENT BECAUSE IT IMPOSES NO BURDEN ON THE RIGHT TO SELF-DEFENSE.

Plaintiffs make no showing that the Challenged Law has any impact on the "individual right to self-defense" articulated in *Bruen* and *Heller*, nor could they.  *See generally* Plaintiffs' Motion for Summary Judgment ("Mot."), ECF No. 101.  Accordingly, the Challenged Law raises no Second Amendment issue, and Plaintiffs' claims should be rejected at the threshold, as a matter of law, for failure to demonstrate that the Challenged Law "burden[s] a law-abiding citizen's right to armed self-defense."  *Bruen*, 142 S. Ct. at 2133.

---

[2] *See Oregon Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, *25–26 (D. Or. July 14, 2023), *appeal docketed*, No. 23-35479 (9th Cir. July 17, 2023);   *Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-cv-246, 2022 WL 17721175, *12 (D.R.I. Dec. 14, 2022), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023).

A.     **The Second Amendment Right as Articulated in *Bruen* and *Heller* Is Based on Lawful "Self-Defense."**

Plaintiffs assert that "[t]he Supreme Court has now repeatedly established that the Second Amendment absolutely 'protects the possession and use of weapons that are in common use'" and that "once it is determined that an arm is in common use and therefore protected, law-abiding citizens have an absolute right to possess it."  Mot. at 5 (citing *Bruen*, 142 S. Ct. at 2128).

Plaintiffs flatly misstate the scope of the Second Amendment as articulated by *Bruen* and *Heller*.  *Bruen* defines the Second Amendment as "protect[ing] an individual right to keep and bear arms ***for self-defense***." 142 S. Ct. at 2125.[3]  The Court's analysis in *Bruen* thus revolved around the "individual right to ***armed self-defense***," *id*. at 2128, and "whether modern and historical regulations impose a comparable burden on the right of ***armed self-defense***." *Id*. at 2133.  And it broadly recognized "[t]he constitutional right to bear arms in public ***for self-defense***." *Id*. at 2156.  Justice Alito made the point plainly: "All that we decide in this case is that the Second Amendment protects the rights of law-abiding people to carry a gun outside the home ***for self-defense***." *Id*. at 2159 (Alito, J., concurring).

Plaintiffs (Mot. at 1) quote a phrase out of context in *Bruen*, where the Court, quoting from *Heller*, stated that "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'"  142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).  In context, the Court was clearly referring to weapons "in common use" ***for self-defense***.  The phrase Plaintiffs quote appears in a paragraph that begins with the Court's statement that *Heller* held "that the Second Amendment protected an individual right ***to armed self-defense***." *Id.* at 2128.  And the following paragraph ends with a quote from *Heller* that "the Second Amendment did not

---

[3] All emphases added unless otherwise noted.

countenance a 'complete prohibition' on the use of 'the most popular weapon chosen by Americans *for self-defense* in the home.'"  *Id.* (quoting *Heller*, 554 U.S. at 629); *see also id.* at 2125 ("In *Heller* and *McDonald* we held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms *for self-defense*.").

Like *Bruen*, *Heller* defines the Second Amendment right based on lawful self-defense. *Heller* analyzed the historical understanding of "the right of having and using arms for *self-preservation and defence*" and found that colonial Americans "understood the right to enable individuals *to defend themselves*."  554 U.S. at 594 (citations omitted).  It found that analogous state constitutional provisions "secured an individual right to bear arms *for defensive purposes*," *id.* at 602, and that "the understanding in the post-Civil War Congress [was] that the Second Amendment protected an individual right to use arms *for self-defense*," *id.* at 616.  *Heller* held that "the inherent right *of self-defense* has been central to the Second Amendment right," *id.* at 628, and that handguns were constitutionally protected because they were the "*quintessential self-defense weapon*," *id.* at 629; *see also McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) ("In *Heller*, we held that the Second Amendment protects the right to possess a handgun in the home *for the purpose of self-defense*.").

