1

2

3

4

The Honorable Judge David G. Estudillo

5

6

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

7   GABRIELLA SULLIVAN, *et al.*,

8              *Plaintiffs*,

No. 3:22-cv-05403-DGE

9        v.

10  BOB FERGUSON, in his official capacity as
    Washington State Attorney General, *et al.*,

COMBINED RESPONSE IN
OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND REPLY IN SUPPORT OF
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

11

12              *Defendants*,

NOTE ON MOTION CALENDAR:
October 16, 2023

13  ALLIANCE FOR GUN RESPONSIBILITY,

14              *Intervenor-Defendant*.

15

16

17

18

19

20

21

22

23

24

25

26

27

Pls.' Resp./Reply in Supp. of Summ. J.

Ard Law Group PLLC

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1

**TABLE OF CONTENTS**

2

**Page**

3

TABLE OF AUTHORITIES ........................................................................ ii

4

I.   INTRODUCTION............................................................................1

5

II.  ARGUMENT ...................................................................................2

6

A.  No Threshold Issue Requires Judgment in Any Defendant's Favor............2

7

B.  Banning Magazines Infringes the Right to Keep and Bear "Arms." ...........2

8

C.  The Banned Magazines Are in Common Use...............................5

9

D.  The Court Should Reject Defendants' Extraneous Arguments. ...............13

10

E.  Defendants Have Failed to Propose a Valid Historical Analogue for the

11

Magazine Ban. ......................................................................19

12

III.  CONCLUSION .............................................................................25

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Pls.' Resp./Reply in Supp. of Summ. J.  - i

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

# TABLE OF AUTHORITIES

**Cases**            **Page**

*Abbott v. Biden*, 70 F.4th 817 (5th Cir. 2023)....................................................3, 4

*Barnett v. Raoul*, --- F. Supp. 3d ----,
     2023 WL 3160285 (S.D. Ill. Apr. 28, 2023)................................................4

*Bittinger v. Tecumseh Prods. Co.*,
     123 F.3d 877 (6th Cir. 1997) ....................................................................19

*Caetano v. Massachusetts*,
     577 U.S. 411 (2016)..................................................................................10

*Chastleton Corp. v. Sinclair*,
     264 U.S. 543 (1924)..................................................................................11

*District of Columbia v. Heller*,
     554 U.S. 570 (2008)................................................7, 9, 13, 14, 20, 23

*Duncan v. Bonta*,
     970 F.3d 1133 (9th Cir. 2020) ..................................................................11

*Duncan v. Bonta*,
     19 F.4th 1087 (2021).................................................................................11

*Duncan v. Bonta*,
     49 F.4th 1228 (2022).................................................................................11

*Duncan v. Bonta*,
     No. 17-cv-1017, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023)........4, 9, 16

*English v. State*,
     35 Tex. 473 (1871)...................................................................................14

*Espinoza v. Montana Dep't of Rev.*,
     140 S. Ct. 2246 (2020)..............................................................................21

*Ezell v. City of Chicago*,
     651 F.3d 684 (7th Cir. 2011) ....................................................................11

*Friedman v. City of Highland Park*,
     784 F.3d 406 (7th Cir. 2015) ...............................................................13, 14

*Fyock v. Sunnyvale*,
     779 F.3d 991 (9th Cir. 2015) ....................................................................15

*Gospel Missions of Am. v. Los Angeles*,
     328 F.3d 548 (9th Cir. 2003) ....................................................................18

*Haaland v. Brackeen*,
     143 S. Ct. 1609 (2023).................................................................................2

*Hansberry v. Lee*,
     311 U.S. 32 (1940)....................................................................................19

Pls.' Resp./Reply in Supp. of Summ. J.  - ii

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

*Hanson v. District of Columbia*,
No. 22-2256, 2023 WL 3019777 (D.D.C. Apr. 20, 2023)........................13

*Heller v. District of Columbia ("Heller II")*,
670 F.3d 1244 (D.C. Cir. 2011) ..............................................................17

*Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.*,
916 F.2d 1174 (7th Cir. 1990) ................................................................11

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) .................................................9, 11, 12, 13, 14

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022)....................2, 10, 12, 14, 15, 18, 19, 21, 22, 23, 24

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) ...................................................................12

*Nunn v. Georgia*,
1 Ga. 243 (1846) .....................................................................................23

*Oregon Firearms Federation v. v. Kotek*,
2023 WL 4541027 (D. Or. July 14, 2023)...............................................17

*Richards v. Jefferson County*,
517 U.S. 793 (1996)................................................................................19

*Staples v. United States*,
511 U.S. 600, 612 (1994).........................................................................24

*Teter v. Lopez*,
76 F.4th 938 (9th Cir. 2023) ............................................................5, 7, 10

*United States v. Alaniz*,
69 F.4th 1124 (9th Cir. 2023) ...................................................................6

*United States v. McAdory*,
935 F.3d 838 (9th Cir. 2019) ....................................................................6

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) ..................................................................11

*Wiesmueller v. Kosobucki*,
547 F.3d 740 (7th Cir. 2008) ..................................................................11

*Young v. Hawaii*,
142 S. Ct. 2895 (2022)............................................................................11

**Constitutional Provisions, Laws, and Statutes**

U.S. CONST. art. I, § 8, cl. 16 ................................................................3

FED. R. EVID. 201, 1972 Advisory Committee Note...............................11

The Militia Act of 1792, Act of May 8, 1792, ch. 33, 1 Stat. 271 § 1 ....................3

1763-1775 N.J. Laws 346, ch. 539 § 10 (1771)....................................20

Pls.' Resp./Reply in Supp. of Summ. J.  - iii

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1852 Haw. Sess. Laws 19 ...................................................................23

1859 Ind. Acts. 129.............................................................................22

1862 Colo. Sess. Laws 56, § 1 .....................................................23, 24

1870 La. Acts 159–60 ........................................................................22

1889 Ariz. Sess. Laws 16 ..................................................................23

1890 Okla. Laws 495 .........................................................................23

1913 Haw. Rev. Laws, ch. 209 .........................................................23

1917 N.C. Sess. Laws 390, ch. 209, § 1 ..........................................25

1920 N.J. Laws 67, ch. 31, § 9.........................................................25

1923 Mo. Laws 24–142 .....................................................................22

1927 Mass. Acts 416, ch. 326, § 5 ....................................................24

1927 Mich. Pub. Acts 888-89, § 1 .....................................................25

1927 R.I. Pub L. 256, § 4 ..................................................................25

1932 Public-No. 275-72D ..................................................................25

1933 Cal. Stat. 1169...........................................................................24

1933 Minn. Laws 231-33, ch. 190, § 1 ..............................................25

1933 Ohio Laws 189-90......................................................................24

1933 S.D. Sess. Laws 245-47, ch. 206, §§ 1–8..................................24

1934 Va. Acts 137-39, ch. 96, §§ 1–7 ...............................................24

1959 Mich. Pub. Acts 249..................................................................25

1959 R.I. Acts & Resolves 260..........................................................25

Colo. Rev. Stat. 1774, § 248 (1881) .................................................22

CHARTER AND REVISED ORDINANCES OF BOISE CITY, IDAHO 119 (1894) ............22

GEORGE R. DONNAN, ANN. CODE OF CRIM. P. & PENAL CODE OF THE STATE OF
      N.Y. AS AMENDED 1882-5, § 410 (4th ed. 1885) .......................................22

Joplin Code of 1917, art. 67, § 1201 ................................................22

Nashville, Tenn., Ordinance, § 738 *in* CLAUDE WALLER, DIGEST OF THE
      ORDINANCES OF THE CITY OF NASHVILLE, TO WHICH ARE PREFIXED THE
      STATE LAWS INCORPORATING, AND RELATING TO, THE CITY (1893) .........22

Nashville, Tenn., Ordinances, Elections, §§ 2–3, *in* JAMES H. SHANKLAND,
      PUBLIC STATUTES OF THE STATE OF TENNESSEE, SINCE THE YEAR 1858,
      BEING IN THE NATURE OF A SUPPLEMENT TO THE CODE (1869)................22

Pls.' Resp./Reply in Supp. of Summ. J.  - iv

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Nashville, Tenn., Ordinances, pt. 3, tit. 12, ch. 108, §§ 1–6, *in* WILLIAM KING
    MCALISTER JR., ORDINANCES OF THE CITY OF NASHVILLE, TO WHICH ARE
    PREFIXED THE STATE LAWS CHARTERING AND RELATING TO THE CITY
    (1881) .......................................................................................................22

Otoe County, Neb., Ordinance No. 7, § 1, *in* GILBERT B. COLFIELD, LAWS,
    ORDINANCES, AND RULES OF NEBRASKA CITY,
    OTOE COUNTY 36 (1872)...........................................................................22

REVISED ORDINANCES OF PROVO CITY, CONTAINING ALL THE ORDINANCES IN
    FORCE 105 (1877) ....................................................................................22