Courts evaluating LCM restrictions since *Bruen* have confirmed that the Second Amendment right articulated in *Bruen* and *Heller* is based on the "right of armed self-defense." *See Hanson*, 2023 WL 3019777, *7 ("the question this Court must now resolve" is whether LCMs "are commonly used or are useful specifically *for self-defense*" (emphasis in original) (quotations and citations omitted)); *Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*, No. 22-cv-951-RGA, 2023 WL 2655150, *4 (D. Del. Mar. 27, 2023), *appeal docketed*, No. 23-1633 (3d Cir. Apr. 7, 2023) ("the Second Amendment extends only to bearable

arms that are 'in "common use" for *self-defense* today'" (quoting *Bruen*, 142 S. Ct. at 2143));
*Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-cv-246, 2022 WL 17721175, *11
(D.R.I. Dec. 14, 2022) ("whether the LCM Ban unduly impairs the right of an individual to *engage
in self-defense* . . . is the primary focus of the Second Amendment analysis"); *Oregon Firearms
Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, *11 (D. Or. July 14, 2023), *appeal
docketed*, No. 23-35479 (9th Cir. July 17, 2023) ("Under *Bruen*, a court must consider whether a
regulated firearm or firearm accessory is 'in common use today *for self-defense*.'" (quoting *Bruen*,
142 S. Ct. at 2134)); *Nat'l Ass'n for Gun Rights v. Lamont*, No. 3:22-1118, 2023 WL 4975979,
*16 (D. Conn. Aug. 3, 2023), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023) ("a weapon
must be both possessed for the purpose of and actually used *for self-defense* in order to fall within
the Second Amendment's protection").

Plaintiffs are therefore wrong in suggesting that the Second Amendment right extends to
all firearms "that are in common use" at a given time. Mot. at 5. The Second Amendment, as
*Bruen* and *Heller* establish, applies only to "commonly used firearms *for self-defense*." *Bruen*,
142 S. Ct. at 2138.

### B.  Plaintiffs Cannot Establish That the Challenged Law Burdens the Right to Lawful Self-Defense.

Plaintiffs have made no showing that the Challenged Law burdens the "right to armed self-
defense" articulated in *Bruen* and *Heller*—nor could they. Empirical research, thoroughly
examined by numerous courts,[4] establishes that LCM restrictions do not burden the "right to armed

---

[4] *See Lamont*, 2023 WL 4975979, *21; *Ocean State Tactical, LLC*, 2022 WL 17721175, *16;
*Hanson*, 2023 WL 3019777, *10–12; *Kotek*, 2023 WL 4541027, *32–33; *Duncan v. Bonta*, 19
F.4th 1087, 1104–05 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895,
*and vacated and remanded on other grounds*, 49 F.4th 1228 (9th Cir. 2022); *Worman v. Healey*,
922 F.3d 26, 37 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Ass'n of
New Jersey Rifle & Pistol Clubs, Inc. (ANJRPC) v. Att'y Gen. New Jersey*, 910 F.3d 106, 121 n.25

self-defense" because the ability to fire more than ten rounds without reloading is empirically unnecessary for self-defense. The National Rifle Association's own database of "armed citizen" accounts demonstrates that the use of more than ten rounds of ammunition for self-defense is "extremely rare."[5] Studies of this database establish that the average number of shots fired by civilians in self-defense was about *two*.[6] Of 736 self-defense incidents from January 2011 to May 2017 reflected in the NRA database, the defender was reported to have fired more than ten bullets in only "*two* incidents (0.3% of all incidents)."[7]

Numerous court decisions have similarly found no evidence that firing more than ten bullets without reloading is necessary for self-defense. *See*, *e.g.*, *Worman*, 922 F.3d at 37 ("not one of the plaintiffs or their six experts could identify even a single example of . . . a self-defense episode in which ten or more shots were fired"); *Duncan*, 19 F.4th at 1104–05 ("The use of more than ten bullets in defense of the home is *'rare,'* or *non-existent*." (citations omitted)); *Rocky Mountain Gun Owners*, 467 P.3d at 331 ("[I]n no case had a person fired even five shots in self-defense, let alone ten, fifteen, or more." (quotations and citation omitted)); *Misch*, 214 Vt. at 356 ("it appears from the available data that … the large-capacity magazine … is *almost never used for self-defense*").

---

(3d Cir. 2018), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *State v. Misch*, 214 Vt. 309, 356–57 (2021), *reargument denied* (Mar. 29, 2021); *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 331 (Colo. 2020).