## **Other Authorities**

Aaron Smith, *Flamethrowers, given up by military, are now being sold to the
    public*, CNN (Aug. 13, 2015), https://cnn.it/3rpRfGr ...............................10

Br. of *Amici Curiae* Violence Policy Center, et al., *District of Columbia v. Heller*,
    (Jan. 11, 2008) (No. 07-290)......................................................................8

Brett Foote, *There are currently 16.1 million Ford F-Series pickups on U.S. roads*,
    FORD AUTHORITY (Apr. 9, 2021), https://bit.ly/3EXWlwE ......................10

CHRISTOPHER S. KOPER, AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT
    WEAPONS BAN: IMPACTS ON GUN MARKETS & GUN VIOLENCE, 1994-2003
    at 65–67, U.S. DEP'T OF JUSTICE, Doc. No. 204431 (July 2004)
    https://bit.ly/3LIqXGl ...............................................................................12

Compl., *Fitz v. Rosenbloom*, No. 3:22-cv-01859, Doc. 1 (Nov. 30, 2022) ...........19

Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms
    Design, Sale, and Carrying on Fatal Mass Shootings in the United States*,
    19 CRIM'Y & PUB. POL'Y 171 (2020).........................................................8

Dave Campbell, *A Look Back at the Thompson Submachine Gun*, AMERICAN
    RIFLEMAN (Apr. 17, 2019), *available at* https://bit.ly/3ZlZL5y .................9

DON TROIANI, DON TROIANI'S SOLDIERS OF THE AMERICAN REVOLUTION 4
    (2007)..........................................................................................................3

*Expanded Homicide Data Table 8: Murder Victims by Weapon, 2014–2018,
    Crime in the United States*, FBI, U.S. Dep't of Just. (2018),
    https://bit.ly/2p0bw4D ...............................................................................8

Flamethrowers? Really? Act, H.R. 4009, 114th Cong. (2015) ...............................9

Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass
    Shootings: The Plausibility of Linkages*,
    17 J. RES. & POL'Y 28 (2016).....................................................................16

*Inflation Calculator*, FEDERAL RESERVE BANK OF MINNEAPOLIS,
    https://bit.ly/3PoLAID ...............................................................................9

James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving
    Beyond Newton*, 18 Homicide Studies 125 (2013) ......................................8

Pls.' Resp./Reply in Supp. of Summ. J.  - v

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868*, HARV. J. OF L. & PUB. POL'Y PER CURIAM (Oct. 1, 2022), https://bit.ly/3CMSKjw ....................24

Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban Cases—Again*, HARV. J. OF L. & PUB. POL'Y PER CURIAM (Sept. 27, 2023), *available at* https://bit.ly/3PWhqwH ......................................................................19, 20

NAT'L RES. COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 115 (2005).........................................................................................................12

NAT'L RES. COUNCIL, PRIORITIES FOR RESEARCH TO REDUCE THE THREAT OF FIREARM-RELATED VIOLENCE 15 (2013) ....................................................12

Nelson Ireson, *25 best-selling cars of 2023, so far*, KELLEY BLUE BOOK, (July 17, 2023), https://bit.ly/3rA8m8r ...................................................................10

NICHOLAS J. JOHNSON ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 1978 (3d ed. 2021) .............................3

RAND CORP., *Effects of Assault Weapon and High-Capacity Magazine Bans on Mass-Shootings* (Jan. 10, 2023), https://bit.ly/3RDN3xe .........................16

RAND CORP., *The Effects of Bans on the Sale of Assault Weapons and High-Capacity Magazines* (Jan. 10, 2023), https://bit.ly/3roOiWB ..................16

RANDOLPH ROTH, AMERICAN HOMICIDE 348 (2009)............................................20

Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking*, THE TRACE (Jan. 6, 2016), https://bit.ly/41tIDv7 .......................................8

Pls.' Resp./Reply in Supp. of Summ. J.  - vi

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

# I.  INTRODUCTION

This is a straightforward case. The Supreme Court has held that the Second Amendment protects the absolute right of law-abiding citizens to have and to use commonly possessed arms. Washington's law infringes that right by outlawing standard-capacity ammunition magazines owned by tens of millions of Americans. That is all that is needed to declare Washington's law unconstitutional.

Defendants make several arguments that magazines are not "arms," and the statewide ban of them, which Defendants acknowledge amounts to a ban on the versions of popular firearms capable of firing more than 10 rounds without reloading, does not even implicate Second Amendment concerns. Their arguments would permit the State to effectively ban semiautomatic firearms (reducing them all to single-shot arms) without ever raising a Second Amendment issue and must be rejected.

As to the history of the Second Amendment, the Supreme Court has already established (and the Ninth Circuit recently reiterated) that arms that are in common use for lawful purposes—meaning those that are typically possessed by law-abiding Americans—*cannot be banned* consistent with the Second Amendment's history. The State fights the governing legal standard, claiming first that "common use" is an element of "the plain text" not a rule derived from history, but the Supreme Court and the Ninth Circuit have been clear that the rule is historical. Alternatively, Defendants try to recast "common use" as "commonly fired in excess of ten times in self-defense," but that is not how the Supreme Court has ever measured it. Defendants attack Plaintiffs' evidence demonstrating that the banned magazines are overwhelmingly popular, but there is no reasonable basis on which to dispute that these items are common. At any rate, it is the State's burden to prove that they are *uncommon*, and the State has not carried that burden.

Defendants also make several interest-balancing arguments that must be rejected as invalid under the proper Second Amendment analysis, which focuses on history. And when Defendants finally do focus on history, they decisively fail to carry their burden, pointing to *no* valid analogues for a law that bars possession of common arms.

Pls.' Resp./Reply in Supp. of Summ. J.  - 1

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

## II.  ARGUMENT

**A.    No Threshold Issue Requires Judgment in Any Defendant's Favor.**

The Grays Harbor Defendants move for summary judgment on Plaintiffs' Section 1983 claims on the same basis that other defendants previously moved to dismiss. Defs. Mot. for Summ. J., Doc. 124 at 3–4 (Sept. 9, 2023). Plaintiffs' oppose this motion for the same reasons they opposed those motions and reserve the right to appeal the decision, but they recognize, under the law of the case, the Section 1983 claims against the Grays Harbor Defendants should be dismissed, *see* Order, Doc. 76 at 15–16 (Oct. 24, 2022) ("Order"), though the Grays Harbor Defendants remain appropriate Defendants to this action under *Ex parte Young*, *see id.* at 12–15.

The King County Defendants argue Plaintiffs lack standing because their injuries are not redressable by an order against King County officials. Defs. Resp., Doc. 110 at 10 (Sept. 1, 2023) ("King Br."). This Court has previously held the opposite, rejecting the claim that King County is not "primarily responsible for investigating and prosecuting" violations of the Magazine Ban, and that Plaintiffs should instead have sued officials from the City of Auburn, which also has authority to enforce violations of the Magazine Ban. Order at 7–9. King County acknowledges that its argument is foreclosed by the law of the case but asks that this Court reconsider in light of *Haaland v. Brackeen*, 143 S. Ct. 1609 (2023). King Br. at 11. It should not. In *Haaland*, the individual challengers to an Indian Child Welfare Act policy that preferred placing Indian children with Indian adoptive or foster parents lacked redressability because they had sued federal officials but "[t]here is no federal official who administers ICWA or carries out its mandates." *Id.* (quotations omitted). Here, as this Court has previously held, the King County Defendants *do have* authority to enforce the Magazine Ban, and that provides "the requisite causal connection for standing purposes." *See* Order at 7 (quotation omitted). Nothing in *Haaland* alters that analysis.

**B.    Banning Magazines Infringes the Right to Keep and Bear "Arms."**

Under *New York State Rifle & Pistol Association v. Bruen*, any law that restricts activity that falls within the plain text of the Second Amendment is presumptively unconstitutional. 142 S. Ct. 2111, 2126 (2022). That is the situation here where Washington has banned ammunition

Pls.' Resp./Reply in Supp. of Summ. J.  - 2

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

magazines that both hold and feed ammunition into semiautomatic firearms, because a ban of those ammunition magazines is a ban of "arms" within the plain text of the Second Amendment. *See* Pls.' Mot. for Summ. J., Doc. 101 at 6–8 ("Pls.' MSJ").