[5] Declaration of Lucy P. Allen at 2–3, *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 123-1) [hereinafter "Allen Decl."]; *see also Armed Citizen Stories*, NRA-ILA, https://perma.cc/H9BC-95HF.

[6] *See* Claude Werner, *The Armed Citizen – A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), https://perma.cc/QTL7-U8EM (average of 2.2 defensive shots fired per incident from 1997–2001); Allen Decl., *supra* note 5, at 3–4 (same, from January 2011 to May 2017).

[7] Allen Decl., *supra* note 5, at 4.

Experts have similarly testified that the ability to fire more than ten rounds without reloading is unnecessary for self-defense. *See* Declaration of Edward Troiano ¶ 10, *Ocean State Tactical, LLC v. State of Rhode Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No. 19-3) ("I am unaware of ***any incident*** in which a civilian has ***ever*** fired as many as 10 rounds in self-defense."); Declaration of James W. Johnson ¶¶ 30, 31, *Kolbe v. O'Malley*, No. 1:13-cv-02841 (D. Md. 2014) (ECF No. 44-3) (then-Baltimore County Police Chief testifying that he was "***unaware of any self-defense incident***" in Baltimore County or "anywhere else in Maryland" for which "it was necessary to fire as many as 10 rounds in self-defense").

Courts evaluating LCM restrictions since *Bruen* have repeatedly held that such laws do not burden the "right of armed self-defense" and therefore do not implicate the Second Amendment. *See Kotek*, 2023 WL 4541027, *33–34 ("[T]he Second Amendment's plain text does not cover LCMs" because "Plaintiffs have not shown that LCMs are commonly employed for self-defense" while "Defendants have produced credible evidence showing that they are not."); *Lamont*, 2023 WL 4975979, *2 ("Plaintiffs' proposed ownership of . . . LCMs is not protected by the Second Amendment because they have not demonstrated that the specific . . . LCMs in the Challenged Statutes are commonly sought out, purchased, and used for self-defense."); *Ocean State Tactical, LLC*, 2022 WL 17721175, *14 ("There is simply no credible evidence in the record to support the plaintiffs' assertion that LCMs are weapons of self-defense and there is ample evidence put forth by the State that they are not."); *Hanson*, 2023 WL 3019777, *12 ("[T]he Second Amendment does not cover LCMs because they are not typically possessed for self-defense.").

In short, Plaintiffs do not and cannot demonstrate that LCMs are needed for "armed self-defense," and accordingly have failed to show that the Challenged Law infringes their Second Amendment rights as articulated in *Bruen* and *Heller*.

## II.   THE CHALLENGED LAW IS RELEVANTLY SIMILAR TO HISTORICAL FIREARMS REGULATIONS.

Because the Challenged Law does not impose ***any*** burden on "a law-abiding citizen's right to armed self-defense," *Bruen*, 142 S. Ct. at 2133, the Court need not evaluate whether the Challenged Law is "consistent with this Nation's historical tradition of firearm regulation," *id*. at 2126. That analogical step only applies in evaluating whether a challenged regulation imposes a "***comparable burden on the right of armed self-defense***." *Id*. at 2133. Here, there is ***no*** burden on the "right of armed self-defense" articulated in *Bruen*, and the burden never shifts to the government to demonstrate under the second prong of *Bruen* that the Challenged Law is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130.

But, in any event, the Challenged Law is constitutional because it is "relevantly similar" to historical laws that regulated arms without unduly burdening armed self-defense. Under *Bruen*, courts conducting an historical inquiry must consider "whether modern and historical regulations impose a comparable burden on the right ***of armed self-defense*** and whether that burden is comparably justified." *Id*. at 2133. *Bruen* recognized that "the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms," *id*. at 2138. "Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id*. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

Since the Founding Era, states have regulated firearms and other dangerous weapons, and courts have consistently upheld laws that imposed no meaningful burden on self-defense. These include 18th and 19th century laws restricting where and when firearms could be carried or discharged, *see Hill v. State*, 53 Ga. 472, 474, 482–83 (1874), laws prohibiting certain excessively dangerous weapons, *see State v. Langford*, 10 N.C. 381, 383–84 (1824); *English v. State*, 35 Tex.