Defendants respond that magazines should be considered "accessories" or "accoutrements" to arms, not arms themselves, noting that the industry markets them as accessories, *see* State Defs. Resp., Doc. 131-1 at 10 (Sept. 12, 2023) ("State Br."), and that their expert concluded that linguistic evidence demonstrates that magazines would have been considered "accoutrements" at the Founding, *id.*; *see also* Decl. of Dennis Baron, Doc. 115-1 at 10 (Sept. 1, 2023) ("Baron Decl."). The retail classification of magazines has no constitutional significance. And as for the "accoutrements" argument, it is built on nothing. The State's linguistic expert notes that "magazine" was not a word used to describe any sort of ammunition container at the Founding, so in order to run his corpus linguistics analysis, he first had to decide that they were analogous to "cartridge boxes" and analyzed how *that* term was used at the Founding. But it is fallacious to compare semiautomatic magazines, which both hold *and feed* ammunition into the chamber to be fired, *see* Nicholas J. Johnson et al., Firearms Law and The Second Amendment: Regulation, Rights, and Policy 1978 (3d ed. 2021), with "cartridge boxes" which were simple containers used to store spare ammunition, *see* Don Troiani, Don Troiani's Soldiers of the American Revolution 4 (2007). In any event, even if magazines were like cartridge boxes, they would still be "arms." Although Baron makes much of the fact that he consulted several databases of Founding-era sources to conclude they were often referenced as "accoutrements," Baron Decl. at 11, he omits to discuss the most important sources. The Constitution gives Congress the authority to "provide for organizing, *arming*, and disciplining the Militia," U.S. Const. art. I, § 8, cl. 16 (emphasis added), and, in the first exercise of this authority in 1792 (one year after the ratification of the Second Amendment) Congress required militiamen to acquire firearms as well as "a knapsack, a pouch, with a box therein, to contain not less than twenty four cartridges." The Militia Act of 1792, Act of May 8, 1792, ch. 33, 1 Stat. 271 § 1. Congress therefore understood "arming" the militia to include outfitting the militia with containers for ammunition. *See Abbott v.*

Pls.' Resp./Reply in Supp. of Summ. J.  - 3

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

1   *Biden*, 70 F.4th 817, 830 (5th Cir. 2023). And again, magazines are not the mere containers to

2   which Baron compares them; they are integral parts of firearms that serve essential functions.

3         Defendants also argue that magazines are not "arms" because they "have no function

4   independent of a firearm, nor are they necessary components of firearms." State Br. at 10; *see also*

5   King Br. at 15. But a trigger has no "function independent of a firearm" either and it *must* be

6   protected—in fact, that magazines *only* function if they are *part* of a firearm demonstrates why a

7   regulation of magazines is a regulation of arms. *See Barnett v. Raoul*, --- F. Supp. 3d ----, 2023

8   WL 3160285, at *8 (S.D. Ill. Apr. 28, 2023). And Defendants acknowledge that magazines *are*

9   necessary components of firearms, since "certain types of modern firearms require a magazine to

10  function as designed." State Br. at 10. But, they argue, though magazines may be necessary, they

11  do not need to have more than 10 rounds to work. *Id.*; King Br. at 15. That is a different question.

12  And it is hard to understand how they can read the *text* of the Second Amendment to divide

13  between magazines that hold ten or fewer rounds (arms) and those that hold more than ten rounds

14  (not arms). That is especially true since the ten-round line the State has drawn is also not related

15  to what a firearm "needs" to function—firearms that require magazines would work with *any* size

16  magazine made to work with the firearm. The State just prefers ten rounds, for now. But there is

17  no limiting principle, and the State's argument would ultimately permit it to render every firearm

18  a one-shot gun without, in its view, even implicating the text of the Second Amendment. *Duncan*

19  *v. Bonta*, No. 17-cv-1017, 2023 WL 6180472, at *3 n.24 (S.D. Cal. Sept. 22, 2023). But it is

20  obvious that such a law *would* implicate the Second Amendment because the State would have

21  effectively outlawed firearms that could fire without reloading. The principle is the same here; the

22  State has outlawed firearms that can fire more than ten times without reloading. That the law

23  targets a *part of the gun* and not the *gun itself*, *see* King Br. at 17, makes no difference. Pls.' MSJ

24  at 7. Defendants assert that "anyone who wanted to purchase, say, a Glock 17 remains free to do

25  so in Washington. And they can buy this firearm with as many 10-round magazines as they want

26  . . . They just cannot purchase a new 17-round magazine to go with it." State Br. at 12. This doesn't

27  prove *their* point, it proves *ours*. The State of Washington has rendered a Glock 17—typically a

Pls.' Resp./Reply in Supp. of Summ. J.  - 4

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

17-round firearm, a 10-round firearm. And in so doing, it has claimed that it is not regulating firearms at all. The Second Amendment cannot be so easily avoided or else it means nothing at all.

**C.    The Banned Magazines Are in Common Use.**

The Magazine Ban is presumptively unconstitutional. To save its law, Washington must prove it is consistent with a historical tradition of firearm regulation. In this case, as Plaintiffs have explained at length, that means the State must show the banned magazines are dangerous and unusual weapons, which is impossible because they are in common use for lawful purposes. Pls.' MSJ at 9–12.

1.    Defendants get this argument wrong at every step. First, they insist that the question of whether a firearm is "in common use" has bearing on whether something is an "arm" within the text of the Second Amendment. State Br. at 12; King Br. at 20. This argument is foreclosed by *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), in which the Ninth Circuit held a Hawaii ban on butterfly knives violated the Second Amendment. *Teter* squarely "reject[ed] Hawaii's argument that the purported 'dangerous and unusual' nature of butterfly knives means they are not 'arms' as that term is used in the Second Amendment. *Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in '*the historical tradition* of prohibiting the carrying of dangerous and unusual weapons.' It did not say that dangerous and unusual weapons are not *arms*." 76 F.4th at 949–50 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). And *Teter* also held if a "weapon is commonly possessed by law-abiding citizens for lawful purposes" it cannot be "dangerous and unusual." 76 F.4th at 950. So although Defendants treat these issues like they are part of the textual analysis and attempt to place the burden on Plaintiffs to demonstrate that the banned magazines are *not* dangerous and unusual and are "in common use for self-defense," *see, e.g.*, State Br. at 13, *Defendants* "bear[ ] the burden of proof in the second prong of the *Bruen* analysis" to prove the banned magazines are "dangerous and unusual," *see Teter*, 76 F.4th at 950.

Given *Teter*'s central importance to this case as a recent, binding decision of the Ninth Circuit that dealt directly with the question of what sort of items are "arms" under the Second

Pls.' Resp./Reply in Supp. of Summ. J.  - 5

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1  Amendment and when they can be banned, it is surprising that only two defendants even *mention*

2  the case and only the State attempts to respond to it. *See* Intervenor Def. Resp., Doc. 125 at 13

3  (Sept. 1, 2023) ("AGR Br."); State Br. at 14 n.8. In addressing the case, the State claims that *Teter*

4  is not binding because it "does not—and cannot—overrule *Alaniz*, *Bruen*, and *Heller*." State Br.

5  at 14 n.8. *United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023), predated *Teter* but involved a

6  Second Amendment challenge to a sentencing enhancement for cases in which a crime was

7  committed and " 'a dangerous weapon (including a firearm) was possessed' and present during the

8  crime." *Alaniz*, 69 F.4th at 1126 (quoting U.S.S.G. § 2D1.1(b)(1)). In summarizing the *Bruen*

9  framework, the court said "*Bruen* step one involves a threshold inquiry. In alignment with *Heller*,

10  it requires a textual analysis" which the *Alaniz* panel took to include the question of "whether the

11  weapon at issue is in common use today for self-defense." 69 F.4th at 1128 (quotations omitted).

12  That statement was dicta, as *Alaniz* did not even *do* a textual analysis but assumed, without

13  deciding, that the text of the Second Amendment was implicated. *Id.* Had it done a textual analysis,

14  the discussion of the "common use" standard *still* would have been dicta since the case was not

15  about a ban on any sort of arm like this one and so the issue of whether an arm was "in common

16  use" would not have come up. *Id.*  This dicta, which was not the result of the panel "confront[ing]

17  an issue germane to the eventual resolution of the case," *United States v. McAdory*, 935 F.3d 838,

18  843 (9th Cir. 2019), but merely a prefatory "comment[] 'made casually and without analysis,

19  uttered in passing without due consideration of the alternatives, or done as a prelude to another

20  legal issue that commands the panel's full attention,' " *Id.* at 843 (quoting *United States v. Ingham*,

21  F.3d 1068, 1078 n.8 (9th Cir. 2007)) (cleaned up), is not binding. For that reason, the case rightfully

22  went unmentioned in *Teter* which *did* squarely confront the issue and *is* binding on this Court. The

23  State's claim that *Bruen* and *Heller* contradict *Teter* is belied both by Plaintiffs' summary

24  judgment brief, in which they argued for the very same analysis *Teter* applied based on those cases,

25  Pls.' MSJ at 9–10, and by the fact that *Teter* itself was analyzing and expounding on those

26  decisions, 74 F.4th at 950. This Court does not have the authority to tell the Ninth Circuit it

27  misinterpreted the Supreme Court.