8

473, 474, 477 (1871); *Andrews v. State*, 50 Tenn. 165, 171, 188–89 (1871), and laws regulating the manner in which arms could be carried, *see State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833); *State v. Reid*, 1 Ala. 612, 614, 621 (1840); *State v. Jumel*, 13 La. Ann. 399, 399-400 (1858).

For example, in the 18th century, Philadelphia, New York and Boston prohibited the discharge of firearms within their cities, and New Hampshire, Connecticut, Georgia, North Carolina and Rhode Island restricted the discharge of firearms after dark.[8]  New Jersey prohibited the setting of "gun traps" that fired automatically if triggered by a device such as a tripwire,[9] and numerous states banned the possession of certain blunt weapons deemed excessively dangerous. *See* Declaration of Robert Spitzer at 12–17, *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 122-1) [hereinafter "Spitzer Decl."].

In the 19th century, states responded to a nationwide surge in homicides by passing laws severely restricting access to certain dangerous weapons.  *See* Declaration of Randolph Roth ¶¶ 28-32, *Nat'l Ass'n for Gun Rights v. Campbell*, No. 22-cv-11431 (D. Mass. Jan. 31, 2023) (ECF No. 21-9) [hereinafter "Roth Decl."].  For example, beginning in the 1830s and continuing through the early 20th century, every state plus the District of Columbia (except for New Hampshire) passed laws restricting Bowie knives, a distinctive long-bladed knife commonly used in violent crime. *See* Spitzer Decl. at 5–11.  In addition, in the 19th century, at least 43 states passed laws restricting the concealed carry of certain arms, most commonly pistols and various types of knives and clubs. *See id.*  Several additional states also passed laws banning "trap guns" during the 19th century.  *Id.* ¶ 77.

---

[8] *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 162–63 (2007).
[9] *Id.*

The Challenged Law is relevantly similar to these 18th and 19th century laws because, like these historical analogues, it does not meaningfully burden armed self-defense.  *See* Part I.B, *supra*.  Moreover, the Challenged Law is "comparably justified" because it was enacted in response to a dramatic rise in gun violence and to protect the public.  *See* Part III.C, *infra*.

Courts that have considered the issue since *Bruen* have overwhelmingly held that modern laws banning LCMs are "relevantly similar" to these historical laws.  *See Kotek*, 2023 WL 4541027, *39–46 (concluding that 19th century restrictions on Bowie knives, trap guns, and the concealed carry of blunt objects, pistols, and revolvers were "relevantly similar" to Oregon's ban on LCMs with a capacity of more than ten rounds, because Oregon's ban "impose[d] a minimal burden on the right to armed self-defense" and analogous historical laws imposed "a similar, if not greater, burden"); *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150 (holding that historical restrictions on Bowie knives, "melee weapons" and concealed carry were "relevantly similar" to Delaware's LCM ban); *Bevis v. City of Naperville*, No. 22-4775, 2023 WL 2077392, *10–16 (N.D. Ill. Feb. 17, 2023), *appeal docketed* (7th Cir. Feb. 23, 2023) (holding that 18th and 19th century restrictions on Bowie knives, other "particularly dangerous weapons," concealed carry and trap guns were relevantly similar to Illinois' LCM ban); *Lamont*, 2023 WL 4975979, *31–32 (holding that historical restrictions on new and dangerous weapon technology, concealed carry and gunpowder regulations were relevantly similar to Connecticut's LCM ban).

## III.  THE CHALLENGED LAW IS CONSISTENT WITH HISTORICAL LAWS REGULATING FIREARMS CAPABLE OF FIRING REPEATEDLY WITHOUT RELOADING.