Pls.' Resp./Reply in Supp. of Summ. J.  - 6

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

In any event, there can be no serious argument that "common use" is part of a "plain text" analysis; even the Defendants, in laying out the test, note that it is based in "the historical tradition of prohibiting the carrying of dangerous and unusual weapons." State Br. at 12 (quoting *Bruen*, 142 S. Ct. at 2128). The State's argument rests on its claim that "in *Bruen*, the Court confirmed that 'handguns are weapons in common use today for self-defense' before" analyzing history, but that is misleading. *Id.* at 14 (quoting *Bruen*, 142 S. Ct. at 2119). *Bruen* made that statement before it did *any* analysis, textual *or* historical, and merely noted the fact as a way of explaining what issues were not before the Court in that case, 142 S. Ct. at 2119. Indeed, the only way the Court could conclude that those issues were not before the Court is if they were undisputed as to both text *and* history.

2.   The State also gets "common use" wrong because it would consider a firearm in "common use" only if it is "commonly fired for self-defense," or, in the case of magazines holding more than 10 rounds, if they are often *fired more than 10 times* in self-defense. *See* State Br. at 17. Here again, this Court is bound to hold otherwise, since *Teter* held that "whether the weapon is *commonly possessed* by law-abiding citizens for lawful purposes" is the relevant metric for judging whether an arm is protected or not. 76 F.4th at 950 (emphasis added). The State's arguments in favor of "commonly fired" are unsupported. The text of the Second Amendment protects the right to "keep and bear arms"— the State's definition of "common use" excludes the two types of "use" that are explicitly mentioned by the text of the Amendment—owning and carrying. Moreover, in *Heller*, the Supreme Court held that a person "bears" a firearm when he carries it "for the purpose of being armed and ready for offensive or defensive action in case of conflict with another person." 554 U.S. at 584 (cleaned up). An arm is "used" when it is kept or carried in *anticipation* of needing to use it, not only in those (thankfully rare) instances when an individual must fire it. For this reason, *Heller* held handguns were in common use because they were "the most popular weapon chosen by Americans for self-defense in the home" without ever once discussing how often handguns are fired. *Id.* at 629.

Pls.' Resp./Reply in Supp. of Summ. J.  - 7

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

3.      This language from *Heller* discloses another error Defendants make repeatedly in discussing common use—while *Heller* focused its analysis on whether and how law-abiding citizens used handguns, Defendants focus on the ways that criminals *misuse* the banned magazines "in mass shootings and other high-profile criminal activity to devastating effect." State Br. at 17. But that is even more true of handguns regardless of magazine capacity, which are the most common firearm used in mass shootings, *see* James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving Beyond Newton*, 18 Homicide Studies 125, 136 (2013); *accord* Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Crim'y & Pub. Pol'y 171, 188 (2020), and are overwhelmingly the weapons of choice for criminals generally, *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2014–2018, Crime in the United States*, FBI, U.S. Dep't of Just. (2018), https://bit.ly/2p0bw4D (64% of murders in 2018 committed with handguns); *see also, e.g.,* Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking*, The Trace (Jan. 6, 2016), https://bit.ly/41tIDv7 (showing that, of the top 20 firearms seized by Chicago Police in 2014, *all 20* were handguns). And yet that did not factor into the Supreme Court's analysis in *Heller* at all. And lest there be any doubt, *Heller* was aware of these facts; indeed, the very same sort of arguments that Defendants make here were made to the Court in *Heller*, as *amici* warned the Court that handguns had no legitimate self-defense functions, that other firearms were much better, and that the characteristics of handguns—including their ammunition capacity—made them only useful to those intent on committing crimes, including mass shootings. *See generally, e.g.*, Br. of *Amici Curiae* Violence Policy Center, et al., *District of Columbia v. Heller*, (Jan. 11, 2008) (No. 07-290). Yet *Heller* looked not to how some criminals misused handguns but to whether law-abiding citizens possessed them for lawful purposes. Because they did, that settled the constitutional question. This Court is bound to do the same.

4.      Defendants deride "common use" as a "popularity contest," that leads to "absurd conclusions that a firearm accessory's constitutionality turns on whether the gun industry chooses to engage in mass campaigns to flood the market" and limits regulation to "rare weapons" which

Pls.' Resp./Reply in Supp. of Summ. J.  - 8

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

is "nonsensical because rare weapons are not the ones causing problems." State Br. at 18. They claim the test is "circular," argue that "Tommy guns" were "all too common during the Prohibition era" and that taking "common use" seriously would permit a "flamethrower" to become constitutionally protected "if it becomes commonly used for self-defense." *Id.* None of these objections have merit. The circularity objection was raised by Justice Breyer in dissent in *Heller* but "the *Heller* majority was obviously unmoved by it." *See Kolbe v. Hogan*, 849 F.3d 114, 153 (4th Cir. 2017) (Traxler, J., dissenting). And try as they might, producers cannot dictate to consumers what to purchase—as Google Glass and the Ford Edsel demonstrate. That is why, when *Heller* was confronted with the popularity of handguns among American consumers it took their popularity as a sign that they were "chosen by American society." 554 U.S. at 628. Consumers today have a choice—as Defendants emphasize in their brief, magazines holding 10 or fewer rounds exist—but larger magazines are standard because the fact is, people *prefer* the greater capacities. As for the concern that "rare weapons are not the ones causing problems"—the State is confusing cause and effect. If it changes what is available, it will change the arms used by criminals. *See, e.g.*, *Duncan*, 2023 WL 6180472 at 5 n.24.

Finally, far from demonstrating some inherent flaw, flamethrowers and "Tommy guns" demonstrate that "common use" leads to none of the concerning outcomes that the Defendants theorize. The Thompson submachine gun, like machine guns generally, has *never* been in common use. When it appeared on the market in 1921 though "virtually anyone with the cash could buy one across the counter," "[s]ales trickled in." Dave Campbell, *A Look Back at the Thompson Submachine Gun*, AMERICAN RIFLEMAN (Apr. 17, 2019), *available at* https://bit.ly/3ZlZL5y. At the same time, automatic firearms became "[t]he guns of choice for most [Prohibition-era] gangs." *Id.* Thirteen years later, Congress passed the National Firearms Act of 1934, severely restricting the lawful possession of machine guns by subjecting them to what at the time was an exorbitant tax. *See Inflation Calculator*, FEDERAL RESERVE BANK OF MINNEAPOLIS, https://bit.ly/3PoLAID ($200 in 1934 equivalent to over $4,500 in 2023). As expected, the "common use" test permits the state to ban arms like the Thompson that are "dangerous and

Pls.' Resp./Reply in Supp. of Summ. J.  - 9

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

unusual." But precisely because they remain uncommon *for a reason*, regulation of unusual weapons will in many cases be unnecessary, even if they could be, like a flamethrower, considered dangerous. The State is alarmed that such a weapon could become commonly used for self-defense and become protected, but like the Tommy gun in 1921, flamethrowers are broadly legal in the United States today. They are currently not regulated as firearms under federal law and they are commercially available. *See* Aaron Smith, *Flamethrowers, given up by military, are now being sold to the public*, CNN (Aug. 13, 2015), https://cnn.it/3rpRfGr; *see also* Flamethrowers? Really? Act, H.R. 4009, 114th Cong. (2015) (A bill "to amend [federal law] to treat flamethrowers the same as machineguns."). And yet we do not see *anyone* using a flamethrower for self-defense because, in the judgment of the American people, they are not as useful for that purpose as other tools, including magazines holding more than ten rounds. Defendants' hypothesized negative effects that could result from "common use" can be rejected because they are hypothetical.

5.      Turning to the numbers, the State argues Plaintiffs have failed to demonstrate that the banned magazines are commonly possessed for lawful purposes, but again, it is the State's burden to show they are *uncommon*. *Teter*, 76 F.4th at 950. Its arguments are unpersuasive on their own terms. First, it attacks the numbers head on, claiming that "fewer than 12% of Americans— 39 million Americans in a nation of over 330 million—have ever owned an LCM." State Br. at 19. But that is, by any metric, "common," especially when the comparison is against weapons that are "highly unusual in society at large." *Bruen*, 142 S. Ct. at 2143 (quotation omitted). Something that is owned by more than 10% of all Americans (to say nothing of all adults or all firearm owners), cannot be "highly unusual in society at large." That is, for example, more than twice as "common" as the best-selling vehicle in the United States, Ford F-Series pickups. *See* Brett Foote, *There are currently 16.1 million Ford F-Series pickups on U.S. roads*, FORD AUTHORITY (Apr. 9, 2021), https://bit.ly/3EXWlwE; *see also* Nelson Ireson, *25 best-selling cars of 2023, so far*, KELLEY BLUE BOOK, (July 17, 2023), https://bit.ly/3rA8m8r. And it is well above the 200,000 stun guns in the United States when *Caetano* was decided. *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring).