The Challenged Law is also consistent with a century of state firearms laws restricting weapons capable of firing repeatedly without reloading.  Such weapons were not in widespread circulation until after ratification of the Fourteenth Amendment in 1868, and long after ratification

of the Second Amendment in 1791. As a result, these analogous historical laws date to those weapons' entry into widespread circulation rather than to the Founding or Antebellum Eras, when virtually no citizens possessed them legally.[10]

**A.   Modern Firearms Capable of Firing Repeatedly Without Reloading Reflect Dramatic Technological Change.**

During the Founding Era, civilians did not have widespread access to firearms capable of firing more than ten rounds without reloading. Such firearms were not widely available to civilians in the United States or in common use prior to at least the late 19th century. *See* Declaration of Brian DeLay ¶ 58, *Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 128) [hereinafter "DeLay Decl."] ("[H]igh-capacity firearms [capable of firing more than ten rounds without reloading] constituted less than 0.002% of all firearms in the United States as late as 1872."). Furthermore, legal possession of such firearms before the late 19th century "was limited almost exclusively to U.S. soldiers and civilian law enforcement officers." Declaration of Michael Vorenberg ¶ 43, *Ocean State Tactical, LLC*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No. 19-2).

Modern firearms capable of firing repeatedly without reloading also bear no resemblance to their historical predecessors. Unlike the typical Revolutionary-era musket, a typical modern AR-15 (i) holds 30 rounds (30 times more than a typical musket at the time of the Founding), (ii) fires approximately 45 rounds per minute (15 times more), (iii) shoots accurately from approximately 600 yards (11 times further), (iv) attains a muzzle velocity of over 3,000 feet per

---

[10] Historical analogues through the 21st century may "settle" the meaning of the Second Amendment, *id.* at 2136, provided they do not "contradict[] earlier evidence." *Bruen*, 142 S. Ct. at 2154 n.28. *See also Hanson*, 2023 WL 3019777, *16 ("apply[ing] 20th century history to the regulation at issue . . . [that] do[es] not contradict any earlier evidence"); *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, *12 ("declin[ing] to disregard" "analogous twentieth-century regulations" restricting machine guns).

second (3 times faster), and (v) can be stored loaded and immediately fired (unlike Founding-era muskets, which were stored empty because of gunpowder degradation).[11]  Modern firearms also incorporate advanced ballistics that make rounds far more lethal than their historical predecessors.[12]  Even the most advanced firearms of the Civil War era were a far cry from the modern AR-15.  For example, the famed 1866 Winchester rifle had a maximum effective range of approximately 100 yards (about one-sixth of an AR-15) and a muzzle velocity of just 1,100 feet per second (roughly one-third of an AR-15).[13]

These dramatic technological changes have made the modern repeating firearm "a significantly different weapon than it was at the time of the founding of the republic" and in a "distinctly different class of lethality."  *See* Declaration of Roger Pauly ¶¶ 100–03, *Oregon Firearms Federation, Inc.*, No. 2:22-cv-01815 (D. Or. Feb. 6, 2023) (ECF No. 120).

> **B.**     ***Bruen* Requires a "More Nuanced Approach" Where Firearms Capable of Firing Repeatedly Without Reloading Were Not Widely Available Until the 20th Century.**

*Bruen* held that courts must adopt a "more nuanced approach" when faced with "dramatic technological changes" in firearms.  *See* 142 S. Ct. at 2132 ("The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the

---

[11] Christopher Ingraham, *What 'Arms' Looked Like When the 2nd Amendment Was Written*, Wash. Post (June 13, 2016), https://perma.cc/H6X5-C2NL; *see also Firearms History and the Technology of Gun Violence*, UC Davis Library, https://perma.cc/YHZ6-8QPG (describing the "complicated process" of loading muskets used by soldiers during the Civil War).

[12] *See, e.g.*, Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://perma.cc/YR7L-PWPS (AK-47 rounds have "a tiny surface area at the bullet tip, [so that] it can easily break through your skin . . . ripping a hole through blood vessels, muscle, and potentially vital organs.").

[13] Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://perma.cc/4ZJA-5V4M.

Reconstruction generation in 1868."). Modern LCMs represent precisely this kind of dramatic technological change. *See* Part III.A, *supra*.

Courts that have considered the issue since *Bruen* have overwhelmingly held that modern LCMs reflect the sort of "dramatic technological change" that requires a more "nuanced approach" to historical analogues. For example, a federal district court recently found that

> [T]he record supports the conclusion that mass shootings carried out with assault weapons and LCMs that result in mass fatalities are a modern societal problem; the development of semiautomatic fire has led to a level of casualties and injuries from firearm violence previously unseen in American history and has been spurred by factors and advances in technology that would have been unimaginable to the Founding Fathers.