Pls.' Resp./Reply in Supp. of Summ. J.  - 10

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Second, the State attacks Plaintiffs' sources, arguing that data from the National Shooting Sports Foundation and from Professor William English is unreliable and hearsay. Taking the evidentiary objection first, facts about how many firearms and magazines exist in America, who owns them, and for what purpose they keep them are all "legislative facts." They are general facts about the world that transcend the immediate activities of the parties but "have relevance to legal reasoning . . . in the formulation of a legal principle or ruling by a judge or court." FED. R. EVID. 201, 1972 Advisory Committee Note; *see also Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990). In a facial constitutional challenge like this one, *all* the relevant facts are "legislative facts" because, "[o]nce standing is established, the plaintiff's personal situation becomes irrelevant." *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011). Such facts are not subject to the rules of evidence—even judicial notice of them is unnecessary. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010); *cf. Teter*, 76 F.4th at 946–47 (denying remand, noting that "historical research required under *Bruen* involves issues of so-called 'legislative facts' "). After all, "the court may ascertain as it sees fit any fact that is merely a ground for laying down a rule of law." *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 548 (1924) (Holmes, J.). They therefore cannot be "hearsay." Furthermore, since they are predicates to legal rules, it is appropriate to discuss and dispute such facts "in the argument section of the brief." *Wiesmueller v. Kosobucki*, 547 F.3d 740, 742 (7th Cir. 2008) (discussing 7th Circuit Rule 28). So, the State's claim that Plaintiffs' must be taken as having failed to rebut their historical evidence (which Plaintiffs rebut below) merely because they did not file a responsive expert report is likewise baseless. State Br. at 31–32.

As to reliability, virtually every source on the issue finds similar levels of ownership to English and NSSF. *See, e.g., Duncan v. Bonta*, 970 F.3d 1133, 1142 (9th Cir. 2020) ("One estimate based in part on government data shows that from 1990 to 2015, civilians possessed about 115 million LCMs out of a total of 230 million magazines in circulation."), *rev'd on reh'g en banc*, 19 F.4th 1087 (2021), *vacated and remanded in light of* Bruen, 142 S. Ct. 2895, 49 F.4th 1228 (2022); *Kolbe*, 849 F.3d at 129 ("[I]n the United States between 1990 and 2012, magazines capable of

Pls.' Resp./Reply in Supp. of Summ. J.  - 11

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

holding more than ten rounds numbered around 75 million, or 46% of all magazines owned."); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015); Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003* at 65–67, U.S. DEP'T OF JUSTICE, Doc. No. 204431 (July 2004), https://bit.ly/3LIqXGl. Even if the State's arguments against the English and NSSF reports are credited, there is no basis on which to find the banned magazines are not commonly owned— indeed, the State's own motivation for the regulation is the fact that these magazines are not "rare." State Br. at 18. Thus, while the State is concerned that NSSF data provides only a "crude guesstimate" and Professor English's paper does not publish the actual survey instrument used or disclose his funding so that "it is impossible to evaluate the potential of bias," *id.* at 21, the State entirely fails to contend with the fact that both sources are entirely in line with others that have reviewed the numbers of magazines or firearms in the country.

The State takes particular issue with some of Professor English's results which it deems "not credible," noting that English concluded that "[g]un owners engage in approximately 1.67 million defensive uses of firearms per year," of which approximately 302,000 involved the firing of actual shots and  found "53.8% of California gun owners have owned an LCM, despite the fact that the sale of LCMs has been banned in California for all but one week since 1994." *Id.* at 21– 22. As for the defensive gun uses reported by English, although it is apparently news to the State, that estimate is *lower* than most accepted reliable estimates. NAT'L RES. COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 115 (2005) (Kleck and Gertz found 2.5 million defensive gun uses each year and "[a]t least 19 other surveys have resulted in estimated numbers of defensive gun uses that are similar (i.e., statistically indistinguishable) to the results found by Kleck and Gertz."); *see also* NAT'L RES. COUNCIL, PRIORITIES FOR RESEARCH TO REDUCE THE THREAT OF FIREARM-RELATED VIOLENCE 15 (2013); *Bruen*, 142 S. Ct. at 2159 (Alito, J., concurring) ("According to survey data, defensive firearm use occurs up to 2.5 million times per year."); *see also id.* at 2157 n.1 (citing approvingly an amicus brief filed by Professor English). And as for the fact that English estimates that 53.8% of Californians have owned a magazine holding more than ten rounds despite

Pls.' Resp./Reply in Supp. of Summ. J.  - 12

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

their legal status in that state, Professor English counted individuals who *have owned* such magazines and also included individuals who owned magazines presently but kept them out-of-state in his count. According to census data, from 2010 to 2021, 5.8 million people moved to California from other parts of the country, or about 15% of California's total population. If that trend can be projected back in time to the previous decade, its easy to see how a significant portion of California's gun owners would have had the opportunity to own these magazines.

**D.      The Court Should Reject Defendants' Extraneous Arguments.**

In addition to fighting the dispositive "common use" analysis that this Court must perform, Defendants advance several irrelevant arguments. The State argues that the banned magazines "serve combat functions—not self-defensive functions." State Br. at 14. Even under the State's misunderstanding of "common use," it is hard to understand why, for example, the fact that ATF determined in 1989 that, for imported arms "large capacity magazines are indicative of military firearms[,]' " *id.* at 15, should have any bearing on the constitutionality of the banned magazines. In fact, this does not fit into the "common use" analysis at all but rather is a separate argument that the State conflates with "common use," wherein it argues that magazines which " 'are most useful in military service' . . . [are] not protected by the Second Amendment." *Id.*. at 17 (quoting *Heller*, 554 U.S. at 627). This argument was accepted as a justification for upholding arms bans pre-*Bruen* by the Fourth and Seventh Circuits, *see Kolbe*, 849 F.3d at 131; *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) (considering that "military-grade weapons" are not protected by the Second Amendment), and has been embraced by at least one district court since, *see Hanson v. District of Columbia*, 2023 WL 3019777, at *8 (D.D.C. Apr. 20, 2023), but it has no basis in the text, history, or Supreme Court precedent. It is based on a distortion of *Heller*'s discussion of firearms "most useful in military service" such as "M-16 rifles." 554 U.S. at 627. The reason *Heller* gave why such firearms potentially "may be banned" is that they are "highly unusual in society at large" and thus within the category of dangerous and unusual weapons. *Id*. *Heller* did not establish a free-floating "useful in military service" test. Indeed, such a test would be perverse given the prefatory clause's stated purpose of the Second Amendment being to

Pls.' Resp./Reply in Supp. of Summ. J.  - 13

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

preserve the militia. *Heller*'s discussion of this issue was a defensive one explaining why, under the operative clause, weapons that are unusual in society generally but useful in military service potentially may be banned notwithstanding that purpose. *Kolbe* therefore badly misread *Heller* by crafting a "heretofore unknown" "stand-alone inquiry" that dispensed with any historical analysis in favor of "ad hoc" comparisons between types of firearms. 849 F.3d at 155–56 (Traxler, J., dissenting). And *Bruen* confirms that *Kolbe* erred by making clear that *all* firearms "in common use today" are protected, 142 S. Ct. at 2143, regardless of whether or not they are useful in the military.

*Friedman* likewise is unpersuasive and abrogated by *Bruen*. Rather than assessing common use, *Friedman* thought "it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' and whether law-abiding citizens retain adequate means of self-defense," *Friedman*, 784 F.3d at 410 (internal citation omitted). None of these considerations survive *Bruen*. Whether a type of firearm existed in the 1790s has no bearing on whether it is constitutionally protected; *Bruen* clarified that weapons that are protected are those that are "in common use *today*." 142 S. Ct. at 2143 (emphasis added). The same is true for whether the banned arms have "some reasonable relationship to the preservation or efficiency of a well regulated militia." *Friedman*, 7384 F.3d at 410 (quoting *Heller*, 554 U.S. at 622). In *Bruen*, the Court analyzed *English v. State*, 35 Tex. 473 (1871), in which the Texas Supreme Court had concluded that the Second Amendment and the state's analogous provision only protected such arms "as are useful and proper to an armed militia." *Id.* at 474. *Bruen* dismissed this rationale as an "outlier[]," and reiterated that the Second Amendment right to keep and bear arms "does not depend on service in the militia." 142 S. Ct. at 2153, 2127. And *Bruen* did nothing to disturb *Heller*'s rejection of the claim that the government can ban one type of arm so long as others remain available for use. 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed.").

Pls.' Resp./Reply in Supp. of Summ. J.  - 14

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1    The State also attempts to separate whether an arm is a "dangerous and unusual weapon"

2    from the question of whether it is in common use, but that is impossible and makes a hash of

3    Supreme Court and Ninth Circuit caselaw. The State claims "[c]ourts have differed on whether it

4    is addressed at *Bruen* step one or step two," but, as explained above, there can be no question.