*Lamont*, 2023 WL 4975979, *29. Another federal district court similarly concluded that "modern-day LCMs represent a dramatic technological change from the Founding and Reconstruction-era firearms based on . . . the time and effort involved in reloading and the time involved in shooting the firearm's rounds" and that "mass shootings using LCMs are an unprecedented societal concern rather than a general societal problem that has persisted since the eighteenth century." *Kotek*, 2023 WL 4541027, *36–38. *See also Hanson*, 2023 WL 3019777, *13–14 ("semi-automatic weapons with which twenty-first century Americans associate large capacity magazines were either not in existence or not manufactured in large numbers until the twentieth century" and "the development of semiautomatic rifles and handguns dramatically increased the number killed and wounded in mass shootings from 1966 to the present" (quotations and citations omitted)); *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, *10–11 ("It was only after World War I when semi-automatic and fully automatic long guns began to circulate appreciably in society" and LCMs "were involved in the majority of [mass shooting] incidents for which magazine capacity could be determined." (quotations and citations omitted)).

Under the more nuanced approach required by *Bruen*, the relevant historical analogues date to the period in which weapons capable of firing repeatedly without reloading became widely available to civilians and the subject of regulatory concern.  The lack of any pre-20th century "historical tradition" of regulating firearms that ***did not exist*** when the Second and Fourteenth Amendments were enacted is meaningless.

### C.   The Challenged Law Is "Relevantly Similar" to Early 20th Century Laws Restricting Weapons Capable of Firing Repeatedly Without Reloading.

Once firearms capable of firing repeatedly without reloading began to circulate widely among civilians in the early 20th century, Congress and a majority of states responded by passing laws limiting access to these weapons.  *See generally* Spitzer Decl. at 36–42.  For example, in 1923, Vermont prohibited persons engaged in hunting from possessing "an automatic rifle of military type with a magazine capacity of over six cartridges."[14]  In 1927, Rhode Island passed a law prohibiting "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."[15]  That same year, Michigan prohibited any firearm that fired more than sixteen times without reloading.[16]  In 1932, Congress passed a law prohibiting "any firearm" in the District of Columbia "which shoots automatically or semiautomatically more than twelve shots without reloading"—a prohibition that has existed in some regulatory form ever since.[17]  In 1933, Ohio outlawed any firearm that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading," and

---

[14] Act of Mar. 22, 1923, no. 130, 1923 Vt. Acts & Resolves 130.

[15] Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, §§ 1, 4.

[16] Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888, § 3.

[17] Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1248 (D.C. Cir. 2011), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

South Dakota banned firearms "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine."[18]

In total, between 1925 and 1934, at least 31 states and the District of Columbia restricted access to certain weapons capable of firing repeatedly without reloading,[19] and at least 22 states plus the District of Columbia restricted ammunition magazines or similar feeding devices, and/or had round capacity limits.  *See* Spitzer Decl. at 36–42.  "Regulations concerning removable magazines and magazine capacity were . . . common as early as the 1920s" and "were adopted by nearly half of all states."  *Id*. at 42.

The Challenged Law is "relevantly similar," *Bruen*, 142 S. Ct. at 2132-33, to these early 20th century laws (as it is to historic 19th century laws, *see* Part II, *supra*) because it too imposes little or no burden on the right of armed self-defense.  *See Hanson*, 2023 WL 3019777, *15 ("The District's LCM ban is similar to the Prohibition-era regulations [of firearms capable of firing repeatedly without reloading] in that the burden it places on an individual's right of self-defense is relatively light."); *Bevis*, 2023 WL 2077392, *12–14 (noting that "[t]wenty-three states imposed some limitation on ammunition magazine capacity" in the early 20th century, and upholding Illinois' LCM ban because it was consistent with that "history of firearm regulation"); *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, *12–14 (holding that any burden imposed by Delaware's LCM ban "is slight" and "comparable" to that imposed by historical laws, including 20th century restrictions on firearms capable of firing repeatedly without reloading).

---

[18] Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189, § 12819-3; Act of Feb. 28, 1933, ch. 206, 1933 S.D. Sess. Laws 245, 245, § 1.