5    State Br. at 22. *Teter*, which the State acknowledges on this point, is binding, and treats it as part

6    of the historical analysis. The decision which the State says treated it differently, *Fyock v.*

7    *Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015), was cited in *Teter* and, what is more, predates *Bruen*

8    and so can shed no light on the issue of "whether it is addressed at *Bruen* step one or step two."

9    The State again attempts to minimize *Teter*'s importance to this case, noting that it "is awaiting *en*

10   *banc* review, [so] we will likely have an answer to this question [where to consider "dangerous

11   and unusual" in the *Bruen* analysis] soon." State Br. at 23 n.16. *Teter* may or may not be taken en

12   banc, but at this point, it is controlling, on-point circuit precedent, which forecloses this argument

13   from the State.

14       Moreover, *Teter* is right. It is unclear *how* the State can consider "dangerous and unusual"

15   separate from common use, given that it acknowledges, under pre-*Teter* Ninth Circuit precedent,

16   a firearm can only be dangerous and unusual if it "has uniquely dangerous propensities" and is not

17   "commonly possessed by law-abiding citizens for lawful purposes." *Id.* at 23 (quoting *Fyock*, 779

18   F.3d at 997). The State eschews discussing (again) common possession and instead focuses only

19   on the allegedly dangerous propensities of the banned magazines: that they eliminate the need for

20   shooters to reload, "robbing potential victims of opportunities to escape," that mass shooters using

21   magazines holding more than ten rounds fire more bullets and kill more people, that law-abiding

22   citizens with more rounds available to them are more likely to endanger bystanders, and that, in

23   the State's judgment, "[n]o honest man needs more than 10 rounds." *Id.* at 17.

24       The State's argument is essentially that, by banning certain magazines, it is limiting the

25   lethality of mass shootings, an undoubtedly important government interest. But no matter how it

26   is packaged, *Bruen* held that such considerations are *not relevant* to a statute's constitutionality

27   under the Second Amendment and this Court cannot consider them. *Bruen*, 142 S. Ct. at 2133 n.7.

Pls.' Resp./Reply in Supp. of Summ. J.  - 15

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

And in any event, this justification is wrong on its own terms. Though the State's expert, Professor Klarevas, claims that breaks in firing to reload create "precious downtime [that] affords those in the line of fire with a chance to flee, hide, or fight back," Decl. of Louis J. Klarevas, Doc. 120-1 at 17 (Sept. 1, 2023), that cannot be demonstrated because changing magazines does not afford enough time in most cases to do *anything*. *See* Rand Corp., *The Effects of Bans on the Sale of Assault Weapons and High-Capacity Magazines* (Jan. 10, 2023), https://bit.ly/3roOiWB; *see also* Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, 17 J. Res. & Pol'y 28 (2016).[1] And though Klarevas claims that the use of banned magazines corresponds to more shots fired and more deaths in mass shootings, his research in this area is an outlier that has been noted to show "improbably large" "effect sizes" from bans like Washington's. *See* Rand Corp., *Effects of Assault Weapon and High-Capacity Magazine Bans on Mass-Shootings* (Jan. 10, 2023), https://bit.ly/3RDN3xe. As for the State's supposition that civilians, armed with magazines holding more than 10 rounds, will never need all the rounds they are carrying *and* may fire more rounds in defense than necessary and therefore possibly injure others as they defend themselves, not only are these concerns contradictory, they are deeply misguided. Of course, a law-abiding citizen defending himself may accidentally hit someone who is not his target—but the State would deny him his right to self-defense on the justification that he *may* do so, without concern for his need of self-defense in the first place. And the State is simply wrong that no one needs more than 10 rounds to defend themselves. "There have been, and there will be, times when many more than 10 rounds are needed to stop attackers." *Duncan*, 2023 WL 6180472 at 6 & n.25 (collecting examples)

---

[1] King County, in a related argument, claims that law-abiding citizens can still fire as much as they need, they just have to reload more often. King Br. at 25. In addition to being an irrelevant interest-balancing argument, it is ill-conceived. A criminal chooses his place of attack and can bring as many magazines as he thinks might be necessary. A victim has no idea an attack is coming, seldom will be so well-outfitted, and will usually have to rely on whatever is in his or her firearm when the attack comes.

Pls.' Resp./Reply in Supp. of Summ. J.  - 16

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

1   The State suggestively claims that magazines holding more than ten rounds were not

2   widely commercially successful "until the late 2000s, and after the massacre at Sandy Hook

3   Elementary." State Br. at 25. The State's implication reflects the unwarranted and dark view it has

4   of lawful firearm owners, and worse, it is fictitious. The magazines it bans have been popular for

5   a long time: "Fully 18 percent of all firearms owned by civilians in 1994 were equipped with

6   magazines holding more than ten rounds." *Heller v. District of Columbia ("Heller II")*, 670 F.3d

7   1244, 1261 (D.C. Cir. 2011). Finally, although its experts argue that magazines holding more than

8   10 rounds are "disadvantageous for self-defense," State Br. at 4, those same experts emphasize

9   that they are very useful to law-enforcement because "changing magazines takes precious time

10  and requires officers to divert their attention from the scene," Decl. of Adrian Diaz, Doc. 118 at 3

11  (Sept. 1, 2023). It is hard to understand why diverting the attention of victims is less

12  disadvantageous.

13      Intervenor Defendant the Alliance for Gun Responsibility spends much of its brief

14  emphasizing the fact that several district courts, in various (mostly preliminary) postures have,

15  following *Bruen*, upheld bans on certain magazines or on firearms inaccurately defined as "assault

16  weapons." *See* AGR Br. 4.  The Alliance emphasizes that the same arguments Plaintiffs make here

17  were rejected in several of those other cases, particularly in *Oregon Firearms Federation v. Kotek*,

18  2023 WL 4541027 (D. Or. July 14, 2023), a consolidated case challenging Oregon's recently

19  enacted magazine ban, in which Plaintiffs SAF and FPC participated. In so doing, the Alliance

20  ignores the one arms ban case that really matters here: *Teter*, which is binding on this Court, was

21  decided after *OFF*, and would have mandated a different ruling from the *OFF* court had it been

22  issued before that decision. These cases are not additive to Defendants' arguments here, but

23  duplicative—as they emphasize, those cases largely adopted the arguments Defendants are making

24  here, and rejected the same arguments made by Plaintiffs—but for the very reasons Plaintiffs have

25  laid out in this brief, they were wrong to do so. Alliance apparently emphasizes these other cases

26  so much to urge this Court to follow the lead of a handful of other courts, as well as to deride

27  Plaintiffs for advancing arguments that have been rejected elsewhere. But among the many things

Pls.' Resp./Reply in Supp. of Summ. J.  - 17

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

that *Bruen* demonstrates, one surely is that there is a danger in following the crowd, especially when the crowd is adopting a view of the Second Amendment that is incompatible with the Supreme Court's binding interpretation of it. And as for Plaintiffs' arguments having been rejected in these other courts, that was true before *Bruen* too, when Plaintiffs' arguments against interest balancing were repeatedly rejected until, in the Supreme Court, they were not. *Compare, e.g.*, Pls.' Resp. to Defs.' Mot. to Dismiss or for Summ. J. & Mem. in Supp. of Pls.' Cross Mot. for Summ. J. at 8–13, *Reese v. ATF*, No. 6:20-cv-01438 (W.D. La. June 17, 2021) (Plaintiffs SAF and FPC arguing, a year before *Bruen*, that *Heller* had "expressly rejected . . . judicial interest balancing" and instead adopted a methodology focused on "text, history, and tradition") *with Bruen*, 142 S. Ct. at 2129 ("[T]he Court of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny.").

Last of all, the Alliance argues not just that this Court should follow these decisions but, at least with respect to the *OFF* decision, that it *must* follow it because Plaintiffs SAF and FPC are issue-precluded by it from raising a Second Amendment claim against Washington's law. But for issue preclusion to apply, the issues in the proceedings must be identical, and that argument fails here for the simple reason that this case and *OFF* raise the issue of the constitutionality of different laws. Furthermore, even if SAF and FPC *were* precluded from raising a constitutional claim here, Plaintiffs Sullivan and Rainier Arms are not. Though the Alliance asserts that just because they are members, they are "in privity" with SAF and FPC and can be bound like them to the *OFF* judgment, its support for that claim is a Ninth Circuit case in which the plaintiff organization and members in question had *themselves* asserted issue preclusion against the defendant, necessarily claiming that were in privity with one another. *Gospel Missions of Am. v. Los Angeles*, 328 F.3d 548, 556 (9th Cir. 2003). That case also involved a challenge to the *same ordinance* as the preceding case, meaning that not only were the parties in privity based on their own arguments, but the member plaintiffs' interests were also implicated in the preceding case. *See id.* That is not true here. Sullivan and Rainier Arms live in and do business in Washington, not Oregon, and SAF and FPC could not be said to have been representing their interests in challenging *Oregon*'s law.