[19] Although most of these laws restricted access to fully automatic weapons, at least seven and as many as ten states, plus the District of Columbia, restricted semi-automatic weapons.  *Id*. ¶ 10.

The Challenged Law also has a "comparabl[e] justifi[cation]" to these early 20th century laws, *Bruen*, 142 S. Ct. at 2132-33, because both address the growing threat of mass violence using firearms.  *See Hanson*, 2023 WL 3019777, *15 ("Just as states and the District enacted sweeping laws restricting possession of high-capacity weapons in an attempt to reduce violence during the Prohibition era, so can the District now."); *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, *13 ("The modern regulations at issue, like the historical regulations discussed by Defendants, were enacted in response to . . . a recent rise in mass shooting incidents, the connection between those incidents and assault weapons and LCMs, and the destructive nature of those weapons."); *Kotek*, 2023 WL 4541027, *45.

An individual bearing arms in 1791 or 1868 was, as a technological matter, unable to commit mass murder with a gun in a matter of seconds.  That situation radically changed only relatively recently.  Modern LCMs, coupled with advances in firearm technology, pose a risk of far greater carnage than was imaginable during the Founding or Antebellum Eras.  *See Lamont*, 2023 WL 4975979, *29.

As a result of dramatic technological changes, the frequency of mass shootings and fatalities caused by mass shootings have surged in modern times.  *See* Roth Decl. ¶¶ 54–60.  As of July 2020, LCMs were used in the ten deadliest mass shootings of the past decade, and mass shootings from 1990 to 2017 involving LCMs resulted in a 62% higher death toll than those not involving LCMs.[20]  *See Ocean State Tactical, LLC*, 2022 WL 17721175, *20 (identifying a "direct connection between employment of LCMs and increased injuries, both in number and seriousness").

---

[20] Giffords Law Center, *Large Capacity Magazines*, Giffords, https://perma.cc/3DKL-ZJMS.

In short, unlike the handgun regulations addressed in *Bruen* and *Heller*, for which the Supreme Court focused on historical antecedents predating the Fourteenth Amendment, a "more nuanced approach" is required when evaluating restrictions on firearms that did not exist before 1791 or even 1868.  142 S. Ct. at 2132.  Applying that "more nuanced approach," these early 20th century laws demonstrate a clear history and tradition of regulating firearms that can fire repeatedly without reloading.  And they reflect a recognition that such regulations do not impinge on any legitimate needs for armed self-defense, but instead are intended to reduce the carnage that can result when many rounds can be fired without reloading.

## CONCLUSION

The Challenged Law does not violate the Second Amendment because (1) applying the standards of *Bruen* and *Heller*, the Challenged Law does not burden the right to "armed self-defense," (2) the Challenged Law is "relevantly similar" to historical laws that imposed restrictions on firearms without burdening "the right of armed self-defense," *Bruen*, 142 S. Ct. at 2132–33, and (3) the Challenged Law is consistent with the country's 20th century history of regulating firearms that can fire repeatedly without reloading, and such historical laws are proper analogues because LCMs reflect "dramatic technological changes" in firearms.

17

Dated: September 8, 2023

Respectfully submitted,

/s/ Timothy C. Hester

*Of Counsel:*

Daniel Weltz
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
DWeltz@cov.com

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE
268 Bush St. #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org

Ciara Wren Malone
MARCH FOR OUR LIVES
90 Church Street # 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

Timothy C. Hester (*admitted pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com

*Counsel for Amici Curiae*

1

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2023, an electronic copy of the foregoing *Amicus Curiae* Brief was filed with the Clerk of Court for the United States District Court for the Western District of Washington using the Court's *CM-ECF* system and was served electronically by the Notice of Docket Activity upon registered *CM-ECF* participants.

Dated: September 8, 2023                         Respectfully submitted,


                                                 /s/ Timothy C. Hester
                                                 Timothy C. Hester (*admitted pro hac vice*)
                                                 COVINGTON & BURLING LLP
                                                 One CityCenter
                                                 850 Tenth Street, NW
                                                 Washington, DC 20001
                                                 (202) 662-6000
                                                 thester@cov.com