Pls.' Resp./Reply in Supp. of Summ. J.  - 18

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

In fact, they did not purport to be—they brought the Oregon case only on behalf of their Oregon members. *See* Compl. ¶¶ 14–15, *Fitz v. Rosenbloom*, No. 3:22-cv-01859, Doc. 1 (Nov. 30, 2022). Under the Alliance's exceptionally broad view of issue preclusion, all Washington members of FPC and SAF can be prevented from challenging their own state's magazine ban merely because they have joined an organization that lost a suit challenging a similar law on behalf of other members located in another jurisdiction. Such a rule would certainly run up against the "clear[] constitutional limits on the 'privity' exception." *Richards v. Jefferson County*, 517 U.S. 793, 798 (1996). After all, if SAF and FPC had *won* in Oregon, that would not entitle Rainier Arms or Sullivan to any relief (since their rights were not impacted by the law in Oregon) and due process cannot abide this sort of heads-I-win-tails-you-lose view of non-party issue preclusion. *See Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 880 (6th Cir. 1997) (noting that the " 'privity' section of the Restatement . . . cited with approval in *Richards*," includes a list of "persons 'represented' by a party" that would not encompass Sullivan or Rainier Arms in this case); *cf. Hansberry v. Lee*, 311 U.S. 32, 41–42, 44–45 (1940).

**E.      Defendants Have Failed to Propose a Valid Historical Analogue for the Magazine Ban.**

Defendants offer several proposed analogues, but this Court need not consider *any* of them because the Supreme Court has already determined that arms "in common use" cannot be banned, and the banned magazines are certainly "in common use." In any event, none of Defendants' proposed historical justifications are sufficient to justify the Magazine Ban.

The State argues that its Magazine Ban responds to "unprecedented social concerns" and "dramatic technological change." State Br. at 24. Even if it were right, it would not matter. While *Bruen* said such things may require "a more nuanced approach" from a court drawing analogies, it does not offer the State a free pass. 142 S. Ct. at 2132. And "a more nuanced approach" cannot make a difference when the *analogy has already been drawn* by the Supreme Court; that is especially true given that the specific rule applicable to this case—that arms "in common use" today are protected—inherently accounts for technological and social changes on which the State

1  places so much emphasis. *See* Mark W. Smith, *What Part of "In Common Use" Don't You*

2  *Understand?: How Courts Have Defied* Heller *in Arms-Ban Cases—Again*, HARV. J. OF L. & PUB.

3  POL'Y PER CURIAM (Sept. 27, 2023), *available at* https://bit.ly/3PWhqwH.

4        In any event, the State is wrong to assert this case involves either. That "LCMs did not

5  exist in 1791 when the Second Amendment was ratified" makes no difference to whether they are

6  constitutionally protected. State Br. at 24. Defendants blame the banned magazines for mass

7  shootings and an increase in firearm deaths, but as discussed above, their expert has been shown

8  to improbably overestimate their effects on fatalities, and violence, even mass violence, is

9  unfortunately nothing new. *See* RANDOLPH ROTH, AMERICAN HOMICIDE 348 (2009) (discussing

10  notable incidents of mass murder in the Reconstruction South).

11        Even if the Court were to take a "more nuanced" approach to analogies, the rule the State

12  purports to draw from history, that "[s]tates have long regulated weapons used for lawless

13  violence" is insupportable. State Br. at 26. After all, handguns are the weapons most frequently

14  used for lawless violence, and *Heller* categorically ruled that they could not be banned.

15  Unsurprisingly, the laws the Defendants point to offer no justification for such a broad rule.

16        The State first cites laws restricting the use of "trap guns," which its expert defines as

17  "contraptions rigged in such a way as to fire when the owner need not be present." *Id.* at 26. In

18  other words, they were not actually restrictions on *owning* any sort of firearm, just laws against

19  misusing a firearm that was legal to own by "set[ting] [it] in such Manner as [the arm] shall be

20  intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance."

21  1763-1775 N.J. Laws 346, ch. 539 § 10  (1771). The same issue plagues King County's reference

22  to colonial laws restricting *when* and *where* firearms could be fired or restrictions on the abilities

23  of individuals to form private militias. *See* King Br. at 23–24. Such laws restrict conduct *with* arms.

24  They say nothing at all about what *types* of arms a person can own, so "they do not remotely burden

25  the right of self-defense as much as an absolute ban." *Heller*, 554 U.S. at 632.

26        The State next cites laws restricting clubs and slungshots from the colonial and founding

27  periods. State Br. at 26–27. The State has failed to present this evidence to the Court with enough

Pls.' Resp./Reply in Supp. of Summ. J.  - 20

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1    clarity to allow it to judge the relevance of the purported analogues. *Bruen* says that laws must be

2    "relevantly similar" to modern-day restrictions in order to serve as analogues, and that means they

3    must be similar both in "how" and "why" they burden the right to keep and bear arms. 142 S. Ct.

4    at 2132–33. The State broadly asserts that "every state in the nation had laws restricting one or

5    more types of clubs," but that is not enough; the State must explain *how* they restricted clubs. *Id.*

6    at 27. The State does claim that the laws were passed due to the weapons "use in criminality and

7    interpersonal violence," *Id.* at 27, which at least attempts to carry its burden, but the claim is not

8    supported by the evidence.

9         The State's expert, Professor Spitzer, claims to have identified several laws that "barred

10   the carrying of 'clubs'" in the states, but even a cursory examination shows that this is not a reliable

11   summary of these laws. For instance, Spitzer cites among these "club" laws a 1797 Delaware law

12   that said that "if any Negro or Mulatto slave presume to carry any guns, swords, pistols, fowling

13   pieces, clubs, or other arms and weapons whatsoever, without his master's special license . . . he

14   shall be whipped with twenty-one lashes upon his back." Decl. of Robert J. Spitzer, Doc. 122-1,

15   Ex. E at 16 (Sept. 1, 2023) ("Spitzer Decl."). A 1798 Kentucky law, *id.* at 33, is much the same,

16   as is the only law the State references in its own brief, a 1664 New York law that similarly punished

17   slaves for carrying weapons without permission by whipping them, *id.* at 59. Such laws do not

18   burden the right in the same way as a flat ban on magazine capacity. Moreover, they are not, as

19   the State claims, justified by concerns with criminality, but rather are born of bigotry and were

20   accepted *then* only because their subjects, enslaved persons, were not considered part of "the

21   People" who had rights under the Constitution. Such laws are abhorrent and should have no role

22   "inform[ing] our understanding of the [Constitution]." *Espinoza v. Montana Dep't of Rev.*, 140 S.

23   Ct. 2246, 2259 (2020). Other laws Spitzer cites, like one 1786 Maine act, were not directed at

24   carrying or possessing clubs in general, but against large numbers being "riotously or tumultuously

25   assembled" with them. Spitzer Decl. at 40. Such laws are different from laws targeting slaves, but

26   also unlike the Magazine Ban because they regulate conduct, not possession or ordinary carriage

27   of arms.

Pls.' Resp./Reply in Supp. of Summ. J.  - 21

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Next, the State claims laws regulating Bowie knives and pistols show a continued "tradition of regulating weapons associated with interpersonal violence." State Br. at 27. Again, the State and its expert have badly misrepresented the historical record. For instance, they claim that "Fifteen states 'all but banned the possession of Bowie Knives outright (by banning both concealed and open carry).' " *Id.* at 28. If true, that would be possibly relevant and important, but the trouble is, it is not true. Of the fifteen States to which the State's expert cites for this proposition, three merely banned *concealed* carry or open carry *with intent* to use the knife in a crime. Colo. Rev. Stat. 1774, § 248 (1881); 1859 Ind. Acts. 129; GEORGE R. DONNAN, ANN. CODE OF CRIM. P. & PENAL CODE OF THE STATE OF N.Y. AS AMENDED 1882-5, at 172, § 410 (4th ed. 1885), two others applied only to certain "sensitive places" or on days of elections, 1870 La. Acts 159–60; Nashville, Tenn., Ordinances, Elections, §§ 2–3, *in* JAMES H. SHANKLAND, PUBLIC STATUTES OF THE STATE OF TENNESSEE, SINCE THE YEAR 1858, BEING IN THE NATURE OF A SUPPLEMENT TO THE CODE, at 108 (1869), and six others did not apply statewide but were limited to certain localities (and even in those localities, some of these were still not broad bans on all forms of carry), Joplin Code of 1917, art. 67, § 1201 (Joplin, Missouri, also only applied to certain "sensitive places"); Nashville, Tenn., Ordinances, pt. 3, tit. 12, ch. 108, §§ 1–6, *in* WILLIAM KING MCALISTER JR., ORDINANCES OF THE CITY OF NASHVILLE, TO WHICH ARE PREFIXED THE STATE LAWS CHARTERING AND RELATING TO THE CITY 340–41 (1881) (Nashville); Nashville, Tenn., Ordinance, § 738 *in* CLAUDE WALLER, DIGEST OF THE ORDINANCES OF THE CITY OF NASHVILLE, TO WHICH ARE PREFIXED THE STATE LAWS INCORPORATING, AND RELATING TO, THE CITY, 364–65 (1893) (Nashville); Otoe County, Neb., Ordinance No. 7, § 1, *in* GILBERT B. COLFIELD, LAWS, ORDINANCES, AND RULES OF NEBRASKA CITY, OTOE COUNTY 36 (1872) (Nebraska City, also notably prohibited all carriage even of rifles, muskets, and pistols, plainly unconstitutional under *Bruen*); CHARTER AND REVISED ORDINANCES OF BOISE CITY, IDAHO 119–20 (1894) (Boise, permitted carrying while traveling); REVISED ORDINANCES OF PROVO CITY, CONTAINING ALL THE ORDINANCES IN FORCE 105, 106–107 (1877) (Provo). One cited law only applied to those who were engaged in the illegal transport of alcohol. 1923 Mo. Laws 24–142. Several others were mere "territorial restrictions" which *Bruen*

Pls.' Resp./Reply in Supp. of Summ. J.  - 22

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1   discounted because they were frequently short lived, rarely tested in court, and irrelevant to most

2   of the country at the time they were in force, *Bruen*, 142 S. Ct. at 2154–55; *see* 1889 Ariz. Sess.

3   Laws 16; 1890 Okla. Laws 495; 1913 Haw. Rev. Laws, ch. 209 (also contained exception for those

4   "authorized by law"); and one Hawaiian law predates Hawaii even having territory status, 1852

5   Haw. Sess. Laws 19. In the end, far from the fifteen the State claims, there is evidence of just *three*

6   states that actually prohibited all forms of carry of Bowie knives—Arkansas, Texas, and West

7   Virginia.

8         Even accepting that these states really did significantly restrict carry of Bowie knives, three

9   outliers (including two states whose laws were also rejected as outliers by the Supreme Court in

10  *Bruen*, *see* 142 S. Ct. at 2153), all post-dating the Civil War, are not enough to establish a national

11  historical tradition of regulation. And in any event, these few laws do not impose a "comparable

12  burden on the right" to Washington's magazine ban, since the historical restrictions did not bar

13  *possession*, as Washington's law does. Furthermore, there is significant evidence that the more

14  onerous restrictions on Bowie knives were understood to violate the right to bear arms for self-

15  defense unless they could be given a narrow construction. *See Nunn v. Georgia*, 1 Ga. 243 (1846);

16  *see also Heller*, 554 U.S. at 612, 626, 629 (singling out *Nunn* as "particularly instructive" regarding

17  the meaning of the Second Amendment).

18        The State claims "multi-shot revolvers" were also met "with regulations 'to discourage the

19  carrying and use of guns'" including two laws the State mentions specifically, from Tennessee and

20  Arkansas that "completely prohibited the sale of easily concealed pistols in the late 1800s." State

21  Br. at 28. Again, the State's description of these laws is too general, and its experts' descriptions

22  are no better. One claims that as of 1899 "at least 35 of the 50 states and territories . . . had public

23  carry laws." Decl. of Brennan Rivas, Doc. 121-1 at 32 (Sept. 1, 2023). But "public carry laws"

24  could mean many things, and it turns out here that it does not mean laws that forbade public carry

25  but, in many cases, merely controlled the *way* that people carried. *See, e.g.*, 1862 Colo. Sess. Laws

26  56, § 1 ("An Act to prevent the Carrying of *Concealed* Deadly Weapons in the cities and Towns

27

Pls.' Resp./Reply in Supp. of Summ. J.  - 23

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

of this Territory" (emphasis added)). That should come as no surprise since *Bruen* itself surveyed the history of restrictions on carrying handguns and held conclusively that "history reveals a consensus that States could *not* ban public carry altogether." 142 S. Ct. at 2146. Laws that "prohibit[] only *a particular mode* of bearing arms which is found dangerous to the peace of society" "do[] not infringe the right of the people to keep and bear arms." *Id.* at 2147 n.19 (quotation omitted). Laws that ban law-abiding citizens from even *acquiring* a type of arm, on the other hand, do.

   In addition to their inaccuracy, the State's analogies from this period could equally well be dismissed because they come too late in time. See Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868*, HARV. J. OF L. & PUB. POL'Y PER CURIAM (Oct. 1, 2022), https://bit.ly/3CMSKjw. It is only in discussing some of these (much too late) laws that the State finally hits on a set of laws that are remotely similar to its Magazine Ban: laws regulating fully automatic firearms and restricting certain ammunition feeding devices. State Br. at 29.

   The machine gun laws can be distinguished as having regulated firearms that were not, as discussed above, in common use at the time. Indeed, the Supreme Court has identified the line between semiautomatic and automatic as key in determining whether a firearm is of a type traditionally "accepted as lawful." *See Staples v. United States*, 511 U.S. 600, 612 (1994). As for the laws regulating semiautomatics with a given magazine capacity, the State does not distinguish them from machine gun laws in its brief, but its expert claims that "as many as ten states plus D.C., enacted laws restricting semi-automatic weapons." Spitzer Decl. at 38. However, digging into these laws demonstrates they are not analogous the Magazine Ban. One law did not ban semiautomatics, it just required a permit, *see* 1933 Ohio Laws 189-90, two laws permitted ordinary possession but banned possession for an "offensive or aggressive purpose," 1933 S.D. Sess. Laws 245-47, ch. 206, §§ 1–8 ; 1934 Va. Acts 137-39, ch. 96, §§ 1–7, two laws only applied to machine guns capable of automatic fire, 1927 Mass. Acts 416, ch. 326, § 5 , 1933 Cal. Stat. 1169, and two

Pls.' Resp./Reply in Supp. of Summ. J.  - 24

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

were limited to regulating the ammunition capacity of firearms used in hunting, 1920 N.J. Laws 67, ch. 31, § 9; 1917 N.C. Sess. Laws 390, ch. 209, § 1. Another law reached semiautomatics only if they were "changed, altered or modified" from their original design to increase their capacity. 1933 Minn. Laws 231-33, ch. 190, § 1.

Only a very small number of jurisdictions banned semiautomatic firearms based on capacity. *See* 1932, Public-No. 275-72D (District of Columbia) (12 rounds without reloading); 1927 Mich. Pub. Acts 888-89, § 1 (16 rounds); 1927 R.I. Pub L. 256, § 4 (12 rounds). Of these laws that most stringently restricted possession of semiautomatic firearms, only the D.C. law was not repealed. *See* 1959 Mich. Pub. Acts 249, 250; 1959 R.I. Acts & Resolves 260, 263. In other words, the State has failed to show an enduring tradition of lawful restriction on the right to own a commonly possessed firearms.

Finally, the State points to the 1994 federal ban on magazines holding more than ten rounds as well as the contemporaneous enactments of other states that similarly abridge the Second Amendment rights of their citizens. Obviously, such laws are not "historical" evidence at all. After all, in *Bruen*, several other states had "may issue" regime's similar to New York's and the Supreme Court did not give them any weight.

## III.  CONCLUSION

For these reasons, the Court should grant summary judgment for Plaintiffs' and against Defendants.

I certify that this memorandum contains 9,975 words, in compliance with the Local Civil Rules, and this Court's Order on briefing in this matter, Dkt. No. 100.

October 2, 2023.

Pls.' Resp./Reply in Supp. of Summ. J.  - 25

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

| | |
|---|---|
| Ard Law Group PLLC | Cooper & Kirk, PLLC |
| | */s/ David H. Thompson* |
| By: _____ | David H. Thompson* |
| | dthompson@cooperkirk.com |
| Joel B. Ard, WSBA # 40104 | |
| Ard Law Group PLLC | */s/ Peter A. Patterson* |
| P.O. Box 11633 | Peter A. Patterson* |
| Bainbridge Island, WA 98110 | ppatterson@cooperkirk.com |
| 206.701.9243 | |
| Joel@Ard.law | */s/ William V. Bergstrom* |
| Attorneys For Plaintiffs | William V. Bergstrom* |
| | wbergstrom@cooperkirk.com |

1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

Mountain States Legal Foundation

*/s/ Brian A. Abbas*
Brian A. Abbas*

2596 S. Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021

FPC Action Foundation

*/s/ Cody J. Wisniewski*
Cody J. Wisniewski*, **

5550 Painted Mirage Road
Las Vegas, NV 89149
Phone: (916) 517-1665

*Admitted pro hac vice
** Not appearing on behalf of Second
Amendment Foundation

Pls.' Resp./Reply in Supp. of Summ. J.  - 26

*Sullivan v. Ferguson*, No. 3:22-cv-05403-DGE

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243